# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
═══════════════════════════════════════X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, ET AL.,

                    Plaintiff(s)

          -against-                          **PLAINTIFFS' FIRST**
                                             *Fed. R. Civ. P. 26 (a)(2)*
DANBURY HOSPITAL, JAMES DEPUY, M.D.,         *(A-B)* **EXPERT**
ET AL.,                                      **DISCLOSURES**

                    Defendants.              *3:02 CV 718*
═══════════════════════════════════════X     *(RNC)(DFM)*

     Plaintiff LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL

GUIGLIANO, and LAURA GUIGLIANO, Individually, by her attorneys, THE LAW

FIRM OF JOSEPH LANNI, P.C., sets forth the following expert disclosure, pursuant to

*Fed. R. Civ. P. 26(a)(2)(A-B)*:

### EXPERT NO. 1:

Identity:

Richard J. Batista, Jr., M.D.
11 Riviera Drive East
Massapequa, New York

Education:

1981 – B.S., State University of New York at Stony Brook;
1985 – M.D., Cornell University Medical College.

Postdoctoral Training:

July 1985 – June 1986, General Surgery Internship, North Shore
University Hospital;

July 1986 – June 1990, General Surgery Residency, North Shore University Hospital;
July 1990 – July 1991, Vascular Surgery Fellowship, Metropolitan Hosp.Ctr. & Westchester County Med. Ctr.

Medical Licensure:  New York # 167502.

Board-Certifications:

1994 – Diplomate, American Board of Surgery.

Hospital Appointments:

1992 – present, Attending Surgeon (General, Vascular & Trauma Surgery), Nassau University Medical Center.

Academic Appointments:

Clinical & Academic Instructor in Surgery, Nassau University Medical Center.

Publications:

See, attached Exhibit "A".

Opinions:

See, attached Exhibit "B", Report of Richard J. Batista, Jr., M.D., dated November 8, 2004.

Compensation:

$9,200.00 to date.

Trial & Deposition Testimony (2000 – 2004):

None.

Dated: Larchmont, New York
        November 16, 2004

Yours, etc.:

By: _____
JOSEPH LANNI    (CT 23566)
The Law Firm Of
JOSEPH LANNI, P.C.
Attorneys for Plaintiffs
138 Chatsworth Avenue, Ste. 6 – 8
Larchmont, New York 10538
Tel:  (914) 834-6600

TO:

MICHAEL NEUBERT (CT 06444)
NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.:  (203) 821-2000

RICHARD A. O'CONNOR (CT 18976)
SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.:   (203) 598-7585

GARIE J. MULCAHEY (CT 05242)
BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.:  (203) 925-8100

KEVIN A. TEPAS (CT 05552)
RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.:  (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.:  (212) 213-1220

EXHIBIT  A

Publications and Presentations':

Friedman, S.G ; Batista, R.J ; Moccio, C.G ; "Aortoiliac Reconstruction in Obese Patients." Surgery. March 1988

Patel, K ; Chan, f.; Batista, R.J.; Clauss, R.; "True Venous Aneurysms and Arterial steal Secondary to AV Fistulae for Dialysis," Journal of Cardiovascular Surgery, 33, 1992.

Imam,M.; Kim, R.; Batista, R.; Ger,R.; "Transposition Muscle flaps for Infected Infruinguinal Vascular Graft," Surgical Rounds, Vol.22, No.4, April 1999.

Feinfeld, D.A.; Batista, R. J ; Mir, R.; Babich, D.; " Changes in Venous Histology in Chronic Hemodialysis Patients," American Journal of Kidney Diseases, Vol.34, (October) 1999.

EXHIBIT  B

Richard J. Batista, Jr., M.D.
11 Riviera Drive East
Massapequa, New York 11758


November 8, 2004


Joseph Lanni, Esq.
The Law Firm of
Joseph Lanni, P.C.
138 Chatsworth Ave., Suites 6-8
Larchmont, New York 10538


Re: Guigliano v. Danbury Hospital, et al.


Dear Mr. Lanni:

I have reviewed in detail the materials pertaining to the case of Guigliano v. Danbury Hospital. Those materials include the Danbury Hospital records, the note of Vanessa Saipher, R.T., the Danbury Hospital emergency code log for the dates of February 1–28, 2001, and the department of health investigation notes.

You requested that I provide you with opinions about the care rendered to Michael Guigliano by the surgeons during the postoperative course, the care rendered by hospital staff during the events leading up to and including a cardiopulmonary arrest suffered by Mr. Guigliano on February 17, 2001, and the cause of this gentleman's subsequent brain damage.

It is my opinion that the cardiopulmonary arrest suffered by Michael Guigliano on February 17, 2001 was due to compromised lung function as a result of progressive abdominal distention. The patient had progressive abdominal distention secondary to an ileus, gastric secretions and colon dilatation. Due to inadequate treatment, this condition elevated the respiratory diaphragm, collapsed the lungs and diminished ventilatory capacity. In turn, this resulted in persistent hypoventilation and hypoxemia during the postoperative course. Serial CXR's on the dates of February 8 – 10, 2001 and a chest CT scan on February 11, 2001, showed bilateral atelectasis. These radiographic findings,

1

combined with the repeated references to marked abdominal distention noted on examination and the patient's complaints of increased respiratory difficulties on being laid flat on his back confirm that the compromised lung function was due to compression from the distended abdomen.

It is highly unlikely that the patient sustained a clinically significant pulmonary embolism contributing to the cardiopulmonary arrest. A V/Q scan was performed on February 10 and interpreted to show a low probability of acute pulmonary embolism in the lateral aspect of the right middle lobe. This does not correspond to the bilateral perihilar and bibasilar pulmonary changes in the form of atelectasis which are seen on the CXR's. The patient was also anticoagulated and a Greenfield filter was placed as prophylaxis for pulmonary emboli. Similarly, there is no clinical evidence of pneumonia as a cause of the persistent respiratory problems.

During the period February 9-17, Mr. Guigliano's respiratory insufficiency was essentially treated with supportive oxygen administered by nasal cannula. The oxygen flow was adjusted to maintain oxygen saturation above 90 percent. According to the records, the oxygen saturation was monitored by pulse oximetry and it essentially hovered in a range of upper 80's to mid-90's in the week prior to the cardiopulmonary arrest. A 90 percent oxygen saturation translates into a PO2 of 60 mm Hg; therefore, there was a large alveolar-arterial gradient in a patient who is physiologically unaccustomed to this lower level of oxygenation and a lowered threshold for respiratory distress. As a result, the patient had a reduced oxygen reserve and an increased stress load on cardiac function seen by the persistent tachycardia. In essence, this patient could not withstand any additional insult to oxygenation without incurring a respiratory arrest.

The patient's cardiac function was further stressed by a progressive decrease in serum electrolytes below normal levels. The potassium and ionized calcium levels decreased from normal levels to below normal levels from admission to February 17. (Potassium and ionized calcium were 3.1 and 0.98 on February 17.) The abnormally low potassium made the myocardium irritable and increased this patient's susceptibility to an arrhythmia provoked by hypoxemia and/or hypoventilation.

The hemoglobin (Hgb) and hematocrit (Hct) also progressively declined to markedly low levels that approximated half of normal range. This reduced the oxygen carrying capacity of the patient's blood. The anemia also contributed to the patient's hypoxemia and decreased the threshold for a cardiac arrest. It also probably made the patient more difficult to adequately resuscitate.

When the patient was placed supine for the CT scan on February 17, this was the catalyst for a respiratory arrest from the increase in compression of the patient's lungs due to the distended abdomen. Without timely and proper intervention, the patient's hypoxemia and respiratory distress worsened to the point of a respiratory arrest. Consequently, the respiratory arrest resulted in a cardiac arrhythmia and hypotension and then progressed to a cardiac arrest (PEA / EMD). Due to improper and untimely CPR measures, the cardiopulmonary arrest caused anoxic encephalopathy to the patient.

It is my opinion to a reasonable degree of medical certainty that a multitude of departures from proper medical practice and proper Basic Life Support protocols in the postoperative treatment given to Mr. Guigliano was committed by the treating surgeons and other medical personnel.

First, the surgeons failed to follow proper practice to treat the patient's massive abdominal distention.   While a nasogastric tube was used to decompress the abdomen and it emptied a large amount of fluid, the NGT was pulled out too soon by a Dr. Borruso on February 15. When the NGT was discontinued, there was still significant abdominal distention that had not resolved and it was still discharging "clear" fluid.  An isolated episode of "serosanguinous" drainage on the night of February 14 does not indicate that the NGT should have been removed.   This was brought to the attention of several physicians and no one thought it necessary to take out the NGT.  In fact, there is a surgery note that appears to have been entered prior to Dr. Borrusso's on February 15 and the decision of this surgeon was to keep the NGT in place.  After this date, the lack of a NGT allowed the abdominal distention to worsen over the next two days.  Dr. Borrusso saw the patient on February 16 and noted that the abdominal distention was still present; therefore, he should have reinserted the NGT at that time.  Surgery also saw the patient on the morning of February 17.  The entries in the progress record on February 16 and 17 show that the abdomen is worsening and it is having a marked effect on the patient's ability to breathe.

Additionally, more aggressive forms of intervention were required in the form of a rectal tube.  It should be noted that a rectal tube was inserted along with an oral gastric tube on February 17 after the patient coded to decompress the abdomen.  This rectal tube remained in use despite the fact that the patient's treatment for a C. difficile infection continued during that time and the available stool cultures indicated the presence of the organism.

Second, the treating surgeons failed to properly treat the patient's electrolyte imbalances.  The patient did not receive massive electrolyte resuscitation (potassium and ionized calcium) until he was brought to the ICU after the cardiopulmonary arrest on February 17.  Repletion of the electrolytes was the responsibility of surgery since the record indicates that the surgery personnel were following the lab values and also the patient's attending physicians.

Third, the patient was not adequately supervised and monitored by sufficiently skilled hospital personnel (e.g.: registered nurse, medical resident or attending physician who would also have training in BLS or CPR) when he was brought to the radiology department for the CT scan on February 17. (It should be noted that an R.N. wrote a "multispecialist" note in the progress record on February 10 that indicates that she monitored and supervised the patient when he was sent for a VQ scan.)  Not only was someone of sufficient skill level needed to accompany the patient for his CT scan, but also this patient required continous pulse oximetry and cardiac monitoring which also

3

was not done. The surgeon ordering the test knew that the patient would need to lie flat for the chest CT scan and should have known from the records that this positioning would cause respiratory distress since that had previously happened several times. The surgeon (along with the nursing staff) should have ordered the proper supervision and monitoring for the CT scan. The respiratory technician and aide in the CT scan room should have called the code when the patient became cyanotic and was gasping for breath. Instead, there was an inexplicable delay (i.e.: placing patient back on a gurney, wheeling out of CT room into hall, telephoning his nurses, etc.) in getting help despite the patient's marked distress. If appropriate supervision and monitoring had been done, the severity of the patient's respiratory distress would have been discovered earlier and there would have been proper intervention undertaken by calling the "code" sooner and ensuring proper ventilation in a timely manner. This is actually what happened on February 10; the oxygen saturation dropped when the patient was placed supine for the VQ scan and the O2 flow rate was increased to 6 l/min to raise the oxygen saturation to acceptable levels and prevent further deterioration in the patient's condition.

Fourth, the patient was obviously not given adequate oxygen therapy when he was brought to the radiology department for his respiratory distress. Oxygen was being administered by nasal cannula prior to the patient being brought to the radiology department; however, it apparently was removed at some point. (The radiology technician's note refers to putting oxygen on the patient after he became cyanotic.) The patient required supplemental oxygenation with a non-rebreather mask. It was a departure from proper medical practice on the part of Danbury Hospital to discontinue supplemental oxygenation and fail to provide oxygenation from a non-rebreather mask during this time. This improper medical practice caused or contributed to the cardiopulmonary arrest suffered by the patient because the non-existent or ineffective delivery of oxygen exacerbated the patient's hypoxemia and permitted him to deteriorate into respiratory arrest and then cardiac arrest.

Fifth, the patient was improperly and untimely resuscitated after sustaining the cardiopulmonary arrest on February 17. The code sheet indicates that the code was called at 1:02 p.m. and that the patient was intubated at 1:05 p.m. The department of health file contains a reference to a three or four minute delay in the arrival of anesthesia to perform the intubation. The post-code notes in the hospital records refer to a ten (10) minute delay in the initiation of CPR. Because this patient was unconscious, ventilation of the patient by an Ambu-bag and mask for a period of at least 3 – 4 minutes was inadequate. The medical personnel needed, at the least, to temporarily insert an oral airway until intubation could occur so as to ensure adequate ventilation of this unconscious patient within that 3 – 4 minute period. Just as significant is that there were no chest compressions being done (see, the DOH file) until the arrival of the CRNA and the respiratory therapist on the scene. This 3 – 4 minute period (possibly even 10 minutes) was crucial to determining the outcome for this patient. It should be kept in mind that the patient had compromised lung function secondary to atelectic compression, severe anemia and electrolyte disturbances; therefore, he was likely more resistant to resuscitation and more susceptible to anoxic brain damage the more the delay in starting effective BLS/CPR techniques.

You have advised me that depositions have been done and are continuing in this matter and that some or all of these depositions will be provided for my review in the future. I will be pleased to discuss the case with you again upon reading the deposition testimony.

Sincerely,

Richard J. Batista, Jr., M.D.

## DECLARATION OF SERVICE
## PURSUANT TO 28 U.S.C. § 1746

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York.

I served a true copy of the annexed: PLAINTIFFS' FIRST *F.R.C.P. 26(a)(2)(A-B)*, EXPERT DISCLOSURES and attachments, dated November 16, 2004, on the date of November *17*, 2004:, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

TO:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

Executed on November *17*, 2004, Larchmont, New York.

JOSEPH LANNI      (CT 23566)

4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
================================X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to be
Incompetent, and LAURA GUIGLIANO, Individually,

                    Plaintiff(s)                    *3:02 CV 718*
                                                    *(RNC)(DFM)*

          -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
F. SCOTT GRAY, M.D., GEORGIANA KNOWLES,
P.A., DEANNA WOLFFE, P.A., DAVID OELBERG,
M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D.,
ARTHUR KOTCH, M.D., JULIA CIRCIUMARA,
M.D., ANDRE KUZNETS, M.D., MICHAELA
FEDERICA, M.D., MAUREEN BENNETT, R.N.,
JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N.,
"JANE DOE NO.1", "JANE DOE NO.2" (*defendants*
*"JANE DOE NO.1" and "JANE DOE NO. 2", full*
*identities unknown, being identified as DANBURY*
*HOSPITAL employees who were assigned to*
*monitor, supervise and attend to patient MICHAEL*
*GUIGLIANO prior to and during a CT Scan procedure*
*on 2/17/01)* and "JANE DOE NO. 3", (*full identity*
*unknown, being identified as a DANBURY HOSPITAL*
*employee who called a "Code 99" on 2/17/01*),

                    Defendants.
================================X

# PLAINTIFFS' FIRST *F.R.C.P. 26(a)(2)(A-B)*
# EXPERT DISCLOSURES

THE LAW FIRM OF JOSEPH LANNI, P.C.
*Attorney for Plaintiff[s]*
LAURA GUIGLIANO
138 CHATSWORTH AVENUE, SUITES 6 – 8
LARCHMONT, NEW YORK 10538
Tel.: (914) 834-6600
Fax: (914) 834-0152

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
============================================X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, ET AL.,

                               Plaintiff(s)

        -against-                      **PLAINTIFFS' SECOND**
                                      ***Fed. R. Civ. P. 26 (a)(2)***
DANBURY HOSPITAL, JAMES DEPUY, M.D.,      ***(A-B)* EXPERT**
ET AL.,                                     **DISCLOSURES**

                        Defendants.        *3:02 CV 718*
============================================X    *(RNC)(DFM)*

      Plaintiff LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL

GUIGLIANO, and LAURA GUIGLIANO, Individually, by her attorneys, THE LAW

FIRM OF JOSEPH LANNI, P.C., sets forth the following expert disclosure, pursuant to

*Fed. R. Civ. P. 26(a)(2)(A-B)*:

      **EXPERT NO. 2:**

      Identity:

      Brian S. Kaufman, M.D.
      Two Rubins Court
      Dix Hills, New York 11746

      Education:

      1973 – B.A., State University of New York at Buffalo;
      1977 – M.D., State University of New York at Buffalo.

      Postdoctoral Training:

      1977 – 1978, Medical Internship, Albany Medical Center;
      1978 – 1980, Medical Residency, Albany Medical Center;
      1980 – 1982, Critical Care Fellowship, Ellis Hospital, Albany Medical
      College;

1984 – 1986, Anesthesiology Residency, New York University Medical Center;
1986 – 1987, Anesthesiology Fellowship, New York University Medical Center.

Medical Licensure:  New York # 134898

Board-Certifications:

1977 – Diplomate, National Board of Medical Examiners;
1980 - Diplomate, American Board of Internal Medicine;
1982 – Instructor, Advanced Cardiac Life Support;
1987 – Diplomate, Critical Care Medicine;
1988 – Diplomate, American Board of Anesthesiology;
1998 – Recertification, Critical Care Medicine.

Hospital Appointments:

1982 – 1983, Director, Medical – Surgical Intensive Care Unit, V.A. Medical Center (Chicago, IL);
1987, Assistant Medical Director, Respiratory Therapy, New York University Medical Center;
1987 – present, Attending Anesthesiologist, New York University Medical Center;
1987 – present, Attending Anesthesiologist, Bellevue Hospital Center;
1987 – present, Attending Anesthesiologist, Dept. of Veterans Affairs Med. Ctr., (New York, NY);
1987 – present, Internal Medicine Attending, New York University Medical Center;
1987 – present, Internal Medicine Attending, Bellevue Hospital Center;
1987 – present, Internal Medicine Attending, Dept. of Veterans Affairs Med. Ctr., (New York, NY);
1988, Medical Director, Respiratory Therapy, New York University Medical Center;
1989, Director, Neurosurgical I.C.U., New York University Medical Center;
1995 – 2000, Associate Director, Surgical I.C.U., Tisch Hospital (NYUMC);
2000 – present, Co-Director, Critical Care Medicine, Tisch Hospital (NYUMC);
2000 – present, Director, Surgical I.C.U., Tisch Hospital (NYUMC).

2

Academic Appointments:

1978 – 1980, Assistant Instructor of Medicine, Albany Medical College;
1982 – 1984, Assistant Professor of Medicine, Univ. of Health Sciences /
Chicago Medical School;
1982 – 1984, Clerkship Coordinator, Dept. of Medicine, Univ. of Health
Sciences / Chicago Medical School;
1983 – 1984, Education Coordinator, Dept. of Medicine, Univ. of Health
Sciences / Chicago Medical School;
1983 – 1984, Director, Critical Care Service, Univ. of Health Sciences /
Chicago Medical School at St. Mary of Nazareth Hosp. Ctr.;
1984 – 1987, Educational Coordinator, Section of Critical Care Medicine,
Dept. of Anesthesiology, New York University School of Medicine;
1987 – 1993, Assistant Professor of Anesthesiology & Medicine, New
York University School of Medicine;
1987 – present, Director, Section of Critical Care Medicine, Dept. of
Anesthesiology, New York University School of Medicine;
1993 – 1996, Associate Professor of Clinical Anesthesiology, New York
University School of Medicine;
1996 – 1999, Associate Professor of Clinical Anesthesiology & Medicine,
New York University School of Medicine;
1999 – present, Associate Professor of Clinical Anesthesiology, Medicine
& Neurosurgery, New York University School of Medicine.

Hospital & Professional Committee Assignments:

Sept. 1986 – Course Coordinator, Cardiopulmonary & Critical Care
Medicine Review, New York University Medical Center;
1987 – present, Vice Chairman, Nutrition Committee, Tisch Hospital
(NYUMC);
1987 – present, Member, Special Care Committee, Tisch Hospital
(NYUMC);
1988 – 1992, Member, Laboratory Committee, Tisch Hospital (NYUMC);
1989 – present, Chairman, Incident Report & Patient Complaints
Subcommittee, Quality Assurance Committee, Tisch Hospital (NYUMC);
1993 – present, Member, Education Committee, American Society of
Critical Care Anesthesiologists;
1993 – present, Adjunct Member, Committee on Acute Medicine,
American Society of Anesthesiologists;
1996 – 1997, Chairman, Annual Meeting Committee, American Society of
Critical Care Anesthesiologists;
1997 – present, Board Member, American Society of Critical Care
Anesthesiologists;
1997 – present, Board Member, Subcommittee on Critical Care, American
Society of Anesthesiologists.

Editorial Boards:

Anesthesiology Review

Awards & Honors:

1987 – Teacher of the Year Award, Dept. of Anesthesiology, New York
University Medical Center;
1993 – Teacher of the Year Award, Dept. of Medicine, New York
University Medical Center;
2001 – Teacher of the Year Award, Pulmonary Medicine / Critical Care
Section, Dept. of Medicine, New York University Medical Center.

Publications:

See, attached Exhibit "A".

Opinions:

See, attached Exhibit "B", Report of Brian S. Kaufman, M.D., dated
November 7, 2004.

Compensation:

$450.00 per hour (total unavailable at present).

Trial & Deposition Testimony (2000 – 2004):

To be provided under separate cover.


Dated: Larchmont, New York
        November 16, 2004


                            Yours, etc.:

                            By:
                            JOSEPH LANNI   (CT 23566)
                            The Law Firm Of
                            JOSEPH LANNI, P.C.
                            Attorneys for Plaintiffs
                            138 Chatsworth Avenue, Ste. 6 – 8
                            Larchmont, New York 10538
                            Tel:  (914) 834-6600

4

TO:

MICHAEL NEUBERT (CT 06444)
NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

RICHARD A. O'CONNOR (CT 18976)
SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

GARIE J. MULCAHEY (CT 05242)
BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

KEVIN A. TEPAS (CT 05552)
RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

EXHIBIT  A

Brian S. Kaufman, M.D.
Curriculum Vitae
Page 3

## BIBLIOGRAPHY

**Papers published:**

1.  Rackow EC, Falk JL, Fein IA, Siegel JS, Packman MI, Haupt MT, Kaufman BS, Putnam D: Fluid resuscitation in circulatory shock: a comparison of the cardiorespiratory effects of albumin, hetastarch, and saline solutions in patients with hypovolemic and septic shock. Crit Care Med 11:839-50, 1983.

2.  Falk JL, Rackow EC, Kaufman BS, Weil MH: Cardiopulmonary resuscitation. Hosp Med 1984.

3.  Kaufman BS, Rackow EC, Falk JL: The relationship between oxygen delivery and consumption during fluid resuscitation of hypovolemic and septic shock. Chest 85:336-40, 1984.

4.  Kaufman BS, Rackow EC, Weil MH: Septic Shock: Update on treatment. Hospital Physician 1984.

5.  Rauch AE, Tartaglia AP, Kaufman B, Kausel H: RBC fragmentation and thymoma. Arch Intern Med 144:1280-2, 1984.

6.  Kaufman BS, Rackow EC, Falk JL: Fluid resuscitation in circulatory shock-colloids versus crystalloids. Curr Stud Hematol Blood Transf 53:186-98, 1986.

7.  Astiz ME, Rackow EC, Falk JL, Kaufman BS, Weil MH: Oxygen delivery and consumption in patients with hyperdynamic septic shock. Crit Care Med 15:26-8, 1987.

8.  Kaufman BS, Kaminsky SJ, Rackow EC, Weil MH: Adult respiratory distress syndrome following orogenital sex during pregnancy. Crit Care Med 15:703-4, 1987.

9.  Rackow EC, Kaufman BS, Falk JL, Astiz ME, Weil MH: Hemodynamic response to fluid repletion in patients with septic shock: evidence for early depression of cardiac performance. Circ Shock 22:11-22, 1987.

10. Astiz ME, Rackow EC, Kaufman B, Falk JL, Weil MH: Relationship of oxygen delivery and mixed venous oxygenation to lactic acidosis in patients with sepsis and acute myocardial infarction. Crit Care Med 16:655-8, 1988.

11. Kutcher WL, Kaufman BS: Occlusion of the right pulmonary artery by an acute dissecting aortic aneurysm. Crit Care Med 16:564-5, 1988.

12. Lieberman A, Ransohoff J, Berczeller P, Brous P, Eng K, Goldstein M, Kaufman B, Koslow M: Neural and adrenal medullary transplants as a treatment for Parkinson's Disease and other neurodegenerative disorders. NeuroView, Trends in Clinical Neurology, 4(2):1-15, 1988.

13. Herschman Z, Kaufman B: Complications arising from the use of ophthalmologic medications in an intensive care unit patient (letter). NY State J Med 89:537-8, 1989.

14. Kaufman BS: Septic shock. Curr Rev Anesthesiol 9(26):201-4, 1989.

15. Herschman Z, Kaufman B: Complications arising from the use of ophthalmologic medications in an intensive care unit patient. New York State Journal of Medicine 89:537-538, 1989

Brian S. Kaufman, M.D.
Curriculum Vitae
Page 4

Papers published cont'd:

16.   Lubarsky D, Kaufman B, Turndorf H: Anesthesia unmasking benign Wolff-Parkinson-White syndrome. Anesth Analg 68:172-4, 1989.

17.   Zakowski M, Kaufman B, Berguson P, Tissot M, Yarmush L, Turndorf H: Esmolol use during resection of pheochromocytoma: report of three cases. Anesthesiology 70:875-7, 1989.

18.   Lubarsky DA, Kaufman B, Turndorf H: Anesthetic care of a patient with an intracranial hemorrhage after thrombolytic therapy. J Clinical Anesth 2:276-279, 1990.

19.   Kaufman BS, Contreras J: Preanesthetic assessment of the patient with renal disease. AnesthesiolClin NA 8:677-95, 1990

20.   Lieberman A, Ransohoff J, Berczeller, Brous P, Eng K, Goldstein M, Kaufman B, Koslow M, Lieberman I: Adrenal medullary transplants as a treatment for Parkinson's disease. Adv Neurol 53:567-570, 1990.

21.   Kaufman BS, Rackow E: (Editorial) Fluid resuscitation of the critically ill. Consensus and Controversies. Anesthesiology Review Vol. XVII Supplement 3, 1990.

22.   Kaufman BS, Griffel MI, Rackow EC, Weil MH: Resolution of lactic acidosis after sedation of a patient with acute myocardial infarction and left ventricular failure. Crit Care Med 19:120-2, 1991.

23.   Kaufman BS: Pitfalls of central hemodynamic monitoring. Resident & Staff Physician 38(10):27-31, 1992.

24.   Sutin KM, Ruskin KJ, Kaufman B: Intravenous fluid therapy in neurologic injury. Crit Care Clin 8:367–408, 1992.

25.   Haupt MT, Kaufman BS, Carlson RW: Fluid resuscitation in patients with increased vascular permeability. Crit Care Clin 8:341-54, 1992.

26.   Griffel MI, Kaufman BS: Pharmacology of colloids and crystalloids. Crit Care Clin 8:235-254, 1992.

27.   Kaufman BS, Young CC: Deep vein thrombosis. Anesthesiol Clin NA 10:823-867, 1992.

28.   Ruskin KJ, Kaufman BS: Epidural anesthesia in the anticoagulated patient. Anesthesiol Rev 19:25-6, 1992.

29.   Young CC, Kaufman BS: Neuroleptic malignant syndrome postoperative onset due to levodopa withdrawal. J Clin Anesth 7:652-6, 1995.

30.   Doerfler ME, Kaufman B, Goldenberg AS: Central venous catheter placement in patients with disorders of hemostasis. Chest 110:185-8, 1996.

31.   Kaufman BS, Weitz S: PACU and ICU: Evaluation and management of postoperative cardiovascular complications. Anesth Clin North Am, 15 (1): 189-205, 1997.

32.   Kaufman B, Gandhi SA, Louie E, Rizzi R, Illei P: Herpes simplex virus hepatitis: case report and review (review). Clin Infect Dis 24:334-8, 1997.

Brian S. Kaufman, M.D.
Curriculum Vitae
Page 5


**Papers published cont'd:**

33.  Dhar P, Kaufman B, Doerfler M, Dadic P: Unusual course of a pulmonary artery catheter. J Cardiothorac Vasc Anesth 12:487-9, 1998.

34.  Kaufman B: Blood lactate measurement in the ICU: is it still useful after all these years? (editorial) J Intensive Care Med 13:215-7, 1998.

35.  Kaufman B, Dhar P: Acute respiratory distress syndrome: potential pharmacologic interventions. J Pharmacy Practice 11:466-85, 1998.

36.  Bekker AY, Kaufman B, Samir H, Doyle W: The use of dexmedetomidine infusion for awake craniotomy. Anesth Analg 2001; 92:1251-3.

37.  Kaufman B, Dhar P, Fermon CM, et al: Chest radiograph interpretation skills of Anesthesiologists. J Cardiothor Vasc Anesth. In Press.

38.  Kaufman B, Samir H, Raviprasad J: Aberrant dialysis catheter placement. Submitted for publication.


**Letters:**

1.  Herschman Z, Kaufman B: Complications arising from the use of ophthalmologic medications in an intensive care unit patient. NY State Med 89:537-538.

**Books & Chapters:**

1.  Kaufman BS, Rackow EC, Falk JL: Fluid resuscitation in circulatory shock. Colloids versus crystalloids. In: *Albumin and the Systemic Circulation.* Blauhut B, Lundsgaard-Hansen P (eds). Basel, Karger, 1986, pp 186-98.

2.  Herschman Z, Kaufman B: Differential diagnosis of wide QRS tachycardias. Anesthesiol Clin N Am 7(2):351-72, 1989.

3.  Kaufman B: Fluid resuscitation of the critically ill: consensus and controversies (editorial). Anesthesiol Rev 17(3S):2, 1990.

4.  Kaufman BS, Contreras J: Preanesthetic assessment of the patient with renal disease. Anesthesiol Clin N Am 8(4):677-95, 1990.

5.  Kaufman B: Deep vein thrombosis and pulmonary embolism in the injured patient. In: *Trauma: Anesthesia and Intensive Care.* Capan LM, Miller SM, Turndorf H (eds). Philadelphia, JB Lippincott, 1991, pp 821-42.

6.  Kaufman B: Infections of the injured. In: *Trauma: Anesthesia and Intensive Care.* Capan LM, Miller SM, Turndorf H (eds). Philadelphia, JB Lippincott, 1991, pp 787-800.

7.  Kaufman B: Management of septic shock. In *Trauma: Anesthesia and Intensive Care.* Capan LM, Miller SM, Turndorf H (eds). Philadelphia: JB Lippincott, 1991, pp 801-20.

Brian S. Kaufman, M.D.
Curriculum Vitae
Page 6

## Books & Chapters:

8.  Meixler S, Kaufman B: Chronic mechanical ventilation. In: *Pulmonary Therapy and Rehabilitation: Principles and Practice. 2nd Edition.* Haas F, Axen K (eds). Baltimore, Williams & Wilkins, 1991, pp 359-74.

9.  Kaufman BS: Fluid resuscitation. In: *Principles and Practice of Medical Intensive Care*, Editors: Carson RW, Geleb MA, Philadelphia, W.B. Saunders Co, 129-150, 1993.

10. Kaufman B, Sutin KM, Wahlander S, Miller SM: Anesthetics and neuromuscular blocking agents. In: *Toxicologic Emergencies Sixth Edition.* Goldfrank CR, Flomenbaum NE, Lewin NA, Weisman RS, Howland MA, Hoffman RS (eds). Stamford, Appleton & Lange, pp 873-912, 1998.

11. Kaufman B, Wahlander S: Local anesthetics in: *Toxicologic emergencies. Seventh Edition.* Goldfrank CR, Flomenbaum NE, Lewin NA, Weisman RS, Howland MA, Hoffman (eds). Lippincott Williams & Wilkens. In press.

12. Sutin KM, Kaufman B: Neuromuscular blocking agents in: *Toxicologic emergencies. Seventh Edition.* Goldfrank CR, Flomenbaum NE, Lewin NA, Weisman RS, Howland MA, Hoffman (eds). Lippincott Williams & Wilkens. In press.

13. Kaufman B: Inhalation Anesthetics in: *Toxicologic emergencies. Seventh Edition.* Goldfrank CR, Flomenbaum NE, Lewin NA, Weisman RS, Howland MA, Hoffman (eds). Lippincott Williams & Wilkens. In press.

14. Kaufman B, Hoffman RS: Care of the poisoned patient. In: *Critical Care Medicine: Perioperative Management. Second Edition.* Murray MJ, Coursin DB, Pearl RG, Prough DS (eds). Lippincott, Williams & Wilkens. In Press.

## Abstracts:

1.  Falk JL, Rackow EC, Fein IA, Siegel J, Packman MI, Haupt MT, Kaufman BS, Putnum D: Cardiac function during fluid challenge with albumin, hetastarch or saline in patients with circulatory shock. Anesthesiology 57:A110, 1982.

2.  Kaufman B, Rackow EC, Falk JL: The effects of fluid resuscitation on oxygen consumption in patients with hypovolemic and septic shock. Crit Care Med 10:207, 1982.

3.  Rackow EC, Falk JL, Fein IA, Seigel J, Packman MI, Haupt MT, Kaufman B, Putnum D: Comparison of albumin, hetastarch and saline solutions for fluid resuscitation of patients with shock. Crit Care Med 10:230, 1982.

4.  Astiz M, Rackow EC, Falk JL, Kaufman BS: Assessment of oxygen utilization in septic shock patients. Crit Care Med 11:250, 1983.

5.  Astiz M, Rackow EC, Falk JL, Kaufman BS: Oxygen delivery and utilization in septic shock patients. Clin Res 31:256A, 1983.

6.  Falk JL, Rackow EC, Fein IA, Siegel JS, Packman MI, Haupt MT, Kaufman BS, Putnam D: The effect of hetastarch, albumin and saline resuscitation on coagulation in shock patients. Crit Care Med 11:219, 1983.

Brian S. Kaufman, M.D.
Curriculum Vitae
Page 7

## Abstracts Cont'd:

7.  Kaufman BS, Rackow EC, Falk JL: Response to fluid challenge in patients with acute myocardial infarction and hypovolemia. Chest 84:331, 1983.

8.  Kaufman BS, Rackow EC, Falk JL, Astiz M, Weil MH: Systemic oxygen deficit in patients with acute myocardial infarction. Clin Res 31:824A, 1983.

9.  Kaufman BS, Rackow EC, Falk JL, Weil MH: Thermodilution cardiac output determination during mechanical ventilation. Clin Res 32:9A, 1984.

10. Kaufman BS, Rackow EC, Falk JL, Weil MH: Oxygen therapy in patients with acute myocardial infarction. Clin Res 32:9A, 1984.

11. Kaufman BS, Rackow EC, Falk JL, Astiz M, Weil MH: Arterial pressure and mortality in patients with acute myocardial infarction. Clin Res 32:778A, 1984.

12. Astiz M, Rackow EC, Falk JL, Kaufman BS, Weil MH: Age related cardiac function in patients with septic shock. Clin Res 32:727A, 1984.

13. Kaufman BS, Rackow EC, Falk JL, Astiz M, Weil MH: Increased metabolic demands in patients with acute myocardial infarction and left ventricular failure. Circ II-309, 1984.

14. Falk JL, Rackow EC, Fein IA, Kaufman BS, Weil MH: Colloid osmotic-pulmonary wedge pressure gradient and pulmonary edema fluid resuscitation in patients with septic shock. Chest 86:287, 1984.

15. Rackow EC, Kaufman BS, Falk JL, Fein IA, Weil MH: Cardiovascular function in patients with septic shock. Clin Res 32:680A, 1984.

16. Rackow EC, Kaufman BS, Falk JL, Astiz ME, Weil MH: Reversible myocardial dysfunction in patients with septic shock. Clin Res 33:295A, 1985.

17. Astiz M, Rackow EC, Kaufman BS, Weil MH: Relationship of mixed venous oxygen saturation to lactic acidosis in patients with circulatory shock. Crit Care Med 14:339, 1986.

18. Lubarsky D, Kaufman B: Changes in lactate levels with decreased oxygen delivery and oxygen consumption under anesthesia. Anesth Analg 68:S171, 1989.

19. Lubarsky D, Kaufman B: Oxygen delivery under anesthesia: a prospective evaluation of 330ml/min/m$^2$ as a "critical" value. Anesth Analg 68:S173, 1989.

20. Lubarsky D, Kaufman BS, Sharnick S, Turndorf H: The effects of induction of anesthesia on mixed venous and peripheral venous oxygen saturations. Anesth Analg 68:S172, 1989.

21. Kaufman B, Doerfler M: Central venous catheterization through guidewire exchange: are post-procedure chest radiographs necessary? Crit Care Med 22:A104, 1994.

EXHIBIT  B

Brian S. Kaufman, M.D.
Two Rubins Court
Dix Hills, New York 11746

November 7, 2004

Joseph Lanni, Esq.
The Law Firm of Joseph Lanni, P.C.
138 Chatsworth Avenue, Suites 6 – 8
Larchmont, New York 10538

RE:   **GUIGLIANO v. DANBURY HOSP., ET AL.**

Dear Mr. Lanni:

This report is in response to your request for my medical opinions about whether there were any departures from good and accepted medical practice in the treatment of Michael Guigliano during his admission to Danbury Hospital in 2001. The focus of my review is the initial ten (10) day period of this admission (February 7 – 17, 2001). My opinions are focused on the medical care rendered during that time, particularly with respect to issues involving the patient's respiratory condition and the events leading up to and encompassing the respiratory arrest of February 17.

I have been provided with the Danbury Hospital record; the Connecticut, Department of Public Health file; a copy of a handwritten note of Vanessa Saipher, R.T.; and Danbury Hospital Emergency Code Log for February 2001.

1

You have advised me that the claims in this case include allegations that departures from proper medical practice caused Mr. Guigliano to sustain a respiratory arrest and that a failure to properly and timely resuscitate Mr. Guigliano caused him to sustain profound anoxic encephalopathy.

According to the Danbury Hospital records, Michael Guigliano was admitted to Danbury Hospital on February 7, 2001 for treatment of multiple fractures of the left lower extremity. These injuries occurred as the result of a fall from a roof

On February 8, 2001, the patient underwent O.R.I.F. surgery for repair of a left tibial plateau fracture by a Dr. DePuy. There was one transient intraoperative episode of hypoxemia. On the first postoperative day, February 9, 2001, the patient was found to be hypoxemic with an oxygen saturation of 87 percent on room air. A pulmonary consult was performed by a Dr. Kotch. A CXR showed perihilar infiltrates. Dr. Kotch's assessment was possible fat emboli syndrome. The patient also spiked a fever of 102.1 on this date. An orthopedic progress note refers to lung base infiltrates and includes aspiration pneumonia in the differential diagnoses. The patient was placed on oxygen via nasal cannula and was monitored with pulse oximetry and telemetry.

A VQ scan was performed on February 10, 2001 and was interpreted as low probability for pulmonary embolism (PE). An ultrasound examination of the lower extremities was also performed and was interpreted as being positive for deep venous thrombosis (DVT). The patient continued to be hypoxemic with oxygen saturations as low as 82 percent on room air. He was also persistently tachycardic. The record reveals that when the patient was taken for the VQ scan he was accompanied by a registered nurse who monitored his vital signs and provided intervention when needed. Monitoring was with pulse oximetry and a cardiac monitor. When the patient was placed in a supine position for the test, his oxygen saturation was noted to drop significantly; therefore, the nurse increased the oxygen flow to 6 l/m to maintain his oxygen saturation in an acceptable range. This event indicated that placing the patient in the supine position caused the onset of hypoxemia probably as a result of abdominal distention that had been found on examination and/or postoperative atelectasis.

Over the next week, Mr. Guigliano's respiratory status and abdominal distention did not improve. During this time he required continual oxygen via nasal cannula to maintain acceptable saturations and a NGT was inserted for a few days in an attempt to decompress the abdomen. Anticoagulation therapy was instituted to prevent emboli migration from the DVT of the legs and eventually reached therapeutic levels.

The patient continued to exhibit hypoxemia on February 11, 2001; oxygen saturation was found to be 75 percent on room air. Also the patient was found to still have a distended, "bloated" abdomen. A surgery consultation by a Dr.

2

Borrusso considered the possibility of a bowel obstruction, an ileus due to analgesic medication or intra-abdominal trauma. CT scans of the chest, abdomen and pelvis were done. The CT scan of the chest showed bilateral patchy lower lobe infiltrates which are consistent with fat emboli syndrome and/or ARDS. The CT scan of the abdomen revealed colon dilatation and a prominent small bowel. On the basis of these CT scan findings, Dr. Borrusso's impression was an ileus secondary to narcotic analgesia. He ordered the patient to be NPO except for ice chips.

On February 12, 2001, the patient underwent placement of an inferior IVC filter as prophylaxis for emboli secondary to the DVT of the lower extremities. Oxygen therapy was continued, the patient had an oxygen saturation of 93 percent on 3 L/m.

The patient returned to the O.R. on February 13, 2001, for a repair of a left calcaneus fracture. This operation was performed by a Dr. Gray and appeared to proceed without complication.

The patient still had abdominal distention on February 14, 2001. His temperature was slightly elevated to 101.1 F. Oxygen saturation was noted to be 96 percent on 5 L/m O2. The patient was also noted to have large liquid bowel movements. Flagyl was ordered to treat Clostridium difficile. The patient had low hemoglobin (Hgb) and hematocrit (Hct). The NGT remained in place for the abdominal distention and was draining fluid. The respiratory treatment consisted of supportive oxygen and incentive spirometry.

On February 15, 2001, the patient's NGT was noted to be draining "fairly clear" fluid; however, the abdomen was still noticeably distended. The NGT was removed on this date. Oxygen saturation was at 94 percent on 3 L/m oxygen. A CXR on this date revealed bibasilar subsegmental atelectasis which was probably due to the abdominal distention.

The patient was initially noted to have oxygen saturations of 93 – 96 percent on room air on February 16, 2001. The patient's anticoagulation was found to be at a therapeutic level of 2.65 INR. A progress note indicates that the abdomen was still distended and "hard". Dr. Kotch saw the patient and found him to be uncomfortable with increasing shortness of breath which he attributed to the distended abdomen. The progress record also refers to the patient's abdomen as being distended with tympanic bowel sounds. The patient was found to become short of breath while sitting on the edge of the bed. Oxygen saturation was found to be at 89 percent on 1 L/m. It became 95 percent on 2 L/m. The patient is quoted as saying that he felt as if his "stomach [was] pushing into [his] lungs, making it hard to breathe". A surgery note indicates the abdomen to be "firm" and distended; the assessment at that time was "ileus" secondary to narcotics. Another surgery note by Dr. Borrusso states that the patient had diarrhea and large amount of flatus; however, the abdomen remained

distended. A GI consult was planned but not done before the patient coded the next day.

On February 17, 2001, at 3:30 a.m., a nurse wrote that the patient's "bowel sounds [are] very slow" and that the "abdomen is huge, distended and firm". At 3:45 a.m., it was noted by the nurse that the patient's lungs were found to have inspiratory and expiratory "crackles" and "wheezing". At 6:45 a.m., the patient was noted to be significantly hypoxemic with an oxygen saturation of 89 – 91 percent on 1 L/m oxygen; it rose to 94 percent when oxygen was increased to 2 L/m. The records indicate that the head of the patient's bed was elevated by the nursing staff and the patient encouraged to take deep breaths. The patient continued to be "very uncomfortable with distended abdomen". It is assumed that elevation of the head of the bed was done to make it easier for the patient to breathe since a supine position compromised his breathing as a result of lung compression from the abdomen.

A surgery note on February 17 indicates the persistence of abdominal distention. The surgeon (unidentified) recommends a Dulcolax suppository and ordered a CT scan of the abdomen. Another progress record entry on February 17, 2001, by a Dr. Kessler refers to the patient feeling "bloated [and] distended." The impression was an ileus. Hemoglobin (Hgb) and hematocrit (Hct) were noted to be 8.5 / 25.8.

At 11:00 a.m., a nurse noted the patient to be uncomfortable with an abdomen that was "firm, distended [and with hypoactive bowel sounds]". It was noted that the patient was to go for a CT scan of the abdomen that day. Oxygen saturation appears to be 96 percent on 2L O2. The note indicates that the patient complained of shortness of breath with position change and activity. The patient is also moderately tachypneic at 20 – 24/m and tachycardic at 100 – 110 bpm. There are no further physicians' notes or nurses' notes in the progress record or chart until sometime after 1:00 p.m. on February 17, 2001.

A review of the laboratory results up to February 17 demonstrates several items of significance There had been mildly low ionized calcium, potassium and Hgb / Hct values throughout the previous ten day period.

There is a handwritten account by a Vanessa Saipher (the CT scan technician) of the events which occurred in the Radiology Department leading up to and encompassing the code event. This note, which is apparently not part of the hospital record, reads:

"Joe Roth, the transporter & myself lowered the stretcher & pulled him across the table. Almost immediately after the move, he started flailing & gasping for breath. He said he couldn't breath & became cyanotic. Joe reached for an oxygen mask & covered his face. I told the patient I was taking him right back to his room & we would do the CT later. He argued

with me 'to do it now'. He would not keep the mask on his face & was in obvious distress. We pulled him back on the stretcher & elevated the bed, while I held the oxygen on his face & Joe hooked him to the pulse ox. The reading was 79 or 80. I told Joe to call his nurse & tell her what was happening, as I pushed the stretcher out the door. As soon as we were thru the doorway, Mr. Guigliano started seizing & I yelled for Joe to get Dr. Berger. Within a few seconds, Dr. Berger & Joe were there & Dr. Berger told me to 'call a code'. I pushed the code button & gave Dr. Berger an ambu bag from the cart. I stepped back & waited for the team. The operator called 'Code 99, 7th floor' & from what I was told later, the team was confused by this. Anesthesia came quickly & we waited for the team."

A neurology consultation by a Dr. Culligan, dated February 18, 2001, makes further reference to the circumstances of the code on the previous day. Dr. Culligan's note states:

"While being placed in the CAT scan machine he was laid flat, and complained of shortness of breath. Shortly thereafter, he had sudden cardiorespiratory arrest. Radiology was on hand within seconds, and able to bag him. A Code 99 was called, and the code team responded. *According to the residents, possibly 10 minutes may have passed before effective CPR was <u>initiated</u>.*"

An infectious disease consultation by a Dr. Hindes, dated February 25, 2001, also makes reference to the circumstances of the code. Dr. Hindes' note states as follows:

"On February 17, while receiving a CAT scan of the abdomen, the patient coded while in radiology. He was bagged within a few seconds, and the code team responded. It is estimated that *approximately 10 minutes may have passed before effective CPR was <u>established</u>.*"


The Connecticut Department of Health file concerning deficiencies in the care and treatment of Michael Guigliano indicates that Danbury Hospital was issued two violations concerning the events pertaining to the cardiopulmonary arrest. "Violation #1" was for the failure to document events prior to the "code" call. "Violation #2" was for a failure to "ensure adequate supervision of patients receiving diagnostic procedures".

A Code 99 Flowsheet in the Danbury Hospital record indicates a "code" was called at 1:02 p.m. on February 17, 2001, when the patient was found to have sustained a respiratory arrest in the CT scan room. There is no indication in the code sheet as to the onset time for the respiratory arrest or when it was first noted by medical personnel. Charting of vital signs and resuscitation

5

measures does not begin until 1:05 p.m. From 1:05 p.m. to 1:25 p.m., the patient was found to be exhibiting cardiac activity in the form of electromechanical dissociation and pulseless electrical activity. Resuscitation measures consisted of intubation, epinephrine, bicarbonate, magnesium sulfate and apparently chest compressions with ventilation. The code lasted until 1:45 p.m.

A "Code 99 / ICU admission note" of February 17, 2001 states that the patient "was found in the CT room unresponsive [with] no pulse, no BP, midriatic pupils, cold extremities."

The post-Code 99 physicians' notes demonstrate that, upon admission to the ICU, the patient was given calcium, potassium and PRBC's via I.V. The patient was diagnosed as suffering from severe anoxic encephalopathy.

When the patient was placed flat for the CT scan in the radiology department on February 17, 2001, this was the triggering event for a downward spiral in oxygen saturation. The patient became progressively more hypoxemic due to atelectasis and shunting secondary to the abdominal distention and possibly aspiration of stomach contents. An oral gastric tube inserted by the C.R.N.A. during the code produced 800 cc of fluid. This amount of fluid is more than a considerable amount and contributed to the compression of the lungs from the abdominal distention. As the hypoxemia progressed, one of two scenarios occurred: either there was a respiratory arrest which then went to a cardiopulmonary arrest or the hypoxemia directly produced a cardiopulmonary arrest. This functional equivalent of a cardiopulmonary arrest persisted without interruption for approximately 25 minutes before any pulse was obtained. As a result of this respiratory arrest and consequent cardiopulmonary arrest, the patient was severely anoxic for a prolonged period of time. This prolonged anoxic episode caused the patient to sustain profound brain damage of a permanent nature. This downward spiral in oxygenation was allowed to progress to cardiopulmonary arrest and brain damage because there was a failure to properly and timely treat the hypoxemia and because there was a failure to timely undertake adequate Basic Life Support measures and cardiopulmonary resuscitation.

It is my opinion with a reasonable degree of medical certainty that the treating surgeons failed to take the necessary and indicated steps to reduce the patient's massive abdominal distention. An opportunity to alleviate or, at least, reduce the compression of the lungs was missed because the nasogastric tube was pulled out too soon on February 15 by Dr. Borrusso before it had any significant therapeutic effect on the abdominal distention. At the time that the NGT was discontinued, it was still draining gastric fluid and this fluid. The removal of the NG tube permitted the abdominal distention to worsen considerably over the next 48 hours and further compromise the patient's respirations. There was also a failure by a surgeon to reinsert the NGT when the

6

abdominal distention was still found to be present and, in fact, more profound on February 17.

The physician ordering the CT scan test should have been aware that Mr. Guigliano's respiratory difficulties increased when he was lying flat. The nurse's note immediately before the February 17 surgery note documents respiratory wheezing and crackling of the lungs and there is HOB elevation to make the patient's breathing easier. Moreover, the progress record documented that this patient had previously exhibited exacerbations of hypoxemia when placed in the supine position for a diagnostic test on February 10. Thus, either the patient's nurse or the physician ordering the test should have had the patient be accompanied by someone of adequate skill level, either another physician (it could be a resident or house staff physician) or a nurse trained in Basic Life Support and CPR and with pulse oximetry and cardiac monitoring. Then the patient's severe hypoxemia would have been timely recognized and there would have been timely intervention (such as administering oxygen via nasal cannula or non-rebreather) to prevent the patient from going into respiratory arrest or cardiopulmonary arrest. This is exactly how the patient was transported and monitored for his VQ scan on February 10.

There is no documentation anywhere in the record indicating that the patient was brought down to the radiology department with the oxygen therapy continuing. When the patient went into severe respiratory distress on the CT scan table, the staff then "reached for an oxygen mask" and applied it to the patient. Why would an oxygen mask need to be applied if this patient was already receiving oxygen? There is no reference in this note of oxygen via nasal cannula being in use. Transporting the patient without oxygen would be a departure from proper medical practice.

There is no documentation anywhere that the patient was brought down to the radiology department with pulse oximetry monitoring in use. The note mentions that the patient was "hooked to the pulse ox" after the oxygen mask was applied. The oxygen saturation was 79 – 80 percent, the patient was severely hypoxemic. If the pulse oximetry had been in use prior to the onset of the severe respiratory distress, the staff would have been aware of the patient's worsening hypoxemia and made an earlier call for help. Transporting Mr. Guigliano without pulse oximetry was a departure from proper practice. The same can be said for transporting the patient without a cardiac monitor.

The patient was "flailing & gasping for breath" and "cyanotic", but no code was called. The radiology technician instead decided to take the patient back to his room and also stopped to telephone the "floor" rather than call a code. The radiology technician also took the time to move the patient onto a gurney and elevate his head. It was only when the radiology technician was pushing the stretcher out of the CT room and the patient began "seizing" (probably from cardiac arrest or marked hypotension), she told the student intern to summon a

physician. It is only after a Dr. Berger arrived on the scene and attempts to ventilate the patient with an Ambu-bag that he instructs the radiology technician to call a code. The staff improperly delayed summoning a physician and calling the code.

The hospital personnel present were apparently inexperienced people who did not know what to do when then patient became cyanotic and was in obvious distress. Since codes in a radiology department are not rare, personnel should be trained to have a very low threshold for calling for help at the first indication that something is wrong and a patient is in distress.

The materials reviewed also indicate that there was a delay in the arrival of the code team. The Saipher note states that the operator was mistaken in announcing the location of the code. The radiology department is on the third floor of the hospital. The hospital code log which states that the "operator misspoke when stating the location the 1st time".

During this time, the patient was being Ambu-bagged via mask by Dr. Berger; however, there is no mention that there is air entry into the lungs. This method of ventilation would most likely have been ineffective to oxygenate this patient given his unconsciousness without an oral airway. More significant, the Department of Public Health investigative file indicates that Ambu-bagging was occurring without compressions for what appears to be at least 3 – 4 minutes if not longer (the progress record indicates a delay of possibly 10 minutes in initiating CPR).

Dr. Berger indicates that he was Ambu-bagging the patient but there is no mention of compressions. Dr. Berger is noted not to have found a pulse when he examined the patient. Both the C.R.N.A. and a respiratory therapist were the first to arrive on the scene and they both indicated that no chest compressions were being done before they showed up. The failure to timely commence performing chest compressions was a serious departure from standards of proper CPR and Basic Life Support. All physicians, as part of their training, must be familiar with CPR and Basic Life Support measures. Similarly, Mr. Roth states that he was ACLS or ALS certified and he should have known to start compressions as well while waiting for the code team. The failure to timely commence performing chest compressions was a serious departure from standards of proper basic life support. In essence, the patient was in cardiorespiratory arrest for several minutes without any adequate circulation and that is a failure to follow proper practice in terms of BLS, CPR and ACLS training.

Because the patient's potassium and ionized calcium became low in the week prior to the cardiopulmonary arrest, this condition made the patient more susceptible to a cardiac arrhythmia secondary to hypoxemic insult and may have contributed to the cardiopulmonary arrest. The patient's Hgb / Hct were also markedly low and this reduced the oxygen carrying capacity of the patient's

8

bloodstream. The patient's severe anemia probably contributed to development of tissue hypoxemia and may have made the patient more susceptible to respiratory and cardiac arrest.

It is my opinion with a reasonable degree of medical certainty, that the failures to follow proper medical practice and proper practice in BLS, CPR and ACLS caused Mr. Guigliano to suffer a cardiopulmonary arrest and sustain severe anoxic encephalopathy.

You have advised me that depositions of the various physicians and hospital personnel involved in the care and treatment of Michael Guigliano are in the process of being completed. I will be glad to review any or all of these depositions as part of my expert opinions in this case.

Very truly yours,

Brian S. Kaufman, M.D.

9

## DECLARATION OF SERVICE
## PURSUANT TO 28 U.S.C. § 1746

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York.

I served a true copy of the annexed: PLAINTIFFS' SECOND *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES, and attachments, dated November 16, 2004, on the date of November _17_, 2004:, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

TO:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

Executed on November _17_, 2004, Larchmont, New York.

JOSEPH LANNI     (CT 23566)

6

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
=================================================X
LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to be
Incompetent, and LAURA GUIGLIANO, Individually,

                    Plaintiff(s)                    *3:02 CV 718*
                                                    *(RNC)(DFM)*

          -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
F. SCOTT GRAY, M.D., GEORGIANA KNOWLES,
P.A., DEANNA WOLFFE, P.A., DAVID OELBERG,
M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D.,
ARTHUR KOTCH, M.D., JULIA CIRCIUMARA,
M.D., ANDRE KUZNETS, M.D., MICHAELA
FEDERICA, M.D., MAUREEN BENNETT, R.N.,
JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N.,
"JANE DOE NO.1", "JANE DOE NO.2" (*defendants
"JANE DOE NO.1" and "JANE DOE NO. 2", full
identities unknown, being identified as DANBURY
HOSPITAL employees who were assigned to
monitor, supervise and attend to patient MICHAEL
GUIGLIANO prior to and during a CT Scan procedure
on 2/17/01)* and "JANE DOE NO. 3", (*full identity
unknown, being identified as a DANBURY HOSPITAL
employee who called a "Code 99" on 2/17/01*),

                    Defendants.
=================================================X

# PLAINTIFFS' SECOND *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES

THE LAW FIRM OF JOSEPH LANNI, P.C.
*Attorney for Plaintiff[s]*
LAURA GUIGLIANO
138 CHATSWORTH AVENUE, SUITES 6 – 8
LARCHMONT, NEW YORK 10538
Tel.: (914) 834-6600
Fax:  (914) 834-0152