UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
================================X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, ET AL.,

                     Plaintiff(s)

        -against-               **PLAINTIFFS' THIRD**
                                 ***Fed. R. Civ. P. 26 (a)(2)***
DANBURY HOSPITAL, JAMES DEPUY, M.D.,   ***(A-B)*** **EXPERT**
ET AL.,                                  **DISCLOSURES**

                  Defendants.        *3:02 CV 718*
================================X    *(RNC)(DFM)*

      Plaintiff LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL

GUIGLIANO, and LAURA GUIGLIANO, Individually, by her attorneys, THE LAW

FIRM OF JOSEPH LANNI, P.C., sets forth the following expert disclosure, pursuant to

*Fed. R. Civ. P. 26(a)(2)(A-B)*:

                 **EXPERT NO. 3:**

                 Identity:

                 Nancy Mure´, R.N., B.S., M.A.
                 15 Admiralty Loop
                 Staten Island, New York 10309

                 Education:

                 1972 – R.N., Kingsborough Community College;
                 1978 – B.S. (Health Science), Brooklyn College;
                 1993 – M.A. (Community Health Care Administration), Brooklyn
                 College.

                 Postdegree Training:

                 1992 – JCAHO Standards of Nursing Care;
                 1994 – Quality Assessment & Improvement;
                 1998 – Infection Control.

<u>R.N. Licensure</u>:  New York, New Jersey & Florida.

<u>Certifications</u>:

Basic Life Support (CPR), Advanced Life Support, & Advanced Trauma Life Support.

<u>Nursing Experience & Appointments</u>:

1972 – 1995, Maimonides Medical Center, Brooklyn, New York;
      1974 – 1983, Assistant Head Nurse, Surgical ICU & Open Heart Surgery Units;
      1983 – 1985, Administrative Coordinator for Critical Care;
      1987 – 1989, Assistant Director of Nursing, Emergency Department;
      1989 – 1995, Director of Nursing, Division of Surgery.
1995 – 1997, Acting Director of Patient Care Services, Surgical Division, University Hospital, University of Medicine & Dentistry of New Jersey, Newark, New Jersey.
1997 - present, Supervisor, Nursing Staff, Clove Lakes Health & Rehabilitation Center (Staten Island, NY).

<u>Academic Appointments</u>:

1997 – present, Member, Faculty Advisory Board, School of Nursing, Kingsborough Community College.

<u>Publications</u>:

See, attached Exhibit "A".

<u>Opinions</u>:

See, attached Exhibit "B", Report of Nancy Mure´, R.N., B.S., M.A., dated November 4, 2004.

<u>Compensation</u>:

$1,350.00 to date.

<u>Trial & Deposition Testimony (2000 – 2004)</u>:

None.

2

Dated: Larchmont, New York
      November 16, 2004

Yours, etc.:

By:

**JOSEPH LANNI    (CT 23566)**
The Law Firm Of
JOSEPH LANNI, P.C.
Attorneys for Plaintiffs
138 Chatsworth Avenue, Ste. 6 – 8
Larchmont, New York 10538
Tel: (914) 834-6600

TO:

MICHAEL NEUBERT (CT 06444)
NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

RICHARD A. O'CONNOR (CT 18976)
SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

GARIE J. MULCAHEY (CT 05242)
BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

KEVIN A. TEPAS (CT 05552)
RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

EXHIBIT  A

## PROFESSIONAL PUBLICATIONS

**The Ethics of Withholding and Withdrawing Food and Water.**
The Thanatology Newsletter, Vol. I, #2 1992.

### Care Plan (2) on Subject(s)
- Vaginal Plastic Operations
- Ureteral Lithotripsy
- Adult Medical - Surgical Nursing
  Published in McGraw Hill Clinical Care Plans: Med/Surg Nursing, 1994

EXHIBIT  B

*Nancy Mure´, R.N., B.S., M.A.*

University Hospital
150 Bergen Street
Newark, N.J. 07103

15 Admiralty Loop
Staten Island, N. Y. 10309

November 4, 2004

Joseph Lanni, Esq.
Joseph Lanni, P.C.
138 Chatsworth Avenue, Suites 6 – 8
Larchmont, N.Y. 10538

RE:    Guigliano v. Danbury Hospital, et al.

Dear Mr. Lanni:

Thank you for the opportunity to review this most interesting case. After careful review of the records and other materials, it is my opinion with reasonable certainty that there were multiple departures from proper nursing practice and hospital practice in the medical treatment rendered to Michael Guigliano on February 17, 2001. My opinions in this matter are based upon my review of the Danbury Hospital records, the Connecticut Department of Public Health investigative file, the statement of a Vanessa Saipher and my education, training and years of experience in the nursing field and in hospital administration.

I am licensed as a registered nurse in New York, New Jersey and Florida. I have been a registered nurse since 1972 after completing the nursing program at Kingsborough Community College. I received a B.S. in Health Science and an M.A. in Community Health Care Administration at Brooklyn College in 1978 and 1993 respectively. From 1972 to 1995, I was employed by Maimonides Medical Center in Brooklyn, New York. I was an Assistant Head Nurse in the Surgical ICU and the Open Heart Surgery Units during the years 1974 – 1983, the Administrative Coordinator for Critical Care during the years 1983 – 1985, the Assistant Director of Nursing for the Emergency Department during the years 1987 – 1989, and the Director of Nursing for the Division of Surgery

during the years 1989 – 1995. From 1995 to 1997, I was the Acting Director of Patient Care Services for the Surgical Division at University Hospital of the University of Medicine & Dentistry of New Jersey in Newark, New Jersey. Since 1997, I have worked as a Supervisor of the Nursing Staff at the Clove Lakes Health & Rehabilitation Center near my home on Staten Island, New York. I am also certified in Basic Life Support, Advanced Life Support, and Advanced Trauma Life Support.

There are several aspects of Mr. Guigliano's condition that must be considered in evaluating the nursing care and hospital care rendered to this patient. The most important is that this patient was never "stable" from a nursing perspective throughout the postoperative course from February 9 to the time that he sustained a cardiopulmonary arrest on February 17, 2001. He consistently exhibited respiratory problems, he complained of SOB and difficulty breathing, and he required supplemental oxygen via nasal cannula to maintain adequate oxygen saturations during this time. The patient often required an oxygen flow rate of 2 – 4 liters per minute to maintain an oxygen saturation of 93 – 95 percent which is still mildly hypoxemic. He was also constantly tachycardic. The patient constantly required and received both pulse oximetry and telemetry monitoring. There were various laboratory abnormalities including anemia and some electrolyte deficiencies. Finally, his abdomen was markedly distended reportedly due to a postoperative ileus and this abdominal distention appeared to compromise his breathing.

The nurses' notes of February 17, 2001, document that Mr. Guigliano was continuing to exhibit respiratory problems and was clearly not stable from the perspective of either oxygenation or cardiac rate. At 3:30 a.m., the nurse wrote that the patient's "bowel sounds [are] very slow" and that the "abdomen is huge, distended and firm". At 3:45 a.m., the nurse notes that the patient's lungs had "crackles" and wheezing on both inspiration and expiration. At 6:45 a.m., the patient was noted to be significantly hypoxemic with oxygen saturations of 89 – 91 percent on a flow rate of 1 liter per minute of oxygen and then 94 percent when oxygen was increased to a flow rate of 2 liters per minute. The head of the patient's bed was elevated by the nursing staff and he was encouraged to take deep breaths. The patient also was said to be "very uncomfortable with distended abdomen". These notes are a further indication that the patient's respiratory status was unstable and that the abdominal distension was contributing to the patient's respiratory difficulties.

At 8:00 a.m., the nurses' daily assessment chart indicates that the patient's respirations were "shallow" and the respiratory rate was elevated at 24 per minute. These findings were observed even though the chart indicates that Mr. Guigliano was receiving oxygen at 2 liters per minute. The oxygen saturation at the time was 95 percent, despite the 2 l/min O2, which is mildly low. The patient was also still tachycardic at that time with a heart rate of 108.

A nurses' note at 11:00 a.m. states that Mr. Guigliano was "still uncomfortable" with an abdomen that was firm and distended. Bowel sounds were hypoactive. The patient's respiratory status was noted to be respirations at 20 – 24 per minute and 96 percent oxygen saturation at 2 l/min of O2. Most important, the nurse noted that the patient complained of shortness of breath ("feels SOB") with changes in his position.

There were also what appear to be decreased breath sounds at the lung bases. The patient was still tachycardic with a telemetry reading of 100 – 110 per minute. Thus, the records show that Mr. Guigliano had abnormal respirations, had complaints of shortness of breath, had an abnormally elevated cardiac rate, required oxygen to maintain saturations in the mid-90's, and required monitoring by pulse oximetry and telemetry. The patient was not stable at the time of his transfer to the radiology department.

There is no nurses' note in the progress record documenting the patient's condition or documenting that monitoring devices (e.g.: pulse oximeter, cardiac monitor) and portable oxygen were in use at the time that he was being transferred from his room for the CT scan of the abdomen on February 17.

Based on the medical records, it appears that the patient was transferred from his hospital room to the radiology department for the abdominal CT scan on February 17, 2001 without the supervision of a CPR trained nurse or multispecialist, without a portable cardiac monitor and without pulse oximetry monitoring. It also appears from the medical records and other materials that the patient was either transferred without portable oxygen or that the oxygen was removed from the patient at some point in time. There is no record anywhere which documents that the patient had any monitoring devices or portable oxygen in use during the transfer to the radiology department.

Mr. Guigliano was a patient who required close 1:1 monitoring by qualified members of the nursing staff when he was transferred for his CT scan on February 17. The "model" for proper nursing supervision can be seen in the notes concerning the patient's transfer for diagnostic testing on February 10, 2001. On that date, he was taken for a VQ scan and was constantly accompanied by a registered nurse referred to as a "multispecialist". A note in the progress record by the multispecialist R.N. demonstrates that the patient was being monitored via pulse oximetry and a portable cardiac monitor throughout the transfer and testing. Moreover, it is documented that oxygen via nasal cannula was being administered to the patient at the time. When the head of the bed was lowered for the test, the patient's oxygen saturation deteriorated to 88 percent (i.e.: laying the patient flat compromised his breathing and made him seriously hypoxemic). In response to this development, the nurse increased the patient's oxygen flow rate from 4 l/min to 6 l/min and the O2 saturation improved. The patient was returned to his room after the completion of this test without "incident". In essence, this note shows that proper supervision by a qualified nurse, proper monitoring and timely intervention in the form of simply increasing the oxygen flow rate prevented a respiratory arrest or cardiopulmonary arrest on this occasion. Additionally, it should be noted that there was no practical difference in the patient's respiratory and cardiac status between February 10 and February 17.

The note of a Vanessa Saipher provides some information on the events leading to the cardiopulmonary arrest suffered by Michael Guigliano in the CT scan room on February 17. Upon Mr. Guigliano's arrival in the radiology department, he was laid flat on the CT scan table which probably contributed to the respiratory arrest that followed. It is documented that when the patient was placed on the table, he immediately "began gasping for breath" and became "cyanotic". The patient was observed to be in "obvious

distress". The note further documents that he was administered oxygen which indicates either that the patient was transferred without oxygen or that the O2 was removed at some point in time. Also pulse oximetry was "hooked" to the patient (which also indicates that pulse oximetry was not in use prior to this) and, according to Ms. Saipher, the O2 saturation was 79 – 80 percent which is severely hypoxemic. The Department of Public Health investigation file notes that Joe Roth, the other technician present in the CT scan room, reported an O2 saturation in the "60's". For unknown reasons, Ms. Saipher decided to return the patient to his room in this condition. She had him moved to a stretcher and had him wheeled out of the room. The D.O.P.H. file also documents that Ms. Saipher inexplicably stopped to call the patient's floor. At this point in time, the patient began to have seizures so a physician named Dr. Berger was summoned. It was only after Dr. Berger arrived on the scene that a decision was made to call a "code" and the code button was pushed. Dr. Berger apparently began to Ambu-bag the patient in an attempt to ventilate him; however, there is no mention of evaluating whether the patient is in cardiac arrest and nothing is documented about the commencement of chest compressions. Finally, it should be noted that the code was mistakenly called to the wrong location and Ms. Saipher indicates that the code team was "confused by this".

Based on the material reviewed, the medical records and other materials document an inexcusable delay in the calling of the "code" and the commencement of proper cardiopulmonary resuscitation measures. Despite the patient "gasping for breath", becoming "cyanotic" and being in "obvious distress", no one in the CT scan room with the patient called a "code". More time is wasted by Ms. Saipher arguing with the patient, making a phone call and attempting to return him to his room. Then still more time is wasted by summoning a Dr. Berger to come see the patient. One progress note, dated February 18, 2001, states that "[a]ccording to the residents, possibly 10 minutes may have passed before effective CPR was <u>initiated</u>." Another note in the chart, dated February 25, 2001, states that "[i]t is estimated that approximately 10 minutes may have passed before effective CPR was established." The "code" should have been called immediately after the patient began gasping for breath and became cyanotic.

The D.O.P.H. investigative file contains notes of an interview with Dr. Berger which appears to indicate a period of "3 – 4 min" before "anesthesia" arrived in the CT scan room and intubated the patient. Anesthesia was present in the CT scan room before the code team. A code flowsheet in the medical records indicates that the "code" was called at 1:02 p.m. on February 17, 2001, when the patient was found to have sustained a respiratory arrest in the CT scan room. Charting of vital signs and resuscitation measures does not begin until 1:05 p.m., three minutes after the code was called. Even if one assumes that the information about the time between the call of the code and the intubation of the patient that is recorded in the D.O.P.H. investigative file and in the code flowsheet is accurate, then there was still an improper delay between the patient becoming cyanotic and the start of adequate cardiopulmonary resuscitation.

The initial resuscitation measures for Mr. Guigliano were also inadequate once the "code" was called. According to the interviews of a Pat DiLaird, R.T., and a Tim Hendries, C.R.N.A., in the D.O.P.H. investigative file, no one started chest compressions until after the patient was intubated. Thus, a period of several minutes probably passed

during which no compressions were being done. Additionally, the D.O.P.H. investigative file indicates that, prior to the intubation, ventilation of the patient was attempted with an Ambu-bag device. This method of ventilation would be ineffective for an unconscious patient such as Mr. Guigliano. An oral airway was required to ventilate the patient prior to an intubation so that air entry into the lungs could be ensured. There is no mention of the use of an oral airway prior to intubation or of an oral airway being present among the emergency equipment on a crash cart in the radiology department.

The cardiopulmonary resuscitation measures rendered to the patient after intubation as documented in the code flowsheet were also inadequate. This patient was in PEA / EMD for an extended period of time (20 – 25 minutes); therefore, an attempt should have been made to restore cardiac function through use of the defibrillator / cardioverter.

According to the medical records, Mr. Guigliano sustained severe anoxic encephalopathy as a result of the cardiopulmonary arrest.

The lack of any contemporaneous documentation about events leading up to the patient's cardiopulmonary arrest and the circumstances surrounding the code in the medical records raises many questions about what actually happened to this patient and is a serious departure from nursing standards of practice.

It is my opinion, with a reasonable degree of professional certainty, that the following departures from proper nursing practice and hospital practice were committed by the nursing staff and hospital staff in the care and treatment of Michael Guigliano on February 17, 2001:

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan under the 1:1 supervision of a CPR trained nurse or multispecialist.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with a portable cardiac monitor.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with pulse oximetry monitoring.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with portable oxygen or there was a failure to maintain the patient on supplemental oxygen.

There was a failure to timely call a "code" for this patient, the "code" should have been called when the patient began "gasping for breath", became "cyanotic" and was in "obvious distress" and the failure to do so wasted several minutes of precious time during which the patient needed proper ventilation and chest compressions.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since chest compressions were not started on this patient for an unduly long period of time.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since the patient was not being ventilated with an oral airway to ensure air entry into the lungs prior to intubation for an unduly long period of time.

There was a failure to timely respond to the "code" call for this patient, there was a delay in excess of 3 – 4 minutes between the patient becoming cyanotic (a sign of severe hypoxemia) and the commencement of adequate CPR measures in the form of intubation and chest compressions.

There was a failure to have an oral airway available as part of the emergency equipment on a crash cart in the radiology department to assist in the ventilation of an unconscious patient during a "code".

There was a failure to perform adequate CPR measures during the "code" because the defibrillator / cardioverter was not used in an attempt to restore cardiac function since the patient was in PEA / EMD for an extended period of time (20 – 25 minutes).

The responsibility of ensuring that the patient was transferred for his CT scan with proper nursing supervision and proper monitoring devices was the duty of the nursing staff assigned to Mr. Guigliano.

It is my opinion, with a reasonable degree of professional certainty, that the failure to transfer the patient for his CT scan without proper nursing supervision, without proper monitoring devices and without maintaining his supplemental oxygen were departures from proper nursing practice and hospital practice which caused or contributed to the patient's cardiopulmonary arrest.

The hospital nursing department has the responsibility to train the nursing staff and hospital personnel who provide patient care to respond properly to patient's in respiratory distress, respiratory arrest and cardiopulmonary arrest. The nurses and hospital personnel are responsible for calling a "code" whenever a patient is observed to be in distress such as respiratory difficulty, respiratory arrest or cardiopulmonary arrest.

It is my opinion, with a reasonable degree of professional certainty, that the failures to timely call a "code" for this patient, to timely commence adequate cardiopulmonary resuscitation measures, to timely respond to the "code" call for this patient and to perform adequate CPR measures during the "code" were departures from proper nursing practice and hospital practice which caused or contributed to the anoxic encephalopathy suffered by this patient as a result of the cardiopulmonary arrest.

I understand that there have been depositions taken of the various nursing and hospital personnel involved in the care of Michael Guigliano. I am available to review this deposition testimony once it becomes available. I look forward to speaking with you about this case.

Very truly yours,

Nancy Mure', R.N., B.S., M.A.

## DECLARATION OF SERVICE
## PURSUANT TO 28 U.S.C. § 1746

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York.

I served a true copy of the annexed: PLAINTIFFS' THIRD *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES, and attachments, dated November 16, 2004, on the date of November _17_, 2004:, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

TO:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

Executed on November _17_, 2004, Larchmont, New York.

JOSEPH LANNI      (CT 23566)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
══════════════════════════════════════X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to be
Incompetent, and LAURA GUIGLIANO, Individually,

                     Plaintiff(s)                         *3:02 CV 718*
                                                          *(RNC)(DFM)*

         -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
F. SCOTT GRAY, M.D., GEORGIANA KNOWLES,
P.A., DEANNA WOLFFE, P.A., DAVID OELBERG,
M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D.,
ARTHUR KOTCH, M.D., JULIA CIRCIUMARA,
M.D., ANDRE KUZNETS, M.D., MICHAELA
FEDERICA, M.D., MAUREEN BENNETT, R.N.,
JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N.,
"JANE DOE NO.1", "JANE DOE NO.2" (*defendants
"JANE DOE NO.1" and "JANE DOE NO. 2", full
identities unknown, being identified as DANBURY
HOSPITAL employees who were assigned to
monitor, supervise and attend to patient MICHAEL
GUIGLIANO prior to and during a CT Scan procedure
on 2/17/01) and "JANE DOE NO. 3", (full identity
unknown, being identified as a DANBURY HOSPITAL
employee who called a "Code 99" on 2/17/01*),

                     Defendants.
══════════════════════════════════════X

# PLAINTIFFS' THIRD *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES

THE LAW FIRM OF JOSEPH LANNI, P.C.
*Attorney for Plaintiff[s]*
LAURA GUIGLIANO
138 CHATSWORTH AVENUE, SUITES 6 – 8
LARCHMONT, NEW YORK 10538
Tel.: (914) 834-6600
Fax:  (914) 834-0152

5

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
═══════════════════════════════════════X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, ET AL.,

                               Plaintiff(s)

          -against-                    **PLAINTIFFS' FOURTH**
                                      *Fed. R. Civ. P. 26 (a)(2)*
DANBURY HOSPITAL, JAMES DEPUY, M.D.,      *(A-B)* **EXPERT**
ET AL.,                                  **DISCLOSURES**

               Defendants.           *3:02 CV 718*
═══════════════════════════════════X      *(RNC)(DFM)*

      Plaintiff LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL

GUIGLIANO, and LAURA GUIGLIANO, Individually, by her attorneys, THE LAW

FIRM OF JOSEPH LANNI, P.C., sets forth the following expert disclosure, pursuant to

*Fed. R. Civ. P. 26(a)(2)(A-B)*:

      **EXPERT NO. 4:**

      Identity:

      Gerard A. Catanese, M.D.
      64 Muttontown Road East
      Syosset, New York 11791

      Education:

      1983 – B.S., St. John's University;
      1987 – M.D., State University Health Science Center at Brooklyn.

Postdoctoral Training:

July 1987 – June 1988, Anatomic Pathology Residency, State University Health Science Center at Brooklyn;
July 1989 – June 1990, Pediatric Internship, Winthrop University Hospital;
July 1990 – June 1992, Clinical Pathology Residency, State University Health Science Center at Brooklyn;
July 1992 – June 1993, Forensic Pathology Fellowship, Office of the Chief Medical Examiner, City of New York.

Medical Licensure:  New York # 175689, New Jersey # 62283, Pennsylvania
# MD-0696-L

Board-Certifications:

1992 – Anatomic & Clinical Pathology;
1994 – Forensic Pathology.

Professional Experience:

July 1993 – September 1993, Medical Examiner, Office of the Chief Medical Examiner, City of New York;
October 1993 – present, Deputy Medical Examiner, Nassau County (New York) Medical Examiner's Office;
August 1994 – April 2002, Associate Medical Examiner, Suffolk County (New York) Medical Examiner's Office;

Publications:

See, attached Exhibit "A".

Opinions:

See, attached Exhibit "B", Report of Gerard A. Catanese, M.D., dated November 2, 2004.

Compensation:

$2,800 to date.

Trial & Deposition Testimony (2000 – 2004):

To be provided under separate cover.

Dated: Larchmont, New York
      November 16, 2004

Yours, etc.:

By:

**JOSEPH LANNI**   (CT 23566)
The Law Firm Of
JOSEPH LANNI, P.C.
Attorneys for Plaintiffs
138 Chatsworth Avenue, Ste. 6 – 8
Larchmont, New York 10538
Tel: (914) 834-6600

TO:

MICHAEL NEUBERT (CT 06444)
NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

RICHARD A. O'CONNOR (CT 18976)
SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

GARIE J. MULCAHEY (CT 05242)
BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

KEVIN A. TEPAS (CT 05552)
RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

EXHIBIT  A

## PUBLICATIONS

*"Recovery of a Mummified Pregnant Woman from a 55-Gallon Drum More Than 30 Years After Her Death", Catanese, G. & Bloom, T., Am. J. For. Med. & Path., 23(3): 245 – 247, 2002.*

EXHIBIT  B

Gerard A. Catanese, M.D.
64 Muttontown Rd.
Syosset, New York 11791
(516) 572-5177


November 2, 2004


Joseph Lanni, Esq.
The Law Firm of Joseph Lanni, P.C.
138 Chatsworth Avenue, Ste. 6 – 8
Larchmont, New York 10538


RE:    GUIGLIANO v. DANBURY HOSP., ET AL.


Dear Mr. Lanni:

At your request, I have reviewed various materials with regard to the above referenced case.  Those materials consisted of the following:

1. Danbury Hospital record (Admission: February 7, 2001 – April 17, 2001);

2. Northeast Center for Special Care records (Admission: April 17, 2001 – July 14, 2003);

3. Records of Kingston Hospital.

The subject of my review in this case was to provide you with my opinions on: (1) whether the plaintiff's decedent. Michael Guigliano. experienced any degree of conscious pain and suffering as a result of his injuries prior to his death; and (2) the cause of Mr. Guigliano's death on July 14. 2003.  During my years of experience in the field of forensic pathology. I have been called upon on numerous occasions to render opinions about the cause of death. the manner of death and the decedent's medical condition prior to death.

My review of the medical records indicates that 51 year old Michael Guigliano fell from a roof and sustained fractures of the left leg and ankle on February 7, 2001. He was taken to Danbury Hospital and admitted for surgical repair of his injuries. There was no significant past medical history.

During this hospital admission, Mr. Guigliano had a full cardiopulmonary arrest on February 17, 2001. The exact etiology of this cardiopulmonary arrest is unclear; however, the medical records indicate that the most likely cause was either a pulmonary embolus or abdominal distention (both complications of his injuries). Subsequent to this event, Mr. Guigliano was found to have developed cerebral anoxia.

A neurology consultation by a Dr. Culligan, dated February 18, 2001, makes it clear that the patient sustained a severe degree of anoxic encephalopathy as a result of this cardiopulmonary arrest. The patient was found completely unresponsive to stimuli. Dr. Culligan was of the opinion that the patient's prognosis was grave.

A second neurology consultation was provided by a Dr. Ylagan on February 21, 2001. Dr. Ylagan's findings were similar to those of Dr. Culligan except that he found that the patient could breathe spontaneously when taken off the ventilator. Dr. Ylagan concurred with Dr. Culligan about the patient's prognosis being dismal.

Neurology continued to follow Mr. Guigliano during the remainder of his stay at Danbury Hospital. During this period of time (approximately two months), Mr. Guigliano's neurological status began to demonstrate intermittent changes.

A neurology note, dated March 10, 2001, states that "[p]atient grimaces face & opens eyes to noxious stimulation". Another neurology note, dated March 12, 2001, states "[p]atient grimaces face to noxious stimulation; no eye opening observed today". An "IPN" note, dated March 14, 2001, makes reference to the patient being "comatose, questionable intermittent response to pain".

Nursing notes contain the following references to the patient's condition: "opens eyes to verbal & tactile stimuli frequently" (April 5, 2001); "unresponsive – eyes open at times but do not track – all extremities flaccid – clonic jerking movements noted when disturbed of upper extremities & head" (April 6, 2001); and "[patient] remains unresponsive but opening eyes during care" (April 8, 2001).

An April 10, 2001, nursing note states:

"P[atient] unresponsive, opens eyes. 6 pm. Wife states Mike moved his [left] arm from pillow to stomach. 45 minutes later wife states he moved his left arm again from pillow to side of body. P[atient] had grimace on face. 8:45 pm during pm care p[atien]t picked hand up and moved it, witnessed by nurse, nursing student, and PCT. P[atien]t still unresponsive, when name called out loudly, twice p[atien]t had startle effect".

Occupational and physical therapy notes also make reference to the patient's capacity to respond to environmental stimuli during the last few weeks of his admission to Danbury Hospital. One O.T. note, dated April 12, 2001, states "[patient] opens eyes to verbal & sensory stim." A physical therapy note of the same date states that "[patient] opened mouth for suctioning, ? coincidence vs purposeful". Yet another O.T. note states "[patient] easily aroused to verbal / tactile stim. B/L eye opening, (+) eye blinks . . . . A/P. P[atien]t with eyes open throughout, (+) eye blinking."

Mr. Guigliano was transferred to the Northeast Center for Special Care on April 17, 2001. During his admission to the Northeast Center for Special Care over the next two years, Mr. Guigliano was noted by multiple medical personnel and family members to display different levels of responsiveness to various stimuli and to show indications of pain and emotion.

On April 21, 2001, slight facial movement with tactile stimuli was noted by the nursing staff. On May 5, 2001, the patient's eyes were noted to be open and blinking by the nursing staff. This continued to be noted in the records on numerous occasions over the next few months.

An occupational therapy evaluation, dated April 23, 2001, indicates that the patient had "inconsistent fixation" and "inconsistence [*sic*] response to commands". A June 25, 2001, occupational therapy note refers to the patient being unable to consistently participate with such activities as command following, tracking, etc. An occupational therapy evaluation, also dated June 25, 2001, makes reference to the patient showing signs of distress 50 percent of the time when placed in a sitting position. An occupational therapy evaluation, dated July 9, 2001, makes reference to "inconsistent fixation & tracking" as well as "responds to verbal stimuli inconsistently".

In a coma and sensory stimulation assessment, dated June 11, 2001, it was noted that the "[patient] opened eyes consistently to ROM / deep pressure (generalized)". A consultation report dated June 13, 2001 refers to the patient being "awake" but not fixating or following with his eyes.

A physical therapy reassessment, dated June 25, 2001, states that the "Nbr appears to respond inconsistently". A follow up consultation, dated June 27, 2001, notes that the patient had "no response to noxious stimuli except for mild extension on UE's". The report also refers to the "oculocephalic reflex" being present. A physical therapy reassessment, dated July 6, 2001, states that the "Nbr is maintaining eyes open for longer periods of time [with decreased] stim needed; however, is still inconsistent".

A meeting summary for October 16, 2001, refers to signs of the patient showing some responsiveness to surroundings. While the note states that the patient is in a persistent vegetative state, it also contains the following:

"Family sees open eyes, family - looked at pumpkin on command could be tracking to colors, scents, moving more than before by to pain, will move body on

command. moves tongue when daughter sticks out tongue. licks lips for grape juice."

In a nurses' note, dated November 5. 2001, it is stated "remains nonresponsive – sometimes opens eyes to verbal stimuli".

On November 13, 2001, the nurses' notes state "Nbr ["neighbor"] alert & responsive to stimuli". A December 23, 2001 note refers to minimal twitching during suctioning of secretion.

An interdisciplinary team meeting summary, dated February 18, 2002, makes reference to the patient as having inconsistent responses and that the patient tried to squeeze hands but was not consistent in doing this.

On an assessment form, dated July 18, 2002, the "neuro" section makes reference to the patient being alert "c/ stim touch & sound eyes close". On an assessment form, dated July 26, 2002, the "neuro" section makes reference to the patient having his eyes open and that he closes them with slapping hands. On an assessment form, dated August 15, 2002, the "neuro" section makes reference to the patient being "alert c/ eyes open – closes c/ noise & clap of hands". On an assessment form, dated September 10, 2002, the "neuro" section makes reference to the patient being "alert – comatose – eyes open to stimuli".

On January 8, 2003, the nurses' notes make reference to the patient having been found "crying" while seated in his wheelchair. Another nurses' note, dated January 15, 2003, refers to the patient being given Percocet every 6 hours as needed due to signs and symptoms of pain.

A January 14. 2003, social work progress note states that "[neighbor] is showing emotions expression to cry, [ illegible ] that [neighbor] is trying to respond past week or 2". A March 28, 2003, social work progress note refers to the patient being in a coma stimulation program and further states that the patient "has not had [a] consistent response to stimulation. Responses are at random & occur more when family is present".

A progress note. dated January 15. 2003. states that the nursing staff was concerned with the patient's pain status as he "cries" and "has grimacing intermittently". The assessment in this progress note states that the patient had "intermittent pain" possibly secondary to deep vein thrombosis.

In a nurses' note. dated April 17. 2003. it was recorded that the patient received Percocet since he appeared to be in pain due to facial grimacing.

A therapeutic activity progress note. dated April 30. 2003. makes reference to the patient being "not consistent with responses to external stimuli & active notice of activity & people in the environment"

Nurses' notes on June 13, 2003, and June 19, 2003, refer to the patient receiving Percocet for pain after being observed to exhibit facial grimacing. A July 1, 2003, nursing note states that the patient was given Percocet after exhibiting "facial grimacing" and that the medication had a positive effect.

Throughout Mr. Guigliano's admission to the Northeast Center for Special Care, he was administered the anticoagulant Lovenox. Anticoagulation therapy was given to this patient due to his immobility from the cerebral anoxia suffered at Danbury Hospital and his history of deep venous thrombosis.

On July 14, 2003, Mr. Guigliano was taken to Kingston Hospital after being found "unresponsive" in his bed at NCSC. At Kingston Hospital, he was found to be markedly hypotensive (blood pressure of 73/38), tachycardic (pulse 123 per minute), and with an ashen pallor. The blood count was extremely low with the hematocrit at 23.0. A massive bleed of the rectus muscle sheath (right abdominal wall) was diagnosed by CT scan. This condition had apparently gone unnoticed by the NCSC staff. Coagulation studies were performed and indicated that the patient had an increased bleeding tendency secondary to the Lovenox therapy. Despite adequate hydration, Mr. Guigliano's condition continued to deteriorate and he continued to be hypotensive. The patient was taken to the O.R. for an emergency evacuation of the hematoma; however, he died from this massive blood loss before surgery could be performed.

An examination of the patient on admission to Kingston Hospital found that the abdomen was "distended" with "fullness felt over [the] lower quadrants", bilateral rhonchi in the lungs, and edema in the lower extremities. The diagnostic impression was abdominal wall hematoma with hemorrhagic shock.

The history and physical by the attending surgeon notes that an abdominal CT scan demonstrated "an extremely large hematoma" of the rectus sheath. The surgeon wrote that the bleeding was causing "hypotension and anemia".

A report of the abdominal CT scan notes that there was a "large hematoma of the anterior abdominal wall involving the rectus sheath on the right" extending from "the anterior subcostal region to the anterior lower pelvis" and measuring "up to 13 cm in AP dimension".

Finally, an EKG done prior to the patient being taken to the O.R. on July 14, 2003, revealed tachycardia but was "otherwise normal".

It is my opinion with a reasonable degree of medical certainty that Mr. Guigliano's death on July 14, 2003, was due to his abdominal hemorrhage and not any other cause such as a myocardial infarction. Hemorrhage is a well known complication of anticoagulation therapy. Michael Guigliano had no other probable etiology for the abdominal hemorrhage aside from the anticoagulation therapy. Moreover, the coagulation studies at Kingston Hospital demonstrate that Mr. Guigliano had an increased bleeding tendency due to the Lovenox. Thus, it is also my opinion with a reasonable

degree of medical certainty that the anticoagulation therapy is responsible for the massive fatal bleeding suffered by this patient.

It is also my opinion with a reasonable degree of medical certainty that Mr. Guigliano's death on July 14, 2003, was a consequence of complications from the cerebral anoxia (i.e.: brain damage) sustained at Danbury Hospital in February 2001. Mr. Guigliano was on the Lovenox therapy due to his lack of mobility from the brain damage and history of deep venous thrombosis. This anticoagulation therapy caused the abdominal hemorrhage directly responsible for the patient's death. Thus, it is clear that Mr. Guigliano's brain damage is causally connected to his death. In addition, Mr. Guigliano was unable to communicate as a result of his brain damage; therefore, he could not bring to the NCSC nursing staff's attention any pain, discomfort or other changes in his condition due to the abdominal wall bleeding. Thus, the patient's fatal bleeding might have been earlier diagnosed and treated (thereby saving his life) had he been able to notify his nurses of the signs and symptoms of the massive abdominal bleeding. This uncommunicative state is also causally connected with his death.

It is my opinion with a reasonable degree of medical certainty that Mr. Guigliano experienced, at least to some extent, conscious pain and suffering during the two and one half year period that he survived after suffering brain damage as a result of the cardiopulmonary arrest of February 17, 2001. This is made obvious by the various entries contained in the Danbury Hospital and Northeast Center for Special Care medical records. There are numerous occasions documented in these records where the patient was responsive to noxious, tactile and verbal stimuli and also experienced pain and discomfort in relation to his condition and the medical treatment necessitated by that condition.

The above opinions may be subject to revision based on any additional material provided to me such as depositions. I am available to review any additional material related to this case should you feel that it is warranted.

Sincerely,

Gerard A. Catanese, M.D.

## DECLARATION OF SERVICE
## PURSUANT TO 28 U.S.C. § 1746

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York.

I served a true copy of the annexed: PLAINTIFFS' FOURTH *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES, and attachments, dated November 16, 2004, on the date of November _17_ , 2004:, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

<u>TO</u>:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

Executed on November _17_ , 2004, Larchmont, New York.

JOSEPH LANNI     (CT 23566)

4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

═══════════════════════════════════X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to be
Incompetent, and LAURA GUIGLIANO, Individually,

                    Plaintiff(s)                *3:02 CV 718*
                                                        *(RNC)(DFM)*

           -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
F. SCOTT GRAY, M.D., GEORGIANA KNOWLES,
P.A., DEANNA WOLFFE, P.A., DAVID OELBERG,
M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D.,
ARTHUR KOTCH, M.D., JULIA CIRCIUMARA,
M.D., ANDRE KUZNETS, M.D., MICHAELA
FEDERICA, M.D., MAUREEN BENNETT, R.N.,
JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N.,
"JANE DOE NO.1", "JANE DOE NO.2" (*defendants*
*"JANE DOE NO 1" and "JANE DOE NO. 2", full*
*identities unknown, being identified as DANBURY*
*HOSPITAL employees who were assigned to*
*monitor, supervise and attend to patient MICHAEL*
*GUIGLIANO prior to and during a CT Scan procedure*
*on 2/17/01)* and "JANE DOE NO. 3", (*full identity*
*unknown, being identified as a DANBURY HOSPITAL*
*employee who called a "Code 99" on 2/17/01*),

                    Defendants.

═══════════════════════════════════X

# PLAINTIFFS' FOURTH *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES

THE LAW FIRM OF JOSEPH LANNI, P.C.
*Attorney for Plaintiff[s]*
LAURA GUIGLIANO
138 CHATSWORTH AVENUE, SUITES 6 – 8
LARCHMONT, NEW YORK 10538
Tel.: (914) 834-6600
Fax: (914) 834-0152