UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
==================================X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, ET AL.,

                                 Plaintiff(s)

              -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
ET AL.,

                       Defendants.
==================================X

**PLAINTIFFS' FIFTH**
*Fed. R. Civ. P. 26 (a)(2)*
**(A-B) EXPERT**
**DISCLOSURES**

*3:02 CV 718
(RNC)(DFM)*

      Plaintiff LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL

GUIGLIANO, and LAURA GUIGLIANO, Individually, by her attorneys, THE LAW

FIRM OF JOSEPH LANNI, P.C., sets forth the following expert disclosure, pursuant to

*Fed. R. Civ. P. 26(a)(2)(A-B)*:

 

**EXPERT NO. 5:**

Identity:

Harriet Zellner, Ph.D.
14 East Fourth Street
New York, New York 10012

Education:

1964 – General Course Certificate, London School of Economics &
Political Science;
1965 – B.A., Harpur College, State University of New York at
Binghamton;
1975 – Ph.D. (Economics), Columbia University.

<u>Academic Honors & Fellowships</u>:

State of New York, Regents' Scholarship;
State of New York, Regents' Fellowship;
Woodrow Wilson Fellowship;
Herbert H. Lehman Fellowship for Graduate Work in the Social Sciences;
U.S. Dept. of Labor Manpower Administration Doctoral Dissertation
Grant (Dissertation: "*The Determinants of the Occupational Distribution
of Women*");
Rutgers University Research Fellowship for Assistant Professors.

<u>Professional Experience</u>:

June 1968 – October 1968, Consultant, RAND Corporation;
July 1973 – July 1976, Assistant Professor, Dept. of Economics, Douglass
College, Rutgers University;
April 1976 – June 1976, Consultant, Organization for Economic
Cooperation & Development;
Sept. 1976 – April 1979, Senior Economic Analyst, National Economic
Research Assoc.;
April 1979 – July 1982, Research Associate, Center for the Social
Sciences, Columbia University;
June 1979 – present, President, Integral Research, Inc.

<u>Academic Courses</u>:

Undergraduate:
        Microeconomics, Labor Economics, Statistics, The Economics of
        Discrimination, and Income Inequality.

Graduate:
        The Economics of Human Resources;
        The Economics of the Labor Market.

<u>Publications</u>:

See, attached Exhibit "A".

<u>Opinions</u>:

See, attached Exhibit "B", Report of Harriet Zellner, Ph.D., dated
November 8, 2004.

<u>Compensation</u>:

$3,000 to date.

<u>Trial & Deposition Testimony (2000 – 2004)</u>:

See attached, Exhibit "C".

Dated: Larchmont, New York
      November 16, 2004

Yours, etc.:

By: _____
    **JOSEPH LANNI   (CT 23566)**
    The Law Firm Of
    JOSEPH LANNI, P.C.
    Attorneys for Plaintiffs
    138 Chatsworth Avenue, Ste. 6 – 8
    Larchmont, New York 10538
    Tel: (914) 834-6600

TO:

MICHAEL NEUBERT (CT 06444)
NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

RICHARD A. O'CONNOR (CT 18976)
SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

GARIE J. MULCAHEY (CT 05242)
BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

KEVIN A. TEPAS (CT 05552)
RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

EXHIBIT  A

Publications

"How the High Court Has Dealt with Statistical Testing", *Employment Law Strategist*, May 2001

"Statistical Testing for Employment Discrimination", *Employment Law Strategist*, April 2001

"Solving for X-Employees", *Corporate Counsel Magazine*, April 2000

"Discriminating Risk", Best's Review: Property/Casualty Edition, October 1999

"Preventing Litigation by Pretesting Proposed Reductions in Force", *Law Firm Partnership and Benefits Report, January 1999*

"Reducing the Risk when Reducing the Force", *Business Law Today*, November/December, 1998

"When is Reduction in Force Too Small to Analyze Statistically?", *Employment Law Strategist*, September, 1998

"By the Numbers: Statistics and Employment Litigation", *Risk Management*, September 1998

"Age Discrimination: Revisiting the Issue of Statistical Evidence", *New York Law Journal*, April 10, 1997

"Not Just a Numbers Game", *Business Law Today*, March/April 1994

"RIF Checklist for In-House Counsel", *New Jersey Law Journal*, November 15, 1993

"When Is It Really Age Discrimination?", *New York Law Journal*, November 4, 1993

"Using Economic Techniques in Degree Valuation", *New York Law Journal*, December 11, 1990

"Discrimination and Affirmative Action: The Nature of Economic Evidence", *Readings in Labor Economics and Labor Relations*, 3rd Edition, edited by Lloyd Reynolds, Stanley Masters and Collette Moser (New York: Prentice Hall, Inc., 1982), (with Dr. Beth Niemi)

"Costs and Benefits of Systems Reliability", *Electric Utilities in Illinois: Proceedings of the Sixth Annual Energy Conference*, September, 1978 (with L. Guth)

"The Determinants of Female Occupational Segregation", *Sex, Discrimination and the Division of Labor*, edited by Dr. C.B. Lloyd, New York: Columbia University Press, 1975

"Discrimination Against Women, Occupational Segregation and the Relative Wage", *American Economic Review: Papers and Proceedings*, May, 1972

"Intra-Family Human Capital Transfer", *Atlantic Economic Journal*, Vol. VIII, No. 1 (March 1980): 71 (with Dr. Beth Niemi)

"The Economics of Alimony," Columbia University Center for the Social Sciences, Pre-Print Series, #68, November, 1980 (with Dr. Beth Niemi)

.

# EXHIBIT  B

An Estimate of the Economic Loss Sustained by Michael Guigliano's
Family on Account of His Accident and Subsequent Death

*Prepared by:*
*Harriet Zellner, Ph.D.*

November 8, 2004

Integral
Research
Inc.

**An Estimate of the Economic Loss Sustained by Michael Guigliano's
Family on Account of His Accident and Subsequent Death**

## I. Introduction

I have been requested by The Law Firm of Joseph Lanni, P.C., counsel to Mrs. Laura Guigliano, to estimate the net economic loss sustained by Mr. Guigliano's family on account of his accident on February 7, 2001 and subsequent death on July 14, 2003.

I am fully qualified to prepare such an estimate. I received my Master's Degree and Doctorate in Economics from Columbia University in the Spring of 1975. I have taught Economics at both the undergraduate and graduate levels at Rutgers University. I have published in the field and have served as referee for several of the most respected economic journals. I have served as expert economist and statistician in connection with a wide range of cases over the last two decades. I am currently President of Integral Research Inc., a consulting firm providing analytical expertise to private firms and government agencies. My curriculum vitae is attached (as Appendix A to this report) along with a list of the cases in which I have testified at deposition or trial over the past five years.

## II. Methodology

### A. Projecting the "But-For" Earnings Stream

In order to calculate the earnings loss sustained by Mr. Guigliano's wife and children on account of his accident and subsequent death, we must first estimate what his earnings would have been had he continued in his position as Director of School Facilities and Operations with the Brewster Central School District for the duration of his work life expectancy. We refer to these lost earnings as "but-for" earnings.

Labor economists have been studying the way in which earnings vary over the work life since the early sixties. Their work shows that real earnings increase most rapidly in the early years of the work life. While earnings continue to increase thereafter, the rate of growth falls as individuals move into the middle years of their work life. Finally, earnings "flatten out" and may ultimately decrease towards the end of the work life. Labor economists term this relationship an "age-earnings profile" and our general procedure is to estimate such a profile in projecting the deceased's "but-for" earnings stream. However, when an individual's earnings are governed by a collective bargaining agreement, it is more appropriate to base the "but-for" earnings projection on the specific terms of that agreement.

Mr. Guigliano's salary increases were governed by Agreements between the Brewster

Central School District Board of Education and the Administrators Association of Brewster. We therefore base our estimate of his "but-for" earnings stream through 2005 on the rates given in the most recently-negotiated contract. To project his "but-for" earnings in the later years of his work life, we combine information on the wage increases negotiated in earlier union contracts with the increases provided for in the current contract so as to obtain a long-run average to use in our projection.[1]

## B. Accounting for Work Life Expectancy

To estimate Mr. Guigliano's "but-for" earnings stream accurately, we must specify the number of years he would – but for his death – have remained in employment. We rely generally on "work life expectancy" estimates to do so. Until recently, the work life expectancy estimates most commonly utilized were those which the U.S. Bureau of Labor Statistics ("BLS") had issued in 1980 and updated in 1986,[2] but since then new work life expectancies — obtained by applying the basic BLS estimation methodology to more recent data — have become available.[3]

These expectancies are given – for each age – by gender, educational level and current labor force status. Mr. Guigliano was 51.8 years of age at the time of his accident, was fully employed and had earned a high school diploma. According to the data, similarly-educated men of this age who were active in the labor force had a work life expectancy of 11 years. My loss estimates assume therefore that Mr. Guigliano would – but for his accident and subsequent death – have remained in his position at the Brewster Central School District until February 6, 2012.

## C. Valuing the Loss of Mr. Guigliano's Household Services

People engage in many productive activities at home, from preparing meals and washing clothes to mowing the lawn, painting the house, doing repairs and managing the household's finances. The economics of this "non-market production" – that is, of production at home for household consumption -- has become an important sub-field in economics, and we can utilize the theoretical and empirical work in the area to value the household services Mr. Guigliano would – had he lived through his life expectancy – have supplied to his family. Estimates of the value of such services – by employment status of the individual and by age, gender, type of household and presence of children younger than 18 in the home are available and I have utilized them in my

---

[1]  Since only the current Agreement was available to me, I used the earlier (1997 to 2001) rate of increase in Mr. Guigliano's own salary as a proxy for the rates increases specified in the earlier Agreement.

[2]  Shirley J. Smith, "*Worklife Estimates: the Effects of Race and Education*". Bulletin 2254 (February 1986), Washington D.C.: U.S. Department of Labor, Bureau of Labor Statistics.

[3]  See "*A Markov Process Model of Work-Life Expectancies Based on Labor Market Activity in 1997-98*", Journal of Legal Economics. Volume 9, Number 3. Winter 1999-00.

Integral
Research
Inc.

analysis.[4]

## D. Estimating the Personal Consumption Deduction

It is necessary to account for the fact that — had the deceased in fact survived through his life expectancy — he would have himself consumed some portion of the household income stream. To find the family's net income loss, we must estimate, and then deduct, his personal expenses from the "but-for" income stream.

Data from the U.S. Bureau of Labor Statistics' "Consumer Expenditure Survey" allow us to do so. Estimates of the percent of total household income separately consumed by each family member — by gender, by total family size and by total household income — are available and are utilized in my analysis.[5]

## E. Estimating the Loss in Retirement Benefits

Mr. Guigliano participated in a pension plan at Brewster Central School Distirct. Under this plan, the size of the annual retirement benefit depends upon years of service at retirement and upon "final average salary"[6] on that date. To estimate the net loss in retirement benefits Mr. Guigliano's family has sustained on account of his accident and death, we must estimate the "but-for" retirement; that is, the benefit for which he would have qualified had he remained with Brewster Central School Distirct through his work life expectancy. Since the "but-for" retirement benefit depends upon the employee's "final average salary", I defer more detailed discussion of the lost-retirement benefits calculation until we have discussed the "but-for" salary projections.

## F. Identifying Offsets to the Estimated Losses

Finally, we must identify any "offset" to this loss such as Workman's Compensation payments or disability retirement benefits. I am informed by counsel that, in this case, such receipts will be reimbursed out of any settlement or award made to the Guigliano family. I have not therefore reduced the lost-income estimate I present below by the value of these offsets.

---

[4] *The Dollar Value of a Day: 1996 Dollar Valuation*, Shawnee Mission, Kansas, 1998.

[5] "Patton-Nelson Personal Consumption Tables Updated", Lierman, Patton and Nelson, *Journal of Forensic Economics*, 11(1)1998, page 3 to 7.

[6] "Final Average Salary" is calculated in one of two ways. Either it is found as "your average salary for the three years immediately preceding your retirement" or, for people whose last three years of salary are not, in fact, their highest years of salary, as: "your three highest fiscal (July 1 to June 30) years of salary." (See description of PERS plan)

Integral
Research
Inc.

### G. Present Valuing the Estimated Loss Stream

Since the various losses incurred and offsets received extend over time (often over many years), and since the value of a dollar received at one point in time differs from its value when received at another point in time ($10,000 today is worth more in real terms than $10,000 receive a year from today), we must adjust our projections of but-for and offset receipts before they can be added and subtracted sensibly.

We do so by "present-valuing" all losses and offsets to the same point in time. Since the definition of a present value and the technique by which present values are obtained is not a matter of common knowledge, some brief non-technical discussion and illustrative calculations will prove useful.

The present value of, say, $5,000 to be received in one year is equal to the amount of money which, if invested today at the going interest rate would mount to $5,000 in a year. If the annual rate of interest is equal to ten percent, this amount of money is equal to $4,545. That is, at ten percent interest, $4,545 will mount to $5,000 by year's end and is, therefore, the present value of a $5,000 payment one year's hence. Similarly, the present value of a $5,000 payment to be receive in two year's time is equal (given an interest rate of ten percent) to $4,132; this amount of money, if invested today at ten percent rate of interest will mount to $5,000 two years from today.

The usual task we face in preparing a damage estimate is to find the present value of a *stream* of payments — say one extending ten or twenty years into the future — rather than of a single payment. Doing so requires, however, no new present-valuation techniques. All we must do to find the present value of say a ten-payment future stream is to sum the ten individually calculated present values.

## III. The Results of the Estimation

### A. Pre-Retirement Losses: Table 1

My estimate of the pre-retirement loss in income is shown in Table 1. In column (3), I report my projection of Mr. Guigliano's "but-for" earnings stream. The projection begins on June 30, 2002 when Mr. Guigliano was taken off the Brewster Central School District payroll and is taken out through the end his work life expectancy on February 6, 2012. The values for 2002 through 2005 were obtained by growing out his earnings in 2001 (equal to $89,607) at the rates specified in the July 1, 2001 to June 30, 2005 Agreement between the Brewster Central School District Board of Education and the Administrators Association of Brewster.[7] To obtain the growth rate at which

---

[7]  The salary-rate increases specified in that document depend upon whether the individual's performance was rated as "Superior", "Commendable" or "Good", with the highest rates going to the best performers. To determine which rates to utilize for the projection of Mr. Guigliano's "but-for" salary increases I consulted his most recent rates of salary increase. Between the first half of 2000 and the first half of 2001, his salary rate increased by 7.45% and between the first half of 2001 and the first half of 2002, his salary rate increased by 9%. As these rates

4

to project the 2006-2012 "but-for" earnings stream, we averaged these rates with those Mr. Guigliano had enjoyed in the previous three years.[8]

As can be seen in the last row of column (3), our estimate of the "but-for" earnings stream sums to $1,408,823. Adding to this our valuation of Mr. Guigliano's "but-for" household services – $83,992 in total, as shown in column (4) – yields a total pre-retirement income loss of $1,492,815. Finally, subtracting our estimate of the appropriate allowance for Mr. Guigliano's "but-for" personal expenses – $148,286, in total as shown in column (6) – yields our estimate of his family's net loss in pre-retirement income: $1,344,530 in current-year dollars and $1,173,251 after present valuation.

### B. The Loss in Retirement Income: Table 2

Under Mr. Guigliano's retirement plan, the size of the annual benefit depends upon several factors. First, the type of election made – "Single Life Allowance" vs. "Joint Allowance-Full" – is important.[9] Under the former, the maximum annual benefit can be obtained, but all benefits cease upon the retiree's death. Under a "Joint Allowance-Full" election, the annual benefit provided, while lower, continues unchanged after the retiree's death ceasing only when his spouse dies.

Under both elections, the annual benefit will depend upon the retiree's years of service at retirement and average salary in the 3 years preceding retirement ("final average salary"). If the "Single Life Allowance" is elected it is easy – with these two facts alone – to determine the size of the annual retirement benefit. The New York State and Local Retirement System maintains a web site that enables members to do just that on-line.[10] Had Mr. Guigliano remained in his position with the Brewster Central School Distirct until the end of his work life expectancy, he would have accumulated approximately 31.3 years of service and, according to our "but-for" earnings projection, his final average salary in the 3 years prior to his retirement would have been equal to $182,445. With these years-of-service and final-average-salary values, his pension benefit under a "Single Life Allowance" election would have been $112,933.

However, Mr. Guigliano took a "Joint Allowance-Full" election and no formula or facility for calculating the annual benefit under this option is provided either on-line or in the retirement-

---

were in line with those specified in the latest Agreement for "Superior" performers. I used the "Superior-Performers" rates to project his future salary. These were equal to: 8.5% for year 2001 to 2002; 10% for year 2002 to 2003; 9% for 2003 to 2004; and 9% for 2004 to 2005.

[8]  This average was equal to 7.45%.

[9]  There is actually a 3rd possible election – "Joint Allowance-Partial" – but as Mr. Guigliano elected the "Joint Allowance-Full" – benefit stream, we will not be concerned with it here.

[10]  A formula is also available in the retirement plan description, entitled "Coordinated Retirement Plan", which counsel made available to me.

Integral
Research
Inc.

plan documents supplied to me. It was necessary therefore to derive an estimation routine for the "Joint Allowance-Full" benefit" that would yield a reasonably accurate result. To do so, I assumed that plan administrators would require that the "Joint Allowance-Full" benefit stream paid to any retiree be equal in present-value terms to the "Single Life Allowance" stream available to that particular retiree. Starting with this assumption – and working with the "Single Life Allowance" stream I *was* able to estimate – I obtained the "but-for" pension stream reported in Table 2.[11]

As can be seen there, we estimate the "but-for" pension stream to equal $2,267,745 in current-year dollars. Adding projected "but-for" household services and then subtracting the projected personal-consumption deduction, we obtain an estimate of the net loss in retirement income equal to $2,281,093 in current-year dollars and $666,726 in present-value terms.

## C. The Total Loss

Summing the Table-1 and Table-2 estimates, we find a net loss in pre- and post-retirement income equal to $3,625,622 in current-year dollars and to $1,839,977 in present-value terms.

Signed: _____ _____
Dr. Harriet Zellner            Date  11/08/04

---

[11]    First I projected the "Single Life Allowance" benefit out to Mr. Guigliano's life expectancy and then projected it out to *Mrs*. Guigliano's life-expectancy, in each case applying the appropriate cost-of-living increases. (As the "Coordinated Retirement Plan", page 19, states: cost-of-living increases – "at 50% of the previous year's annual rate of inflation" – begin when the retiree is "age 62 or older and retired for five or more years".) Let's call the former stream the "A" stream and the latter stream the "B" stream. Naturally, the B stream summed to a much larger amount than the A stream because it ran for more than 7 additional years. Next I found the present value of each stream: PV(A) and PV(B) and took the ratio of one to the other: PV(A) over PV(B). I then obtained my estimate of the (nominal) "Joint Allowance-Full" benefit in each year by multiplying the (nominal) B-stream benefit in each year by this ratio. One can see that the present value of the "but-for" pension stream estimated in this fashion is equal, as required, to the present value of the "Single Life Allowance" stream out to Mr. Guigliano's life expectancy.

Integral
Research
Inc.

Table 1

Estimating the Loss in Income Sustained by Michael Guigliano's
Family on Account of His Accident and Subsequent Death

| Age (12/31) | Year | "But-For" Earnings | "But-For" Household Services | "But-For" Earnings Plus "But-For" Services | Personal Consumption Deduction | Net Loss in Income | |
|---|---|---|---|---|---|---|---|
| | | | | | | Current-Year Dollars | Present Value Terms * |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 53.7 | 2002 7/1--> | $48,612 | $3,900 | $52,512 | | $52,512 | $52,512 |
| 54.7 | 2003 | $106,946 | $7,978 | $114,924 | $6,232 | $108,692 | $108,692 |
| 55.7 | 2004 | $116,571 | $8,163 | $124,734 | $13,836 | $110,898 | $110,898 |
| 56.7 | 2005 | $127,063 | $8,361 | $135,423 | $14,404 | $121,020 | $116,182 |
| 57.7 | 2006 | $136,550 | $8,563 | $145,113 | $14,896 | $130,217 | $120,014 |
| 58.7 | 2007 | $146,745 | $8,770 | $155,515 | $18,102 | $137,413 | $121,583 |
| 59.7 | 2008 | $157,702 | $8,983 | $166,684 | $18,655 | $148,029 | $125,740 |
| 60.7 | 2009 | $169,477 | $9,200 | $178,676 | $19,225 | $159,452 | $130,028 |
| 61.7 | 2010 | $182,130 | $9,423 | $191,553 | $19,812 | $171,741 | $134,451 |
| 62.7 | 2011 | $195,729 | $9,651 | $205,380 | $20,417 | $184,963 | $139,013 |
| 63.7 | 2012 | $210,343 | $9,884 | $220,227 | $26,745 | $193,482 | $139,603 |
| 62.8 | to 26 | $21,299 | $1,001 | $22,300 | $2,708 | $19,592 | $14,136 |
| Totals | | $1,408,823 | $83,992 | $1,492,815 | $148,286 | $1,344,530 | $1,173,251 |

(*) Only future years are reduced to present value.

Table 2

Estimating the Loss in Post-Retirement Income Sustained by Michael Guigliano's
Family on Account of His Accident and Subsequent Death

| Year (2) | Age as of 12/31 Michael Guigliano (1) | Age as of 12/31 Laura Guigliano (2) | "But-For" Pension (3) | "But-For" Household Services (4) | "But-For" Pension Plus "But-For" Services (5) | Personal Consumption Deduction (6) | Net Loss in Retirement Income — Current-Year Dollars (7) | Net Loss in Retirement Income — Present Value Terms * (8) |
|---|---|---|---|---|---|---|---|---|
| 2012 to 2/6 | 63.7 / 62.8 | 61.6 | $81,167 | $9,891 | $91,058 | $10,320 | $80,737 | $44,767 |
| 2013 | 64.7 | 62.6 | $90,312 | 11,337 | 101,649 | 11,483 | 90,166 | 46,824 |
| 2014 | 65.7 | 63.6 | 90,312 | 11,679 | 101,991 | 12,284 | 89,708 | 43,631 |
| 2015 | 66.7 | 64.6 | 90,312 | 12,032 | 102,344 | 12,284 | 90,060 | 41,025 |
| 2016 | 67.7 | 65.6 | 90,312 | 12,395 | 102,707 | 12,284 | 90,423 | 38,578 |
| 2017 | 68.7 | 66.6 | 90,312 | 12,769 | 103,081 | 12,284 | 90,797 | 36,281 |
| 2018 | 69.7 | 67.6 | 92,374 | 13,154 | 105,528 | 12,414 | 93,115 | 34,847 |
| 2019 | 70.7 | 68.6 | 94,484 | 13,551 | 108,035 | 12,545 | 95,490 | 33,469 |
| 2020 | 71.7 | 69.6 | 96,641 | 13,960 | 110,601 | 12,678 | 97,923 | 32,145 |
| 2021 | 72.7 | 70.6 | 98,848 | 14,381 | 113,229 | 12,812 | 100,417 | 30,873 |
| 2022 | 73.7 | 71.6 | 101,106 | 14,815 | 115,921 | 12,948 | 102,973 | 29,651 |
| 2023 | 74.7 | 72.6 | 103,414 | 15,262 | 118,676 | 13,085 | 105,592 | 28,477 |
| 2024 | 75.7 | 73.6 | 105,776 | 15,723 | 121,499 | 13,223 | 108,275 | 27,348 |
| 2025 | 76.7 | 74.6 | 108,191 | 16,197 | 124,388 | 13,363 | 111,025 | 26,264 |
| 2026 | 77.7 | 75.6 | 110,662 | 16,686 | 127,348 | 13,505 | 113,843 | 25,223 |
| to 2/7 | 76.8 | | | $1,557 | $112,218 | $1,349 | $110,870 | $24,564 |
| 2027 | | 76.6 | 113,189 | | 113,189 | | 113,189 | 26,776 |
| 2028 | | 77.6 | 115,774 | | 115,774 | | 115,774 | 25,651 |
| 2029 | | 78.6 | 118,417 | | 118,417 | | 118,417 | 24,554 |
| 2030 | | 79.6 | 121,122 | | 121,122 | | 121,122 | 23,648 |
| 2031 | | 80.6 | 123,887 | | 123,887 | | 123,887 | 19,780 |
| 2032 | | 81.6 | 126,716 | | 126,716 | | 126,716 | 18,949 |
| 2033 | | 82.6 | 129,610 | | 129,610 | | 129,610 | 18,132 |
| to 10/22 | | 82.4 | $104,416 | | $104,416 | | $104,416 | $14,624 |
| **Totals** | | | $2,267,745 | $188,701 | $2,456,446 | $175,354 | $2,281,093 | $666,726 |

(*) Only future years are reduced to present value.

EXHIBIT  C

List of Cases In Which Dr. Zellner Gave
Courtroom or Deposition Testimony
Over the Last Five Years

*    *D. Drew Abrams and Thomas W. Loucks et al. v. General Electric Company*, U.S. District Court, Northern District of New York, 95 Civ. 1734 (RWS).

**    *Frank B. Bornholdt vs. Nicholas F. Brady, Secretary of the United States Department of the Treasury, and Lawrence B. Gibbs, Commissioner of the Internal Revenue Service of the United States of America*, U.S. District Court, Southern District of New York.

*    *Vielka Blaizes v. Alliance National Incorporated et al.* and *Gwendolyn Williams v. Alliance National Incorporated et al.* and *Ingrid Campbell v. Alliance National Incorporated et al.*, U.S. District Court, Southern District of New York.

*    *Sheila MacPherson-Brennan et al. vs. Bell Atlantic-New Jersey, Inc.*, Superior Court of New Jersey, Atlantic County Law Division, ATL-L-831-97.

*    *Gregory Carson et al. v. Giant Food, Inc.*, U.S. District Court, Northern District of Maryland, JFM96-2882.

*    *John Cilli, et al. v. Houghton Mifflin Company/McDougal Littell & Company*, United States District Court for theDistrict of New Jersey, Civil Action No. 95-6524.

**    *Dianne C. Conway vs. Air East Corporation et al.*, Supreme Court of the State of New York.

*    *Charles M. Crocker, et al., v. Schweizer Aircraft Corporation* and *John W. Rennie et al. v. Schweizer Aircraft Corporation,* U.S. District Court, District of Maryland, Northern Division.

**    *Lucinda Cravenho vs. John Cravenho,* Supreme Court of the State of New York, County of Kings, Index No. 7104/91.

**    *District Council 37 v. Department of Parks*, U.S. District Court, Southern District of New York.

*    *Veronica E. Geyer v. State of New Jersey; Office of the Attorney General, Department of Law and Public Safety, et al.*, Superior Court of New Jersey Law Division: Mercer County.

continued ...

Integral
Research
Inc.

** *John Glover, et al vs. The City of Elmira*, New York, U.S. District Court, Western District of New York.

** *Victoria Greenbaum v. Svenska Handelsbanken. New York,* U.S. District Court, Southern District of New York.

• *David B. Hayt, M.D., v. The New York Hospital-Cornell Medical Center and Cornell University Medical College,* U.S. District Court, Southern District of New York.

* *Raymond A. Hunt, Sr. et al. vs. Tektronix, Inc.*, U.S. District Court, Western District of New York.

* *James F. Hurst v. F.W. Woolworth Company*, U.S. District Court, Southern District of New York

* *Joseph Kalakay vs. Textron Lycoming, a Division of AVCO Corporation,* U.S. District Court, District of Connecticut.

* *Charlynn C. Maniatis vs. The New York Hospital-Cornell Medical Center,* U.S. District Court, Southern District of New York.

• *Robert Manning v. Utilities Mutual Insurance Company et al.,* U.S. District Court, Southern District of New York.

** *Martha Mogull vs. CB Commercial, et al.*, Superior Count of New Jersey, Law Division, Bergen County.

* *Ralph C. Morgan v. Pitney Bowes, Inc.*, U. S. District Court, District of Connecticut

* *Raquib A. Muhammad et al. vs. Giant Food, Inc.,* U. S. District Court, District of Columbia, Civil Action No. 97-2085 (RCL).

* *Felix J. Murphy v. General Electric Company,* U.S. District Court, Northern District of New York.

* *Payroll Equity Plans, Inc. vs. The Bank of New York*, Supreme Court of the State of New York, County of New York, Index No. 12868/84.

** *Cathy Pyle against County of Suffolk et al.*, Supreme Court of the State of New York, County of Suffolk

continued ...

Integral
Research
Inc.

**    *Charles Robinson, et al. vs. Metro-North Commuter Railroad Company*, U.S. District Court, Southern District of New York.

*     *Thanjan et al. v. Tyco Submarine Systems LTD. and Tyco International LTD.*, Superior Court of New Jersey Law Division: Morris County.

*     *Dorothy Sheppard et al. vs. Consolidated Edison Company of New York, Inc.*, U.S. District Court, Eastern District of New York, 94 Civ. 0403.

*     *Mara Waser v. Toys "R" Us, Inc.*, U.S. District Court, Northern District of Illinois, Eastern Division, Civil Action No. 95C 6686.

**    *Clara Zveiter vs. Brazilian National Superintendency of Merchant Marine and Lloyd Brasileiro*, U.S. District Court, Southern District of New York, 92 Civ. 3548.

**    *Joanne DeSimone v. JP Morgan/Chase Bank and Rupert Blake*, U.S. District Court, Southern District of New York, 02 Civ. 7039

" * " Denotes Deposition Testimony
" ** " Denotes Trial Testimony

March 2004

Integral
Research
Inc.

## DECLARATION OF SERVICE
## PURSUANT TO 28 U.S.C. § 1746

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York.

I served a true copy of the annexed: PLAINTIFFS' FIFTH *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES, and attachments, dated November 16, 2004, on the date of November _17_, 2004:, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

TO:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL, OELBERG,
YUAN, KOTCH, CIRCIUMARA,
KOUZNETSOV (s/h/a KUZNETS),
TUDORICA, BURNETT, BROWN,
HOFFMAN, DOE NO. 1, DOE NO. 2
& DOE NO. 3
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

SACHNER & O'CONNOR
Attorneys for Defendants
DEPUY, GRAY, & WOLFFE
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323
Tel.: (203) 598-7585

BAI, POLLOCK, BLUEWEISS
& MULCAHEY, P.C.
Attorneys for Defendants
KNOWLES
One Corporate Drive
Shelton, CT 06484
Tel.: (203) 925-8100

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Attorneys for Plaintiffs
220 Fifth Avenue
Seventh Floor
New York, New York 10001
Tel.: (212) 213-1220

Executed on November _17_, 2004, Larchmont, New York.

JOSEPH LANNI     (CT 23566)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
=================================================X

LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to be
Incompetent, and LAURA GUIGLIANO, Individually,

                    Plaintiff(s)                              *3:02 CV 718*
                                                             *(RNC)(DFM)*

            -against-

DANBURY HOSPITAL, JAMES DEPUY, M.D.,
F. SCOTT GRAY, M.D., GEORGIANA KNOWLES,
P.A., DEANNA WOLFFE, P.A., DAVID OELBERG,
M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D.,
ARTHUR KOTCH, M.D., JULIA CIRCIUMARA,
M.D., ANDRE KUZNETS, M.D., MICHAELA
FEDERICA, M.D., MAUREEN BENNETT, R.N.,
JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N.,
"JANE DOE NO.1", "JANE DOE NO.2" (*defendants*
*"JANE DOE NO.1" and "JANE DOE NO. 2", full*
*identities unknown, being identified as DANBURY*
*HOSPITAL employees who were assigned to*
*monitor, supervise and attend to patient MICHAEL*
*GUIGLIANO prior to and during a CT Scan procedure*
*on 2/17/01)* and "JANE DOE NO. 3", (*full identity*
*unknown, being identified as a DANBURY HOSPITAL*
*employee who called a "Code 99" on 2/17/01*),

                    Defendants.
=================================================X

# PLAINTIFFS' FIFTH *F.R.C.P. 26(a)(2)(A-B)* EXPERT DISCLOSURES

THE LAW FIRM OF JOSEPH LANNI, P.C.
*Attorney for Plaintiff[s]*
LAURA GUIGLIANO
138 CHATSWORTH AVENUE, SUITES 6 – 8
LARCHMONT, NEW YORK 10538
Tel.: (914) 834-6600
Fax:  (914) 834-0152

# EXHIBIT D

**The Law Firm Of**
**JOSEPH LANNI, P. C.**
138 Chatsworth Avenue, Suites 6 – 8
Larchmont, New York 10538
Tel: (914) 834-6600  /  Fax: (914) 834-0152


December 29, 2004

**VIA FACSIMILE**
**VIA REGULAR MAIL**

Eric Stockman, Esq.
Neubert, Pepe & Monteith
195 Church Street
New Haven, CT 06510

Richard A. O'Connor, Esq.
Sachner & O'Connor, L.L.C.
765 Straits Turnpike
Building 2, Suite 1001
Middlebury, CT 06762-1323

Garie Mulcahey, Esq.
Bai, Pollock, Blueweiss
& Mulcahey, P.C.
10 Middle Street
Bridgeport, CT 06604

Kevin Tepas, Esq.
Ryan, Ryan, Johnson
& Deluca, LLP
80 Fourth Street
Stamford, CT 06905


**RE:    GUIGLIANO v. DANBURY HOSPITAL, ET AL.**
*302 CV 718 (RNC)(DFM)*

Dear Counsel:

I have received written authorization from my client, Laura Guigliano, to discontinue the claims against those answering defendants whose conduct was not addressed by and not considered to constitute departures from proper medical and nursing practice in our experts' reports. Thus, the plaintiff is willing to withdraw all claims asserted against defendants Gray, DePuy, Wolff, Knowles-Carlson, Oelberg, Yuan, Kouznetsov and Tudorica.

According to *Fed. R. Civ. P. 41,* the discontinuance or dismissal of claims against a defendant can be accomplished by stipulation, designated to be "with prejudice", signed by all of the parties (*Rule 41(a)(1)*) or by court order (*Rule 41(a)(2)*). Please advise me at the earliest convenience whether all parties are willing to proceed with the discontinuance of the claims against the above named defendants via stipulation as provided by Rule *41(a)(1)* or whether filing a motion for the requisite court order pursuant to (*Rule 41(a)(2)*) is needed.

*December 29, 2004*
*Page 2 of 2*

    Assuming that a stipulation will be sufficient, I am forwarding the original of a
*Fed. R. Civ. P. 41(a)(1) Stipulation of Voluntary Dismissal of Certain Claims, dated
December 29, 2004*, (signed by Mr. Morgan and I), enclosed with the copy of this letter
to Mr. O'Connor (Sachner & O'Connor). I ask Mr. O'Connor to sign this stipulation on
behalf of his clients and then send the stipulation to Ms. Mulcahy (Bai, Pollock, et al.) for
signature, then for Ms. Mulcahy to send it on to the offices of Neubert, et al., and so
forth. Upon its return to my offices, we will take care of electronically filing same with
the court clerk.

    Thank you for your courtesy and cooperation with this matter.


                                    Very truly yours,



                                    **JOSEPH LANNI** (CT 23566)

JL/
Enclosure




Cc:

Scott F. Morgan, Esq.
Weiner, Millo & Morgan, LLC
220 Fifth Avenue, 7th Floor
New York, New York 10001