UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
========================================X
LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL GUIGLIANO, a Person Adjudged to be Incompetent, and LAURA GUIGLIANO, Individually,

Plaintiffs,

*3:02 CV 718 (RNC) (DFM)*

–against –

DANBURY HOSPITAL, et al.

Defendants.
========================================X

**PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT CATANIA'S FED. R. CIV. P. 19 (b) MOTION TO DISMISS PLAINTIFFS' ACTION FOR NON-JOINDER OF DR. KESSLER AS A DEFENDANT**

Submitted by:

**JOSEPH LANNI, ESQ.** (CT 23566)
THE LAW FIRM OF JOSEPH LANNI, P.C.
Attorneys for Plaintiff LAURA GUIGLIANO

**ORAL ARGUMENT [ IS ___ / IS NOT __X__]
REQUESTED FOR THIS MOTION.**

## TABLE OF CONTENTS

***Page No.***


Preliminary Statement……………………………………………………………………..4

Statement of Facts…………………………………………………………………………5

Argument

Point I: Defendants May Implead
Dr. Kessler as a Third-Party Defendant
Without Depriving this Court
of its Diversity Jurisdiction………………………………………………………………13

Point II: Dr. Kessler Is Not An
Indispensable Party to This Case
Under Fed. R. Civ. P. 19 (b)……………………………………………………………..15

Point III: Any Apportionment Claim
Against Dr. Kessler Must Be Supported
By An Expert Opinion…………………………………………………………………...17

Conclusion……………………………………………………………………………….18


## TABLE OF EXHIBITS


Exhibit 1 – *Report of Richard J. Batista, M.D., dated November 8, 2004*

Exhibit 2 – *Report of Brian S. Kaufman, M.D., dated November 7, 2004*

Exhibit 3 – *Report of Nancy Mure', R.N., dated November 4, 2004*

# TABLE OF AUTHORITIES

## Cases

*Caterpillar, Inc. v. Lewis, 519 U.S.61, 117 S. Ct. 467, 136 L. Ed2d 437 (1996)*

*Jaser v. New York Property Ins. Underwriting Ass'n, 815 F.2d 240, 242 (2d Cir. 1987)*

*Kim v. The Convent of the Sacred Heart, Inc., 1998 WL 241213 (D. Conn)*

*Provident Tradesman Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S. Ct 733, 19 L.E.2d 936 (1968)*

*Stowe v. McHugh, 46 Conn. App. 391, 394-398 (1997)*

*Teamsters Local Union No. 171 v. Keal Driveway Co., 173 F. 3d 915, 918 (4th Cir. 1999)*

## Statutes:

*Fed. R. Civ. P. 14 (a)*

*Fed. R. Civ. P. 19(a)*

*Fed. R. Civ. P. 19(b)*

*Fed. R. Civ. P. 26 (a)*

**PRELIMINARY STATEMENT**

This *Memorandum of Law* is submitted in opposition to the motion filed by defendant JOSEPH J. CATANIA, M.D., dated June 30, 2005, pursuant to *Fed. R. Civ. P. 19(b),* seeking dismissal of plaintiffs' action for non-joinder of an allegedly indispensable party. That allegedly indispensable party is Frank Kessler, M.D. Plaintiff's opposition to this motion is essentially premised upon the same grounds as those set forth in *Plaintiffs' Memorandum of Law in Response to the Defendants John Borruso, M.D., and Danbury Surgical Associates, P.C., F.R.C.P. 19 (b) Motion to Dismiss Plaintiffs' Action for Non-Joinder, dated June 22, 2005*, previously submitted to this Court.

In essence, defendant CATANIA's motion and the motion by defendants BORRUSSO and DANBURY SURGICAL are meritless to the extent that they seek dismissal of this action and these motions should be denied for three (3) reasons. First, the moving defendants may implead Dr. Kessler as a third party defendant without disturbing the diversity jurisdiction of this Court. Second, Dr. Kessler is not an indispensable party under *Fed. R. Civ. P. 19 (b)*. Third, the plaintiff has no objection to the moving defendants seeking apportionment against Dr. Kessler upon these defendants submitting the requisite proof in the form of expert medical opinions stating that the claims against Dr. Kessler have merit.

**STATEMENT OF FACTS**

This action, premised on diversity jurisdiction, sounds in medical malpractice, negligence and wrongful death.

On February 7, 2001, plaintiff's decedent MICHAEL GUIGLIANO, a New York resident, was admitted to defendant Danbury Hospital in Connecticut after sustaining a fractured leg and foot in a fall at work. Mr. GUIGLIANO underwent surgery to repair these fractures and remained in the hospital for further care. During this hospital admission, plaintiff's decedent was occasionally seen by Dr. FRANK KESSLER. Dr. KESSLER is an internist with privileges at DANBURY HOSPITAL whose office is located just over the state line in New York.

During the postoperative course, Mr. GUIGLIANO developed abdominal distention and breathing difficulties that worsened over time. A nasogastric tube was inserted to relieve the abdominal distention; however, this tube was removed by defendant surgeon BORRUSSO on February 15, 2001. Over the next two days, the patient's abdominal distention and breathing difficulties continued to worsen. On February 17, 2001, a CT scan of the abdomen was ordered for the patient by defendant surgeon CATANIA. Subsequently, Mr. GUIGLIANO was brought to the hospital's CT scan department where he went into severe respiratory distress when laid flat on the CT scan table. The patient's respiratory distress then progressed to a cardiopulmonary arrest. Though eventually resuscitated after approximately 30 minutes, Mr. GUIGLIANO became severely brain damaged, quadriplegic, ventilator dependent, and semi-comatose as a result of this

cardiopulmonary arrest. He died from complications of these injuries at the Northeast Center for Special Care on July 14, 2003.

It is alleged that Mr. GUIGLIANO's injuries and death were caused by the medical malpractice and negligence of the defendant Danbury Hospital and the medical personnel caring for him during the first ten (10) days (February 7 – 17, 2001) of this hospital admission. Named among the defendants in this action are the moving defendants, JOSEPH J. CATANIA, M.D., JOHN BORRUSO, M.D., and DANBURY SURGICAL ASSOCIATES, P.C.[1]

During discovery in this action, plaintiff's counsel disclosed expert reports pursuant to *Fed. R. Civ. P. 26 (a)* and the requirements of the Case Management Order then in effect. The reports of plaintiff's medical experts identify multiple errors made during various stages of the medical treatment rendered to the decedent by the named defendants (DANBURY HOSPITAL, BORRUSSO, CATANIA, and DANBURY SURGICAL ASSOC.). These same expert reports do not state that Dr. KESSLER committed any medical error and they do not in any way implicate the treatment rendered by Dr. KESSLER.

Plaintiff's surgery expert, Richard J. Batista, M.D., identifies the following five (5) major departures from proper medical practice in the treatment at issue:

> It is my opinion to a reasonable degree of medical certainty that a ***multitude of departures from proper medical practice*** and proper Basic Life Support protocols in the postoperative treatment given to Mr. Guigliano was committed by the treating surgeons and other medical personnel.

[1] Defendants JOSEPH J. CATANIA, M.D., and JOHN BORRUSO, M.D., are employees of defendant DANBURY SURGICAL ASSOCIATES, P.C.

***First, the surgeons failed to follow proper practice to treat the patient's massive abdominal distention.*** While a nasogastric tube was used to decompress the abdomen and it emptied a large amount of fluid, the NGT was pulled out too soon by a Dr. Borruso on February 15. When the NGT was discontinued, there was still significant abdominal distention that had not resolved and it was still discharging "clear" fluid. An isolated episode of "serosanguinous" drainage on the night of February 14 does not indicate that the NGT should have been removed. This was brought to the attention of several physicians and no one thought it necessary to take out the NGT. In fact, there is a surgery note that appears to have been entered prior to Dr. Borrusso's on February 15 and the decision of this surgeon was to keep the NGT in place. After this date, the lack of a NGT allowed the abdominal distention to worsen over the next two days. Dr. Borrusso saw the patient on February 16 and noted that the abdominal distention was still present; therefore, he should have reinserted the NGT at that time. Surgery also saw the patient on the morning of February 17. The entries in the progress record on February 16 and 17 show that the abdomen is worsening and it is having a marked effect on the patient's ability to breathe.

Additionally, more aggressive forms of intervention were required in the form of a rectal tube. It should be noted that a rectal tube was inserted along with an oral gastric tube on February 17 after the patient coded to decompress the abdomen. This rectal tube remained in use despite the fact that the patient's treatment for a C. difficile infection continued during that time and the available stool cultures indicated the presence of the organism.

***Second, the treating surgeons failed to properly treat the patient's electrolyte imbalances.*** The patient did not receive massive electrolyte resuscitation (potassium and ionized calcium) until he was brought to the ICU after the cardiopulmonary arrest on February 17. ***Repletion of the electrolytes was the responsibililty of surgery since the record indicates that the surgery personnel were following the lab values*** and also the patient's attending physicians.

***Third, the patient was not adequately supervised and monitored by sufficiently skilled hospital personnel (e.g.: registered nurse, medical resident or attending physician who would also have training in BLS or CPR) when he was brought to the radiology department for the CT scan on February 17.*** (It should be noted that an R.N. wrote a "multispecialist" note in the progress record on February 10 that indicates that she monitored and supervised the patient when he was sent for a VQ scan.) Not only was someone of sufficient skill level needed to accompany the patient for his CT scan, but also this patient required continous pulse oximetry and cardiac monitoring which also was not done. The surgeon ordering the test knew that the patient would need to lie flat for the chest CT scan and should have known from the records that this positioning would cause respiratory distress since that had previously happened several times. The surgeon (along with the nursing staff) should have ordered the proper supervision and monitoring for the CT scan. The respiratory technician and aide in the CT scan room should have called the code when the patient became cyanotic and was gasping for breath. Instead, there was an inexplicable delay (i.e.: placing patient back on a gurney, wheeling out of CT room into hall, telephoning his nurses, etc.) in getting help despite the patient's marked distress. If

appropriate supervision and monitoring had been done, the severity of the patient's respiratory distress would have been discovered earlier and there would have been proper intervention undertaken by calling the "code" sooner and ensuring proper ventilation in a timely manner. This is actually what happened on February 10; the oxygen saturation dropped when the patient was placed supine for the VQ scan and the O2 flow rate was increased to 6 l/min to raise the oxygen saturation to acceptable levels and prevent further deterioration in the patient's condition.

***Fourth, the patient was obviously not given adequate oxygen therapy when he was brought to the radiology department for his respiratory distress.*** Oxygen was being administered by nasal cannula prior to the patient being brought to the radiology department; however, it apparently was removed at some point. (The radiology technician's note refers to putting oxygen on the patient after he became cyanotic.) The patient required supplemental oxygenation with a non-rebreather mask. It was a departure from proper medical practice on the part of Danbury Hospital to discontinue supplemental oxygenation and fail to provide oxygenation from a non-rebreather mask during this time. This improper medical practice caused or contributed to the cardiopulmonary arrest suffered by the patient because the non-existent or ineffective delivery of oxygen exacerbated the patient's hypoxemia and permitted him to deteriorate into respiratory arrest and then cardiac arrest.

***Fifth, the patient was improperly and untimely resuscitated after sustaining the cardiopulmonary arrest on February 17.*** The code sheet indicates that the code was called at 1:02 p.m. and that the patient was intubated at 1:05 p.m. The department of health file contains a reference to a three or four minute delay in the arrival of anesthesia to perform the intubation. The post-code notes in the hospital records refer to a ten (10) minute delay in the initiation of CPR. Because this patient was unconscious, ventilation of the patient by an Ambu-bag and mask for a period of at least 3 – 4 minutes was inadequate. The medical personnel needed, at the least, to temporarily insert an oral airway until intubation could occur so as to ensure adequate ventilation of this unconscious patient within that 3 – 4 minute period. Just as significant is that there were no chest compressions being done (see, the DOH file) until the arrival of the CRNA and the respiratory therapist on the scene. This 3 – 4 minute period (possibly even 10 minutes) was crucial to determining the outcome for this patient. It should be kept in mind that the patient had compromised lung function secondary to atelectic compression, severe anemia and electrolyte disturbances; therefore, he was likely more resistant to resuscitation and more susceptible to anoxic brain damage the more the delay in starting effective BLS/CPR techniques.

(*See*, *Exhibt 1, Report of Richard J. Batista, M.D., dated November 8, 2004, pp. 3 – 4 [Emphasis added]*.) Dr. Batista's expert opinions focus on the multiple acts and omissions committed by the moving defendant surgeons, BORRUSSO and CATANIA, and by hospital personnel. His report nowhere identifies Dr. KESSLER as a physician who committed malpractice and it does not

implicate Dr. KESSLER in any act of malpractice.

Plaintiff's critical care medicine expert, Brian S. Kaufman, M.D., identifies the following major departures from proper medical practice in the treatment at issue:

> ***It is my opinion with a reasonable degree of medical certainty that the treating surgeons failed to take the necessary and indicated steps to reduce the patient's massive abdominal distention***. An opportunity to alleviate or, at least, reduce the compression of the lungs was missed because the nasogastric tube was pulled out too soon on February 15 by Dr. Borrusso before it had any significant therapeutic effect on the abdominal distention. At the time that the NGT was discontinued, it was still draining gastric fluid and this fluid was "fairly clear". The removal of the NG tube permitted the abdominal distention to worsen considerably over the next 48 hours and further compromise the patient's respirations. There was also a failure by a surgeon to reinsert the NGT when the abdominal distention was still found to be present and, in fact, more profound on February 17.
>
> ***The physician ordering the CT scan test should have been aware that Mr. Guigliano's respiratory difficulties increased when he was lying flat***. The nurse's note immediately before the February 17 surgery note documents respiratory wheezing and crackling of the lungs and there is HOB elevation to make the patient's breathing easier. Moreover, the progress record documented that this patient had previously exhibited exacerbations of hypoxemia when placed in the supine position for a diagnostic test on February 10. ***Thus, either the patient's nurse or the physician ordering the test should have had the patient be accompanied by someone of adequate skill level, either another physician (it could be a resident or house staff physician) or a nurse trained in Basic Life Support and CPR and with pulse oximetery and cardiac monitoring***. Then the patient's severe hypoxemia would have been timely recognized and there would have been timely intervention (such as administering oxygen via nasal cannula or non-rebreather) to prevent the patient from going into respiratory arrest or cardiopulmonary arrest. This is exactly what happened when the patient was placed supine for his VQ scan on February 10.
>
> ***There is no documentation anywhere in the record indicating that the patient was brought down to the radiology department with the oxygen therapy continuing.*** When the patient went into severe respiratory distress on the CT scan table, the staff then "reached for an oxygen mask" and applied it to the patient. Why would an oxygen mask need to be applied if this patient was already receiving oxygen? There is no reference in this note of oxygen via nasal cannula being in use. Transporting the patient without oxygen would be a departure from proper medical practice.
>
> ***There is no documentation anywhere that the patient was brought down to the radiology department with pulse oximetry monitoring in use.*** The note mentions that the

patient was "hooked to the pulse ox" after the oxygen mask was applied. The oxygenation saturation was 79 – 80 percent, the patient was severely hypoxemic. If the pulse oximetry had been in use prior to the onset of the severe respiratory distress, the staff would have been aware to the patient's worsening hypoxemia and made an earlier call for help. Transporting Mr. Guigliano without pulse oximetry was a departure from proper practice. The same can be said for transporting the patient without a cardiac monitor.

***The patient was "flailing & gasping for breath" and "cyanotic", but no code was called***. The radiology technician instead decided to take the patient back to his room and also stopped to telephone the "floor" rather than call a code. The radiology technician also took the to move the patient onto a gurney and elevate his head. It was only when the radiology technician was pushing the stretcher out of the CT room and the patient began "seizing" (probably from cardiac arrest or marked hypotension), she told the student intern to summon a physician. It is only after a Dr. Berger arrived on the scene and attempts to ventilate the patient with an Ambu-bag that he instructs the radiology technician to call a code. The staff improperly delayed summoning a physician and calling the code.

***The hospital personnel present were apparently inexperienced people who did not know what to do when then patient became cyanotic and was in obvious distress***. Since codes in a radiology department are not rare, personnel should be trained to have a very low threshold for calling for help at the first indication that something is wrong and a patient is in distress.

***The materials reviewed also indicate that there was a delay in the arrival of the code team***. The Saipher note states that the operator was mistaken in announcing the location of the code. The radiology department is on the third floor of the hospital. The hospital code log which states that the "[o]perator misspoke when stating the location the 1st time".

(*See, Exhibit 2, Report of Brian S. Kaufman, M.D., dated November 7, 2004, pp. 6 – 8 [Emphasis added]*.) Similar to Dr. Batista's report, Dr. Kaufman's expert opinions focus on the multiple acts and omissions committed by the moving defendant surgeons, BORRUSSO and CATANIA, and by hospital personnel. Similarly, Dr. Kaufman's report nowhere identifies Dr. KESSLER as a physician who committed malpractice and it does not implicate Dr. KESSLER in any act of malpractice.

Plaintiff's nursing care expert, Nancy Mure', R.N., identifies the following major departures from proper nursing practice in the treatment at issue:

It is my opinion, with a reasonable degree of professional certainty, that ***the following departures from proper nursing practice and hospital practice were committed by the nursing staff and hospital staff*** in the care and treatment of Michael Guigliano on February 17, 2001:

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan under the 1:1 supervision of a CPR trained nurse or multispecialist.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with a portable cardiac monitor.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with pulse oximetry monitoring.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with portable oxygen or there was a failure to maintain the patient on supplemental oxygen.

There was a failure to timely call a "code" for this patient, the "code" should have been called when the patient began "gasping for breath", became "cyanotic" and was in "obvious distress" and the failure to do so wasted several minutes of precious time during which the patient needed proper ventilation and chest compressions.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since chest compressions were not started on this patient for an unduly long period of time.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since the patient was not being ventilated with an oral airway to ensure air entry into the lungs prior to intubation for an unduly long period of time.

There was a failure to timely respond to the "code" call for this patient, there was a delay in excess of 3 – 4 minutes between the patient becoming cyanotic (a sign of severe hypoxemia) and the commencement of adequate CPR measures in the form of intubation and chest compressions.

There was a failure to have an oral airway available as part of the emergency equipment on a crash cart in the radiology department to assist in the ventilation of an unconscious patient during a "code".

There was a failure to perform adequate CPR measures during the "code" because the defibrillator / cardioverter was not used in an attempt to restore cardiac function since the patient was in PEA / EMD for an extended period of time (20 – 25 minutes).

> The ***responsibility of ensuring that the patient was transferred for his CT scan with proper nursing supervision and proper monitoring devices was the duty of the nursing staff*** assigned to Mr. Guigliano.
>
> It is my opinion, with a reasonable degree of professional certainty, that ***the failure to transfer the patient for his CT scan without proper nursing supervision, without proper monitoring devices and without maintaining his supplemental oxygen were departures from proper nursing practice and hospital practice*** which caused or contributed to the patient's cardiopulmonary arrest.

(*See, Exhibit 3, Report of Nancy Mure', R.N.,, dated November 4, 2004, pp. 5 – 6 [Emphasis added]*.) Ms. Mure's expert opinions focus on the multiple acts and omissions committed by the nursing staff and other hospital personnel. Similarly, Ms. Mure's report nowhere identifies Dr. KESSLER as a physician who committed malpractice and it does not implicate Dr. KESSLER in any act of malpractice.

In sum, the claims of malpractice made by the plaintiff, through her medical experts, in this case against the named defendants (DANBURY HOSPITAL, BORRUSSO, CATANIA, and DANBURY SURGICAL ASSOC.) are numerous and involve various aspects of the medical treatment rendered to plaintiff's decedent MICHAEL GUIGLIANO. None of these numerous acts of malpractice are alleged by the plaintiff to have been committed by Dr. KESSLER and these allegations do not implicate Dr. KESSLER's treatment.

**ARGUMENT**

**POINT I:**

**DEFENDANTS MAY IMPLEAD DR. KESSLER AS A THIRD-PARTY DEFENDANT WITHOUT DEPRIVING THIS COURT OF ITS DIVERSITY JURISDICTION**

Defendant CATANIA's counsel asserts that:

> "the assessment and management of the plaintiff-decedent's ionized calcium was the responsibility either of the plaintiff-decedent's general medicine provider, Dr. Frank Kessler, or the service which admitted the plaintiff-decedent to the hospital, the orthopedic surgeons."

(*See, Defendant CATANIA's Memorandum of Law, dated June 30, 2005, ¶ 6, p. 3*.) Moreover, these same attorneys further assert that:

> "the assessment of the plaintiff-decedent's acuity level, hence stability, as well as decision making as to the appropriate level of cardiac monitoring, was primarily the responsibility of the plaintiff-decedent's general medicine provider, Dr. Frank Kessler."

(*See, Defendant CATANIA's Memorandum of Law, dated June 30, 2005, ¶ 11, p. 6*.) Clearly, defendant CATANIA's attorneys believe that Dr. KESSLER committed acts of malpractice in the limited treatment that he rendered to plaintiff's decedent.

Defendant CATANIA's attorneys claim that joinder of Dr. KESSLER as a third-party defendant cannot proceed, pursuant to *Fed. R. Civ. P. 19 (a)*, because bringing in Dr. KESSLER as a third party defendant would allegedly destroy diversity between the parties and deprive this Court of jurisdiction. (*See, Defendant CATANIA's Memorandum of Law, dated June 30, 2005, ¶ 15, p. 7*.) The moving defendants assert that the diversity jurisdiction of this Court would be disturbed since

plaintiff LAURA GUIGLIANO is a New York resident and the putative third-party defendant, Dr. KESSLER, is also a New York resident. The applicable case law, apparently overlooked by the moving defendants' counsel, indicates that diversity jurisdiction would not be destroyed by bringing in Dr. KESSLER as a third party defendant.

The plaintiff refers this Court to the ruling of the U. S. Supreme Court in ***Caterpillar, Inc. v. Lewis, 519 U.S.61, 117 S. Ct. 467, 136 L. Ed2d 437 (1996)***. In that case, the Supreme Court stated that:

> [o]nce federal subject matter jurisdiction is established over the underlying case between [plaintiff] and [defendant] the jurisdictional propriety of each additional claim is to be assessed individually. Thus, assuming that jurisdiction is based upon diversity of citizenship between [plaintiff] and [defendant], the question concerning impleader is whether there is a jurisdictional basis for the claim by [defendant] against [third-party defendant]. The fact that [plaintiff] and [third-party defendant] may be co-citizens is completely irrelevant. Unless [plaintiff] chooses to amend his complaint to assert a claim against [third-party defendant], [plaintiff] and [third-party defendant] are simply not adverse, and there need be no basis of jurisdiction between them.

***Id., 117 S. Ct. at 472, n.1 (citation omitted)***. ***See, accord, Kim v. The Convent of the Sacred Heart, Inc., 1998 WL 241213 (D. Conn)***.

The rulings in ***Caterpillar, supra,*** and ***Kim, supra,*** unequivocally indicate that diversity jurisdiction would remain undisturbed if the moving defendants (CATANIA, BORRUSSO and DANBURY SURGICAL ASSOC.) were to file a third-party complaint against Dr. KESSLER. Since defendant CATANIA's attorneys (as well as counsel for defendants BORRUSSO and DANBURY SURGICAL) are claiming that Dr. KESSLER committed two acts of malpractice in the treatment rendered to Mr. GUIGLIANO, then the proper remedy for this situation is impleader

of Dr. KESSLER as a third-party defendant in this case pursuant to *Fed. R. Civ. P. 14 (a)*.

It should additionally be noted that none of the defendants should be permitted to assert a claim for apportionment against the orthopedic surgeons, Drs. GRAY and DEPUY, since these former defendants were granted summary judgment in their favor. Thus, any claims against the orthopedic surgeons have already been adjudicated.

**POINT II:**

**DR. KESSLER IS NOT AN INDISPENSABLE PARTY**
**<u>TO THIS CASE UNDER FED. R. CIV. P. 19 (b)</u>**

"Dismissal of a case is a drastic remedy…which should be employed only sparingly." ***Teamsters Local Union No. 171 v. Keal Driveway Co., 173 F. 3d 915, 918 (4th Cir. 1999)***. The Second Circuit has instructed that as an alternative to dismissal, courts must take a "flexible approach" when deciding what parties need to be present for the just resolution of a suit. ***See, Jaser v. New York Property Ins. Underwriting Ass'n, 815 F.2d 240, 242 (2d Cir. 1987), citing Provident Tradesman Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S. Ct 733, 19 L.E.2d 936 (1968).*** Moreover, the Second Circuit has further cautioned that very few cases should be terminated due to the absence of a non-diverse party unless there has been a reasoned determination that the non-joinder makes resolution of the action impossible. ***Id***. There has been no such showing in this case.

Dr. KESSLER is not an indispensable party to the adjudication of this case pursuant to *Fed. R. Civ. P. 19 (b)* for several reasons.

First, plaintiff's experts have never identified or implicated any act or omission by Dr. KESSLER as a departure from proper medical practice in this case. Second, none of the defendants have produced an expert opinion to the effect that Dr. KESSLER committed any act of malpractice that caused or contributed to the catastrophic injuries sustained by Mr. GUIGLIANO and his subsequent death. Third, the plaintiff's malpractice claims against the named defendants in this case encompass a multiplicity of acts and omissions far more vast in scope than the issues of the "management of the plaintiff-decedent's ionized calcium" and the "appropriate level of cardiac monitoring" raised by defendant CATANIA's counsel against Dr. KESSLER.

The lengthy excerpts from the reports of plaintiff's experts cited above demonstrate that the issues of "ionized calcium" and "cardiac monitoring" are only two among a vast array of issues being raised in this case. While Dr. Batista's report notes that "lab values" (i.e.: inclusive of ionized calcium) were being followed by "surgery personnel" and "the patient's attending physicians", his opinion specifically places responsibility for monitoring ionized calcium with the surgeons. Moreover, the patient's attending physicians were the orthopedic surgeons GRAY and DEPUY[2]. Moreover, the expert reports of Dr. Batista, Dr. Kaufman and Ms. Mure' all state that plaintiff's decedent should have been transported to the CT scan on February 17 while being monitored by a multispecialist nurse using pulse oximetry, a portable cardiac monitor and supplemental oxygen. In essence, the multiplicity of the acts of malpractice identified by plaintiff's experts precludes any finding that the supposed inability to bring a third party claim against Dr. KESSLER would make resolution of this action impossible. It clearly does not. Since Dr. KESSLER cannot be viewed as

[2] Former defendants GRAY and DEPUY were the attending physicians for Mr. GUIGLIANO and the orthopedic surgeons who treated his leg and foot fractures. They were dismissed from this case on summary judgment.

an indispensable party under *Fed. R. Civ. P. 19(b)*, dismissal of this action is not warranted.

Finally, the fact that the moving defendants can bring in Dr. KESSLER as a third party defendant without depriving this Court of its diversity jurisdiction is yet another ground for denying the defendants' motions for dismissal under *Fed. R. Civ. P. 19(b)*.

**POINT III:**

**ANY APPORTIONMENT CLAIM AGAINST DR. KESSLER MUST BE SUPPORTED BY AN EXPERT OPINION**

That portion of the motions which request leave to assert an apportionment claim against Dr. KESSLER should be denied since the moving defendants (CATANIA, BORRUSSO and DANBURY SURGICAL ASSOC.) have failed to submit the requisite proof that such claims against Dr. KESSLER have merit.

The purported potential apportionment claims sought to be imposed by the moving defendants are unsupported by any expert medical opinion. The moving defendants do not disclose a qualified expert to testify as to deviations from the standard of medical care and causation by Dr. KESSLER nor do they claim that they will be making such a disclosure. More important, the moving defendants fail to submit the affidavit of a medical expert or even a report by a medical expert in support of their motion which asserts that Dr. KESSLER committed departures from proper medical practice by failing to monitor the patient's ionized calcium or by failing to arrange for appropriate cardiac monitoring during the patient's transport to the CT scan. In ***Stowe v. McHugh, 46 Conn. App. 391, 394-398 (1997)***, it was held that an apportionment claim in a medical

malpractice action requires qualified expert testimony. Thus, the moving defendants are asking this Court to grant leave to assert an unsupported and speculative claim of malpractice against Dr. KESSLER so that they may reduce any damage award that may be made against them. This Court should deny that aspect of the defendants' motions which seek leave to assert apportionment claims without prejudice to renew upon the submission of expert opinion evidence in support of those claims.

**CONCLUSION**

For the abovestated reasons, this honorable Court is respectfully requested to deny the defendant CATANIA's motion for dismissal of the action, pursuant to *Fed. R. Civ. P. 19(b)*, for non-joinder of Dr. KESSLER in its entirety. This honorable Court is further respectfully requested to deny that portion of the motion seeking leave to assert an apportionment claim against Dr. KESSLER without prejudice to renew upon submission of expert opinion evidence in support of such claims.

Dated: Larchmont, New York
July 18, 2005

Joseph Lanni

Digitally signed by Joseph Lanni
DN: cn=Joseph Lanni, c=US, email=josephlanni@msn.com
Date: 2005.07.18 21:43:49 -04'00'

**JOSEPH LANNI (CT 23566)**
THE LAW FIRM OF JOSEPH LANNI, P.C.
Attorneys for Plaintiff LAURA GUIGLIANO
138 Chatsworth Avenue, Suites 6-B
Larchmont, New York 10538
(914) 834-6600

TO:

SCOTT F. MORGAN, ESQ.
WEINER, MILLO & MORGAN, LLC
Co-Counsel for Plaintiff
LAURA GUIGLIANO
220 Fifth Avenue, 7th Floor
New York, New York 10001

NEUBERT, PEPE & MONTIETH, P.C.
Attorneys for Defendants
DANBURY HOSPITAL,
195 Church Street
New Haven, CT 06510

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendant
BORRUSO & DAN. SURG. ASSOC., P.C.
80 Fourth Street
Stamford, CT 06905

HALLORAN & SAGE, L.L.P.
Attorneys for Defendant
CATANIA
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

**DECLARATION OF SERVICE**
**PURSUANT TO 28 U.S.C. § 1746**

I, **JOSEPH LANNI**, an attorney duly admitted to practice before this Court, hereby certify, under the penalty of perjury, that the following is true and correct:

I am over 18 years of age, I am not a party to the action, and I reside in Westchester County in the State of New York. I served a true copy of the annexed: **PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT CATANIA'S FED. R. CIV. P. 19(b) MOTION TO DISMISS PLAINTIFFS' ACTION FOR NON-JOINDER OF DR. KESSLER AS A DEFENDANT,** dated July 18, 2005, on the date of July 19, 2005, by mailing the same via first class mail or the equivalent in a sealed envelope deposited in a post office or receptacle for mail provided by the U. S. Postal Service or via an express delivery courier service to the offices of counsel for the defendants located at the address indicated below:

TO:

NEUBERT, PEPE & MONTEITH
Attorneys for Defendants
DANBURY HOSPITAL
195 Church Street
New Haven, CT 23067
Tel.: (203) 821-2000

RYAN, RYAN, JOHNSON
& DELUCA, LLP
Attorneys for Defendants
BORRUSSO & DANBURY SURG. ASSOC., P.C.
80 Fourth Street
Stamford, CT 06905
Tel.: (203) 357-9200

HALLORAN & SAGE, LLP
Attorneys for Defendants
CATANIA
One Goodwin Square
Hartford, CT 06103
Tel.: (860) 522-6103

SCOTT F. MORGAN (CT 23648)
WEINER, MILLO & MORGAN, LLP
Co-Counsel for Plaintiffs
220 Fifth Avenue
New York, New York 10001
Tel.: (212) 213-1220

Executed on July 19, 2005, Larchmont, New York.

Joseph Lanni
Digitally signed by Joseph Lanni
DN: cn=Joseph Lanni, c=US, email=josephlanni@msn.com
Date: 2005.07.18 21:44:30 -04'00'

**JOSEPH LANNI (CT 23566)**