# EXHIBIT 1

# REPORT OF RICHARD J. BATISTA, M.D.

1

Richard J. Batista, Jr., M.D.
11 Riviera Drive East
Massapequa, New York 11758

November 8, 2004

Joseph Lanni, Esq.
The Law Firm of
Joseph Lanni, P.C.
138 Chatsworth Ave., Suites 6-8
Larchmont, New York 10538

Re:  Guigliano v. Danbury Hospital, et al.

Dear Mr. Lanni:

I have reviewed in detail the materials pertaining to the case of Guigliano v. Danbury Hospital. Those materials include the Danbury Hospital records, the note of Vanessa Saipher, R.T., the Danbury Hospital emergency code log for the dates of February 1–28, 2001, and the department of health investigation notes.

You requested that I provide you with opinions about the care rendered to Michael Guigliano by the surgeons during the postoperative course, the care rendered by hospital staff during the events leading up to and including a cardiopulmonary arrest suffered by Mr. Guigliano on February 17, 2001, and the cause of this gentleman's subsequent brain damage.

It is my opinion that the cardiopulmonary arrest suffered by Michael Guigliano on February 17, 2001 was due to compromised lung function as a result of progressive abdominal distention. The patient had progressive abdominal distention secondary to an ileus, gastric secretions and colon dilatation. Due to inadequate treatment, this condition elevated the respiratory diaphragm, collapsed the lungs and diminished ventilatory capacity. In turn, this resulted in persistent hypoventilation and hypoxemia during the postoperative course. Serial CXR's on the dates of February 8 – 10, 2001 and a chest CT scan on February 11, 2001, showed bilateral atelectasis. These radiographic findings,

combined with the repeated references to marked abdominal distention noted on examination and the patient's complaints of increased respiratory difficulties on being laid flat on his back confirm that the compromised lung function was due to compression from the distended abdomen.

It is highly unlikely that the patient sustained a clinically significant pulmonary embolism contributing to the cardiopulmonary arrest.  A V/Q scan was performed on February 10 and interpreted to show a low probability of acute pulmonary embolism in the lateral aspect of the right middle lobe.  This does not correspond to the bilateral perihilar and bibasilar pulmonary changes in the form of atelectasis which are seen on the CXR's.  The patient was also anticoagulated and a Greenfield filter was placed as prophylaxis for pulmonary emboli.  Similarly, there is no clinical evidence of pneumonia as a cause of the persistent respiratory problems.

During the period February 9-17, Mr. Guigliano's respiratory insufficiency was essentially treated with supportive oxygen administered by nasal cannula.  The oxygen flow was adjusted to maintain oxygen saturation above 90 percent.  According to the records, the oxygen saturation was monitored by pulse oximetry and it essentially hovered in a range of upper 80's to mid-90's in the week prior to the cardiopulmonary arrest.  A 90 percent oxygen saturation translates into a PO2 of 60 mm Hg; therefore, there was a large alveolar-arterial gradient in a patient who is physiologically unaccustomed to this lower level of oxygenation and a lowered threshold for respiratory distress. As a result, the patient had a reduced oxygen reserve and an increased stress load on cardiac function seen by the persistent tachycardia.  In essence, this patient could not withstand any additional insult to oxygenation without incurring a respiratory arrest.

The patient's cardiac function was further stressed by a progressive decrease in serum electrolytes below normal levels.  The potassium and ionized calcium levels decreased from normal levels to below normal levels from admission to February 17.  (Potassium and ionized calcium were 3.1 and 0.98 on February 17.)  The abnormally low potassium made the myocardium irritable and increased this patient's susceptibility to an arrhythmia provoked by hypoxemia and/or hypoventilation.

The hemoglobin (Hgb) and hematocrit (Hct) also progressively declined to markedly low levels that approximated half of normal range.  This reduced the oxygen carrying capacity of the patient's blood.  The anemia also contributed to the patient's hypoxemia and decreased the threshold for a cardiac arrest.  It also probably made the patient more difficult to adequately resuscitate.

When the patient was placed supine for the CT scan on February 17, this was the catalyst for a respiratory arrest from the increase in compression of the patient's lungs due to the distended abdomen.  Without timely and proper intervention, the patient's hypoxemia and respiratory distress worsened to the point of a respiratory arrest.  Consequently, the respiratory arrest resulted in a cardiac arrhythmia and hypotension and then progressed to a cardiac arrest (PEA / EMD).  Due to improper and untimely CPR measures, the cardiopulmonary arrest caused anoxic encephalopathy to the patient.

It is my opinion to a reasonable degree of medical certainty that a multitude of departures from proper medical practice and proper Basic Life Support protocols in the postoperative treatment given to Mr. Guigliano was committed by the treating surgeons and other medical personnel.

First, the surgeons failed to follow proper practice to treat the patient's massive abdominal distention. While a nasogastric tube was used to decompress the abdomen and it emptied a large amount of fluid, the NGT was pulled out too soon by a Dr. Borruso on February 15. When the NGT was discontinued, there was still significant abdominal distention that had not resolved and it was still discharging "clear" fluid. An isolated episode of "serosanguinous" drainage on the night of February 14 does not indicate that the NGT should have been removed. This was brought to the attention of several physicians and no one thought it necessary to take out the NGT. In fact, there is a surgery note that appears to have been entered prior to Dr. Borrusso's on February 15 and the decision of this surgeon was to keep the NGT in place. After this date, the lack of a NGT allowed the abdominal distention to worsen over the next two days. Dr. Borrusso saw the patient on February 16 and noted that the abdominal distention was still present; therefore, he should have reinserted the NGT at that time. Surgery also saw the patient on the morning of February 17. The entries in the progress record on February 16 and 17 show that the abdomen is worsening and it is having a marked effect on the patient's ability to breathe.

Additionally, more aggressive forms of intervention were required in the form of a rectal tube. It should be noted that a rectal tube was inserted along with an oral gastric tube on February 17 after the patient coded to decompress the abdomen. This rectal tube remained in use despite the fact that the patient's treatment for a C. difficile infection continued during that time and the available stool cultures indicated the presence of the organism.

Second, the treating surgeons failed to properly treat the patient's electrolyte imbalances. The patient did not receive massive electrolyte resuscitation (potassium and ionized calcium) until he was brought to the ICU after the cardiopulmonary arrest on February 17. Repletion of the electrolytes was the responsibililty of surgery since the record indicates that the surgery personnel were following the lab values and also the patient's attending physicians.

Third, the patient was not adequately supervised and monitored by sufficiently skilled hospital personnel (e.g.: registered nurse, medical resident or attending physician who would also have training in BLS or CPR) when he was brought to the radiology department for the CT scan on February 17. (It should be noted that an R.N. wrote a "multispecialist" note in the progress record on February 10 that indicates that she monitored and supervised the patient when he was sent for a VQ scan.) Not only was someone of sufficient skill level needed to accompany the patient for his CT scan, but also this patient required continous pulse oximetry and cardiac monitoring which also

was not done. The surgeon ordering the test knew that the patient would need to lie flat for the chest CT scan and should have known from the records that this positioning would cause respiratory distress since that had previously happened several times. The surgeon (along with the nursing staff) should have ordered the proper supervision and monitoring for the CT scan. The respiratory technician and aide in the CT scan room should have called the code when the patient became cyanotic and was gasping for breath. Instead, there was an inexplicable delay (i.e.: placing patient back on a gurney, wheeling out of CT room into hall, telephoning his nurses, etc.) in getting help despite the patient's marked distress. If appropriate supervision and monitoring had been done, the severity of the patient's respiratory distress would have been discovered earlier and there would have been proper intervention undertaken by calling the "code" sooner and ensuring proper ventilation in a timely manner. This is actually what happened on February 10; the oxygen saturation dropped when the patient was placed supine for the VQ scan and the O2 flow rate was increased to 6 l/min to raise the oxygen saturation to acceptable levels and prevent further deterioration in the patient's condition.

      Fourth, the patient was obviously not given adequate oxygen therapy when he was brought to the radiology department for his respiratory distress. Oxygen was being administered by nasal cannula prior to the patient being brought to the radiology department; however, it apparently was removed at some point. (The radiology technician's note refers to putting oxygen on the patient after he became cyanotic.) The patient required supplemental oxygenation with a non-rebreather mask. It was a departure from proper medical practice on the part of Danbury Hospital to discontinue supplemental oxygenation and fail to provide oxygenation from a non-rebreather mask during this time. This improper medical practice caused or contributed to the cardiopulmonary arrest suffered by the patient because the non-existent or ineffective delivery of oxygen exacerbated the patient's hypoxemia and permitted him to deteriorate into respiratory arrest and then cardiac arrest.

      Fifth, the patient was improperly and untimely resuscitated after sustaining the cardiopulmonary arrest on February 17. The code sheet indicates that the code was called at 1:02 p.m. and that the patient was intubated at 1:05 p.m. The department of health file contains a reference to a three or four minute delay in the arrival of anesthesia to perform the intubation. The post-code notes in the hospital records refer to a ten (10) minute delay in the initiation of CPR. Because this patient was unconscious, ventilation of the patient by an Ambu-bag and mask for a period of at least 3 – 4 minutes was inadequate. The medical personnel needed, at the least, to temporarily insert an oral airway until intubation could occur so as to ensure adequate ventilation of this unconscious patient within that 3 – 4 minute period. Just as significant is that there were no chest compressions being done (see, the DOH file) until the arrival of the CRNA and the respiratory therapist on the scene. This 3 – 4 minute period (possibly even 10 minutes) was crucial to determining the outcome for this patient. It should be kept in mind that the patient had compromised lung function secondary to atelectic compression, severe anemia and electrolyte disturbances; therefore, he was likely more resistant to resuscitation and more susceptible to anoxic brain damage the more the delay in starting effective BLS/CPR techniques.

You have advised me that depositions have been done and are continuing in this matter and that some or all of these depositions will be provided for my review in the future. I will be pleased to discuss the case with you again upon reading the deposition testimony.

Sincerely,

**[E-COPY]**

_____
Richard J. Batista, Jr., M.D.