**EXHIBIT 2**

**REPORT OF BRIAN S. KAUFMAN, M.D.**

Brian S. Kaufman, M.D.
Two Rubins Court
Dix Hills, New York 11746

November 7, 2004

Joseph Lanni, Esq.
The Law Firm of Joseph Lanni, P.C.
138 Chatsworth Avenue, Suites 6 – 8
Larchmont, New York 10538

RE:    **GUIGLIANO v. DANBURY HOSP., ET AL.**

Dear Mr. Lanni:

This report is in response to your request for my medical opinions about whether there were any departures from good and accepted medical practice in the treatment of Michael Guigliano during his admission to Danbury Hospital in 2001. The focus of my review is the initial ten (10) day period of this admission (February 7 – 17, 2001). My opinions were to focus on the medical care rendered during that time, particularly with respect to issues involving the patient's respiratory condition and the events leading up to and encompassing the respiratory arrest of February 17.

I have been provided with the Danbury Hospital record; the Connecticut, Department of Public Health file; a copy of a handwritten note of Vanessa Saipher, R.T.; and Danbury Hospital Emergency Code Log for February 2001.

You have advised me that the claims in this case include allegations that departures from proper medical practice caused Mr. Guigliano to sustain a respiratory arrest and that a failure to properly and timely resuscitate Mr. Guigliano caused him to sustain profound anoxic encephalopathy.

According to the Danbury Hospital records, Michael Guigliano was admitted to Danbury Hospital on February 7, 2001 for treatment of multiple fractures of the left lower extremity. These injuries occurred as the result of a fall from a roof

On February 8, 2001, the patient underwent O.R.I.F. surgery for repair of a left tibial plateau fracture by a Dr. DePuy. There was one transient intraoperative episode of hypoxemia. On the first postoperative day, February 9, 2001, the patient was found to be hypoxemic with an oxygen saturation of 87 percent on room air, A pulmonology consult was performed by a Dr. Kotch. A CXR showed perihilar infiltrates. Dr. Kotch's assessment was possible fat emboli syndrome. The patient also spiked a fever of 102.1 on this date. An orthopedic progress note refers to lung base infiltrates and includes aspiration pneumonia in the differential diagnoses. The patient was placed on oxygen via nasal cannula and was monitored with pulse oximetry and telemetry.

A VQ scan was performed on February 10, 2001 and was interpreted as low probability for pulmonary embolism (PE). An ultrasound examination of the lower extremities was also performed and was interpreted as being positive for deep venous thrombosis (DVT). The patient continued to be hypoxemic with oxygen saturations as low as 82 percent on room air. He was also persistently tachycardic. The record reveals that when the patient was taken for the VQ scan he was accompanied by a registered nurse who monitored his vital signs and provided intervention when needed. Monitoring was with pulse oximetry and a cardiac monitor. When the patient was placed in a supine position for the test, his oxygen saturation was noted to drop significantly; therefore, the nurse increased the oxygen flow to 6 l/m to maintain his oxygen saturation in an acceptable range. This event indicated that placing the patient in the supine position caused the onset of hypoxemia probably as a result of abdominal distention that had been found on examination and/or postoperative atelectasis.

Over the next week, Mr. Guigliano's respiratory status and abdominal distention did not improve. During this time he required continual oxygen via nasal cannula to maintain acceptable saturations and a NGT was inserted for a few days in an attempt to decompress the abdomen. Anticoagulation therapy was instituted to prevent emboli migration from the DVT of the legs and eventually reached therapeutic levels.

The patient continued to exhibit hypoxemia on February 11, 2001; oxygen saturation was found to be 75 percent on room air. Also the patient was found to still have a distended, "bloated" abdomen. A surgery consultation by a Dr.

Borrusso considered the possibility of a bowel obstruction, an ileus due to analgesic medication or intra-abdominal trauma.  CT scans of the chest, abdomen and pelvis were done.  The CT scan of the chest showed bilateral patchy lower lobe infiltrates which are consistent with fat emboli syndrome and/or ARDS.  The CT scan of the abdomen revealed colon dilatation and a prominent small bowel.  On the basis of these CT scan findings, Dr. Borrusso's impression was an ileus secondary to narcotic analgesia.  He ordered the patient to be NPO except for ice chips.

On February 12, 2001, the patient underwent placement of an inferior IVC filter as prophylaxis for emboli secondary to the DVT of the lower extremities.  Oxygen therapy was continued, the patient had an oxygen saturation of 93 percent on 3 L/m.

The patient returned to the O.R. on February 13, 2001, for a repair of a left calcaneus fracture.  This operation was performed a by Dr. Gray and appeared to proceed without complication.

The patient still had abdominal distention on February 14, 2001.  His temperature was slightly elevated to 101.1 F.  Oxygen saturation was noted to be 96 percent on 5 L/m O2.  The patient was also noted to have large liquid bowel movements.  Flagyl was ordered to treat Clostridium difficile. The patient had low hemoglobin (Hgb) and hematocrit (Hct). The NGT remained in place for the abdominal distention and was draining fluid.  The respiratory treatment consisted of supportive oxygen and incentive spirometry.

On February 15, 2001, the patient's NGT was noted to be draining "fairly clear" fluid; however, the abdomen was still noticeably distended.  The NGT was removed on this date.  Oxygen saturation was at 94 percent on 3 L/m oxygen.  A CXR on this date revealed bibasilar subsegmental atelectasis which was probably due to the abdominal distention.

The patient was initially noted to have oxygen saturations of 93 – 96 percent on room air on February 16, 2001.  The patient's anticoagulation was found to be at a therapeutic level of 2.65 INR.  A progress note indicates that the abdomen was still distended and "hard".  Dr. Kotch saw the patient and found him to be uncomfortable with increasing shortness of breath which he attributed to the distended abdomen.  The progress record also refers to the patient's abdomen as being distended with tympanic bowel sounds.  The patient was found to become short of breath while sitting on the edge of the bed.  Oxygen saturation was found to be at 89 percent on 1 L/m.  It became 95 percent on 2 L/m.  The patient is quoted as saying that he felt as if his "stomach [was] pushing into [his] lungs, making it hard to breathe".  A surgery note indicates the abdomen to be "firm" and distended; the assessment at that time was "ileus" secondary to narcotics.  Another surgery note by Dr. Borrusso states that the patient had diarrhea and large amount of flatus; however, the abdomen remained

4

distended.  A GI consult was planned but not done before the patient coded the next day.

On February 17, 2001, at 3:30 a.m., a nurse wrote that the patient's "bowel sounds [are] very slow" and that the "abdomen is huge, distended and firm".  At 3:45 a.m., it was noted by the nurse that the patient's lungs were found to have inspiratory and expiratory "crackles" and "wheezing". At 6:45 a.m., the patient was noted to be significantly hypoxemic with an oxygen saturation of 89 – 91 percent on 1 L/m oxygen; it rose to 94 percent when oxygen was increased to 2 L/m.  The records indicate that the head of the patient's bed was elevated by the nursing staff and the patient encouraged to take deep breaths.  The patient continued to be "very uncomfortable with distended abdomen".  It is assumed that HOB elevation was to make it easier for the patient to breathe since a supine position compromised his breathing as a result of lung compression from the abdomen.

A surgery note on February 17 indicates the persistence of abdominal distention.  The surgeon (unidentified) recommends a Dulcolax suppository and ordered a CT scan of the abdomen.  Another progress record entry on February 17, 2001, by a Dr. Kessler refers to the patient feeling "bloated [and] distended."  The impression was an ileus.  Hemoglobin (Hgb) and hematocrit (Hct) were noted to be 8.5 / 25.8.

At 11:00 a.m., a nurse noted the patient to be uncomfortable with an abdomen that was "firm, distended [and with hypoactive bowel sounds]".  It was noted that the patient was to go for a CT scan of the abdomen that day.  Oxygen saturation appears to be 96 percent on 2L O2.  The note indicates that the patient complained of shortness of breath with position change and activity.  The patient is also moderately tachypneic at 20 – 24/m and tachycardic at 100 – 110 bpm.  There are no further physicians' notes or nurses' notes in the progress record or chart until sometime after 1:00 p.m. on February 17, 2001.

A review of the laboratory results up to February 17 demonstrates several items of significance There had been mildly low ionized calcium, potassium and Hgb / Hct values throughout the previous ten day period.

There is a handwritten account by a Vanessa Saipher (the CT scan technician) of the events which occurred in the Radiology Department leading up to and encompassing the code event.  This note, which is apparently not part of the hospital record, reads:

> "Joe Roth, the transporter & myself lowered the stretcher & pulled him across the table.  Almost immediately after the move, he started <u>flailing</u> & <u>gasping for breath</u>.  He said he couldn't breath & became <u>cyanotic</u>.  Joe reached for an oxygen mask & covered his face.  I told the patient I was taking him right back to his room & we would do the CT later.  He argued

5

> with me 'to do it now'. He would not keep the mask on his face & was in obvious distress. We pulled him back on the stretcher & elevated the bed, while I held the oxygen on his face & Joe hooked him to the pulse ox. The reading was 79 or 80. I told Joe to call his nurse & tell her what was happening, as I pushed the stretcher out the door. As soon as we were thru the doorway, Mr. Guigliano started seizing & I yelled for Joe to get Dr. Berger. Within a few seconds, Dr. Berger & Joe were there & Dr. Berger told me to 'call a code'. I pushed the code button & gave Dr. Berger an ambu bag from the cart. I stepped back & waited for the team. The operator called 'Code 99, 7th floor' & from what I was told later, the team was confused by this. Anesthesia came quickly & we waited for the team."

A neurology consultation by a Dr. Culligan, dated February 18, 2001, makes further reference to the circumstances of the code on the previous day. Dr. Culligan's note states:

> "While being placed in the CAT scan machine he was laid flat, and complained of shortness of breath. Shortly thereafter, he had sudden cardiorespiratory arrest. Radiology was on hand within seconds, and able to bag him. A Code 99 was called, and the code team responded. ***According to the residents, possibly 10 minutes may have passed before effective CPR was <u>initiated</u>***."

An infectious disease consultation by a Dr. Hindes, dated February 25, 2001, also makes reference to the circumstances of the code. Dr. Hindes' note states as follows:

> "On February 17, while receiving a CAT scan of the abdomen, the patient coded while in radiology. He was bagged within a few seconds, and the code team responded. It is estimated that ***approximately 10 minutes may have passed before effective CPR was <u>established</u>***."

The Connecticut Department of Health file concerning deficiencies in the care and treatment of Michael Guigliano indicates that Danbury Hospital was issued two violations concerning the events pertaining to the cardiopulmonary arrest. "Violation #1" was for the failure to document events prior to the "code" call. "Violation #2" was for a failure to "ensure adequate supervision of patients receiving diagnostic procedures".

A Code 99 Flowsheet in the Danbury Hospital record indicates a "code" was called at 1:02 p.m. on February 17, 2001, when the patient was found to have sustained a respiratory arrest in the CT scan room. There is no indication in the code sheet as to when the respiratory arrest onset or was first noted by medical personnel. Charting of vital signs and resuscitation measures does not

6

begin until 1:05 p.m.  From 1:05 p.m. to 1:25 p.m., the patient was found to be exhibiting cardiac activity in the form of electromechanical disassociation and pulseless electrical activity.  Resuscitation measures consisted of intubation, epinephrine, bicarbonate, magnesium sulfate and apparently chest compressions with ventilation.  The code lasted until 1:45 p.m.

A "Code 99 / ICU admission note" of February 17, 2001 states that the patient "was found in the CT room unresponsive [with] no pulse, no BP, midriatic pupils, cold extremities."

The post-Code 99 physicians' notes demonstrate that, upon admission to the ICU, the patient was given calcium, potassium and PRBC's via I.V.  The patient was diagnosed as suffering from severe anoxic encephalopathy.

When the patient was placed flat for the CT scan in the radiology department on February 17, 2001, this was the triggering event for a downward spiral in oxygen saturation.  The patient became progressively more hypoxemic due to atelectasis and shunting secondary to the abdominal distention and possibly aspiration of stomach contents.  An oral gastric tube inserted by the C.R.N.A. during the code produced 800 cc of fluid.  This amount of fluid is more than a considerable amount and contributed to the compression of the lungs from the abdominal distention. As the hypoxemia progressed, one of two scenarios occurred: either there was a respiratory arrest which then went to a cardiopulmonary arrest or the hypoxemia directly produced a cardiopulmonary arrest. This functional equivalent of a cardiopulmonary arrest persisted without interruption for approximately 25 minutes before any pulse was obtained.  As a result of this respiratory arrest and consequent cardiopulmonary arrest, the patient was severely anoxic for a prolonged period of time.  This prolonged anoxic episode caused the patient to sustain profound brain damage of a permanent nature.  This downward spiral in oxygenation was allowed to progress to cardiopulmonary arrest and brain damage because there was a failure to properly and timely treat the hypoxemia and because there was a failure to timely undertake adequate Basic Life Support measures and cardiopulmonary resuscitation.

It is my opinion with a reasonable degree of medical certainty that the treating surgeons failed to take the necessary and indicated steps to reduce the patient's massive abdominal distention.  An opportunity to alleviate or, at least, reduce the compression of the lungs was missed because the nasogastric tube was pulled out too soon on February 15 by Dr. Borrusso before it had any significant therapeutic effect on the abdominal distention.  At the time that the NGT was discontinued, it was still draining gastric fluid and this fluid was "fairly clear". The removal of the NG tube permitted the abdominal distention to worsen considerably over the next 48 hours and further compromise the patient's respirations.  There was also a failure by a surgeon to reinsert the NGT when the

abdominal distention was still found to be present and, in fact, more profound on February 17.

The physician ordering the CT scan test should have been aware that Mr. Guigliano's respiratory difficulties increased when he was lying flat. The nurse's note immediately before the February 17 surgery note documents respiratory wheezing and crackling of the lungs and there is HOB elevation to make the patient's breathing easier. Moreover, the progress record documented that this patient had previously exhibited exacerbations of hypoxemia when placed in the supine position for a diagnostic test on February 10. Thus, either the patient's nurse or the physician ordering the test should have had the patient be accompanied by someone of adequate skill level, either another physician (it could be a resident or house staff physician) or a nurse trained in Basic Life Support and CPR and with pulse oximetery and cardiac monitoring. Then the patient's severe hypoxemia would have been timely recognized and there would have been timely intervention (such as administering oxygen via nasal cannula or non-rebreather) to prevent the patient from going into respiratory arrest or cardiopulmonary arrest. This is exactly what happened when the patient was placed supine for his VQ scan on February 10.

There is no documentation anywhere in the record indicating that the patient was brought down to the radiology department with the oxygen therapy continuing. When the patient went into severe respiratory distress on the CT scan table, the staff then "reached for an oxygen mask" and applied it to the patient. Why would an oxygen mask need to be applied if this patient was already receiving oxygen? There is no reference in this note of oxygen via nasal cannula being in use. Transporting the patient without oxygen would be a departure from proper medical practice.

There is no documentation anywhere that the patient was brought down to the radiology department with pulse oximetry monitoring in use. The note mentions that the patient was "hooked to the pulse ox" after the oxygen mask was applied. The oxygenation saturation was 79 – 80 percent, the patient was severely hypoxemic. If the pulse oximetry had been in use prior to the onset of the severe respiratory distress, the staff would have been aware to the patient's worsening hypoxemia and made an earlier call for help. Transporting Mr. Guigliano without pulse oximetry was a departure from proper practice. The same can be said for transporting the patient without a cardiac monitor.

The patient was "flailing & gasping for breath" and "cyanotic", but no code was called. The radiology technician instead decided to take the patient back to his room and also stopped to telephone the "floor" rather than call a code. The radiology technician also took the to move the patient onto a gurney and elevate his head. It was only when the radiology technician was pushing the stretcher out of the CT room and the patient began "seizing" (probably from cardiac arrest or marked hypotension), she told the student intern to summon a physician. It is

only after a Dr. Berger arrived on the scene and attempts to ventilate the patient with an Ambu-bag that he instructs the radiology technician to call a code. The staff improperly delayed summoning a physician and calling the code.

The hospital personnel present were apparently inexperienced people who did not know what to do when then patient became cyanotic and was in obvious distress. Since codes in a radiology department are not rare, personnel should be trained to have a very low threshold for calling for help at the first indication that something is wrong and a patient is in distress.

The materials reviewed also indicate that there was a delay in the arrival of the code team. The Saipher note states that the operator was mistaken in announcing the location of the code. The radiology department is on the third floor of the hospital. The hospital code log which states that the "[o]perator misspoke when stating the location the 1st time".

During this time, the patient was being Ambu-bagged via mask by Dr. Berger; however, there is no mention that there is air entry into the lungs. This method of ventilation would have been ineffective to oxygenate this patient given his unconsciousness without an oral airway if there is little or no air entry into the lungs. More significant, the Department of Public Health investigative file indicates that Ambu-bagging was occurring without compressions for what appears to be at least 3 – 4 minutes if not longer (the progress record indicates a delay of possibly 10 minutes in initiating CPR).

Dr. Berger indicates that he was Ambu-bagging the patient but there is no mention of compressions. Dr. Berger is noted not to have found a pulse when he examined the patient. Both the C.R.N.A. and a respiratory therapist were the first to arrive on the scene and they both indicated that no chest compressions were being done before they showed up. The failure to timely commence performing chest compressions was a serious departure from standards of proper CPR and Basic Life Support. All physicians, as part of their training, must be familiar with CPR and Basic Life Support measures. Similarly, Mr. Roth states that he was ACLS or ALS certified and he should have known to start compressions as well while waiting for the code team. The failure to timely commence performing chest compressions was a serious departure from standards of proper ALS / ALCS. In essence, the patient was in cardiorespiratory arrest for several minutes without any adequate circulation and that is a failure to follow proper practice in terms of BLS, CPR and ALS training.

Because the patient's potassium and ionized calcium became low in the week prior to the cardiopulmonary arrest, this condition made the patient more susceptible to a cardiac arrhythmia secondary to hypoxemic insult and may have contributed to the cardiopulmonary arrest. The patient's Hgb / Hct were also markedly low and this reduced the oxygen carrying capacity of the patient's bloodstream. The patient's severe anemia probably contributed to the hypoxemia

and may have made the patient more susceptible to respiratory and cardiac arrest.

It is my opinion with a reasonable degree of medical certainty, that the failures to follow proper medical practice and proper practice in BLS, CPR and ALS caused Mr. Guigliano to suffer a cardiopulmonary arrest and sustain severe anoxic encephalopathy.

You have advised me that depositions of the various physicians and hospital personnel involved in the care and treatment of Michael Guigliano are in the process of being completed.  I will be glad to review any or all of these depositions as part of my expert opinions in this case.


Very truly yours,

**[E-COPY]**

_____
Brian S. Kaufman, M.D.