# EXHIBIT 3

# REPORT OF NANCY MURE', R.N.

1

*Nancy Mure´, R.N., B.S., M.A.*

*University Hospital*                                                                                    *15 Admiralty Loop*
*150 Bergen Street*                                                                          *Staten Island, N. Y. 10309*
*Newark, N.J. 07103*

November 4, 2004

Joseph Lanni, Esq.
Joseph Lanni, P.C.
138 Chatsworth Avenue, Suites 6 – 8
Larchmont, N.Y. 10538

RE:    Guigliano v. Danbury Hospital, et al.

Dear Mr. Lanni:

    Thank you for the opportunity to review this most interesting case. After careful review of the records and other materials, it is my opinion with reasonable certainty that there were multiple departures from proper nursing practice and hospital practice in the medical treatment rendered to Michael Guigliano on February 17, 2001. My opinions in this matter are based upon my review of the Danbury Hospital records, the Connecticut Department of Public Health investigative file, the statement of a Vanessa Saipher and my education, training and years of experience in the nursing field and in hospital administration.

    I am licensed as a registered nurse in New York, New Jersey and Florida. I have been a registered nurse since 1972 after completing the nursing program at Kingsborough Community College. I received a B.S. in Health Science and an M.A. in Community Health Care Administration at Brooklyn College in 1978 and 1993 respectively. From 1972 to 1995, I was employed by Maimonides Medical Center in Brooklyn, New York. I was an Assistant Head Nurse in the Surgical ICU and the Open Heart Surgery Units during the years 1974 – 1983, the Administrative Coordinator for Critical Care during the years 1983 – 1985, the Assistant Director of Nursing for the Emergency Department during the years 1987 – 1989, and the Director of Nursing for the Division of Surgery

during the years 1989 – 1995.  From 1995 to 1997, I was the Acting Director of Patient Care Services for the Surgical Division at University Hospital of the University of Medicine & Dentistry of New Jersey in Newark, New Jersey.  Since 1997, I have worked as a Supervisor of the Nursing Staff at the Clove Lakes Health & Rehabilitation Center near my home on Staten Island, New York.  I am also certified in Basic Life Support, Advanced Life Support, and Advanced Trauma Life Support.

There are several aspects of Mr. Guigliano's condition that must be considered in evaluating the nursing care and hospital care rendered to this patient.  The most important is that this patient was never "stable" from a nursing perspective throughout the postoperative course from February 9 to the time that he sustained a cardiopulmonary arrest on February 17, 2001.  He consistently exhibited respiratory problems, he complained of SOB and difficulty breathing, and he required supplemental oxygen via nasal cannula to maintain adequate oxygen saturations during this time.  The patient often required an oxygen flow rate of 2 – 4 liters per minute to maintain an oxygen saturation of 93 – 95 percent which is still mildly hypoxemic.  He was also constantly tachycardic.  The patient constantly required and received both pulse oximetry and telemetry monitoring.  There were various laboratory abnormalities including anemia and some electrolyte deficiencies.  Finally, his abdomen was markedly distended reportedly due to a postoperative ileus and this abdominal distention appeared to compromise his breathing.

The nurses' notes of February 17, 2001, document that Mr. Guigliano was continuing to exhibit respiratory problems and was clearly not stable from the perspective of either oxygenation or cardiac rate.  At 3:30 a.m., the nurse wrote that the patient's "bowel sounds [are] very slow" and that the "abdomen is huge, distended and firm".  At 3:45 a.m., the nurse notes that the patient's lungs had "crackles" and wheezing on both inspiration and expiration.  At 6:45 a.m., the patient was noted to be significantly hypoxemic with oxygen saturations of 89 – 91 percent on a flow rate of 1 liter per minute of oxygen and then 94 percent when oxygen was increased to a flow rate of 2 liters per minute.  The head of the patient's bed was elevated by the nursing staff and he was encouraged to take deep breaths.  The patient also was said to be "very uncomfortable with distended abdomen".  These notes are a further indication that the patient's respiratory status was unstable and that the abdominal distension was contributing to the patient's respiratory difficulties.

At 8:00 a.m., the nurses' daily assessment chart indicates that the patient's respirations were "shallow" and the respiratory rate was elevated at 24 per minute.  These findings were observed even though the chart indicates that Mr. Guigliano was receiving oxygen at 2 liters per minute.  The oxygen saturation at the time was 95 percent, despite the 2 l/min O2, which is mildly low.  The patient was also still tachycardic at that time with a heart rate of 108.

A nurses' note at 11:00 a.m. states that Mr. Guigliano was "still uncomfortable" with an abdomen that was firm and distended.  Bowel sounds were hypoactive.  The patient's respiratory status was noted to be respirations at 20 – 24 per minute and 96

3

percent oxygen saturation at 2 l/min of O2. Most important, the nurse noted that the patient complained of shortness of breath ("feels SOB") with changes in his position. There were also what appear to be decreased breath sounds at the lung bases. The patient was still tachycardic with a telemetry reading of 100 – 110 per minute. Thus, the records show that Mr. Guigliano had abnormal respirations, had complaints of shortness of breath, had an abnormally elevated cardiac rate, required oxygen to maintain saturations in the mid-90's, and required monitoring by pulse oximetry and telemetry. The patient was not stable at the time of his transfer to the radiology department.

There is no nurses' note in the progress record documenting the patient's condition or documenting that monitoring devices (e.g.: pulse oximeter, cardiac monitor) and portable oxygen were in use at the time that he was being transferred from his room for the CT scan of the abdomen on February 17.

Based on the medical records, it appears that the patient was transferred from his hospital room to the radiology department for the abdominal CT scan on February 17, 2001 without the supervision of a CPR trained nurse or multispecialist, without a portable cardiac monitor and without pulse oximetry monitoring. It also appears from the medical records and other materials that the patient was either transferred without portable oxygen or that the oxygen was removed from the patient at some point in time. There is no record anywhere which documents that the patient had any monitoring devices or portable oxygen in use during the transfer to the radiology department.

Mr. Guigliano was a patient who required close 1:1 monitoring by qualified members of the nursing staff when he was transferred for his CT scan on February 17. The "model" for proper nursing supervision can be seen in the notes concerning the patient's transfer for diagnostic testing on February 10, 2001. On that date, he was taken for a VQ scan and was constantly accompanied by a registered nurse referred to as a "multispecialist". A note in the progress record by the multispecialist R.N. demonstrates that the patient was being monitored via pulse oximetry and a portable cardiac monitor throughout the transfer and testing. Moreover, it is documented that oxygen via nasal cannula was being administered to the patient at the time. When the head of the bed was lowered for the test, the patient's oxygen saturation deteriorated to 88 percent (i.e.: laying the patient flat compromised his breathing and made him seriously hypoxemic). In response to this development, the nurse increased the patient's oxygen flow rate from 4 l/min to 6 l/min and the O2 saturation improved. The patient was returned to his room after the completion of this test without "incident". In essence, this note shows that proper supervision by a qualified nurse, proper monitoring and timely intervention in the form of simply increasing the oxygen flow rate prevented a respiratory arrest or cardiopulmonary arrest on this occasion. Additionally, it should be noted that there was no practical difference in the patient's respiratory and cardiac status between February 10 and February 17.

The note of a Vanessa Saipher provides some information on the events leading to the cardiopulmonary arrest suffered by Michael Guigliano in the CT scan room on February 17. Upon Mr. Guigliano's arrival in the radiology department, he was laid flat

on the CT scan table which probably contributed to the respiratory arrest that followed. It is documented that when the patient was placed on the table, he immediately "began gasping for breath" and became "cyanotic". The patient was observed to be in "obvious distress". The note further documents that he was administered oxygen which indicates either that the patient was transferred without oxygen or that the O2 was removed at some point in time. Also pulse oximetry was "hooked" to the patient (which also indicates that pulse oximetry was not in use prior to this) and, according to Ms. Saipher, the O2 saturation was 79 – 80 percent which is severely hypoxemic. The Department of Public Health investigation file notes that Joe Roth, the other technician present in the CT scan room, reported an O2 saturation in the "60's". For unknown reasons, Ms. Saipher decided to return the patient to his room in this condition. She had him moved to a stretcher and had him wheeled out of the room. The D.O.P.H. file also documents that Ms. Saipher inexplicably stopped to call the patient's floor. At this point in time, the patient began to have seizures so a physician named Dr. Berger was summoned. It was only after Dr. Berger arrived on the scene that a decision was made to call a "code" and the code button was pushed. Dr. Berger apparently began to Ambu-bag the patient in an attempt to ventilate him; however, there is no mention of evaluating whether the patient is in cardiac arrest and nothing is documented about the commencement of chest compressions. Finally, it should be noted that the code was mistakenly called to the wrong location and Ms. Saipher indicates that the code team was "confused by this".

Based on the material reviewed, the medical records and other materials document an inexcusable delay in the calling of the "code" and the commencement of proper cardiopulmonary resuscitation measures. Despite the patient "gasping for breath", becoming "cyanotic" and being in "obvious distress", no one in the CT scan room with the patient called a "code". More time is wasted by Ms. Saipher arguing with the patient, making a phone call and attempting to return him to his room. Then still more time is wasted by summoning a Dr. Berger to come see the patient. One progress note, dated February 18, 2001, states that "[a]ccording to the residents, possibly 10 minutes may have passed before effective CPR was <u>initiated</u>." Another note in the chart, dated February 25, 2001, states that "[i]t is estimated that approximately 10 minutes may have passed before effective CPR was established." The "code" should have been called immediately after the patient began gasping for breath and became cyanotic.

The D.O.P.H. investigative file contains notes of an interview with Dr. Berger which appears to indicate a period of "3 – 4 min" before "anesthesia" arrived in the CT scan room and intubated the patient. Anesthesia was present in the CT scan room before the code team. A code flowsheet in the medical records indicates that the "code" was called at 1:02 p.m. on February 17, 2001, when the patient was found to have sustained a respiratory arrest in the CT scan room. Charting of vital signs and resuscitation measures does not begin until 1:05 p.m., three minutes after the code was called. Even if one assumes that the information about the time between the call of the code and the intubation of the patient that is recorded in the D.O.P.H. investigative file and in the code flowsheet is accurate, then there was still an improper delay between the patient becoming cyanotic and the start of adequate cardiopulmonary resuscitation.

The initial resuscitation measures for Mr. Guigliano were also inadequate once the "code" was called. According to the interviews of a Pat DiLaird, R.T., and a Tim Hendries, C.R.N.A., in the D.O.P.H. investigative file, no one started chest compressions until after the patient was intubated. Thus, a period of several minutes probably passed during which no compressions were being done. Additionally, the D.O.P.H. investigative file indicates that, prior to the intubation, ventilation of the patient was attempted with an Ambu-bag device. This method of ventilation would be ineffective for an unconscious patient such as Mr. Guigliano. An oral airway was required to ventilate the patient prior to an intubation so that air entry into the lungs could be ensured. There is no mention of the use of an oral airway prior to intubation or of an oral airway being present among the emergency equipment on a crash cart in the radiology department.

The cardiopulmonary resuscitation measures rendered to the patient after intubation as documented in the code flowsheet were also inadequate. This patient was in PEA / EMD for an extended period of time (20 – 25 minutes); therefore, an attempt should have been made to restore cardiac function through use of the defibrillator / cardioverter.

According to the medical records, Mr. Guigliano sustained severe anoxic encephalopathy as a result of the cardiopulmonary arrest.

The lack of any contemporaneous documentation about events leading up to the patient's cardiopulmonary arrest and the circumstances surrounding the code in the medical records raises many questions about what actually happened to this patient and is a serious departure from nursing standards of practice.

It is my opinion, with a reasonable degree of professional certainty, that the following departures from proper nursing practice and hospital practice were committed by the nursing staff and hospital staff in the care and treatment of Michael Guigliano on February 17, 2001:

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan under the 1:1 supervision of a CPR trained nurse or multispecialist.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with a portable cardiac monitor.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with pulse oximetry monitoring.

There was a failure to transfer the patient from his hospital room to the radiology department for the abdominal CT scan with portable oxygen or there was a failure to maintain the patient on supplemental oxygen.

There was a failure to timely call a "code" for this patient, the "code" should have been called when the patient began "gasping for breath", became "cyanotic" and was in "obvious distress" and the failure to do so wasted several minutes of precious time during which the patient needed proper ventilation and chest compressions.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since chest compressions were not started on this patient for an unduly long period of time.

There was a failure to timely commence adequate cardiopulmonary resuscitation measures since the patient was not being ventilated with an oral airway to ensure air entry into the lungs prior to intubation for an unduly long period of time.

There was a failure to timely respond to the "code" call for this patient, there was a delay in excess of 3 – 4 minutes between the patient becoming cyanotic (a sign of severe hypoxemia) and the commencement of adequate CPR measures in the form of intubation and chest compressions.

There was a failure to have an oral airway available as part of the emergency equipment on a crash cart in the radiology department to assist in the ventilation of an unconscious patient during a "code".

There was a failure to perform adequate CPR measures during the "code" because the defibrillator / cardioverter was not used in an attempt to restore cardiac function since the patient was in PEA / EMD for an extended period of time (20 – 25 minutes).

The responsibility of ensuring that the patient was transferred for his CT scan with proper nursing supervision and proper monitoring devices was the duty of the nursing staff assigned to Mr. Guigliano.

It is my opinion, with a reasonable degree of professional certainty, that the failure to transfer the patient for his CT scan without proper nursing supervision, without proper monitoring devices and without maintaining his supplemental oxygen were departures from proper nursing practice and hospital practice which caused or contributed to the patient's cardiopulmonary arrest.

The hospital nursing department has the responsibility to train the nursing staff and hospital personnel who provide patient care to respond properly to patient's in respiratory distress, respiratory arrest and cardiopulmonary arrest. The nurses and hospital personnel are responsible for calling a "code" whenever a patient is observed to be in distress such as respiratory difficulty, respiratory arrest or cardiopulmonary arrest.

It is my opinion, with a reasonable degree of professional certainty, that the failures to timely call a "code" for this patient, to timely commence adequate cardiopulmonary resuscitation measures, to timely respond to the "code" call for this patient and to perform adequate CPR measures during the "code" were departures from proper nursing practice and hospital practice which caused or contributed to the anoxic encephalopathy suffered by this patient as a result of the cardiopulmonary arrest.

I understand that there have been depositions taken of the various nursing and hospital personnel involved in the care of Michael Guigliano. I am available to review this deposition testimony once it becomes available. I look forward to speaking with you about this case.

Very truly yours,

**[E-COPY]**
Nancy Mure´, R.N., B.S., M.A.