UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAURA GUIGLIANO, as Administrator of the Estate of MICHAEL GUIGLIANO, Deceased, and LAURA GUIGLIANO, Individually<br>    Plaintiffs,<br><br>V.<br><br>DANBURY HOSPITAL, ET AL.<br>    Defendants. | CIVIL ACTION NO.<br>3:02 CV 718 (RNC) (DFM)<br><br><br><br><br><br><br><br>JULY 25, 2005 |

**DEFENDANT'S REPLY TO PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS FOR NON-JOINDER OF FRANK J. KESSLER, M.D. AS A DEFENDANT**

The defendant Joseph J. Catania, M.D. hereby replies to the Plaintiffs' Memorandum of Law dated July 18, 2005 in opposition to the Defendant's Motion to Dismiss for Non-Joinder as follows.

**I.** Plaintiffs' reliance on Caterpillar, Inc. v. Lewis, 519 U.S. 61, 117 S.Ct. 467, 136 L. Ed. 2d 437 (1996) is misplaced for several reasons. In Caterpillar, the Supreme Court held that the District Court, indeed, did err in failing to remand the case for lack of diversity jurisdiction when the matter was removed. The Court's rationale for finding that the District Court's error was not fatal, was that there was complete diversity among the parties when final judgment was entered.

10858.0123

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

Further, the holding in Caterpillar does not apply to this matter because the "overwhelming and overriding considerations" on which the court relied in its decision are not present in the instant case.  The court in Caterpillar clearly recognized the defendant Lewis's arguments that court erred in failing to remand the case to state court were "hardly meritless, but . . . [ran] up against an overriding consideration.  Once a diversity case has been *tried* in federal court . . . considerations of finality, efficiency and economy become overwhelming."  (emphasis added).  Here, the case has not yet been tried, so the considerations of finality, efficiency and economy are not at issue.

Additionally, the Caterpillar court emphasized the fact that complete diversity did in fact exist between Lewis and Caterpillar at the time of judgment.  The same is not true in the instant case.  In the present matter, Dr. Catania seeks to assert his right to claim an apportionment of liability with respect to Dr. Kessler.  In Connecticut, the right to apportionment is integral to the defendants' alleged liability to the plaintiffs and to their defense of plaintiffs' allegations of negligence and causation.  In Barry v. Quality Steel Products, Inc., 263 Conn. 424, 446 (2003) the Connecticut Supreme Court recognized the fundamental nature of this right to seek apportionment of liability.  In Barry, the Court abandoned superseding negligence as a separate legal doctrine, expressly on the premise that the doctrine is already inherent in the Connecticut scheme of apportionment of liability.  As a result, the jury will consider the issue of Dr. Kessler's level of involvement and responsibility for the medical care of Michael Guigliano at the

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

time any verdict is entered in this case. Consequently, unlike <u>Caterpillar</u> where there was diversity at the time of judgment, here diversity will not present at the time any judgment enters, unless the defendants were to withdraw their apportionment claim against Dr. Kessler, which clearly is not their intention.

In <u>Caterpillar</u>, the court mentioned, in footnote 1, Caterpillar's third-party action against Lewis's employer, Gene Wilson Enterprises ("GWE"), also a resident of Kentucky. The court found that the co-residency of Lewis and GWE did not destroy diversity, because there was no direct action between the co-residences. Lewis's action was against Caterpillar alone, and Caterpillar's third-party action was only against third-party defendant GWE. Although the two causes of action both appear to have arisen as a result of Lewis's injuries and subsequent damages, they were separate and distinct causes of action, based on different theories of liability. Therefore, the two causes of action were severable, and the court could have tried them separately had they wished to do so.

In the instant case, the defendant does not claim a separate cause of action against Dr. Kessler, but claims that his own liability to the plaintiffs, if found, requires a consideration of the liability attributable to Dr. Kessler. The defendant does not seek money damages from Dr. Kessler. Rather, the defendant asserts that Dr. Kessler's presence, as a defendant is required in a fair determination of damages, if any, he owes to the plaintiffs.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

The plaintiffs do not appear to appreciate the distinction between a third-party defendant and an apportionment defendant. Further they have misrepresented this defendant's position to the court. (*See Plaintiffs' Memorandum of Law dated July 18, 2005, p. 13*) This defendant does not claim a separate, third party cause of action against Dr. Kessler. Dr. Catania does not claim that Dr. Kessler committed a tort against him or that he owes him money damages. In <u>Bloom v. Gershon</u>, 271 Conn. 96, 110 (2004), the Connecticut Supreme Court held that "apportionment claims are claims for the apportionment of liability and are, therefore, separate and distinct from claims for monetary damages." This defendant's right of apportionment as to Dr. Kessler is not an independent and discrete cause of action, which might be severed from the plaintiffs' claim against the defendant and tried separately. It is a basic part of the defendant's defense to the plaintiffs' direct claims against him. Under Connecticut's law of apportionment of liability, Dr. Kessler is <u>not</u> a third-party defendant as to whom the defendant claims a separate and severable cause of action. Rather, at trial, the jury will consider Dr. Kessler as if he were a defendant who had been sued directly by the plaintiffs. The only distinction is that unless the plaintiffs plead over, the defendants will, at the time of trial, have the burden of proof as to the allegations of negligence and causation against Dr. Kessler. Therefore, the right of apportionment, which the defendant has asserted, is distinguishable from the separate and severable causes of action discussed by the Court in <u>Caterpillar</u>.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

**II.**   Dr. Kessler is an indispensable party to this case as contemplated by Fed. R. Civ. P. 19.  Although Mr. Guigliano was originally admitted to the orthopedic service at Danbury Hospital, a review of the Danbury Hospital medical record and deposition testimony reveals that the orthopedic surgeons relied on Dr. Kessler for the medical management of Mr. Guigliano.  (Exhibit A, Depo Tr. Dr. James W. Depuy, M.D).  Further, in the days leading up to Michael Guigliano's cardio pulmonary arrest, Dr. Kessler was overseeing the decedent's medical care.

> Q. All right.  Why was it that you wanted Dr. Kessler to take over the management of the patient's anticoagulation?
>
> A. Because internists generally manage the anticoagulation for blood clots.
>
> Q. Okay.  Now, as of this date, other than managing anticoagulation, did you have an understanding of what Dr. Kessler's role was in this case?
>
> A. Dr. Kessler's role was to manage this patient medically.
>
> Q. Along with the other consults?
>
> MR. O'CONNOR:  Objection to form.
> MS. HAGERTY: Objection to form.
> MR. POTOK:  Objection.
>
> A. I don't understand what you mean.
>
> Q. How did his role differ from the roles of Dr. Kotch and Dr. Borruso, to your understanding.
>
> MR. STOCKMAN:  Objection.
> MS. HAGERTY:  Join in the objection.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

> A. His role was overseer of his medical condition; to aid Dr. Kotch and Dr. Borruso in any way he could medically; to help with the electrolytes, if there was electrolyte imbalance; aid in helping with anticoagulation.
>
> That is, as I interpret it, the internist's role.

(Depo Tr. Dr. James W. Depuy, M.D. p. 63)

Dr. Kessler assessed the decedent medically and evaluated his lab values in the week prior to his cardiopulmonary arrest. As his attending physician, Dr. Kessler communicated with consulting specialists and documented his awareness of the Michael Guigliano's care. The orthopedic PA documented communication with Dr. Kessler regarding Mr. Guigliano's postoperative difficulties February 9, 2001. In fact, the orthopedic surgeons relied on Dr. Kessler to provide medical clearance before taking Mr. Guigliano back to the operating room on February 13, 2001.

Moreover, according to the medical record and deposition testimony of Maryann Milleville R.N., (Exhibit B) Dr. Kessler was the last physician to evaluate and Mr. Guigliano prior to his cardiopulmonary arrest on the morning of February 17, 2001. In addition to noting that a CT Scan of the abdomen and pelvis had been scheduled, Dr. Kessler noted Mr. Guigliano's low hemoglobin and hematocrit lab values. These values relate to the red blood cells and the oxygen carrying capacity of the blood. Dr. Kessler also ordered Mr. Guigliano's anticoagulant therapy to be discontinued.

The plaintiffs' experts have authored written reports, which assert that a failure to manage the plaintiff-decedent's ionized calcium constituted medical negligence, which

- 6 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

caused or contributed to the plaintiff-decedent's injury. Further, they assign at least partial responsibility for the failure to monitor to the "patient's attending physicians."

More specifically, plaintiffs' expert Dr. Batista states in his report dated November 8, 2004 as follows:

> The patient's cardiac function was further stressed by a progressive decrease in serum electrolytes below normal levels. The potassium and ionized calcium levels decreased from normal levels to below levels from admission to February 17. (Potassium and ionized calcium were 3.1 and 0.98, respectively, on February 17). The abnormally low potassium made the myocardium irritable and increased this patient's susceptibility to an arrhythmia provoked by hypoxemia and/or hypoventilation.

(p. 2 of the report).

> Second, the treating surgeons failed to properly treat the patient's electrolyte imbalances. The patient did not receive massive electrolyte resuscitation, (potassium and ionized calcium) until he was brought to the ICU after the cardio pulmonary arrest on February 17. Repletion of the electrolytes was the responsibility of surgery, since the record indicates that the surgery personnel were following the lab values, and <u>also the patient's attending physicians</u>.

(p. 3 of the report, underlining added).

As the medical record and Dr. Depuy's deposition testimony reveal, Dr. Kessler, as his attending physician, was monitoring Mr. Guigliano's lab values, ordering medications and overseeing his medical care.

In addition, plaintiffs' expert Dr. Kaufman states in his report dated November 7, 2004 as follows: "A review of the laboratory results up to February 17 demonstrates

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

several items of significance.  There had been mildly low ionized calcium, potassium and hemoglobin and hematocrit values throughout the previous ten-day period." (p. 4 of the report).

> Because the patient's potassium and ionized calcium became low in the week prior to the cardio pulmonary arrest, this condition made the patient more susceptible to a cardiac arrhythmia secondary to hypoxemic insult and may have contributed to the cardiac pulmonary arrest.  <u>The patient's hemoglobin and hematocrit were also markedly low, and this reduced the oxygen-carrying capacity of the patient's bloodstream</u>.  The patient's severe anemia probably contributed to the development of tissue hypoxemia and may have made the patient more susceptible to respiratory and cardiac arrest.

(pp. 8 & 9 of the report underlining added).

The hemoglobin and hematocrit levels referred to by Dr. Kaufman were the same values noted by Dr. Kessler on the morning of February 17, 2001.

The plaintiffs' expert Nancy Muré, R.N., B.S., M.A. states in her report dated November 4, 2004 as follows:  "Based on the medical records, it appears that the patient was transferred from his hospital room to the Radiology Department for an abdominal CT Scan on February 17, 2001, without the supervision of a CPR-trained nurse or a multispecialist, without a portable cardiac monitor and without pulse oximetry monitoring."  (p. 3 of the report).

> Mr. Guigliano was a patient who required close, one-to-one monitoring by qualified members of the nursing staff when he was transferred for his CT Scan on February 17.  The model for the proper nursing supervision can be seen in the

- 8 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

> notes concerning the patient's transfer for diagnostic testing on February 10, 2001. On that date, he was taken for a VQ Scan and was constantly accompanied by a registered nurse referred to as a 'multispecialist.'

(p. 2 of the report)

Attorney Joseph Lanni took the deposition of Mary Anne Milleville, the floor nurse assigned to care for the, Michael Guigliano, on the morning of February 17, 2001, on October 18, 2004. Nurse Milleville testified at her deposition that she was aware that Dr. Catania had been in at the change of shift that morning to order a CT Scan for Mr. Guigliano. "I know that she said that the general surgeon was in, Dr. Catania, right around shift change and that he was going to order CT Scan, because he was complaining about his belly bothering him." (p. 13, Depo. Tr. of Milleville). Nurse Milleville testified that subsequent to Dr. Catania, Dr. Kessler was in to evaluate the patient and that he was aware of the order for the CT Scan. (p. 19, Id.)

> Q. Did you see Dr. Kessler on the unit that day?
>
> A. Yes.
>
> Q. Where did you see him?
>
> A. At the nursing station.
>
> Q. Did you speak to him about the patient?
>
> A. Yes.
>
> Q. Do you recall what, if anything, he said about the patient?

One Goodwin Square
225 Asylum Street
Hartford, CT 06103


HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

> A. Well, we both talked a little. I know with him and he said it looks like Michael, you know, I want you – I know he has the CT Scan coming. But I did ask him – I said, you know, he seems to get respirations increase a little – you know positioning in bed.

(pp. 19 & 20, Id.)

Further, Nurse Milleville testified that Dr. Kessler told her that plaintiff-decedent, Michael Guigliano, could go to CT Scan off the cardiac monitor.

> A. I did tell him he is on the monitor. Showed him the monitor. I said he is running a little tachy, 100   110. We talked about the test that was coming, okay. He said, <u>he took him off to go downstairs</u>.
>
> Q. Now, you talked about the test that was coming?
>
> A. CT Scan.
>
> Q. And that was the CT Scan of the patient's abdomen and pelvis that was scheduled for that day; correct?
>
> A. Correct.
>
> Q. And you say, Dr. Kessler said he could come off for the test?
>
> A. He was on a telemetry monitor. They don't work in the halls. I said, he needs to go down to the test. He said he could come off to go down.

(p. 20 of report)

The plaintiff's own experts have asserted that Mr. Guigliano required close, one-to-one monitoring by qualified members of the nursing staff. Indeed, on February 10, 2001, one week prior to the day of the code, Mr. Guigliano required the assistance of

- 10 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

the multispecialist nurse who transported him on the cardiac monitor to the VQ scan when he was laid flat and became acutely short of breath. According to Nurse Milleville's sworn testimony, Dr. Kessler is responsible for the decision to take Mr. Guigliano off the monitor when he was transported to the CT Scan, not Dr. Catania as asserted by the plaintiff's expert, Dr. Batista. Because he was taken of the cardiac monitor, he was transported to the CT Scan by an unskilled technician rather than a "multispecialist nurse." The failure to properly monitor Mr. Guigliano clearly caused or contributed to his injury. Still, after taking the deposition of Nurse Milleville the plaintiffs have not seen fit to join Dr. Kessler.

Deciding whether or not to dismiss an action for failure to join an indispensable party pursuant to Rule 19 requires a two-step inquiry. See Viacom Int'l Inc. v. Kearney, 212 F.3d 721, 724 (2d Cir.2000) (citing Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 124, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968)). The first step, governed by Rule 19(a), involves an inquiry whether the "absent party belongs in the suit" and whether joinder is feasible. Viacom Int'l, 212 F.3d at 724-25. If the threshold standard is met, the second step, governed by Rule 19(b), entails an inquiry as to whether failure to join the absent party warrants dismissal. Associated Dry Goods Corp. v. Towers Financial Corp., 920 F.2d 1121, 1123 (2d Cir.1990). Application of these steps must be tempered by the need to "entertain the broadest possible scope of action, consistent with fairness to parties." United Mine Workers of America v.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

Gibbs, 383 U.S. 715, 724, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Supreme Court has long recognized that "joinder of claims, parties and remedies is strongly encouraged." Id.

Rule 19(a) governs whether or not an absent party should be named in the lawsuit. The rule seeks to "bring before the court all persons whose joinder would be desirable for a just adjudication of the action." 7 Wright, Miller & Kane, *Federal Practice & Procedure: Civil* § 1604 at 35 (3d ed.2001). In relevant part, the rule provides that:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. Fed. R. Civ. P. 19(a).

If a court finds that joinder of a party is preferable but not feasible, it must then turn to the question whether the missing party is an indispensable party, whose absence necessitates dismissal under Rule 19(b). The rule provides:

> If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the

- 12 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

> absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.
>
> Fed. R. Civ. P. 19(b), <u>Jaser v. New York Property Insurance Underwriting Assoc.</u>, 815 F.2d 240, 242 (2d Cir.1987)

Dr. Kessler is plainly an indispensable party to the present litigation. Review of the plaintiffs' own expert reports, in conjunction with the medical record, and deposition testimony makes it abundantly clear that should liability be found, Dr. Kessler must assume a large portion. Further, there can be no explanation for the plaintiffs' decision to keep Dr. Kessler out of the litigation other their obvious preference for the Federal Forum.

**III.** The plaintiffs are correct that the defendants' apportionment claim against Dr. Kessler requires support by a qualified expert opinion. The plaintiffs are incorrect, however, as to when that opinion is required. In the case cited by the plaintiffs, <u>Stowe v. McHugh</u>, 46 Conn. App. 391, 394-398 (1997), it was held that an apportionment claim in a medical malpractice action requires qualified expert testimony. That testimony is required at the time of trial. This misunderstanding is consistent with a plaintiffs' confusion on the point of third-party defendants, as opposed to apportionment

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

defendants.  Lostritto v. Community Action Agency of New Haven, Inc., 269 Conn. 10 (2004) further illustrates the distinction between a civil action filed to recover damages and an apportionment complaint which seeks only apportionment of liability.  In Lostritto, the court found Connecticut General Statutes Section 52-190a, which requires a good faith certificate to be filed prior to the filing of an action to recover damages for personal injury or wrongful death, did not apply to the filing of an apportionment complaint.

> By its own terms, Section 52-190a(a) applies only to those actions in which a party seeks 'to recover damages . . . .'  Pursuant to Section 52-102b(a), the demand for relief in an apportionment complaint seeks only an 'apportionment of liability.'  'Liability refers to a legal obligation or responsibility; Black's Law Dictionary, (6th Ed. 1990); whereas 'damages' refers to 'monetary compensation' for loss or injury.  Id.  The terms are not synonymous.  Accordingly, 52-190a, which applies only to civil actions 'to recover damages,' does not apply to apportionment complaints, which seek only an apportionment of liability.

This defendant fully understands his burden of proof and is prepared to provide expert witness testimony at the time of trial to support his claim of apportionment of liability to Dr. Kessler.  In the meantime, however, he will adopt the opinions of the plaintiffs' experts, Dr. Kaufman and Nancy Muré, R.N. along with the deposition testimony of Dr. Depuy, Nurse Milleville, and the medical record itself in support of his allegations.

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105

DEFENDANT,
JOSEPH J. CATANIA, M.D.

By_____
      Timothy J. Grady
      HALLORAN & SAGE LLP
      Fed. Bar #ct26730
      One Goodwin Square
      225 Asylum Street
      Hartford, CT 06103
      (860) 522-6103
      His Attorneys

- 15 -

One Goodwin Square　　　　HALLORAN　　　　Phone (860) 522-6103
225 Asylum Street　　　　　& SAGE LLP　　　　Fax (860) 548-0006
Hartford, CT 06103　　　　　　　　　　　　　　Juris No. 26105

CERTIFICATION

This is to certify that on this 25th day of July 2005, I hereby mailed a copy of the foregoing to:

| | |
|---|---|
| Joseph Lanni, Esq.<br>138 Chatsworth Avenue, Suites 6-8<br>Larchmont NY 10538<br>**For the Plaintiff** | Scott F. Morgan, Esq.<br>Weiner Millo & Morgan, LLC<br>220 Fifth Avenue, 7th Floor<br>New York NY 10001<br>**For the Plaintiff** |
| Richard O'Connor, Esq.<br>Christine Anne Robinson, Esq.<br>Stephen P. Sachner, Esq.<br>Sachner & O'Connor<br>Crossroad West<br>765 Straits Turnpike<br>P.O. Box 1323<br>Middlebury CT 06762-1323<br>**For the Defendants Depuy** | Kevin Tepas, Esq.<br>Jane Callahan Hagerty, Esq.<br>Beverly J. Hunt, Esq.<br>Jeffrey Charles Nagle, Esq.<br>Daniel E. Ryan, III, Esq.<br>Michael T. Ryan, Esq.<br>Eric W. F. Niederer, Esq.<br>Ryan Ryan Johnson & Deluca, LLP<br>80 Fourth Street<br>Stamford CT 06905<br>**For the Defendants Danbury Surgical Associates, P.C. and Borrusso** |
| Richard L. Grant, Esq.<br>36 Tamarack Avenue, PMB #213<br>Danbury, CT 06811<br>**For the Defendant Borrusso** | Eric J. Stockman, Esq.<br>Maureen Sullivan Dinnan, Esq.<br>Nancy A. Meehan, Esq.<br>Michael D. Neubert, Esq.<br>Neubert Pepe & Montieth, P.C.<br>195 Church Street<br>New Haven CT 06510<br>**For the Defendants Danbury Hosp., Iulia Circiumara, Roth, Saipher Bennett, Brown, Hoffman, Doe #1, 2 & 3** |
| Regina Duchin Kraus, Esq.<br>Tyler, Cooper & Alcorn, LLP<br>P.O. Box 1936<br>205 Church Street<br>New Haven, CT 06509-1910<br>**For the Defendant Berger** | Gaileen A. Kaufman, Esq.<br>Bai Pollock Bluewiess & Mulcahey<br>One Corporate Drive<br>Shelton CT 06484<br>**For the Defendant Knowles** |

_____
Timothy J. Grady

714237_1.DOC

- 16 -

One Goodwin Square
225 Asylum Street
Hartford, CT 06103

HALLORAN
& SAGE LLP

Phone (860) 522-6103
Fax (860) 548-0006
Juris No. 26105