UNITED STATES DISTRICT COURT

──────────── District of Connecticut ────────────

────────────────────────────────X
LAURA GUIGLIANO, as Guardian Ad Litem for
MICHAEL GUIGLIANO, a Person Adjudged to
be incompetent, and LAURA GUIGLIANO,
Individually

    Plaintiff,

vs.
DANBURY HOSPITAL, ET AL

    Defendants.
────────────────────────────────X

CIVIL ACTION NO.
3:02 CV00718 (RNC) (DFM)

JULY 25, 2005

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO STRIKE PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL
AND TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

This is a claim of medical malpractice based on an incident occurring on February 17, 2001, during a hospitalization at the Danbury Hospital in Danbury, Connecticut.

The present action was commenced on April 24, 2002, with the filing of a Complaint dated April 12, 2002. On July 14, 2003, Michael Guigliano died. The action was then stayed by this Court on or about July 24, 2003, pending appointment of the plaintiff Laura Guigliano as the Administratrix of her late husband's estate. On May 26, 2004, a status conference was held before the Court. Subsequently, the plaintiff served an Amended Complaint dated June 29, 2004, which asserted claims for medical malpractice and wrongful death on behalf of the Estate of Michael Guigliano, Deceased.

After service of the Amended Complaint, the parties undertook to continue with discovery proceedings. Thirteen separate depositions of fact witnesses were held between September 13, 2004 and December 17, 2004.

The plaintiff filed a Second Amended Complaint dated March 9, 2005, which joined Scott B. Berger, M.D., among other defendants. However, Dr. Berger was subsequently discovered by the plaintiff to be a resident of New York.

On June 7, 2005, Judge Martinez held a status conference on this matter. Subsequent to the status conference, a Scheduling Order was issued to simplify and clarify the pleadings because at that time there were several resident physicians, nurses and technicians who were agents of Danbury Hospital but named individually as defendants. It was evidently the Court's intention to streamline the matter. The parties appear to have been in agreement that it made sense to drop the agents of Danbury Hospital from the case to streamline this matter.

However, without any discussion as to the merits of Dr. Berger's involvement in the case or his potential share of liability, the plaintiffs stated that they may dismiss Dr. Berger. Despite no agreement to voluntarily dismissal all claims against Dr. Berger, the plaintiffs filed the Third Amended Complaint on June 14, 2005, which removed Dr. Berger from the caption. The plaintiffs' attempt to remove Dr. Berger from this action is merely an attempt to preserve the diversity jurisdiction of this Court.

On July 19, 2005 the plaintiffs filed Voluntary Dismissal of Certain Claims against Dr. Berger. The plaintiffs appear to believe that they may voluntarily dismiss their claims as to Dr. Berger in order to preserve the diversity jurisdiction of the Court because Dr. Berger had yet to answer the Second Amended Complaint.

Rule 41(a) refers to the voluntary dismissal of "an action." The Court of Appeals for the Second Circuit has held that: "the word 'action' as used in the rules denotes the entire controversy, whereas 'claim' refers to what has traditionally been termed a 'cause of action.'" Harvey Aluminum, Inc. v. American Cyanamid Co., 203 F.2d 105, 108, cert. denied, (2d Cir.

1953). Therefore, a plaintiff may not dismiss one of several defendants under Rule 41(a), but must proceed under Rule 21. Wright & Miller, Federal Practice & Procedure: Civil. 3d § 2362.

However, a condition to dropping a party under Rule 21 because the party's citizenship destroys the Court's subject matter jurisdiction over the case is that the party's presence in the action is not required by Rule 19. When the party is indispensable to the action, Rule 19, rather than Rule 21 applies and may result in the dismissal of the action. Wright, Miller & Kane, Federal Practice & Procedure, Civil. 3d § 1685. In Soberay Machine & Equipment Co. v. MRF, Ltd., Inc., 181 F.3d 759, (6th Cir. 1999) the court recognized that a party may not create diversity by dropping a non-diverse and indispensable party. See also Zepik v. Tidewater Midwest, Inc., 719 F. Supp. 751, 755. (N.D. Ind.1989); Insurance Underwriting Assoc., 815 F.2d 240, 242 (2d Cir.1987).

A plaintiff may preserve diversity jurisdiction by dropping a non-diverse party not indispensable to the action under Rule 19. Fritz v. American Home Shield Corp., 751 F.2d 1152, 1154 (11th Cir.1985) (citing Wright & Miller, Federal Practice and Procedure § 1685 (1972)). A district court generally has discretion to determine whether to drop a party under Rule 21. Id. But before doing so, it must find that the party is not indispensable under Rule 19. Id. at 1155. Also see Anderson v. Moorer, 372 F.2d 747, 750, n. 4 (5th Cir.1967); Ralli-Coney, Inc. v. Gates, 528 F.2d 572, 575 (5th Cir.1976).

Rule 19 provides that the court shall consider the following factors:

first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed ... . F.R.C.P. 19(b).

If a court is unable to conclude that the nondiverse defendant is dispensable under Rule 19, it cannot allow their dismissal under Rule 21. See <u>Fritz</u>, supra., 751 F.2d at 1155 (citing <u>Ralli-Coney</u>, supra., 528 F.2d at 575).

In the instant case, there has been no finding by the Court that Dr. Berger is a dispersible party. Absent such a finding, he is a party in this case and as a New York resident destroys diversity jurisdiction. Moreover, a review of the record to date demonstrates that Dr. Berger is an indispensable party. Deposition testimony has been given in this case that Dr. Berger was the physician who first responded when Michael Guigliano developed respiratory distress, and subsequently went into cardio pulmonary arrest. See Depo. Tr. of Timothy J. Hendrie, p. 30, attached hereto as Exhibit A, and Depo. Tr. of Vanessa Saipher, p. 57, attached hereto as Exhibit B.

Plaintiffs' own experts have opined that Dr. Berger's attempts at resuscitation were ineffective due to his failure to employ an oral airway when ventilating the patient, as well as his failure to begin chest compressions, when he had found the patient to be without a pulse. Dr. Kaufman states on page 8 of his report dated November 7, 2004:

> During this time, the patient was being Ambu bagged via mask via Dr. Berger; however, there is no mention that there is air entry into the lungs. This method of ventilation would most likely been ineffective to oxygenate this patient given his unconsciousness without an oral airway. More significant, the Department of Public Health investigative file indicates that Ambu bagging was occurring without compressions for what appears to be at least 3-4 minutes if not longer (the progress record indicates the delay of possibly 10 min. in initiating CPR). See Exhibit C attached hereto.

Nancy Mure, R.N. states on page 4 of her report dated November 4, 2004 that "Dr. Berger apparently began to Ambu bag the patient in an attempt to ventilate him; however, there is no mention of evaluating whether the patient is in cardiac arrest and nothing is documented about the commencement of chest compressions." See Exhibit D attached hereto.

It is abundantly clear that the plaintiffs wish to dismiss Dr. Berger from this action in order to preserve the diversity jurisdiction of the Court. However, it is also obvious from a review of the medical record, deposition testimony and the plaintiffs' expert reports that Dr. Berger is an indispensable party to the adjudication of this action. Since Dr. Berger is an indispensable party as contemplated by Rule 19, his dismissal is not permissible. As Dr. Berger's presence in the action destroys the diversity jurisdiction of the Court must dismiss the action for lack of subject matter jurisdiction.

WHEREFORE, the defendants, John Borruso, M.D. and Danbury Surgical Associates, P.C. request that the Court strike the Plaintiff's Notice of Voluntary Dismissal and dismiss this action.

THE DEFENDANTS,
JOHN BORRUSO, M.D. AND DANBURY
SURGICAL ASSOCIATES, P.C.

By: _____
Eric W.F. Niederer, Esq. (CT 25773)
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT  06905
Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

      I hereby certify that on July 25, 2005, a copy of the above was mailed to the following counsel and pro se parties of record:

Joseph Lanni, Esq.
The Law Firm of Joseph Lanni, P.C.
138 Chatsworth Avenue
Suites 6-8
Larchmont, NY 10538
Attorney for Plaintiffs

Scott F. Morgan, Esq.
Weiner, Millo & Morgan, LLC
220 Fifth Avenue
New York, NY 10001
Attorney for Plaintiffs

Michael Neubert, Esq.
Eric Stockman, Esq.
Maureen Sullivan Dinnan, Esq.
Nancy A. Meehan, Esq.
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
Attorney for Defendant, Danbury Hospital

Richard O'Connor, Esq.
Stephen P. Sachner, Esq.
Christine A. Robinson, Esq.
Sachner & O'Connor
The Crossroads West
765 Straits Turnpike
Building 2, Suite 1001
P.O. Box 1323
Middlebury, CT 06762-1323
Attorney for Defendant, James Depuy, M.D.

Regina Duchin Kraus, Esq.
Tyler, Cooper & Alcorn, LLC
205 Church Street
P.O. Box 1936
New Haven, CT 06509
Attorney for Defendant, Scott B. Berger, M.D.

Richard C. Tynan, Esq.
Timothy J. Grady, Esq.
Halloran & Sage, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103-4303
Attorney for Defendant, Joseph J. Catania, M.D.

Garie Mulcahey, Esq.
Christine Norton, Esq.
Jason Hyjek, Esq.
Gaileen Kaufman, Esq.
Bai, Pollock, Blueweiss & Mulcahey
One Corporate Drive, 5th Floor
Shelton, CT 06484
Attorney for Defendant, Georgina Knowles-Carson

                                              _____
                                              Eric W. F. Niederer, Esq.

I:\Procases\290 117\memorandum of law to support strike dismissal072005.wpd

# EXHIBIT A

1  Q.  When you arrived on the scene of the code,
2  can you tell us who was present?
3  A.  I think the x-ray tech was there; the person
4  I assumed to be the radiologist; and I think the
5  respiratory therapist, I believe.
6  Q.  I'm going to ask you to turn now to the notes
7  of your interview, which is contained in Plaintiffs'
8  Exhibit 5.  It's described as Exhibit B, page 13 of 13.
9      Just for the record, that's one of the items
10 you reviewed prior to --
11 A.  That is correct.
12 Q.  -- your deposition.
13     I'm going to draw your attention to some
14 notations TOWARD the middle of the page that read,
15 quote:
16     "Q.  When you arrived, what was happening
17     "A" colon:  "The radiologist was there trying
18 to ventilate the patient, and the CT tech," period, end
19 quote.
20     When you say that the x-ray tech was there,
21 that's the same person as the CT tech that's referred
22 to in this statement?
23 A.  I believe so, yes.
24 Q.  Do you recall who that was?
25 A.  No.

# EXHIBIT B

1    A.   Because I've seen seizures before, and he was
2  having a seizure.
3    Q.   Describe for me how he was experiencing a
4  seizure.
5    A.   I couldn't describe that right now, sir.  I
6  don't remember.
7    Q.   Now, from the point in time that you first
8  noticed him being cyanotic up until the point in time
9  that you pushed the stretcher out of the CT scan room,
10 did he remain cyanotic?
11   A.   I don't remember.
12   Q.   You don't remember one way or another?
13   A.   That's correct.
14   Q.   Now, if you could just read the next
15 sentence, please.
16   A.   "As soon as we were through the doorway,
17 Mr. Guigliano started seizing and I yelled for Joe to
18 get Dr. Berger."
19   Q.   Now, when the patient started seizing, did
20 that have any particular significance to you in terms
21 of his status?
22   A.   Yes, sir.
23   Q.   What was that?
24   A.   I knew he was in distress -- well, bigger
25 distress than he was two seconds ago.

# EXHIBIT C

abdominal distention was still found to be present and, in fact, more profound on February 17.

The physician ordering the CT scan test should have been aware that Mr. Guigliano's respiratory difficulties increased when he was lying flat. The nurse's note immediately before the February 17 surgery note documents respiratory wheezing and crackling of the lungs and there is HOB elevation to make the patient's breathing easier. Moreover, the progress record documented that this patient had previously exhibited exacerbations of hypoxemia when placed in the supine position for a diagnostic test on February 10. Thus, either the patient's nurse or the physician ordering the test should have had the patient be accompanied by someone of adequate skill level, either another physician (it could be a resident or house staff physician) or a nurse trained in Basic Life Support and CPR and with pulse oximetery and cardiac monitoring. Then the patient's severe hypoxemia would have been timely recognized and there would have been timely intervention (such as administering oxygen via nasal cannula or non-rebreather) to prevent the patient from going into respiratory arrest or cardiopulmonary arrest. This is exactly what happened when the patient was placed supine for his VQ scan on February 10.

There is no documentation anywhere in the record indicating that the patient was brought down to the radiology department with the oxygen therapy continuing. When the patient went into severe respiratory distress on the CT scan table, the staff then "reached for an oxygen mask" and applied it to the patient. Why would an oxygen mask need to be applied if this patient was already receiving oxygen? There is no reference in this note of oxygen via nasal cannula being in use. Transporting the patient without oxygen would be a departure from proper medical practice.

There is no documentation anywhere that the patient was brought down to the radiology department with pulse oximetry monitoring in use. The note mentions that the patient was "hooked to the pulse ox" after the oxygen mask was applied. The oxygenation saturation was 79 – 80 percent, the patient was severely hypoxemic. If the pulse oximetry had been in use prior to the onset of the severe respiratory distress, the staff would have been aware to the patient's worsening hypoxemia and made an earlier call for help. Transporting Mr. Guigliano without pulse oximetry was a departure from proper practice. The same can be said for transporting the patient without a cardiac monitor.

The patient was "flailing & gasping for breath" and "cyanotic", but no code was called. The radiology technician instead decided to take the patient back to his room and also stopped to telephone the "floor" rather than call a code. The radiology technician also took the to move the patient onto a gurney and elevate his head. It was only when the radiology technician was pushing the stretcher out of the CT room and the patient began "seizing" (probably from cardiac arrest or marked hypotension), she told the student intern to summon a physician. It is

# EXHIBIT D

percent oxygen saturation at 2 l/min of O2. Most important, the nurse noted that the patient complained of shortness of breath ("feels SOB") with changes in his position. There were also what appear to be decreased breath sounds at the lung bases. The patient was still tachycardic with a telemetry reading of 100 – 110 per minute. Thus, the records show that Mr. Guigliano had abnormal respirations, had complaints of shortness of breath, had an abnormally elevated cardiac rate, required oxygen to maintain saturations in the mid-90's, and required monitoring by pulse oximetry and telemetry. The patient was not stable at the time of his transfer to the radiology department.

There is no nurses' note in the progress record documenting the patient's condition or documenting that monitoring devices (e.g.: pulse oximeter, cardiac monitor) and portable oxygen were in use at the time that he was being transferred from his room for the CT scan of the abdomen on February 17.

Based on the medical records, it appears that the patient was transferred from his hospital room to the radiology department for the abdominal CT scan on February 17, 2001 without the supervision of a CPR trained nurse or multispecialist, without a portable cardiac monitor and without pulse oximetry monitoring. It also appears from the medical records and other materials that the patient was either transferred without portable oxygen or that the oxygen was removed from the patient at some point in time. There is no record anywhere which documents that the patient had any monitoring devices or portable oxygen in use during the transfer to the radiology department.

Mr. Guigliano was a patient who required close 1:1 monitoring by qualified members of the nursing staff when he was transferred for his CT scan on February 17. The "model" for proper nursing supervision can be seen in the notes concerning the patient's transfer for diagnostic testing on February 10, 2001. On that date, he was taken for a VQ scan and was constantly accompanied by a registered nurse referred to as a "multispecialist". A note in the progress record by the multispecialist R.N. demonstrates that the patient was being monitored via pulse oximetry and a portable cardiac monitor throughout the transfer and testing. Moreover, it is documented that oxygen via nasal cannula was being administered to the patient at the time. When the head of the bed was lowered for the test, the patient's oxygen saturation deteriorated to 88 percent (i.e.: laying the patient flat compromised his breathing and made him seriously hypoxemic). In response to this development, the nurse increased the patient's oxygen flow rate from 4 l/min to 6 l/min and the O2 saturation improved. The patient was returned to his room after the completion of this test without "incident". In essence, this note shows that proper supervision by a qualified nurse, proper monitoring and timely intervention in the form of simply increasing the oxygen flow rate prevented a respiratory arrest or cardiopulmonary arrest on this occasion. Additionally, it should be noted that there was no practical difference in the patient's respiratory and cardiac status between February 10 and February 17.

The note of a Vanessa Saipher provides some information on the events leading to the cardiopulmonary arrest suffered by Michael Guigliano in the CT scan room on February 17. Upon Mr. Guigliano's arrival in the radiology department, he was laid flat

4