0001
1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE DISTRICT OF CONNECTICUT
3                    VOLUME I
4   - - - - - - - - - - - - - - - - - - x
                                       :
5   LAURA GUIGLIANO, as ADMINISTRATOR
    of the ESTATE of MICHAEL GUIGLIANO, :
6   DECEASED, and LAURA GUIGLIANO,
    Individually                       :
7               Plaintiffs,
                                       :
8       vs.
                                       :
9   DANBURY HOSPITAL, ET AL,
                                       :
10              Defendants.
                                       :
11  - - - - - - - - - - - - - - - - - - x
12                    3:02 CV 718(RNC)(DFM)
13
14          Deposition of MICHAEL B. TEIGER, M.D.,
15      taken pursuant to the Federal Rules of Civil
16      Procedure 26(B)(4)(a), at the offices of
17      Michael B. Teiger, M.D., 1000 Asylum Avenue,
18      Hartford, Connecticut, before Michelle E.
19      Pappas, License #00081, a Notary Public in
20      and for the State of Connecticut, on Tuesday,
21      February 28, 2006, at 8:50 a.m.
22
23
24
25
0002
1               A P P E A R A N C E S
2
    THE LAW FIRM OF JOSEPH LANNI, P.C.
3   Attorneys for the Plaintiffs
    138 Chatsworth Avenue, Suites 6 - 8
4   Larchmont, New York  10538
      By:  JOSEPH LANNI, ESQ.
5     Tele:  (914) 834-6600
6
    RENDE, RYAN & DOWNES, LLP
7   Attorneys for the Apportionment Defendant and
    Third-Party Defendant

8   202 Mamaroneck Avenue
    White Plains, New York  10601
9       By:  MICHAEL F. GRADY, ESQ.
        Tele:  (914) 681-0444
10
11   NEUBERT, PEPE & MONTEITH, P.C.
     Attorneys for the Defendant Danbury Hospital
12   195 Church Street, 13th Floor
     New Haven, Connecticut  06510-2026
13       By:  ERIC J. STOCKMAN, ESQ.
        Tele:  (203) 821-2000
14
15   RYAN, RYAN, JOHNSON & DELUCA, LLP
     Attorneys for the Defendants John Borruso, M.D. and
16   Danbury Surgical Associates
     80 Fourth Street
17   Stamford, Connecticut  06905
        By:  BEVERLY HUNT, ESQ.
18       Tele:  (203) 357-9200
19
     HALLORAN & SAGE, LLP
20   Attorneys for the Defendant Joseph Catania, M.D.
     One Goodwin Square
21   Hartford, Connecticut  06103
        By:  TIMOTHY GRADY, ESQ.
22       Tele:  (860) 522-6103.
23
24
25
0003
 1           S T I P U L A T I O N S
 2
 3        IT IS HEREBY STIPULATED AND AGREED by and
 4   between counsel representing the parties that each
 5   party reserves the right to make specific objections at
 6   the trial of the case to each and every question asked
 7   and of the answers given thereto by the deponent,
 8   reserving the right to move to strike out where
 9   applicable, except as to such objections as are
10   directed to the form of the question.
11        IT IS FURTHER STIPULATED AND AGREED by and
12   between counsel representing the respective parties
13   that proof of the official authority of the Notary
14   Public before whom this deposition is taken is waived.
15        IT IS FURTHER STIPULATED AND AGREED by and
16   between counsel representing the respective parties

17  that the reading and signing of the deposition by the
18  deponent is not waived.
19        IT IS FURTHER STIPULATED AND AGREED by and
20  between counsel representing the respective parties
21  that all defects, if any, as to the notice of the
22  taking of the deposition are waived.
23        Filing of the Notice of Deposition with the
24  original transcript is waived.
25
0004
 1            (December 28, 2005, report marked
 2        Plaintiffs' Exhibit 1 for identification.)
 3            (Vanessa Saipher Incident Report marked
 4        Plaintiffs' Exhibit 2 for identification.)
 5            (Code 99 Flow Sheet marked Plaintiffs'
 6        Exhibit 3 for identification.)
 7            (Emergency Code Log marked Plaintiffs'
 8        Exhibit 4 for identification.)
 9            (Transportation Scheduling Sheet marked
10        Plaintiffs' Exhibit 5 for identification.)
11         MR. STOCKMAN:  Just at the outset, the
12        Doctor has patient issues, as doctors will,
13        patient issues are encountered from time to
14        time, and we've agreed, if necessary, we'll
15        bring the Doctor back for the resumption of
16        the deposition if we do not finish today for
17        a time convenient to everyone.
18         MR. LANNI:  Just to add to that, it's my
19        understanding that Dr. Teiger has to break
20        the deposition at 11 a.m., thereabouts?
21         THE WITNESS:  Unfortunately, my life
22        goes on despite this, but I'll be here to do
23        the best I can.  I thank you for all of your
24        patience and indulgence and apologize if you
25        have to drive up here again, but we do pay
0005
 1        for parking, if that helps.
 2         MR. LANNI:  And then we'll do our best
 3        to reschedule you at a time that's mutually
 4        convenient for all parties.  And,
 5        furthermore, it's been agreed that should
 6        Plaintiff need to submit a motion to the
 7        Court extending the deadlines with regard to
 8        depositions and other matters in this case,
 9        that all parties will consent to such a
10         motion.  Any problem with that gentleman and

11      lady?
12          MR. M. GRADY:  No.
13          MR. STOCKMAN:  Generally speaking, no, I
14      have no problem applicable to discovery
15      deadlines.
16          MR. LANNI:  Okay.
17    M I C H A E L  B .  T E I G E R ,  M . D . ,
18      called as a witness, having first been duly sworn
19      by Michelle E. Pappas, a Notary Public in and for
20      the State of Connecticut, was examined and
21      testified as follows:
22  DIRECT-EXAMINATION
23  BY MR. LANNI:
24      Q.  Good morning, Dr. Teiger.
25      A.  Good morning.
0006
1       Q.  My name is Joseph Lanni, I'm the attorney for
2   the Guigliano family.  I'm going to be asking you some
3   questions today concerning your expert opinions in the
4   case of Guigliano versus Danbury Hospital, et al.  Any
5   question that I ask you that you do not understand,
6   please let me know, I'll be more than happy to rephrase
7   the question to make it -- more than happy to rephrase
8   the question for you so that you can better understand
9   it.  Okay?
10      A.  Thank you for that.
11      Q.  Sure.  And please, I'm going to ask you to
12  verbalize all your responses because the court reporter
13  can't take down any nods of the head or shake of the
14  head or any type of gesture, so I'll ask you to
15  verbalize all your responses.
16      A.  I'll be happy to do my best.
17      Q.  Okay.  Moreover, we have marked a number of
18  items as exhibits for today's deposition.  Exhibit 1 is
19  the original of your report concerning your expert
20  opinions in this case dated December 28, 2005.  And
21  Exhibit 2 is an incident report of a Virginia Saipher
22  concerning the events in the CT scan suite of February
23  17, 2001.
24          Exhibit 3 is the Code 99 flow sheet
25  concerning the cardiopulmonary arrest of February 17,
0007
1   2001.  Exhibit 4 is the emergency code log for Danbury
2   Hospital pertaining to the month of February 2001.  And
3   Exhibit 5 is what's called the Transportation
4   Scheduling Sheet for the date of February 17, 2001.

5      Please feel free to look at the exhibits that
6  I have identified to you to provide me with answers to
7  any of my questions.  Moreover, please feel free to
8  refer to any of the materials that you have reviewed in
9  this case to provide me with answers to my questions.
10 Okay, sir?
11     A.  Thank you for that introduction.  I'd like to
12 comment that I believe I'm familiar with all of the
13 Plaintiff's exhibits except what is marked Plaintiffs'
14 Exhibit 2.
15     Q.  Which would be the Virginia Saipher incident
16 report?
17     A.  That's correct.  I don't believe I've had an
18 opportunity to read this report yet, although, it is
19 short and I'll be happy to do that today.
20        MR. STOCKMAN:  Why don't you take some
21        time to do it.
22     Q.  Yeah, by all means.
23     A.  May I please.  As you know I came with an
24 extensive amount of records --
25     Q.  Yes, sir.
0008
1      A.  -- that Attorney Stockman has provided for
2  me.
3         (Pause in the proceedings.)
4      A.  I assume this Exhibit 2 is the radiology
5  technician's report?
6      Q.  Yes, sir.
7      A.  And I do believe that I have read her
8  deposition as part of my records, but I've not seen
9  this written report previously, and it seems to
10 corroborate what I understand to be the information
11 given in her deposition, so thank you for letting me
12 read this.
13     Q.  All right.  Now, with regard to Plaintiffs'
14 Exhibit 1, your report that has been disclosed to all
15 counsel in this case dated December 28, 2005, does that
16 report contain all of your expert opinions in this case
17 up to this date?
18        MR. STOCKMAN:  Objection.  You can
19        answer.
20     A.  That's a general question, Attorney.  It
21 contains many of my opinions.  I'm not sure if it
22 contains all of the opinions I have in this case.  I
23 think it responded to the request of Mr. Stockman
24 regarding this case.

25      Q.  Did you prepare any other reports with regard
0009
1   to your expert opinions in this case at any time?
2       A.  I have no other reports.
3       Q.  All right.  Did you prepare any drafts of
4   your report that is dated December 28, 2005, which were
5   forwarded to the attorneys for Danbury Hospital?
6       A.  I have -- that were forwarded to Attorney --
7       Q.  The attorneys for Danbury Hospital?
8       A.  The only communications I've had is with
9   Mr. Stockman.
10      Q.  My question was did you ever prepare a draft
11  version of Plaintiffs' Exhibit 1 which was sent to the
12  attorneys for Danbury Hospital?
13      A.  I believe not.
14      Q.  Okay.  Now, with regard to --
15      A.  This should be the only copy of my written
16  report.
17      Q.  Okay.  With regard to Plaintiffs' Exhibit 1,
18  this report, did you write that report entirely on your
19  own?
20      A.  Yes, sir.
21      Q.  Okay.  Did you prepare or maintain any notes
22  aside from this report concerning your expert opinions
23  in this case?
24      A.  I believe that over the course of reviewing
25  all this paper I have notes, written notes that would
0010
1   be on the back of some of the communications, nothing
2   of which is anything more than summary information of
3   review of this voluminous data.
4       Q.  Okay.
5           MR. LANNI:  Would it be possible for
6           Counsel to obtain photocopies of those
7           reports, of those notes and provide them to
8           all attorneys?
9           MR. STOCKMAN:  Yes.
10      A.  I would just suggest at this point that the
11  amount of written material I have in this case is
12  rather small.
13      Q.  Okay.  Understand.
14      A.  I'll look through the materials, and if
15  there's any handwritten notes, I'll photocopy them for
16  you.
17      Q.  Thank you.  Could you tell us when were you
18  first contacted with regard to reviewing this case and

19  providing expert opinions?
20      A.  Might apologize for my lack of knowledge of
21  being sure, because I think I was contacted sometime in
22  the distance to initially discuss the case with
23  Dr. Stockman, although no records were received,
24  perhaps.
25      Q.  Okay.
0011
 1      A.  And then as the records came, I have many
 2  communications, as you can see, from Neubert, Pepe &
 3  Monteith's office regarding continued communications of
 4  this information.  Am I being clear?
 5      Q.  Yes, you are.
 6      A.  In other words, records have been forthcoming
 7  over several months, and as you can see I have many
 8  communications with the office.  I'm at loss to tell
 9  you exactly when I was contacted by the firm initially.
10      Q.  Could you give me an approximate date?
11      A.  Approximate of the communications are in the
12  late months of 2005, but I may have talked to an
13  attorney on the case the year previous.
14      Q.  All right.  Is there any way for you to
15  approximate or estimate when you were first retained as
16  an expert witness in this case?
17      A.  It is possible -- my staff will be here
18  shortly -- to review any of my bills, I may be able to
19  get a better idea of when I first was contacted by the
20  firm, and I'll be happy to get that information in the
21  next few moments.
22      Q.  Okay.  Because I -- you anticipated my next
23  question, which is that you did bill for the time that
24  you spent reviewing materials in connection with this
25  case; correct?
0012
 1      A.  I have sent bills and been paid for my time
 2  review to date, yes.
 3      Q.  Okay.
 4      A.  And I'll be happy to get that information for
 5  you.
 6      Q.  All right.  Did you charge a particular rate
 7  for reviewing these materials and preparing your
 8  report?
 9      A.  My usual and customary rate for medical
10  review of legal cases is a standard $450 per hour of
11  time.
12      Q.  Okay.  And that is for reviewing materials?

13      A.  My rate is usually the same whether I'm
14   reviewing materials, in court, giving depositions,
15   traveling, et cetera.
16      Q.  All right.  And that would also include time
17   spent preparing a report?
18      A.  Yes, sir.
19      Q.  Okay.  Can you estimate for me the total
20   amount that you have billed with regard to your expert
21   opinions in this case?
22      A.  I'd be happy more than happy to tell you
23   exactly hours I billed as soon as I can get the bills.
24   We've had several hours of case review and reading,
25   rather than estimate, I'd prefer just to give you the
0013
 1   exact number, if I may.  But I would say many.
 2      Q.  And we'll ask for copies of all your bills
 3   that have been submitted to date.
 4      A.  Off the record.
 5          (Pause in the proceedings.)
 6      Q.  Did you have any meetings or telephone
 7   conferences with the attorneys for the defendant
 8   hospital with regard to your expert opinions in this
 9   case?
10          MR. STOCKMAN:  You're talking about me?
11          He testified he's only spoken to me.  Is that
12          what you're asking?
13      Q.  In general, I don't know he's only spoken to
14   you or anybody else, so --
15      A.  The answer to the question, the only
16   communication I've had with anyone in this case has
17   been Attorney Stockman.  I've not had any conversations
18   with any of the principals in this case, no attorneys,
19   no hospital representatives.  The only communications
20   I've had is either by telephone or in person with
21   Attorney Stockman.  And I believe his office has
22   provided me entirely with all the materials that I've
23   had a chance to review in the case.
24      Q.  Okay.  Now, with regard to face-to-face
25   meetings that you had with Mr. Stockman --
0014
 1      A.  Yes.
 2      Q.  -- to discuss your expert opinions in this
 3   case, can you tell me how many face-to-face meetings?
 4      A.  We've had two face-to-face meetings.  We've
 5   had a handful of telephone conversations.  Attorney
 6   Stockman came to my office one time last week and we

7    reviewed details of the case in general sense in this
8    room, and then we met again today, this morning before
9    this meeting for approximately one half hour.
10        Q.  Okay.
11        A.  Again to discuss the details and for him to
12    review many of the records that I've to date.
13        Q.  No other face-to-face meetings with
14    Mr. Stockman?
15        A.  None social, professional, or otherwise.
16        Q.  And with regard to the first meeting you had
17    with him, how long did that take?
18        A.  That was approximately a 45-minute meeting,
19    during which I again had to run off because of clinical
20    responsibilities.  I think I'm identifying my time here
21    in these depositions as scattered.
22        Q.  With regard to very early morning occurring
23    today, how long did that meeting take?
24        A.  We met perhaps 15, 20 minutes.
25        Q.  How many telephone conferences have you had
0015
1    with Mr. Stockman to discuss your --
2        A.  Two or three, perhaps.
3        Q.  Did any of those telephone conferences take
4    place prior to the time that you authored your report?
5        A.  Yes, sir, they did.
6        Q.  How many?
7        A.  There were perhaps two.  Somewhere in my
8    vague recollection I may have talked to Attorney
9    Stockman in general terms about this case over a year
10    and a half ago and we discussed the general details.
11    He may have tried to identify whether I might be a
12    useful or helpful expert in this case.
13            We began to talk more seriously about the
14    case when he felt I was a useful expert, and at that
15    point he shared with me the records, and we discussed
16    the case in general terms and then specific.
17        Q.  Okay.  Now, with regard to the materials that
18    you reviewed in formulating your expert opinions --
19        A.  Yes, sir.
20        Q.  -- are all of them identified in your report
21    dated December 28, 2005?
22        A.  Unfortunately, I believe the answer to that
23    is no.
24        Q.  Okay.
25        A.  However, the only materials that I'm aware
0016

1  of, which came to me more recently, were those that
2  would have been generated more recently than that date
3  of December 2005.  In other words, I believe other
4  depositions were forwarded to me for my review as they
5  were generated.  I believe that is an entirely accurate
6  description of all the records that I've reviewed and
7  all the depositions and written material up to the date
8  of that.
9      Q.  Report?
10     A.  Report.
11     Q.  Okay.  Can you tell me what other materials
12  you reviewed which are not identified in this report?
13     A.  For example, I have a letter dated January
14  27, 2006, from Neubert, Pepe & Monteith which includes
15  an expert report submitted on behalf of Dr. Catania
16  that was generated on December 12, 2005, and that is
17  information that was not included in my original
18  report.
19     Q.  And you read that expert's report?
20     A.  Yes, sir.  Yes, sir, I did.  I also have an
21  article that was sent to me by Attorney Stockman from
22  Journal of American Medical Association which was
23  published after my report, which is also used in
24  helping formulate my opinion, and this was published
25  after my report or this was available to me after my
0017
1  report that I've written.
2          MR. LANNI:  Again, I would ask for a
3      copy of that article.
4          MR. STOCKMAN:  Sure.
5      Q.  Okay.
6      A.  I also have -- I just get the title on the
7  article.
8      Q.  Sure.  Why don't we just note for the record,
9  Doctor, if you could please, the title of the article
10  and the author.
11     A.  The title, first document's "Rhythm and
12  Clinical Outcome from In-Hospital Cardiac Arrest Among
13  Children and Adults."  It was published by Vindy M.
14  NadKarni, M.D. --
15     Q.  And a number of other physicians?
16     A.  -- et al, published in the Journal of Medical
17  Association, and this was a study from the University
18  of Pennsylvania School of Medicine.
19     Q.  Any other materials that you reviewed in
20  formulating your opinion in this case that are not

21   identified in your report?
22      A.  I think probably not.
23      Q.   Okay.  Dr. Teiger, have you previously
24   testified in court as an expert witness in medical
25   malpractice cases?
0018
1      A.  Yes, sir, I have.
2      Q.   Okay.  And could you tell us and approximate,
3   if you need to, the total number of times that you have
4   testified as an expert witness in medical malpractice
5   cases?
6            MR. STOCKMAN:  In court or in
7         deposition?
8            MR. LANNI:  In court.
9      Q.  Sir, first in court.
10      A.   I would suggest half a dozen cases I have
11   actually been in court testifying as an expert witness.
12      Q.   Okay.  And have you testified at depositions
13   as an expert witness in medical malpractice cases?
14      A.   I have testified in several depositions for
15   medical malpractice cases as an expert over the years
16   that I've been in practice.
17      Q.   And could you tell us the approximate number
18   of times?
19      A.   Perhaps twice the number that I've actually
20   been in court.  Many cases have settled before trial,
21   as you know.  But I've been deposed as an expert
22   witness many times.
23      Q.   Now, do you have any type of records or
24   materials which would document the cases in which you
25   have testified, either in court or at a deposition, as
0019
1   an expert witness in medical malpractice cases?
2            MR. STOCKMAN:  Objection.  You can
3         answer.
4      A.   I really never made a habit of keeping track
5   of the records.
6      Q.   All right.  Is there any way -- is there any
7   way that you can identify for us the medical
8   malpractice cases in which you have testified in court
9   as an expert witness?
10      A.   Unfortunately, I'm sure that I would not be
11   able to generate that information.  This is not
12   something that I keep active records on.  The
13   malpractice cases have come up over years and represent
14   only a small fraction of what I do in my practice, so

15   in general I do not keep records.  I suppose in general
16   terms if I were pushed, I could come up with some of
17   the non-specifics of cases that I've been involved with
18   medical malpractice.
19      Q.   Backtracking just a little bit, you told us
20   that you had testified at depositions as an expert
21   witness, is there any way that you can estimate the
22   number of depositions in which you've testified as an
23   expert witness?
24      A.   I'm sorry, I just don't think I can generate
25   that data for you.  I also do a large amount of legal
0020
1   work for asbestos occupational cases in the State of
2   Connecticut, and I'm involved with legal depositions
3   for those cases.  And malpractice cases and product
4   liability cases sometimes get mixed.
5          I do keep records of all the legal work that
6   I do and I've done for the past five years, and if need
7   be, I can get that report and then we can go through
8   each case, which one may be the malpractice versus the
9   occupational cases.
10          I probably have over 300 cases I've been
11   involved with in the past four, five years, most of
12   which are the asbestos product liability work that I'm
13   expert for.  So if it's necessary, I suppose that would
14   be one way we can dig up that information.
15      Q.   Let me ask you this:  Well, when you say you
16   have some type of records that indicate the legal
17   matters that you've been involved in as an expert
18   witness --
19      A.   Yes.
20      Q.   -- in what form would those records be?
21      A.   These are my personal records that I keep on
22   the legal work that I do as a portion of my practice
23   that's on Excel spreadsheet which I keep at home for my
24   personal records.
25      Q.   Do they list information pertaining to each
0021
1   case?
2      A.   They are actually very thorough as to the
3   name of the case, the attorney firm involved, the
4   amount that I've charged, whether I've generated a
5   formal written report, whether I've been deposed, et
6   cetera.  The records would actually be the way for me
7   to identify which legal cases I've been involved with
8   for the past five years.  I have been in practice for

9    23 years now, and prior to that I've been involved over
10   the years on occasional malpractice cases, cases which
11   I may not have records for.
12       Q.  Okay.
13       A.  But at least in the past five years that
14   would be some way for us to identify the cases I've
15   been involved with.
16       Q.  I would call for production of the records
17   pertaining the last five years that reflect the cases
18   in which you've testified as an expert witness.
19           MR. LANNI:  Just note that's a discovery
20         request in this deposition.
21       Q.  Now, with regard to the medical malpractice
22   cases in which you have testified either in court or at
23   a deposition as an expert witness, could you tell us in
24   some way, either the percentage or the total number, of
25   those matters in which you have testified on behalf the
0022
1    defendant?
2        A.  Again, I don't keep accurate records of that.
3    However, I have never identified myself as an expert
4    for either plaintiff or defense.  I've identified
5    myself as an expert in the field, and I have been
6    deposed, reviewed cases, and testified for both sides
7    over the years.  In general, I have identified myself
8    as available to both sides if requested.  To the best
9    of my recollection the majority of cases that I have
10   testified in have been on the side of the defense.
11       Q.  All right.  Is there any way you can estimate
12   the percentage of cases in which you have testified as
13   an expert on behalf of the defense?
14       A.  To the best of my recollection I only
15   remember two cases that I've testified for the
16   plaintiff, therefore the rest would be for the defense.
17   The majority.
18       Q.  Now --
19       A.  And I'm sorry for being vague, but that's the
20   best I can do to my recollection.
21       Q.  You don't have to apologize.  It's
22   understood.  With regard to the medical malpractice
23   cases in which you have testified as an expert witness,
24   either in court or at a deposition, have they all been
25   within the State of Connecticut?
0023
1        A.  No, sir, they have not.
2        Q.  Okay.  What other states have you testified

3  in at medical malpractice cases?
4      A.  I have testified in New York City, in
5  Brooklyn, to the best of my recollection, in one
6  medical malpractice case.
7      Q.  Okay.  Any other locations outside the State
8  of Connecticut?
9      A.  To the best of my recollection my experience
10  has been entirely within the State of Connecticut.
11     Q.  Now, you told us that you have testified as
12  an expert witness in asbestos products liability cases?
13     A.  That is correct.
14     Q.  Can you estimate how many of those cases you
15  have testified either in court or at a deposition as an
16  expert?
17     A.  I have written reports as an independent
18  medical evaluator on literally hundreds of cases over
19  the years, since that's an interest and a subspecialty
20  of mine.  Of those cases I have been deposed many times
21  by counsel for my opinion in those cases.  Occasionally
22  I've been to court to discuss those cases as an expert
23  witness.
24         I have been called upon to be an expert
25  witness, as an expert in many mesothelioma cases.  I
0024
1  have written reports on several of those cases.  I
2  would estimate the total cases that I've been involved
3  as asbestos over the years is close to 300 cases.
4      Q.  Okay.  With regard to your involvement as an
5  expert witness in the asbestos cases, can you estimate
6  how many of those 300 cases were on behalf of the
7  defense and how many were on behalf of the plaintiff?
8      A.  The majority of cases that I've been involved
9  with have been on the side of the defense.  I've been
10  involved with my patients as an expert, which would be
11  as the plaintiff side in several.  Again, the numbers
12  are not forthcoming with accuracy to me, but we're
13  talking about an estimation.
14     Q.  Have you testified previously as an expert
15  witness for Mr. Stockman's firm, Neubert, Pepe &
16  Monteith?
17     A.  To the best of my recollection the answer is
18  no.
19     Q.  Have you testified previously as an expert
20  witness for any of the other defense firms involved in
21  this case, the firms of Ryan, Ryan, Johnson & Deluca or
22  Halloran & Sage?

23     A.  To the best of my recollection the answer is
24  no.
25     Q.  All right.  And same question with respect to
0025
 1  Mr. Grady's firm, Rende, Ryan & Downes?  Not to leave
 2  him out.
 3     A.  To the best of my recollection the answer is
 4  no.
 5     Q.  Now, you mentioned you reviewed other medical
 6  malpractice cases on behalf of attorneys cases that did
 7  not go to trial; correct?
 8     A.  That is correct.
 9     Q.  And can you estimate for me the number of
10  cases in total that you have reviewed for attorneys in
11  terms of medical malpractice actions?
12     A.  I would suggest that the number probably is
13  in the range of several dozen over the years.  I
14  frequently get called by attorneys to give informal
15  opinions on the cases with review of records, and more
16  often than not no report is requested.  I have reviewed
17  many records on medical malpractice cases and hear
18  nothing further from the attorney after I give my
19  informal opinion.
20         In my house, which is where I do all this
21  work, I have many cases on the floor of my dining room
22  that are relatively active but have been lingering for
23  years.  So the number probably is somewhere in the
24  several dozen cases of malpractice cases that I have
25  reviewed or discussed with attorneys informally, and
0026
 1  then some go to be more formal, and I'm sure you know
 2  the process.
 3     Q.  Well acquainted with it.
 4     A.  Yes.
 5     Q.  Now, with regard to the total number of cases
 6  that you've reviewed for attorneys, is there any way to
 7  estimate the number that you have, in which you have
 8  testified for the defense, I'm sorry, in which you have
 9  reviewed the materials for the defendants as opposed to
10  plaintiffs?
11     A.  Probably the vast majority of opinions -- of
12  cases which I have reviewed have been generated by
13  attorneys for the defense.  My opinions with regard to
14  the total number of cases that I've reviewed could end
15  up on both sides.  I try to maintain my identity as an
16  independent evaluator, and sometimes I will be clear

17   with the attorney that the case seems very clearly one
18   of malpractice or bad outcome and my opinion is what it
19   is.  So of all the cases that I reviewed, while most
20   are generated by the defense, the opinions could be
21   anywhere.
22     Q.  Now, have you ever reviewed any materials in
23   cases for Mr. Stockman's firm, Neubert, Pepe &
24   Monteith, other than this case?
25     A.  To the best of my recollection the answer
0027
1   would be no.
2     Q.  Have you ever reviewed any materials with
3   regard to this case for the other defense firms
4   involved in this case?
5     A.  To the best of my recollection the answer
6   would be no.
7     Q.  Have you ever been represented in a legal
8   matter by any of the defense firms involved in this
9   case?
10     A.  I have never been sued for malpractice.  I've
11   never had a case arise against me, and I have never
12   been represented by any of the firms involved in this
13   case.
14     Q.  Okay.  And I'm not limiting my question to
15   medical malpractice cases, I'm just asking you with
16   regard to representation in any legal matter.
17     A.  In my past, in 2001 a consent decree was
18   issued against my practice for what we consider a
19   trivial issue that arose with regard to processing of
20   x-ray materials in my office.  The consent decree was
21   generated in 2001, and since I began my practice in
22   1983, that's the only legal issue that's ever arisen
23   against me or my practice.
24     Q.  What I'm interested in, with respect to that
25   legal matter were you represented by any of the firms
0028
1   involved in this case?
2     A.  No, sir.
3     Q.  Okay.  Now, your CV, correct me if I'm wrong,
4   lists a number of hospital affiliations; correct?
5     A.  That is correct.
6     Q.  If you could just tell me your hospital
7   affiliations for the record?
8     A.  I'll be happy to do so.  May I ask the date
9   of that CV you have?
10         MR. STOCKMAN:  August 20, 2005.

11      A.   Nothing much is changed since then, but,
12   obviously, we're in February of 2006.  My primary
13   hospital affiliation is Saint Francis Hospital Medical
14   Center in Hartford, Connecticut.  I have maintained
15   courtesy privileges at Hartford Hospital, at Manchester
16   Hospital, at the University of Connecticut Health
17   Center.
18         I have staff privileges at the Rocky Hill
19   Veteran's Home and Hospital.  I'm active staff at the
20   Rehab Hospital of Connecticut, which is an affiliate of
21   Saint Francis Hospital and Medical Center, and I
22   believe that's it, all inclusive.
23      Q.   Okay.  What is the nature of your affiliation
24   with Saint Francis Hospital?
25      A.   I am a private practitioner in private
0029
1   practice at my own office at 1000 Asylum Avenue.  I am
2   a senior medical attending at Saint Francis Hospital,
3   and I have full privileges to practice medicine at the
4   hospital.
5         I have over the years become the director of
6   the hospitalists program at Saint Francis, which is a
7   fairly active and busy program in the hospital now, and
8   my work includes full hospital care of patients,
9   including pulmonary, critical care medicine, and
10   general hospital medicine.
11      Q.   Okay.  Now, with regard to any of the
12   hospitals that you are affiliated with --
13      A.   Yes.
14      Q.   -- do you know if any of the law firms
15   involved in this case represent those hospitals in
16   medical malpractice matters?
17      A.   I'm sure that over the years there must be
18   some affiliation between these firms and Saint Francis
19   Hospital, but to the best of my knowledge the answer
20   would be no.
21      Q.   Okay.  Do you know whether Saint Francis
22   Hospital -- do you know in particular whether Saint
23   Francis Hospital has ever been represented by Neubert,
24   Pepe & Monteith, Mr. Stockman's firm?
25      A.   No, sir, I don't.
0030
1      Q.   Now, your CV does not provide any information
2   with regard to publications that you may have authored
3   or co-authored in your career?
4      A.   Yes, sir.

5      Q.   And your CV indicates that you are board
6    certified in the field of internal medicine?
7      A.   That is correct.
8      Q.   And also in the subspecialty of pulmonology?
9      A.   That is correct.
10     Q.   Okay.  Have you authored or co-authored any
11   articles or publications or medical literature of any
12   kind in the field of internal medicine during your
13   career?
14     A.   The publications that I've ever been involved
15   with are years old now and were generated when I was a
16   fellow in pulmonary medicine.  I consider them trivial
17   and insignificant to my career and I've chosen not to
18   list those publications.  In fact, they're so old now
19   that I'm not sure what value they were.
20       Just as a comment, I have made my career
21   entirely one of clinical practice of medicine and
22   hospital work, and I do not consider myself a
23   researcher by any stretch.  As you can see from my CV,
24   I have been involved with several research programs
25   that have been generated along the way through Saint
0031
1    Francis as an investigator, but many of these did not
2    end up in the generation of literature.  So while I
3    have been involved in the field of research in many
4    different aspects, I do not have a publication list
5    available.
6      Q.   Have you with respect to any of the medical
7    literature that you may have authored or co-authored,
8    did any of that involve critical care issues?
9          MR. STOCKMAN:  Objection.  You can
10         answer.
11     A.   I'm sure somewhere along the way the answer
12   to that question would be yes.  For example, case
13   reports of critical care patients that I've been
14   involved with as a senior medical attending may have
15   been written as case reports for literature by junior
16   pulmonary fellows or young practicing physicians, and I
17   may be included in the author list as a senior medical
18   attending, but not having been the primary author of
19   the report.
20     Q.   Well, do you maintain any records or other
21   materials which would indicate the medical literature
22   in which you are identified as a co-author?
23     A.   I felt that that information is not important
24   to my career and I have not maintained that

25   information.  I have a feeling if the index medicus was
0032
1   researched, my name would come up at some point over
2   the past many years as being included as an author.  I
3   have not included that as part of my CV.
4      Q.  Would you have maintained copies of the
5   medical literature itself that you have that -- on
6   which you were listed as a co-author in your office or
7   at your home?
8      A.  The answer is absolutely not, no, sir.
9      Q.  Now, with regard to your report dated
10   December 28, 2005, you rendered certain opinions with
11   regard to the care rendered by the surgeons and the
12   hospital staff in this case.
13          MR. STOCKMAN:  Objection.  You can
14       answer.
15      Q.  Is that correct?
16      A.  Yes, sir.
17      Q.  Okay.  Would it also be correct for me to say
18   that your report sets forth certain opinions regarding
19   the cause of the brain damage sustained by this
20   patient?
21          MR. STOCKMAN:  Objection.  You can
22       answer.
23      A.  The answer is yes.
24      Q.  Okay.  Now, in your report you set forth
25   certain opinions regarding the care rendered by the
0033
1   nursing staff at Danbury Hospital, isn't that true?
2          (Pause in the proceedings.)
3      A.  I do give an opinion with regard to the
4   nursing staff.
5      Q.  Yes.  Okay.
6      A.  Yes.
7      Q.  And with regard to those opinions, do you
8   consider yourself qualified to render opinions about
9   nursing care?
10      A.  Yes, sir, I do.
11      Q.  Okay.  And why do you consider yourself
12   qualified to render opinions about nursing care?
13      A.  My entire hospital professional work involves
14   the interaction with the care of patients between the
15   physician work and the nurses.  Over the years I have
16   huge interaction with the responsibilities of nurses
17   and understand what their responsibilities and
18   requirements are in order to give what we consider to

19  be the best patient care available.  So my knowledge of
20  nursing care comes from my fairly extensive interaction
21  of hospital work at my hospital, Saint Francis, over
22  the years, as well as other institutions.
23      Q.  All right.  So what you are saying, and
24  correct me if I'm wrong, is that your experience in
25  working with the nursing staff at Saint Francis and
0034
1  other hospitals leads you to believe that you're
2  qualified to render opinions about nursing care?
3      A.  I think it would be a normal expectation that
4  physicians who work closely with nurses and in the
5  hospital on a day-to-day basis to the extent that I do
6  would know the responsibilities and requirements of
7  nursing in general and in specific.  Of course, I don't
8  have a nursing degree, but I don't believe that is
9  required to make me aware of what nursing
10  responsibility is.
11      Q.  All right.  So let me just clarify what
12  you're telling me.  You're saying that you consider
13  yourself qualified to render opinions about the quality
14  of nursing care based upon your experiences and
15  interactions with the nursing staff at Saint Francis
16  Hospital and the other hospitals that you've been
17  affiliated with in your career; is that what you're
18  saying?
19          MR. STOCKMAN:  Objection.  And he can
20          answer, but he's already answered this
21          question in two forms.  You can respond.
22      A.  I think that would be a fair statement.
23      Q.  Now, if you could just turn to your report,
24  sir.  And I'm going to draw your attention to page two
25  of your report, and the second full paragraph in that
0035
1  report.
2      A.  Yes.
3      Q.  And the first sentence in that report reads,
4  "Mr. Guigliano suffered a cardiopulmonary arrest on
5  February 17, 2001, due to compromised lung function as
6  a result of progressive abdominal distention."  Now,
7  what I've just read to you, that's one of your opinions
8  in this case; correct?
9      A.  That's a general statement, yes, regarding
10  his case.
11      Q.  Okay.  That would be one of your opinions?
12      A.  I would have to say yes, since I've written

13  it in the report.
14      Q.  In your opinion how did progressive abdominal
15  distention cause compromised lung function in this
16  patient?
17      A.  Abdominal -- progressive abdominal distention
18  would impair any patient's ability to take deep, full
19  breaths and use his lungs to full capacity.
20      Q.  Okay.  And with regard to the opinion --
21  withdrawn.
22          With regard to this particular aspect of your
23  opinion, could you tell us what is the basis of that
24  opinion in the materials that you reviewed?
25      A.  Hopefully you won't ask me to go to specific
0036
1   pages, but I think it was a well-documented issue that
2   the patient's abdomen was distended, and this was a
3   problem he had on the floor for several days, so
4   abdominal distention is identified in the medical
5   records as existing.
6       Q.  Okay.
7       A.  And from a pulmonologist point of view we
8   know that abdominal distention can impair pulmonary
9   function on a normal pathophysiological basis, which
10  I'll be happy to describe, if you like.
11      Q.  Yes, sir, please.
12      A.  Respiration requires the ability of the lungs
13  to expand.  The total ability of a patient's lung to
14  expand is documented as total lung capacity, which for
15  any given individual is identified as a number.  If a
16  patient has abdominal distention, the total lung
17  capacity would be reduced because the abdominal
18  distention would impair a patient's ability to take a
19  full, deep breath.
20          So abdominal distention would impair total
21  lung capacity in a similar fashion to pregnancy with
22  abdominal distention would impair total lung capacity.
23  This is something that is recognized as normal
24  physiology or pathophysiology in this case, and this
25  patient's abdominal distention would have compromised
0037
1   his respiratory capabilities.
2       Q.  Okay.  Now, in your opinion how did the
3   compromised lung function secondary to this progressive
4   abdominal distention cause or contribute to the
5   cardiopulmonary arrest of this patient on February 17,
6   2001?

7          MS. HUNT:  Object to the form.
8          MR. STOCKMAN:  Objection.  You can
9      answer.
10     A.  Loss of total lung capacity, loss of
11  ventilatory ability, loss of this patient's ability to
12  use his lungs to full capacity, would in a general
13  sense contribute to overall physiological
14  deterioration.  It is not my implication that abdominal
15  distention was the entire cause of Mr. Guigliano's
16  cardiopulmonary arrest, but it certainly contributed by
17  preventing him from having full respiratory ability.
18          We do know that his oxygen saturation was
19  measured as compromised just prior to the arrest, and
20  the oxygen saturations of 70 to 80 percent, where it
21  should be well above 90 percent.  So we do know that
22  his respiration function was compromised.  The
23  abdominal distention to me was clearly an indication,
24  was manifested by a low oxygen saturation.  I hope
25  those comments are helpful.
0038
1          MR. LANNI:  If you could just read back
2      that last portion of his response, the last
3      two sentences, if you could.
4          (Answer read.)
5          (Answer reread.)
6      Q.  So are you saying that the low oxygen
7   saturation was either in whole or in part caused by the
8   abdominal distention?
9          MS. HUNT:  Object to the form.
10         MR. T. GRADY:  Objection to the form.
11         MR. STOCKMAN:  Objection.  You can
12     answer.
13     A.  The way you phrased the question is a little
14  bit difficult, but in a ill patient who has many
15  medical problems and processes going on, everything
16  contributes to his overall deterioration.  From a
17  pulmonologist's point of view, the low oxygen
18  saturation contributes to his overall difficulty, as
19  does the abdominal distention.
20          My suggestion to you is that the abdominal
21  distention contributed to his low oxygen saturation
22  because he was unable to ventilate to full capacity.
23  Of course, we know that the significant portion of his
24  illness was his pseudomembranous colitis, which was in
25  large part the cause of his abdominal distention,
0039

1    associated with his pain medication that he was getting
2    and lack of proper bowel function.
3          So I believe this man was ill and his
4    difficulty was multifactorial, but certainly his
5    respiratory compromise on the basis of his abdominal
6    distention was a large factor.
7    Q.   Okay.  Now, you described this patient as
8    being ill and that his difficulties were
9    multifactorial, could you tell us what do you mean by
10   that?
11        A.   The patient was ill because he was in the
12   hospital under care, and his illness had to do with
13   many things, including his recovery from the fractured
14   ankle, the abdominal distention which he had for
15   several days, his anxiety and distress about being in
16   the hospital and being laid up and immobile.  There
17   were many factors involved in his overall difficulty.
18   By "ill," I mean that the patient clearly required to
19   be in the hospital because he had medical difficulties.
20   Q.   When you described this patient as ill and
21   having difficulties that were multifactorial in nature,
22   would that necessarily include his respiratory
23   compromise?
24        A.   I think his respiratory status was considered
25   stable and adequate for floor monitoring and floor
0040
1    evaluation.
2    Q.   I'm just asking you is that one of the
3    factors that leads you to conclude that this patient
4    was ill?
5    A.   Yes, sir.
6    Q.   Okay.  Now, I believe you testified, and
7    correct me if I'm wrong, that the abdominal distention
8    was not the entire cause of the cardiopulmonary arrest;
9    correct?
10        A.   That is my opinion, yes.
11        Q.   Okay.  And could you tell me in your opinion
12   what other causes were there of the cardiopulmonary
13   arrest?
14        A.   We do know that this patient had a
15   significant pseudomembranous colitis, was -- and
16   identified to have an ileus on a clinical basis by his
17   physicians, he was in significant pain and required
18   narcotic analgesics.  At the time of the decision to
19   get a CAT scan the surgeons felt that it was
20   appropriate to evaluate his abdomen because of the

21  distention, because of the persisting difficulty with
22  bowel dysmotility and his overall poor condition.
23      Q.  Okay.  Well, when you describe him as being
24  in overall poor condition, what factors lead you to
25  describe him as being in "overall poor condition"?
0041
1          MR. STOCKMAN:  Objection.  You can
2          answer.
3      A.  I wonder if you could be a little more
4  specific how you would like me to answer you with
5  regard to his clinical state.
6      Q.  Well, you're the one who used the term
7  "overall poor condition," I'm just asking you what do
8  you mean by that?
9      A.  That would be a better way to answer the
10  question, I think.  I think Mr. Guigliano was ill, I
11  think his abdomen was not functioning properly, his
12  bowels were not functioning properly.  I think he
13  needed to be in the hospital under care and
14  observation.  I think he was ill.  By those statements
15  I want to imply I think he did not require intensive
16  care unit level of treatment.  If there are any other
17  comments about what degree of illness, I hope you can
18  help direct me with your questioning.
19      Q.  Okay.  Well, when you classified this patient
20  as being in "overall poor condition," you're referring
21  in part to his abdominal distention; correct?
22      A.  Correct.
23      Q.  And you're referring in part to his
24  pseudomembranous colitis; correct?
25      A.  Correct.
0042
1      Q.  And you're referring in part to his
2  compromised lung function; correct?
3      A.  Correct.
4      Q.  Okay.
5      A.  And those are the issues that lead me to tell
6  you that the patient is ill.
7      Q.  Okay.  And you're referring in part to his
8  problems with oxygen saturation?
9      A.  Again, it's a factor, yes.
10      Q.  Okay.  Now, you told us in your report that
11  the patient's cardiopulmonary arrest was due to
12  compromised lung function as a result of progressive
13  abdominal distention?
14          MS. HUNT:  Objection to form.

15          MR. T. GRADY:  Objection to form.
16          MR. STOCKMAN:  Objection.
17     Q.  Correct?
18     A.  I didn't mean to imply in any way that was
19  the only factor responsible.
20     Q.  And therein Mr. Guigliano suffered
21  "cardiopulmonary arrest on February 17, 2001, due to
22  compromised lung function as a result of progressive
23  distention -- abdominal distention."  Do you identify
24  any other causes of the respiratory arrest?
25          MS. HUNT:  Objection.
0043
 1     Q.  Cardiopulmonary --
 2          MS. HUNT:  Objection.  Object to the
 3          characterization of the question, and it
 4          takes out of context the entirety of the
 5          paragraph.
 6          MR. STOCKMAN:  I'll join the objection
 7          as well.  If you understand the question, you
 8          can answer it.
 9     A.  I think I understand it.  I would like to
10  state for the record that I think the cause of the
11  cardiopulmonary arrest is multifactorial.  I do not
12  mean to imply in any way that the low oxygen saturation
13  was the sole issue involved in this case.
14     Q.  I'm just asking you with regard to this
15  particular sentence that leads off this paragraph, does
16  it identify any other cause of the cardiopulmonary
17  arrest?
18     A.  I think the sentence needs to be identified
19  for what it is.  But stating for the record here today,
20  I'd like to clarify the best I can that I do not
21  believe that the low oxygen saturation only is the
22  entire cause of his cardiopulmonary arrest, and if my
23  sentence implies that, then I hope to modify that by my
24  deposition today.
25     Q.  We'll get to that.  But my question is with
0044
 1  regard to this particular sentence.
 2          MR. STOCKMAN:  You're just asking has he
 3          laid out the other alternative in this; is
 4          that correct?
 5     Q.  Let me ask the question again.  All right.
 6  With regard to this sentence, "Mr. Guigliano suffered a
 7  cardiopulmonary arrest on February 17, 2001, due to
 8  compromised lung function as a result of progressive

9   abdominal distention," do you identify any other causes
10  of the cardiopulmonary arrest, yes or no?
11      A.  Again, I think the cause of the
12  cardiopulmonary arrest is multifactorial, and in that
13  regard I think that there are other factors that are
14  the cause of the cardiopulmonary arrest.
15      Q.  That's -- those are not identified in this
16  particular sentence I read to you?
17      A.  Of course not.
18      Q.  Okay.  Now, aside from progressive abdominal
19  distention causing compromised lung function, could you
20  list for me the other factors that in your opinion
21  caused or contributed to the cardiopulmonary arrest of
22  this patient on February 17, 2001?
23      A.  I can identify the toxicity from
24  pseudomembranous colitis as a cause, as a potential
25  cause.  I can identify ileus as a potential cause.  I
0045
1   can identify the injury due to his fall as a potential
2   cause.  I can identify his general anxiety and debility
3   in the hospital as a potential cause.  I can also
4   speculate as to any one of other issues which may have
5   contributed which I cannot define due to the data I
6   have available.
7       Q.  All right.  Now --
8       A.  But I prefer not to speculate, unless you
9   would like me to do so.
10      Q.  Oh, no, I'm not interested in your
11  speculation, I'm interested in your opinions.
12      A.  Sometimes opinions are speculation, sir.
13      Q.  Well, I'm interested in your opinions that
14  are based on degree of medical certainty or medical
15  probability.  Okay?
16      A.  I understand.
17      Q.  Okay.  Now, you mentioned that "toxicity from
18  pseudomembranous colitis" was a potential cause or a
19  contributing factor in the patient's cardiopulmonary
20  arrest; correct?
21      A.  I think that would be a correct statement,
22  yes.
23      Q.  Okay.  And when you wrote your report on
24  December 28, 2005, you were aware of the fact that this
25  patient had been diagnosed with pseudomembranous
0046
1   colitis; correct?
2       A.  From review of the record pseudomembranous

3  colitis was proven by culture.
4      Q.  Okay.  And can you tell me where in your
5  report you specifically state that toxicity from
6  pseudomembranous colitis is a potential cause or
7  contributing factor to this patient's cardiopulmonary
8  arrest?
9      A.  By the way you've asked the question, I don't
10  believe that I state that specifically.
11      Q.  Okay.  Now, you mentioned that ileus was a
12  potential cause or contributing factor in this
13  patient's cardiopulmonary arrest; correct?
14      A.  In my report or in my discussions here today?
15      Q.  No.  In your discussions here today, I'm
16  talking about what you just testified to.
17      A.  I think that's correct.
18      Q.  Okay.  Yes.  All right.  Now, you've
19  testified that ileus is a potential cause or
20  contributing factor to the cardiopulmonary arrest, and
21  my question to you is when you wrote your report on
22  December 28, 2005, you were aware that this patient had
23  been diagnosed with a ileus during his admission?
24      A.  That's correct.
25      Q.  Okay.  And I'm asking you where in your
0047
1  report does it specifically state that ileus was a
2  potential cause or contributing factor to this
3  patient's cardiopulmonary arrest?
4      A.  It does not state that.
5      Q.  Okay.  Now --
6      A.  I believe it's implied by the words that I've
7  written.  But do I specifically state that ileus is the
8  cause or contributing factor, the answer is no.
9      Q.  All right.
10      A.  I think the second complete paragraph on page
11  two implies that ileus is a contributing factor.
12      Q.  Okay.  Well, how would ileus be a
13  contributing factor to the cardiopulmonary arrest?
14      A.  Again, ileus would be responsible for, in
15  whole or in part, with abdominal distention.  Abdominal
16  distention would cause pulmonary respiratory
17  compromise, it would cause low oxygen saturation that
18  would contribute, and I think my wording implies that
19  is an issue, although I have not stated specifically --
20      Q.  All right.
21      A.  -- in my report that ileus contributed to his
22  cardiac arrest.

23      Q.   All right.  Now, let me backtrack for a
24   moment.  You testified that toxicity as a result of
25    pseudomembranous colitis would be a potential factor in
0048
1    contributing to the cardiopulmonary arrest; correct?
2        A.   I think that is a correct statement, yes.
3        Q.   And could you tell us how that toxicity from
4    pseudomembranous colitis would be a potential
5    contributing factor?
6        A.   Any infectious disease, whether it becomes,
7    manifests systematically with general illness,
8    abdominal distention, contributes to the overall body
9    compromise, and that regard he would not be able to
10   handle insults as well as they come along.  His body is
11   weakened, his defense system is weakened, he is unable
12   to handle the stresses or strains of hemodynamic
13   cardiopulmonary instability.  So toxicity makes him
14   weaker and more susceptible to difficulties than an
15   otherwise healthy person.  And again, I identified this
16   gentleman as being sick, requiring hospitalization.
17      Q.   What is the physiological mechanism by which
18   toxicity from pseudomembranous colitis would impair
19   this patient's ability to handle any cardiopulmonary
20   instability?
21      A.   We consider patients who are ill with this
22   type of toxicity as having cells which are sick.  Sick
23   cell syndrome is one phrase that's in the medical
24   literature.  Cells don't handle things as well, his
25    heart is not as strong, his lungs are not as capable of
0049
1    exchanging oxygen, his intestinal tract is not capable
2    of handling digestive juices, his brain is not capable
3    of handling neurological function.  His cells are sick
4    in general because of the toxicity.
5           And from a layman's point of view, anybody
6    knows when they are sick with the flu they don't work
7    as well, they're unable to get up and do everything
8    that they are capable of when they're well.  So I
9    consider this patient to have been toxic from the
10    pseudomembranous colitis and suffered from general body
11   cell sickness.
12      Q.   Okay.  Would you be able to tell us what
13   clinical evidence documented that this patient was
14   toxic from the pseudomembranous colitis?
15      A.   We can go over the vital signs that might be
16   on the floor.  He had abdominal distention, he was

17    irritable, he was in pain, he had difficulty with
18    staying stable in the hospital.  He was certainly not
19    calm, by any nurses notes.  He manifested signs that we
20    clinically identify as patients being sick.
21       Q.   When you say that this patient had difficulty
22    in staying stable in the hospital, what are you
23    referring to?
24       A.  I'm talking more to movement, in the fact
25    that he seemed to be up and down from bed, the nurses
0050
1    were not able to make him comfortable at times.  He was
2    irritable.
3       Q.  So you're saying that the difficulty in
4    staying stable was related to his ability to move and
5    his irritability?
6              MR. STOCKMAN:  Objection.  You can
7           answer.
8       A.  By all the nurses notes and clinical records
9    that I can see, the patient was clearly uncomfortable
10    with his ankle, with his abdomen, with his respiratory
11    status, with the frustration being in the hospital.  He
12    was not a patient who was identified as comfortable and
13    happy to be where he was convalescing.
14       Q.  Okay.  So you're saying that when you use
15    that term "stable," you're referring to the comfort of
16    the patient?
17       A.  I'm saying that's one manifestation, yes.
18       Q.  Okay.
19       A.  Certainly, the patient was uncomfortable.
20       Q.  Let me just backtrack a little bit to the
21    toxicity issue.  You told us that there was clinical
22    evidence in the Danbury Hospital chart which indicated
23    that this patient was toxic from the pseudomembranous
24    colitis; is that correct?  Is that a correct statement
25    of your testimony?
0051
1       A.  It's my opinion that the patient manifested
2    toxicity based on the records that I reviewed in the
3    clinical picture, yes.
4       Q.  Okay.  And --
5       A.  I'm not sure I can identify progress or
6    nursing notes today with -- all these records state
7    this patient as toxic.  My opinion is that given the
8    range of difficulty that he had and the diagnosis and
9    the clinical picture, my opinion is that this patient
10    was ill and manifested signs of toxicity associated

11    with the pseudomembranous colitis.
12       Q.   Okay.
13       A.   One of those manifestations would be the
14    abdominal distention and the respiratory difficulty.
15       Q.   Okay.  So what you're saying is that the
16    toxicity from the pseudomembranous colitis in part
17    caused the abdominal distention?
18               MS. HUNT:  Object to the form.
19               MR. T. GRADY:  Join.
20               MR. STOCKMAN:  You can answer.
21       A.   I think that's clear, my opinion, as one of
22     the contributing factors to the abdominal distention,
23     yes.
24       Q.   And you're also saying that the ileus was one
25     of the contributing factors in the abdominal
0052
1    distention; correct?
2       A.   That is correct.  And the ileus could be
3    caused by the pseudomembranous colitis, by the narcotic
4    use, or both.
5       Q.   Okay.  And with regard to both the factors of
6    ileus and toxicity, would you agree with me that those
7    factors indirectly caused the compromised lung function
8    in this patient?
9               MS. HUNT:  Objection to the form.
10               MR. STOCKMAN:  Join.
11               MR. T. GRADY:  Join.
12       A.   I might object to the word "indirectly,"
13    since I'm not sure how to answer that question.
14    Whether direct or indirect factor, it certainly was a
15    contributing factor.
16       Q.   Of the abdominal distention?
17       A.   That is my opinion, yes.
18       Q.   Okay.  And that abdominal distention in turn
19    caused the compromised lung function?
20               MR. STOCKMAN:  Objection.  You can
21          answer.
22               MS. HUNT:  Objection.
23       A.   I think that would be a fair statement, yes.
24       Q.   Okay.  Now, would -- withdrawn.
25          With regard to the issue of this patient
0053
1    being toxic as a result of the pseudomembranous
2    colitis, is that something that you would expect the
3    surgeons who were treating this patient to be aware of
4    when this patient was under their care?

```
 5                MR. STOCKMAN:  Objection.
 6                MR. T. GRADY:  Object to the form.
 7                MR. STOCKMAN:  This witness has not been
 8         disclosed as to surgical standard of care.
 9                MR. LANNI:  I understand.  I'm not
10         asking about standard of care.
11                MS. HUNT:  I think you are.
12                MR. STOCKMAN:  I think you are too.  I
13         think you're asking what he would expect the
14         surgeons to expect.  If that's not the
15         characterization, I'm --
16         Q.  I'm asking would you have expected the
17    surgeons to be aware of the clinical evidence that
18    indicated this patient was toxic from pseudomembranous
19    colitis?
20                MS. HUNT:  Object to the form.
21                MR. STOCKMAN:  Again, objection, Doctor,
22         if you have an opinion, you can render it.
23         A.  It's my opinion that the surgeons were aware
24    of the patient's toxicity and his illness because they
25    decided to pursue the difficulty the patient had with a
0054
 1    CAT scan.  So my opinion is the surgeons -- my opinion
 2    is that I would expect the surgeons to be aware of the
 3    toxicity since they were caregivers at the bedside.
 4    And it is my opinion that they were aware of the
 5    toxicity and decided to pursue a diagnostic evaluation
 6    with the CAT scan on the day of his cardiopulmonary
 7    arrest.  I don't believe I'm giving a surgical opinion.
 8    I believe I'm giving an opinion on the care of a
 9    critically ill, modify, care of a ill patient in the
10    hospital based on their clinical evaluation and rounds
11    at the bedside.
12         Q.  All right.
13         A.  So I don't believe that's a surgical opinion,
14    that's a medical care opinion.
15         Q.  And you would agree with me that based upon
16    the materials in the records that you reviewed, the
17    surgeons had made the diagnosis of ileus; correct?
18         A.  The surgeons were aware that the abdomen was
19    distended and not functioning properly, and there was a
20    dysmotility that would be identified as an ileus, they
21    decided to pursue the cause of the ileus further with
22    the abdominal CAT scan, and that would be the
23    appropriate standard of care, the appropriate next
24    step.
```

25      Q.   Okay.  Well, would you as a physician, would
0055
1    you have expected the physicians taking care of this
2    patient to be aware of the fact that the abdominal
3    distention in this patient was compromising his lung
4    function?
5            MS. HUNT:  Object to the form.
6            MR. STOCKMAN:  Objection.  Again, I
7         don't want the witness to speculate.  This
8         witness has not disclosed to testify the
9         standard of reasonable care applicable to
10         other physicians.
11    Q.   You can answer.
12    A.   It's my opinion that they were aware of his
13    abdominal distention and respiratory compromise, but
14    it's my opinion it's a question of degree.
15    Q.   Okay.  Well, my question is a little bit more
16    basic than that.  My question is would you have
17    expected that the physicians taking care of this
18    patient would be aware that the abdominal distention
19    was compromising lung function?
20            MS. HUNT:  Object to the form.
21            MR. T. GRADY:  Object to the form.
22            MR. STOCKMAN:  Object to the form.  You
23         can answer.
24    A.   It seems to me you're asking a question in
25    general terms rather than a specific of this case.
0056
1    From that point of view I think a physician caring for
2    a patient with this type of medical illness would be
3    aware that all factors involved would contribute to his
4    respiratory status.
5            In other words, the abdominal distention
6    would be an expected cause of some respiratory
7    difficulty, not necessarily critical respiratory
8    difficulty but some respiratory difficulty, that would
9    be the expected level of care a medical student would
10    possess.
11    Q.   Okay.
12            MR. STOCKMAN:  Could we talk?  Just take
13         a five-minute break.
14            (Recess taken:  10:10 - 10:27.)
15    Q.   Returning to the issue of the causes of the
16    cardiopulmonary arrest that you testified to today, I
17    believe you mentioned that his injuries due to the fall
18    were a potential cause of the cardiopulmonary arrest;

19  correct?
20      A.  I'd like to state that they were a
21  contributing cause to his cardiopulmonary arrest.
22      Q.  Right, a potential --
23          MR. STOCKMAN:  Objection to the form.
24      It's a mischaracterization.  He just said
25      he'd like to state it was a contributing
0057
1      factor.
2      Q.  With respect to that, how were his injuries
3  as a result of the fall a potential contributing
4  factor?
5          MS. HUNT:  Object to the form.
6          MR. STOCKMAN:  Objection.  You can
7      answer.
8      A.  I think his injuries were significant to his
9  system by the fact that he had a fracture that was a
10  complicated fracture that caused pain, that caused leg
11  swelling, that caused him to require these narcotic
12  medication, that required him to use antibiotics,
13  therapy, which then led to his other factors, had
14  contributed to his overall general debility.  So the
15  fact that his bony fracture existed began the cascade
16  of other difficulties.
17      Q.  Okay.  And that would include the ileus?
18      A.  I think the ileus was a step, several steps
19  down the road --
20      Q.  Okay.
21      A.  -- from his original injury.  Forget he
22  required operation, he required general anesthesia, all
23  of these things are contributing factors.
24      Q.  So you would you agree with me that when you
25  say his injuries from the fall are a potential
0058
1  contributing factor, would you agree that that would be
2  an indirect cause?
3          MS. HUNT:  Object to the form.
4          MR. STOCKMAN:  Object to the form.  You
5      can answer.
6      A.  I think from a medical point of view I would
7  like to characterize that as a contributing factor in
8  his overall general destabilization of good health.
9      Q.  Okay.  Okay.  When you use that term,
10  "destabilization of good health," would you use that
11  term to describe his condition on the morning of
12  February 17, 2001?

13     A.  Was that the day he suffered the
14 cardiopulmonary arrest?
15     Q.  Yes.
16     A.  By that time he had a number of factors which
17 were causing him, his overall condition to be very
18 unstable and to be poor, but the primary inciting
19 factor in this gentleman who was well prior to his
20 injury was the fact that he fell and broke his leg.
21     Q.  All right.  Now --
22     A.  So I would consider that the primary inciting
23 event that led to all other events.
24     Q.  Okay.  Would it be correct to say this, that
25 the fractures led to a cascade of other events?
0059
1     A.  I think that would be the best
2 characterization of the issue here.
3     Q.  Okay.
4     A.  I think it would be a misrepresentation for
5 me to state that his ankle fracture contributed to a
6 cardiac arrest without identifying that there were many
7 other factors in the cascade along the way that
8 eventually led him to the most important event.
9     Q.  Okay.  Now, you also mentioned that anxiety
10 in this patient was a potential cause or contributing
11 factor to his cardiopulmonary arrest; correct?
12             MR. STOCKMAN:  Objection.
13             MS. HUNT:  Objection.
14     A.  I would also include anxiety as an important
15 factor in any medical case, since that does contribute
16 to the patient's overall sense of well-being,
17 stability, general health.
18     Q.  Okay.
19     A.  And that is an important factor, not a
20 trivial factor.
21     Q.  And, in fact, you do make reference to no --
22 in your report, I'm going to draw your attention to
23 page three.
24     A.  Yes, please.  Is there a specific place?
25     Q.  Yes, number two, at the bottom of the page.
0060
1             MR. STOCKMAN:  Indent to paragraph
2         number two.
3     A.  I am aware of my statement there.  I am
4 referring specifically to the episode that occurred in
5 the radiology suite, although anxiety and stress of
6 having to be in the hospital was commented on many

7   times in general on the floor, as well as this specific
8   episode.
9       Q.   Okay.  And that's --
10      A.   But I do note that there was a significant
11  anxiety, quote/unquote, event that occurred in the
12  radiology suite.
13      Q.   Okay.
14      A.   And that was referenced to by the interaction
15  between the radiology tech. and the patient.
16      Q.   Right.  And -- withdrawn.
17          Are there entries in the Danbury Hospital
18  records which support your contention that this patient
19  was exhibiting anxiety related to his condition
20  throughout the admission up to February 17th?
21      A.   I believe the answer to that question is yes.
22  Although, I can't, with the volume of the records, put
23  my specific finger on those comments.  In a general
24  comment after reviewing the medical records it was my
25  opinion that this gentleman had several episodes of
0061
1   difficulty with being in the hospital and anxiety that
2   he had expressed to his wife over the days of being in
3   the hospital, and the frustrations that he had with
4   being laid up with a fractured ankle, not being able to
5   move well, the pain issue, the abdominal distention
6   issue, all were referenced either in the progress or
7   the nurses notes as being issues that the patient had
8   difficulty with.
9       Q.   Okay.  Now, could you tell us in your opinion
10  how anxiety was a potential contributing factor to the
11  cardiopulmonary arrest?
12          MS. HUNT:  Object to the form.
13          MR. STOCKMAN:  Objection.  You can
14      answer.
15      A.   In a general sense anxiety can contribute to
16  respiratory compromise.  The anxiety of a patient puts
17  the patient in a stress situation and his muscles in
18  general tighten.  With the muscle tightening there is
19  an increased difficulty for taking full, deep breaths,
20  and I see that from a clinical point of view many, many
21  times.
22          So as a general statement anxiety can cause
23  respiratory compromise, contribute to respiratory
24  difficulty.  And I can be much more specific from a
25  physiological point of view if you like.
0062

1    Q.  Please.
2    A.   Again, anxiety causes internal stress,
3    internal stress causes muscular tenseness and
4    tightening, muscular tenseness and tightening
5    contributes to increased difficulty of taking full,
6    deep breaths because of the restriction on the chest
7    and on the back, on the neck, on the abdomen, and a
8    more tense patients breathe poorly compared to someone
9    who's relaxed.
10          So I do believe that anxiety and stress are
11   contributing factors to respiratory compromise.  It's
12   certainly what I see in clinical practice all the time,
13   and I believe that is a contributing factor also in
14   this gentleman's overall case.
15   Q.  All right.  Of course, you as a pulmonologist
16   are familiar with the term hypoxemia; correct?
17   A.  Yes.
18   Q.  And if you can just tell us for the record
19   what is hypoxemia?
20   A.  Hypoxemia is a description of low oxygen
21   levels in the blood stream.
22   Q.  Okay.  Can anxiety in a patient be secondary
23   to hypoxemia?
24   A.  Yes.
25   Q.  When this patient -- withdrawn.
0063
1          I believe you mentioned that this patient
2    exhibited some anxiety in the CT scan suite when it
3    became apparent that the test was not going to be done;
4    correct?
5    A.  I'm sorry, could you restate that?
6          MR. LANNI:  Why don't we read back the
7          question.
8          (Question read.)
9    A.  The answer to that question is yes.
10   Q.  Okay.  And at the time that he expressed or
11   exhibited this anxiety, was there clinical evidence
12   that he was hypoxemic?
13   A.  The oxygen saturation monitor measured a
14   saturation of between 79 to 80 percent oxygen
15   saturation, which defines the effect of hypoxemia.
16          MR. STOCKMAN:  You said the effective?
17   Q.  The effect of.
18   A.  The effect of.  As you do know, oxygen
19   saturation is indirect monitor of hypoxemia.  Hypoxemia
20   technically is the identification of oxygen in the

21   blood, and saturation measures oxygen saturation on the
22   skin with the skin monitor.  So without confusing the
23   two issues, there is evidence that there was hypoxemia
24   on the basis of his oxygen saturation measured with his
25   finger.
0064
 1       Q.   Could the anxiety the patient exhibited in
 2   the CT scan suite have been in part secondary to his
 3   hypoxemia?
 4       A.   It is my opinion with some qualification that
 5   an oxygen saturation of 79 to 80 percent, while low, is
 6   not critically low enough to cause undue anxiety.  In
 7   other words, hypoxemia, if severe enough, can cause the
 8   brain not to function properly, can cause confusion,
 9   can cause agitation, can cause mental instability.  It
10   is not my opinion that an oxygen saturation of 79 to 80
11   is low enough to have caused that sort of situation in
12   this gentleman.
13           Again, his illness was multifactorial, and I
14   believe that anxiety in this gentleman was only perhaps
15   partly caused by the physiological derangements.
16       Q.   Okay.  When you say the physiological
17   derangements, you're referring to his hypoxemia?
18       A.   Yes.  It is not my opinion that the hypoxemia
19   was bad enough to have caused his anxiety alone.
20       Q.   It's a contributing factor?
21       A.   It may be a contributing factor, but not the
22   only factor.
23       Q.   Okay.  Well, can the position of a patient
24   with abdominal distention have an effect on the
25   patient's lung function?
0065
 1       A.   Yes, sir.
 2       Q.   And in what way can it have an effect on the
 3   patient's lung function?
 4       A.   The patients breathe better when they sit
 5   upright.  Patients have more difficulty with breathing
 6   when they lie flat.  That is normal accepted physiology
 7   of how things work.  If a patient lies flat, the
 8   accentuation of difficulty because of his abdominal
 9   distention would clearly be much worse.
10           So with this particular patient, sitting up
11   would be much easier for him with regard to breathing
12   than if he laid flat.  And, in fact, it was clear that
13   this gentleman could not lie flat and was much more
14   comfortable sitting upright.

15    Q.  Okay.  Would you agree with the proposition
16  that placing this patient in a supine position with his
17  abdominal distention would aggravate his compromised
18  lung function, would you agree with that statement?
19          MR. STOCKMAN:  Objection to the form.
20          MR. T. GRADY:  Object to the form.
21    A.  I think that would be a fair statement.
22    Q.  Okay.
23    A.  And, in fact, they tried to lay this
24  gentleman flat, he couldn't do it and needed to sit up.
25    Q.  Okay.  Now, let me just go on to another
0066
 1  issue, and that issue is raised in the same paragraph
 2  we were discussing on page two of your report.  If you
 3  could just turn to page two of your report, sir.  Okay.
 4  And you mentioned in that last sentence of the report,
 5  of this -- I'm sorry.  You mentioned in the last
 6  sentence of this paragraph that "as a result of the
 7  arrest he developed severe anoxic encephalopathy which
 8  ultimately contributed to his death."
 9    A.  Yes, sir.
10    Q.  Correct?
11    A.  That is my statement.
12    Q.  All right.  And if you could just -- and that
13  is one of your opinions in this case; correct?
14    A.  Yes, sir, it is.
15    Q.  Okay.  And in your opinion -- could you tell
16  us in your opinion how the cardiopulmonary arrest
17  caused the severe anoxic encephalopathy in this
18  patient?
19    A.  The loss of effective circulation to the
20  brain would cause lack of oxygen to the brain because
21  of impaired circulation, and the lack of oxygen would
22  cause cell death of the brain, and that would lead to a
23  severe encephalopathy, primarily on the basis of loss
24  of effective circulation and the lack of delivery of
25  oxygen to the brain.
0067
 1    Q.  Okay.  Now, when you use that term, "anoxic,"
 2  what does that mean in lay terms?
 3    A.  Anoxic is medical term for no oxygen.
 4    Q.  The complete absence of oxygen?
 5    A.  We use that term, although you understand
 6  that there's not zero oxygen.  But anoxia means
 7  essentially no flow of oxygen to the blood --
 8    Q.  Okay.

9      A.  -- to the brain.

10     Q.  And when you use that term "encephalopathy,"
11  you could just describe for us in lay terms what that
12  means?

13     A.  Pathology to the brain, brain damage.  It's
14  general medical term identifying pathology to the
15  brain.

16     Q.  Okay.  Now, could you tell us in your opinion
17  how this patient's severe encephalopathy contributed to
18  his death?

19          MR. STOCKMAN:  Objection.  You can
20      answer.

21     Q.  It's in his report.

22     A.  We can go over the specifics of this case,
23  which might be tedious considering that he lived after
24  this event for some time.  Nevertheless, from a general
25  statement point of view, encephalopathy led to coma and

0068

1   coma ends up as inability to care for yourself, get out
2   of bed, feed, et cetera.

3          The brain injury will lead to a cascade of
4   other complications while the patient is in this
5   encephalophic state, and the complications would be
6   responsible for his death.  In a general sense things
7   like blood clots, infection, cardiac arrhythmias, are
8   things that occur in patients who have severe anoxic
9   encephalopathy.  So while the brain injury may in and
10  of itself not cause the death of a patient, the
11  complications setup as a result of the encephalopathy
12  will.

13     Q.  Okay.  And it's your opinion that such
14  complications did cause this patient's death?

15     A.  It is my opinion that the encephalopathy led
16  to a cascade of events which ultimately led to this
17  patient's demise, that his brain injury was bad enough
18  he was not -- he was resuscitated, but with brain
19  damage.

20     Q.  Okay.  Would it be correct for me to say that
21  anoxic encephalopathy can occur within a period of
22  within three to four minutes of lack of oxygen to the
23  brain?

24          MR. STOCKMAN:  Objection.

25     Q.  Would that be correct for me to state as a

0069

1   general statement?

2          MR. STOCKMAN:  Objection.  You can

3        answer, if you know.
4        A.  We generally consider that period of anoxia
5    or hypoxemia, the loss of establishment of circulation,
6    would be a long enough period of time or short enough
7    period of time to establish cell death of the brain,
8    neuronal death, the period of three to four, perhaps
9    five minutes, but no longer than that would be the
10    period of time that cells would die.  It would be
11    assumed that -- I'll leave my comments there unless you
12    have additional questions for me with that regard.
13        Q.  With regard to this particular patient, do
14    you have an opinion as to how long a period of time the
15    anoxia took to cause the encephalopathy in this
16    patient?
17        A.  It is my opinion in this case that the
18    establishment of cardiopulmonary resuscitation in this
19    particular case was rapid, as best as can be done in an
20    institution, which is to say that there was not a
21    prolonged period of time where he was not attended to
22    with regard to CPR.
23        Q.  I think you may have misunderstood my
24    question.  I'm not asking a the question in terms of
25    whether CPR measures were initiated --
0070
1        A.  Okay.
2        Q.  -- in relation to the --
3        A.  I thought that's what you were asking me.
4        Q.  -- in relation to the onset of the
5    cardiopulmonary arrest, my question was a little bit
6    more basic.  And that is that, do you have an -- do you
7    have an opinion as to the amount of time that this
8    patient was anoxic before the onset of encephalopathy?
9        A.  I think my answer to this question would be
10    long enough, since he became anoxic, since he developed
11    encephalopathy and he had severe brain damage.  So I
12    think the answer to the question, he was anoxic long
13    enough to cause cell death.
14        Q.  Okay.  Well --
15        A.  I hope that answers your question.  I'm
16    trying to do the best I can.
17        Q.  I think we're getting on the right track.
18    Would that have been at least a period of three to four
19    minutes?
20            MR. STOCKMAN:  Objection.  You can
21        answer.
22        A.  Considering the fact that he had

23   encephalopathy and severe brain damage, it would be
24   clear to me that he had anoxia for at least that long.
25    How he got there, over what period of time can be the
0071
 1   debatable issue and we can discuss that if you like.
 2   But the fact that he had severe encephalopathy after
 3   this event implies to me that he had anoxia for long
 4   enough to cause the cell damage.
 5       Q.  Okay.  Well --
 6       A.  In other words, he was fine before.
 7       Q.   Would the anoxic encephalopathy have onset in
 8   this patient at any time earlier than three to four
 9   minutes after anoxia began?
10           MR. STOCKMAN:  Could you read that
11           question back.
12           (Question read.)
13           MR. STOCKMAN:  Are you asking whether in
14           this patient's brain cell death could have
15           occurred sooner than three to four minutes?
16           MR. LANNI:  Yeah.
17           MR. STOCKMAN:  All right.  Objection.
18           You can answer.
19       A.  I'm not sure why I would speculate to that,
20   since our standard of understanding is it takes three
21   to four minutes for cell damage to occur, for cell
22   death to occur, so for me to speculate did his anoxic
23   encephalopathy occur sooner than that, I'm not sure.
24       Q.  You couldn't do that?
25       A.  I'm not sure why I would have an opinion that
0072
 1   things would be accelerated in this case.
 2       Q.  Let me just backtrack a little bit to the
 3   issue of abdominal distention causing the compromised
 4   lung function.  All right.  And you characterized the
 5   abdominal distention as "progressive" in your report;
 6   correct?
 7       A.  You'd have to point to me where I said
 8   progressive.  I knew it was present and an issue for
 9   several days.
10       Q.  Why don't we go back to page two of the
11   report, and I'm going to draw your attention to the
12   first sentence.
13       A.  Oh, as a result of progressive abdominal
14   distention, yes.
15       Q.  And when you use that term, word
16   "progressive" to describe the abdominal distention,

17   what do you mean by that?
18       A.   Progressive abdominal distention is a phrase
19   that we use in describing patients who have difficulty.
20   His difficulty persisted for days.  I don't mean to
21   imply that we measured his abdominal girth and it was
22   larger every day, but the issue was present with
23   persisting severity on the floor, it required
24   antibiotic treatment, and also required the need to
25   investigate further as to why this was persisting.
0073
1        So when I use the term "progressive abdominal
2    distention," I mean that the abdominal issue was a
3    persisting issue that continued to require attention
4    and prompted the physicians to look into it further.
5        Q.   Okay.  You didn't use the word "persistent"
6    in describing this patient's abdominal distention in
7    this report; correct?
8        A.   Quite honestly, had I known we would be
9    discussing this issue so thoroughly I might have
10   changed my word, but progressive and persistent to me
11   imply the same thing.
12       Q.   Let me ask you this, when you use the
13   word progressive --
14       A.   Yes.
15       Q.   -- in writing notes in a hospital chart or
16   making entries in your office records, do you do so to
17   describe a condition that is worsening or deteriorating
18   over time?
19       A.   Certainly.
20       Q.   Okay.  And would you agree with the
21   proposition that the Danbury Hospital records in this
22   case indicate that this patient's abdominal distention
23   was worsening in the days leading up to the
24   cardiopulmonary arrest?
25           MS. HUNT:  Object to the form.
0074
1            MR. T. GRADY:  Objection.
2            MR. STOCKMAN:  Objection to the form.
3        Q.   Would you agree with that proposition?
4        A.   I think it was clear to me without question
5    that this gentleman was not improving.  I think clear
6    to me that the abdominal distention was an issue and
7    persisted.  The expectation is this gentleman's
8    condition would improve after his operative course,
9    instead he developed pseudomembranous colitis that was
10   identified by culture and his condition was anything

11    but improving.

12          So the term persistent and progressive to me

13    would be fairly synonymous.  He was not improving, his

14    condition was compromising his respiratory function,

15    and he was not doing well.  From that point of view I

16    would suggest that he both had persistent symptoms and

17    progressive symptoms in the fact that he wasn't getting

18    better.

19       Q.  Well, is there -- withdrawn.

20          When you reviewed the chart --

21       A.  And just as one additional comment, we expect

22    patients to get better.

23       Q.  Okay.  When you reviewed the chart was there

24    any clinical evidence that you saw which indicated that

25    this patient's abdominal distention was worsening in

0075

1    the 48 hours before the cardiopulmonary arrest?

2       A.  I'm not sure I can comment on that specific

3    time frame.  I think this gentleman's abdominal

4    difficulty was a continued issue for his physicians who

5    were caring for him and eventually led them on the day

6    of the cardiopulmonary arrest to decide that further

7    investigation needed to be done, and that's when the

8    CAT scan was ordered.  So I think his physicians and I

9    share the opinion that things were not okay, that

10    required additional attention.

11       Q.  Okay.  Do you recall seeing the note of a

12    pulmonologist named Dr. Kotch dated February 16th in

13    the progress record?

14       A.  I did review the entire chart, but I don't

15    have that note with me specifically.

16       Q.  Okay.  Well, if you could just -- let me

17    just --

18          MR. STOCKMAN:  Why don't we save that

19          question for next time.

20       Q.  But let me just ask this question.

21          MR. STOCKMAN:  I knew we were going down

22          that path.  It'll take more than a few

23          minutes.

24       Q.  No.  Go back to the issue.

25          MR. STOCKMAN:  Yeah.

0076

1       Q.  A supine position aggravating the compromised

2    lung function as a result of the abdominal distention,

3    would you expect the physicians taking care of this

4    patient to have been aware that laying this patient

5   flat would aggravate lung function?
6           MS. HUNT:  Object to the form.
7           MR. T. GRADY:  Object to the form.
8           MR. STOCKMAN:  Objection to form.  We've
9       been saying over and over again, he's not
10      disclosed as to the standard of care, but he
11      can answer.
12    A.  I'm not sure whether you're asking me
13  specifics in this case, but with regard to this
14  particular patient or what is expected of a physician
15  who would be viewing a patient at the bedside, I
16  think --
17    Q.  The second, in general, why don't we talk
18  about it in general.
19          MR. STOCKMAN:  Objection.  Do you mean
20      in general or -- because you said the second,
21      because he was talking about specifics.
22          MR. LANNI:  No, the latter.  He asked
23      whether he was talking about the specifics in
24      this case or whether in general.
25    Q.  We're talking about a physician looking at a
0077
1   patient at bedside; correct?
2    A.  My comments will be in a general sense.
3    Q.  Yes.
4    A.  And don't pertain to a surgical versus
5   medical specialty but pertain to the care of a patient
6   at the bedside, whether it be surgeon or a medicine
7   person.
8    Q.  Right.
9    A.  The difficulty with respiratory compromise
10  would be something that would be observed by any
11  physician, and whether a patient is able to maintain a
12  supine or upright position would be something that
13  would be observed by any physician at the bedside.
14          If it is assumed that these physicians
15  actually saw the patient at the bedside, which of
16  course they did, then they would be at the perfect
17  location to determine whether the patient had, number
18  one, respiratory compromise in general, or whether he
19  had difficulty laying flat or sitting up.
20          During rounds at the bedside patients are
21  frequently in bed and they may be lying flat at the
22  time of visit, so the observation of whether the
23  patient had respiratory difficulty lying flat or
24  needing to sit up would be identified right at the

25    bedside by a physician who's making his rounds on a
0078
1    daily basis.
2       Q.   Okay.  Well, if a patient is exhibiting
3    abdominal distention --
4       A.   Yes.
5       Q.   -- would you expect a physician to be aware
6    that laying this patient supine could aggravate lung
7    function?
8              MR. T. GRADY:  Object to the form.
9              MS. HUNT:  Object to the form.
10      Q.   Would you expect that?
11             MS. HUNT:  Object to the form.
12             MR. STOCKMAN:  Objection.  You can
13         answer.
14      A.   In a general sense, answer is yes.  It could
15    be that the physician's always viewed the patient lying
16    in bed flat and having no respiratory difficulty or
17    minimal respiratory difficulty, in this specific case.
18      Q.   You're aware that a Dr. Catania saw this
19    patient on the morning of February 17th; correct?
20      A.   I'm aware that this patient was seen by
21    physicians and nurses on the morning of the cardiac
22    arrest, yes.
23      Q.   Okay.  Now, do you know whether the patient
24    was supine in bed or had the head of the bed elevated
25    at the time that Dr. Catania saw him?
0079
1       A.   I don't believe the notes represent what
2    position he was in when he was examined.
3       Q.   Okay.  Well, do you recall whether there is a
4    nursing note immediately preceding Dr. Catania's note
5    that makes reference to position of this patient in
6    bed?
7       A.   I believe the answer to that is yes, but I
8    can't reference that specific note at this time.
9       Q.   Okay.  Do you recall that the note refers to
10    the patient, to the head of the patient's bed being
11    elevated?
12      A.   I would defer my comments until I saw the
13    specific note.
14      Q.   All right.  We'll get to that next time.
15    Listen, thank you for your patience.  I know we're a
16    little bit past 11 o'clock, we'll stop right here.  Is
17    that okay with you?
18      A.   Thank you very much.

19      Q.   Okay.
20           MR. LANNI:  We'll pick this up at a time
21      mutually convenient to all parties.
22           (Time noted:  11:02 a.m.)
23      (Jurat follows on page 80, no omission.)
24
25
0080
 1   IN THE UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF CONNECTICUT
 3                  VOLUME I
 4   - - - - - - - - - - - - - - - - - x
     LAURA GUIGLIANO, as ADMINISTRATOR
 5   of the ESTATE of MICHAEL GUIGLIANO, :
     DECEASED, and LAURA GUIGLIANO,
 6   Individually                    :
             Plaintiffs,
 7                                 :
        vs.
 8                                 :
     DANBURY HOSPITAL, ET AL,
 9                                 :
             Defendants.
10   - - - - - - - - - - - - - - - - - x
11                   3:02 CV 718(RNC)(DFM)
12           With the addition of the changes, if
13      any, indicated on the attached errata sheet,
14      the foregoing is a true and accurate
15      transcript of my testimony given in the
16      above-entitled action on February 28, 2006.
17
18      _____
             MICHAEL B. TEIGER, M.D.
19
         Subscribed and sworn to before me, the
20
     undersigned authority, on this the _____ day of
21
     _____, 2006.
22
23      _____
                 Notary Public
24
25   My commission expires:
0081
 1

I N D E X

2

EXAMINATIONS

3

Page

4

Direct-examination by Mr. Lanni .................... 5

5

6          PLAINTIFFS' EXHIBITS FOR IDENTIFICATION

7   No.  Description                    Page

8   1   December 28, 2005, report ...................... 4
9   2   Vanessa Saipher Incident Report ............... 4
10  3   Code 99 Flow Sheet ............................ 4
11  4   Emergency Code Log ............................ 4
12  5   Transportation Scheduling Sheet ............... 4

13

14          (Exhibits retained by Mr. Stockman.)

15

16

17

18

19

20

21

22

23

24

25

0082

1          C E R T I F I C A T E

2

3          I hereby certify that I am a Notary Public,

4   in and for the State of Connecticut, duly commissioned

5   and qualified to administer oaths.

6          I further certify that the deponent named in

7   the foregoing deposition was by me duly sworn, and

8   thereupon testified as appears in the foregoing

9   deposition; that said deposition was taken by me

10  stenographically in the presence of counsel and reduced

11  to typewriting under my direction, and the foregoing is

12  a true and accurate transcript of the testimony.

13          I further certify that I am neither of

14  counsel nor attorney to either of the parties to said

15  suit, nor am I an employee of either party to said

16  suit, nor of either counsel in said suit, nor am I

17  interested in the outcome of said cause.

18          Witness my hand and seal as Notary Public
19     this _____ day of _____, 2006.
20
21          _____
                Michelle E. Pappas
22              License #00081
                Notary Public
23
     My Commission expires:
24     June 30, 2009
25