0082
1
2                        VOLUME II
3
    IN THE UNITED STATES DISTRICT COURT
4
    FOR THE DISTRICT OF CONNECTICUT
5
    - - - - - - - - - - - - - - - - - - x
6
    LAURA GUIGLIANO, as Administrator   :
7   of the Estate of Michael Guigliano,
    Deceased, and LAURA GUIGLIANO,      :
8   individually,
                                        :
9            Plaintiffs,
                            : Case No.
10       vs.
                            : 3:02 CV 718
11   DANBURY HOSPITAL, J. BORRUSO,
    M.D., JOSEPH CATANIA, M.D., and     :
12   DANBURY SURGICAL ASSOCIATES, P.C.,
                                        :
13           Defendants.
                                        :
14   - - - - - - - - - - - - - - - - - - x
15
16           Continued deposition of MICHAEL B.
17      TEIGER, M.D., taken pursuant to the
18      Federal Rules of Civil Procedure, at the
19      Offices of Pulmonary Internal Medicine
20      Associates of Greater Hartford, 1000 Asylum
21      Avenue, Hartford, Connecticut, before Bonita
22      Cohen, a Registered Merit Reporter and Notary
23      Public in and for the State of Connecticut,
24      License Number 00041, on Friday, April 7,
25      2006, at 1:23 p.m.
0083
1
2
3           A P P E A R A N C E S
4
    THE LAW FIRM OF JOSEPH LANNI, P.C.
5   Attorneys for the Plaintiffs
    Suites 6-8
6   138 Chatsworth Avenue

Larchmont, New York  10538
7  (914) 834-6600
     By:  JOSEPH LANNI, Esq.
8
9   NEUBERT, PEPE & MONTEITH, P.C.
     Attorneys for the Defendant Danbury Hospital
10   13th Floor
     195 Church Street
11   New Haven, Connecticut  06509-1940
     (203) 821-2000
12      By:  ERIC J. STOCKMAN, Esq.
13
     RYAN, RYAN, JOHNSON DeLUCA, LLP
14   Attorneys for the Defendant J. Borruso, M.D.
     80 Fourth Street
15   P.O. Box 3057
     Stamford, Connecticut  06905-0057
16   (203) 357-9200
        By:  BEVERLY J. HUNT, Esq.
17
18   RENDE, RYAN & DOWNS
     Attorneys for the Defendant Dr. Kessler
19   202 Mamaroneck Avenue
     White Plains, New York  10601
20   (914) 681-0444
        By:  MICHAEL GRADY, Esq.
21
22
23
24
25
0084
 1
              A P P E A R A N C E S (cont'd)
 2
 3
     HALLORAN & SAGE, LLP
 4   Attorneys for the Defendant Joseph Catania, M.D.
     One Goodwin Square
 5   225 Asylum Street
     Hartford, Connecticut  06103-4303
 6   (860) 522-6103
        By:  TIMOTHY J. GRADY, Esq.
 7
 8
 9

10
11                    oOo
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0085
1       M I C H A E L   B.   T E I G E R , M.D.,
2       recalled as a witness, having been previously
3       duly sworn, was examined and testified further as
4       follows:
5    DIRECT EXAMINATION
6    BY MR. LANNI:  (Continued)
7       Q.   Good afternoon, again, Dr. Teiger.  Again,
8    feel free to refer to the hospital record or your
9    report or any other material before -- in responding to
10   my questions.  Okay?
11      A.   Thank you.  I brought what I think are
12   complete copies of all the information that has been
13   given to me in this case.
14      Q.   Thank you.
15           Dr. Teiger, do you recall seeing a nurse's
16   note in the chart for the morning of February 17th,
17   regarding elevation of the head of the patient's bed?
18      A.   Is there a way you can refer to that
19   specifically rather than go through all the records
20   here today?
21      Q.   Yes.  I'm going to refer you to page 95 of
22   the chart.
23           MR. STOCKMAN:  Just for ease of
24           reference, I'll let him use my book.
25           MR. LANNI:  Absolutely.
0086
1       A.   I have page 95 here.
2       Q.   I'm going to draw your attention to the
3    nurse's note timed 6:45 a.m.

4     A.   Can you tell me whose signature that is?
5     Q.   No, I cannot.  But I'm going -- I'm going to
6  just draw your attention --
7     A.   I do see that note, but I'm not sure exactly
8  whose signature that is.
9     Q.   Okay.
10     A.   I believe it is not the signature of Maryann
11  Milleville; is that correct?
12     Q.   It doesn't appear to be.
13          So, but anyway, my question was:  With
14  respect to that particular note, do you recall
15  reviewing that in your review of the materials in this
16  case?
17     A.   Well, to be honest, I don't have recollection
18  of reviewing it.  I've read the note now.
19     Q.   All right.  In reviewing that note now, with
20  respect to the portion of the note that has the
21  notation "HOB" and an upgoing arrow, do you see that?
22     A.   Yes, sir.
23     Q.   Do you have an understanding of what that
24  refers to?
25     A.   That would usually refer to head of bed
0087
1  elevation.
2     Q.   Okay.  And with respect to that particular
3  note, there's a sentence which appears to read, quote:
4          Encouraged to take deep breaths and HOB
5          elevated, end quote.
6          Do you see that?
7     A.   Yes, I do.
8     Q.   Okay.  And with respect to that particular
9  note, do you have an understanding as to why the head
10  of the bed was elevated at that point in time?
11          MR. STOCKMAN:  Objection.  You can
12          answer.
13     A.   I'm not sure what the question is, Attorney.
14     Q.   Well, in reading that --
15     A.   In reading this note, the nurse is making
16  observations based on what she has seen.  There's
17  usually filler information rather than information of
18  tremendous import.
19     Q.   All right.  My question is with respect to
20  this particular sentence, quote:
21          Encouraged to take deep breaths and HOB
22          elevated, period, end quote.
23     A.   To me that would be standard nursing care for

24    somebody who is post-op with abdominal discomfort.  It
25    describes a patient who to me seems not terribly
0088
 1    distressed, his oxygen saturation is reasonably good,
 2    on 2 liters of nasal oxygen, which is not a lot of
 3    oxygen supplement.  She's describing him as
 4    uncomfortable.  He's encouraged to take deep breaths,
 5    which would be the routine for somebody who is post-op
 6    and you're trying to treat atelectasis.
 7        Q.   By the way, when had he last been operated on
 8    as of this point in time?
 9        A.   The date of this note is 2/17, and his
10    operation was several days previous.
11        Q.   Okay.
12        A.   Remember, though, that during this time, he
13    had his abdominal difficulty with pseudomembranous
14    colitis, somebody felt he had a narcotic bowel, and his
15    chest x-ray identified atelectasis.  So he was still in
16    the throes of what we would consider being ill in the
17    hospital.  I believe I mentioned that in my deposition
18    when we met previously.
19        Q.   Does this note indicate, though, to you that
20    the nurses elevated the head of this patient's bed?
21        A.   It doesn't imply that at all.  All it to me
22    says, it's an observation that the head of the bed was
23    elevated.  Quite honestly, many patients' heads are
24    elevated in the hospital.
25        Q.   The fact that he was encouraged to take deep
0089
 1    breaths, does that have any particular significance to
 2    you?
 3        A.   To me that just represents good nursing care
 4    of somebody who is encouraging the patient to take deep
 5    breaths, because that's what should be done in order to
 6    improve ventilation, improve atelectasis.
 7        Q.   The fact that it's mentioned in the same
 8    sentence, that he's encouraged to take deep breaths and
 9    the head of the bed is elevated, does that indicate to
10    you that the nurses elevated the head of the bed, to
11    you, with respect to his respirations?
12        A.   It doesn't, absolutely not.  Again, I don't
13    put much importance on the flow of this note except to
14    say that the patient -- patient's nurse was doing her
15    job of observing the patient whose head of the bed was
16    elevated, and he was encouraged to take deep breaths.
17             This is not an alarming or concerning note,

18  because it is short and to the point, and I think if
19  the nurse had any worries about difficulty, she would
20  have embellished much more than what she did.
21      Q.  Now --
22      A.  Head of bed elevation is what I would expect
23  to see in a typical nursing note.
24      Q.  Okay.  With respect to this particular note,
25  at 6:45 a.m., there's -- there are two pulse oximetry
0090
1  readings; correct?
2      A.  I noticed that, yes.
3      Q.  And the first one appears to be what?
4      A.  89 to 90 -- 89 to 91 percent on 1 liter nasal
5  cannula is noted, and the oxygen saturation rises to
6  94 percent on 2 liters nasal cannula.
7      Q.  And I take it you looked at this note, even
8  though you may not have a recollection of it, but I
9  take it you looked at this note when you formulated
10  your opinions in this case?
11      A.  I'm sure that I did, yes.
12      Q.  All right.  And did you have an understanding
13  then or do you have an understanding now as to why the
14  oxygen flow rate was increased from 1 liter per minute
15  to 2 liters per minute at that time?
16          MR. STOCKMAN:  Objection.  You can
17          answer.
18      A.  Do I have an understanding of why that was
19  done?
20      Q.  Yes.
21      A.  Because that would be proper medical care,
22  certainly proper nursing care, to increase the liter
23  flow so that the saturation was greater than
24  90 percent, because that is our standard of care.
25      Q.  In other words, the -- your understanding is
0091
1  that the flow rate went from 1 liter per minute to
2  2 liters per minute to improve the oxygen saturation to
3  above 90 percent; is that your understanding?
4      A.  I can't comment on what the nurse's thought
5  process was at that time.  But I will comment that
6  standard of care would require somebody who sees an
7  oxygen saturation below 90 percent to try and
8  supplement that with additional oxygen.
9          We consider 90 percent and above to be
10  appropriately treatable.  We would consider less than
11  90 percent to be appropriately treatable, and if

12    somebody has a saturation of 89 percent, we would give
13    more oxygen to get that saturation higher.  I'm sure
14    that's what the nurse thought, and appropriately.
15         I would point out that 1 liter, 2 liters of
16    oxygen is not a big intervention on our part.  One or
17    2 liters describes FI 02 delivery of between 24 and
18    28 percent.  Normal is 20 percent.  Therefore,
19    supplement of 1 or 2 liters of oxygen, in our world, is
20    a small incremental increase in supplement.
21         If the patient was distressed, we would
22    consider 50 percent, 70 percent or a hundred percent
23    oxygen supplement to be a strong intervention.
24    Q.  It is an increase, though; correct?
25    A.  It's -- it's a small increase, yes, from
0092
 1    1 liter to 2 liters.
 2    Q.  It appears to be an increase to elevate the
 3    oxygen saturation to above 90 percent; is that correct?
 4    A.  Yes.  And the fact that 1 liter increase in
 5    oxygen raised the oxygenation from 89 to 94 percent
 6    tells me that his lungs were working with a reasonable
 7    degree of effectiveness.
 8    Q.  Okay.
 9    A.  He did not have refractory hypoxemia.
10    Q.  As of the morning of February 17th, 2001, was
11    there any indication in the chart -- and I'm talking
12    about in the time that this patient was in the
13    hospital, up to and including February 17th of 2001 --
14    was there any indication that the patient's abdominal
15    distention was having some impact on his ability to
16    breathe?
17    A.  I think atelectasis was identified in this
18    gentleman, yes.
19    Q.  And when you say that "atelectasis was
20    identified in this gentleman," are you saying that the
21    atelectasis was, in turn, caused or in some way was
22    caused, to some degree, by abdominal distention?
23         MR. STOCKMAN:  Objection to form.
24         MR. TIMOTHY GRADY:  Objection.
25         MS. HUNT:  Objection.
0093
 1    A.  It's a well-known medical fact that abdominal
 2    distention can be responsible for atelectasis.  That's
 3    normal pathophysiology.
 4    Q.  With respect to this particular patient,
 5    would it be correct to say that the abdominal

6    distention in some way contributed to the atelectasis,
7    which, in turn, contributed to his breathing
8    respiratory difficulties?
9            MS. HUNT:  Object to the form.
10           MR. STOCKMAN:  Objection.  You can
11       answer.
12    A.  I would rather answer that question in two
13   parts rather than have the sequence you described.
14    Q.  Why don't we take the first part.
15        Would it be correct to say that in this
16   particular patient, abdominal distension in some way
17   contributed to atelectasis as of the morning of
18   February 17, 2001?
19           MR. TIMOTHY GRADY:  Object to the form.
20       You can answer.
21    A.  I would agree with that statement entirely.
22    Q.  And would it be correct for me to say that as
23   of February 17th, 2001, the atelectasis had some impact
24   on his ability to breathe?
25           MR. STOCKMAN:  Objection.
0094
1            MR. TIMOTHY GRADY:  Objection.
2            MS. HUNT:  Objection.
3    Q.  Would that be correct for me to say?
4    A.  Atelectasis, by definition, is impairment of
5    the ability to breathe to full capacity.
6    Q.  So that would be yes?
7    A.  I think the answer would be yes.
8    Q.  Okay.  Within the week leading up to
9    February 17th of 2001, was this patient on pulse
10   oximetry monitoring?
11           MR. STOCKMAN:  Are you asking continuous
12       pulse oximetry monitoring?
13           MR. LANNI:  No.  Some type of pulse
14       oximetry monitoring.
15    Q.  Was this patient on pulse oximetry
16   monitoring?
17    A.  You're describing from the time he entered
18   the hospital on admission until the 17th, was pulse ox
19   obtained?  The answer is yes.
20    Q.  And within that week, I'm talking about -- so
21   let me restate the question.
22    A.  Please.
23    Q.  From approximately February 10th up to and
24   including the morning of February 17th, 2001, was this
25   patient on some type of pulse oximetry monitoring?

0095
1         MR. STOCKMAN:  Objection.  You can
2     answer.  I'm just concerned about the
3     implication that it's continuous.
4         MR. LANNI:  I said "some type of."
5     A.  I'm not sure whether you're questioning my
6  memory of the records that I've read, or was he being
7  monitored with pulse oximetry obtained from time to
8  time, and I saw pulse oximetry readings recorded on
9  this gentleman between the time of admission and the
10  17th.
11     Q.  Okay.  And in fact, as of the morning of the
12  17th, there's notations which indicate that he was
13  undergoing pulse oximetry readings; correct?
14     A.  That's correct.  And we've just discussed
15  those as part of the record here, yes.
16     Q.  Within that same time frame, within
17  approximately February 10th all the way up until
18  February 17th of 2001, was this patient on what is
19  known as telemetry monitoring?
20     A.  He was on a telemetry monitor, yes.
21     Q.  Now, let me draw your attention to page 462
22  of the chart.
23         (Discussion off the record)
24     Q.  I'm going to draw your attention to page 462
25  of the chart.  It's in the physician's orders.  I'm
0096
1  going to draw your attention in particular to an order
2  that is dated February 9th of 2001 at 11:30 a.m.  Do
3  you see that?
4     A.  Yes, I do.
5     Q.  All right.  And I believe that the top line
6  of that order reads, quote:
7         O2 NC prn to keep O2 greater than or
8         equal to 97 percent, end quote.
9       Do you see that?
10     A.  I do.
11     Q.  Do you have an understanding of what that
12  refers to?
13     A.  Do I have an understanding of what that order
14  means?
15     Q.  Yes.
16     A.  Or why the order was written in response to
17  the patient's condition?
18     Q.  No, no.  I'm just asking you do you have an
19  understanding of what that order means.

20      A.  Yes, I do.
21      Q.  What does it mean?
22      A.  That means that the physician who ordered it
23  wanted to tell the nurse that she should be
24  monitored -- monitoring his oxygen saturation, and if
25  it falls less than 90 percent, then she gives him
0097
1  enough oxygen by nasal cannula to bring the oxygen
2  saturation up to or greater than 97 percent saturation.
3      Q.  Okay.
4      A.  It's a fairly unusual order to me and fairly
5  excessive, since 97 percent is not really absolutely
6  required for good patient care or good oxygenation, but
7  the doctor felt that he wanted to give this patient
8  enough.
9      Q.  All right.  And I take it that --
10      A.  I might have -- I didn't mean to intercede.
11          MR. STOCKMAN:  Let him ask the
12      questions.
13      Q.  Based upon the materials that you reviewed,
14  do you know if this order was ever discontinued?
15      A.  To the best of my recollection, I don't know.
16      Q.  Okay.  Could you tell me, how would one
17  determine if oxygen saturation is maintained at greater
18  than or equal to 97 percent?
19      A.  Can you repeat the question, please.
20      Q.  Sure.  How does one determine whether oxygen
21  saturation is kept at greater than or equal to
22  97 percent?  How does one determine that?
23      A.  One determines that by either a saturation
24  monitor or by blood gas testing.
25      Q.  Okay.  And same question would be, how would
0098
1  one determine if oxygen saturation was maintained at
2  90 percent or greater or less?  How would one do that?
3      A.  By the same methods.
4      Q.  It would be either arterial blood gases or
5  pulse oximetry monitoring?
6      A.  Correct.
7      Q.  Would someone with specialized training be
8  needed to interpret pulse oximetry monitoring?
9      A.  I'm not sure how to answer that question.
10  Specialized training, do you mean medical training?
11      Q.  Some degree of medical training.
12      A.  As opposed to a layperson?  Of course.
13      Q.  Who would that be?

14      A.   That could be a nurse; that could be a
15   respiratory technician; that could be a physician; that
16   could be a monitor watcher.
17      Q.   When you say "a monitor watcher," are there
18   any other terms to describe such a person?
19      A.   There are people employed by the hospital
20   whose job it is just to watch monitors, either
21   telemetry, remote pulse oximetry, EKG technicians who
22   watch rhythm strips, and they're technicians.
23      Q.   All right.
24      A.   So they're not -- so they are trained.  They
25   are technical people, but their focus is to identify
0099
1   the numbers and trends.
2      Q.   Would someone with specialized training be
3   needed to provide any medical intervention that would
4   be required to maintain oxygen saturation at or greater
5   than 97 percent?
6      A.   You're talking about medical therapeutics,
7   and the giving of oxygen is medical therapy, and
8   by-directive therapy should be given by qualified
9   personnel.
10      Q.   Such as what?
11      A.   A physician, a licensed person who is
12   licensed to practice -- to give therapy.  So a
13   respiratory therapist is licensed, a nurse is licensed,
14   a physician is licensed.  A technician is not licensed.
15      Q.   So to follow this particular order and
16   provide medical intervention by giving oxygen to
17   maintain oxygen saturation at or greater than
18   97 percent, it would have to be some licensed medical
19   personnel; would that be correct to say?
20      A.   I can't think of a situation in a hospital
21   environment where that would not be correct.
22      Q.   Okay.  Looking at that particular order
23   regarding maintaining oxygen saturations, whether it's
24   97 percent or a similar order for 90 percent, who, if
25   anyone, was responsible for following that order?
0100
1      A.   Medical orders are written for the support
2   personnel, which includes nurses and respiratory
3   therapists.  Primarily the orders are written for
4   nurses, although an order like this, which is
5   respiratory related, might be delegated to the
6   respiratory therapy department.
7      Q.   Okay.

8      A.   And in our hospital, respiratory therapists
9    would be qualified and would probably take the
10   responsibility of carrying out this order.
11     Q.   If you could just turn to page 464 of the
12   chart.  I'm going to draw your attention to a
13   physician's order dated February 10th of 2001 at
14   1:00 a.m. on page 464.  Do you see that?
15     A.   Yes, I do.
16     Q.   Do you recall seeing that order when you
17   reviewed this chart and formulated your opinions?
18     A.   I recall that a V/Q scan was done, and I
19   remember the results of the test.
20     Q.   Do you recall that specific order, though?
21     A.   To the best of my recollection, the answer
22   would be no.
23        MS. HUNT:  What is the order?
24        THE WITNESS:  The order reads, "number
25        69 V/Q scan," and that refers to a
0101
1         ventilation/perfusion lung scan in an attempt
2         to look for a pulmonary embolism.
3      Q.   And there's a number 8 in that order;
4    correct?  Do you see that a few lines down?
5      A.   I believe that's 80, but it says "telemetry."
6      Q.   Right.  And what is your understanding of
7    that aspect of the order, the reference to telemetry?
8      A.   In our hospital, telemetry refers to remote
9    monitoring of the patient's electrocardiogram.  We have
10   remote telemetry in our hospital, and I assume that
11   that means the same.
12     Q.   Okay.  And in your review of the medical
13   records, is there any indication that this physician's
14   order with respect to telemetry was ever discontinued?
15     A.   To the best of my knowledge, the telemetry
16   order was not discontinued.
17     Q.   Okay.  Now, with respect to telemetry
18   monitoring on this patient, would someone with
19   specialized training be needed to interpret telemetry
20   monitor readings?
21     A.   Yes.
22     Q.   Who would that be?
23     A.   Again, I think it depends on the hospital
24   protocol, but generally telemetry monitoring is done by
25   people we call EKG technicians, whose job it is to read
0102
1    and report electrocardiogram strips which are obtained

2    by the telemetry monitor.

3        Q.   Do you know if there were nurses at

4    Danbury Hospital as of February 2001 who were trained

5    to read telemetry monitoring devices?

6        A.   I can only give you my assumption, but I

7    can't tell you for a fact that they were specifically

8    trained.  In any hospital that I've ever worked in, it

9    would be expected that nurses would have been able to

10   read, interpret and act on telemetry readings.

11       Q.   And would someone with specialized medical

12   training be needed to provide any medical intervention

13   in response to telemetry readings?

14       A.   The therapy and medical care of irregular

15   heart rhythms would be under the purview of a

16   physician.

17       Q.   If there were a sudden change in a telemetry

18   reading that required medical intervention, who, if

19   anyone, would have the specialized training to respond

20   to that?

21            MR. STOCKMAN:  Objection.  You can

22         answer.

23       A.   The physician.

24       Q.   Anyone else?

25       A.   I believe it is not the responsibility of the

0103

1    nurse to treat.  The treatment of irregular heart

2    rhythms, if necessary, would be under the jurisdiction

3    and responsibilities of the physician --

4        Q.   Let me --

5        A.   -- alone.

6        Q.   Let me give you a hypothetical.

7            If a patient was to be on telemetry, and the

8    telemetry indicated tachycardia, let's say in the range

9    of 150 beats per minute, what, if any, obligation would

10   the nurse or personnel monitoring that telemetry have?

11       A.   It would be standard of care that the

12   nurse -- the nurse's responsibility would be to

13   identify that the rhythm is abnormal, to identify that

14   it is a potential problem and then to notify the

15   superior, who would be responsible for intervention,

16   and almost always that would be the attending

17   physician.

18            When there is more than one physician, it

19   would be the appropriate physician to render a

20   treatment, which is to say that if it's an orthopedic

21   case, the person who managed the rhythm would be the

22  cardiologist, the internist with experience, et cetera.
23    Q.  All right.
24    A.  But it would be the nurse's responsibility to
25  identify the abnormality and notify the appropriate
0104
1  person that treatment is necessary.
2    Q.  Okay.  If a patient is ordered to be on
3  telemetry, and that order is not discontinued, and
4  they're being transported to an area of the hospital
5  where there is no telemetry, how would one go about
6  monitoring that patient for determining if there was a
7  cardiac arrhythmia?
8    A.  A judgment would be made prior to the
9  transport as to whether telemetry was necessary for the
10  period of time the patient might be in another area of
11  the hospital.
12    Q.  So how would one -- if one wanted to continue
13  that type of monitoring, how would one do that?
14        MR. STOCKMAN:  You're talking the
15        mechanism for implementing that?
16        MR. LANNI:  Yes.
17    A.  If it was determined that monitoring was
18  necessary, then the transportation would include
19  monitoring equipment.
20    Q.  Such as a portable cardiac monitor?
21    A.  Such as a portable cardiac monitor, portable
22  pulse oximeter, whatever might be felt necessary, given
23  the condition of the patient.
24    Q.  I see.  Now, with respect to this particular
25  order for telemetry, do you have an understanding as to
0105
1  who, if anyone, was responsible for following that
2  order?
3    A.  The entire medical staff caring for the
4  patient has the responsibility for telemetry.
5    Q.  That would be the nursing staff?
6    A.  Well, the telemetry is instituted, and the
7  monitoring becomes a part of the patient's care.
8    Q.  Okay.
9    A.  Just as vital signs are a part of the
10  patient's care, intake and output.  Telemetry is part
11  of the observation mechanism that the staff would be
12  responsible for.  Sometimes the data is gathered by
13  nurses, and sometimes the data is gathered by
14  technicians, and sometimes data is gathered by nurse
15  assistants.

16    Q.  All right.
17    A.  All of which is made available on the chart
18  for the physician's review.
19    Q.  Well, who, if anyone, is responsible for
20  ensuring that this order is followed?  This order for
21  telemetry.
22    A.  The nursing staff.
23    Q.  Could I have that page back, please.
24      (Witness complies)
25    Q.  Between February 10th, 2001, when this order
0106
1  was -- the telemetry order was written, and up until
2  the morning of February 17th of 2001 -- when I say the
3  morning of February 17th, let's use as a cutoff
4  11:00 a.m., all right, which is the last nurse's note
5  in the chart -- was telemetry monitoring indicated for
6  this patient?
7      MR. STOCKMAN:  As a medical matter or as
8      a matter of the order?
9      MR. LANNI:  I'm sorry.  You want to draw
10     a distinction between the two?
11     MR. STOCKMAN:  Yes.
12     MR. LANNI:  I'm asking him was it
13     indicated for this patient.
14     MR. STOCKMAN:  Objection.  You can
15     answer.
16    A.  These days in hospital practice, as a matter
17  of trying to give the best patient care that we can,
18  telemetry monitoring is an additional step that's been
19  instituted by facilities to better monitor patients.
20  Similarly, the institution of pulse oximetry in the
21  hospitals is also a way of better monitoring patients,
22  with the idea of giving the best observation that we
23  can.
24      Telemetry was instituted in this patient, I'm
25  sure, as one of several measures to identify that the
0107
1  patient was monitored well, that his heart rhythm was
2  monitored along with his oxygenation.
3      Between the period of the 10th to the 17th, I
4  was impressed that there were no significant
5  identifications of life-threatening, abnormal,
6  irregular, dangerous heart rhythms identified by
7  telemetry.
8      Therefore, to answer your question, I think
9  that while telemetry was instituted correctly as a way

10    to monitor the patient, it became an unnecessary
11    monitoring tool as time went on.  Not to say that
12    irregular rhythms couldn't happen in the future, but
13    stability had been identified, in my opinion, for many
14    days as far as the cardiac rhythm was concerned.
15        Q.  Now, given what you've just told me, are you
16    saying that within that time frame, from February 10th
17    through the morning of February 17th, up to and
18    including 11:00 a.m., that you're of the opinion
19    telemetry was not indicated?
20        A.  I'd prefer not to have the question phrased
21    that way.  Whether it's indicated or not is not the
22    issue.  It's a mechanism of identifying stability in a
23    patient, and for that period of time, this gentleman
24    demonstrated cardiac stability.  I think it was
25    probably not necessary, but I wouldn't use the phrase
0108
1    "not indicated."
2        Q.  So are you saying that it was indicated?
3            MR. STOCKMAN:  Objection.
4            MR. MICHAEL GRADY:  I'll object.
5        A.  I think that's a way of twisting the question
6    to get an answer that I'm still not comfortable with.
7        Q.  You can't answer that question?
8        A.  I think the gentleman demonstrated cardiac
9    stability for many days.  Therefore, more likely than
10    not, the monitoring was not necessary.  From an
11    indicated point of view, we take vital signs, and it's
12    a matter of routine, not whether it's indicated or not
13    based on his condition.
14        Q.  Well, correct me if I'm wrong, but I believe
15    that you testified that the telemetry was a method to
16    determine if this patient was stable; correct?
17        A.  As are vital signs.
18        Q.  Right.
19        A.  Correct.
20        Q.  And would the same hold true for pulse
21    oximetry readings, that it's a method of monitoring to
22    determine if this patient is stable?
23        A.  As are vital signs.  The answer to the
24    question is yes.
25        Q.  All right.  Now, with respect to telemetry in
0109
1    this patient, would you agree with me that the
2    physician who ordered telemetry monitoring in this
3    patient believed that he needed such monitoring?  Would

4   you agree with that?
5       A.   Again, I can't be sure what the thought
6   process was.  I don't think that there was a concern
7   that his cardiac status was unstable and, therefore,
8   the patient should be on monitor.  I believe the use of
9   the telemetry was a method of giving the patient better
10  observation in the year 2005 --
11      Q.   '1?
12      A.   -- 2001, because we have the ability to do
13  that.
14          I might point out to you that the use of
15  oximetry is a relatively new use of monitoring, and the
16  oxygen saturation has been considered now the fifth
17  vital sign after temperature, blood pressure, pulse and
18  respirations.  The use of oximetry now has become
19  standard of care.
20          We do have ability to monitor
21  electrocardiograms remotely because of technology, and
22  I believe this is another method of assessing patients
23  in the hospital.  Whether it's indicated or not in this
24  specific patient I don't think is the question.
25      Q.   Well, let me ask that question with respect
0110
1   to pulse oximetry.  Between February 10th of 2001 and
2   up until the morning of February 17th, 11:00 a.m., was
3   pulse oximetry indicated in this patient?
4              MR. STOCKMAN:  Objection.
5              MR. TIMOTHY GRADY:  Objection.
6       A.   In this specific case the answer is yes,
7   because he was identified to have respiratory problems
8   early on.  He had a pulmonary consultant who identified
9   pneumonia.  He had an abnormal chest x-ray, and he was
10  treated with antibiotics, and he was identified to have
11  atelectasis on chest x-ray.  For all those reasons,
12  pulse oximetry would be indicated in this specific
13  patient.
14          Additionally, pulse oximetry is done on
15  patients who have no pulmonary difficulty whatsoever
16  just because it's a method of monitoring an important
17  organ which is responsible for good health.  Oximetry
18  is done in emergency rooms as a matter of routine.
19      Q.   Let me see if I have your opinion on the
20  issue of monitoring this patient clear.  What you're
21  saying is that telemetry was indicated for this
22  patient, but not necessary, in your view; isn't that
23  correct?

24          MR. STOCKMAN:  Objection.  That's not
25      what he's been saying for the last ten
0111
1      minutes.
2      Q.  Well, what are you saying with respect to
3   that?
4      A.  I'm saying --
5      Q.  I'm not clear on what you're saying.
6          MR. STOCKMAN:  Objection.
7          MR. MICHAEL GRADY:  Objection.  Asked
8      and answered.  Go ahead.
9      A.  I'm saying the gentleman had no reason for
10  anybody to suspect a cardiac difficulty that would
11  require telemetry.  I'm saying this patient -- there
12  was no indication that he had an irregular heart
13  rhythm, therefore, that he needed to be monitored.
14          I'm saying that telemetry, in my opinion, in
15  this case was used as a matter of course as another
16  method of identifying potential problems in a man who
17  was ill, and the technology was there.  When you asked
18  me was it indicated, that would imply to me that there
19  was a cardiac problem that needed watching.
20      Q.  Well, he did have tachycardia; correct?
21      A.  He also had a fractured ankle, and he was
22  sick.  So the answer is yes, he did have tachycardia.
23      Q.  And in fact, he had tachycardia from at least
24  February 10th all the way through the morning of
25  February 17th?
0112
1      A.  There were times where his pulse was above
2   100.
3      Q.  Okay.  And in fact, that's noted more than
4   once in the nurse's notes during that period of time;
5   correct?
6      A.  Yes.
7      Q.  Okay.  And the fact that he has tachycardia
8   throughout that time, would that be something that
9   needs monitoring in some way?
10      A.  Aside from taking the pulse, which would be
11  some way, the answer is maybe nothing else is required.
12      Q.  All right.  The fact that this patient had
13  tachycardia from February 10th through February 17th,
14  is that an indication for using telemetry to monitor
15  his cardiac status?  Is that an indication?
16      A.  In my opinion, not necessarily.
17      Q.  The fact that a physician ordered oxygen,

18   supplemental oxygen, to be given to maintain oxygen
19   saturations at or greater than a certain level --
20          MR. TIMOTHY GRADY:  Objection to the
21       form.  That hasn't been established that that
22       was a physician's order.
23          MR. LANNI:  It says "doctor's orders,"
24       and I think that that's a safe bet that
25       that's a physician's order.
0113
1           MR. TIMOTHY GRADY:  It's not.  It says
2        ""P.A."
3           MR. LANNI:  I understand.  Cosigned.
4     Q.  Let me restate the question.  The fact that a
5    physician ordered that the patient's oxygen saturations
6    be kept at or above a certain percentage and that
7    supplemental oxygen be used to maintain that, if
8    necessary, would that indicate to you that someone
9    determined that some degree of pulmonary monitoring was
10   indicated in this patient?
11    A.  Yes --
12          MR. STOCKMAN:  Objection.
13          MR. TIMOTHY GRADY:  Note my objection.
14    A.  Yes, it would.
15          MR. STOCKMAN:  When there's a logical
16       break point, can we take a two-minute break?
17          (Discussion off the record)
18    Q.  Have you ever used the term "labile oxygen
19   saturations"?  Have you ever used that term?
20    A.  No.
21    Q.  As of the morning of February 17th, 2001, did
22   this patient require supplemental oxygen to maintain
23   his oxygen saturations within normal range?
24    A.  Yes.
25    Q.  And did he require supplemental oxygen to
0114
1    maintain his oxygen saturation within normal range or
2    acceptable range from February 10th at least up until
3    the morning of the 17th?
4     A.  Yes.
5     Q.  By the way, what is your definition of
6    tachycardia?
7     A.  My definition is the same that's in any
8    medical textbook, which is a pulse greater than 100.
9     Q.  In a resting patient?
10    A.  Of course.
11    Q.  And, of course, you as a pulmonologist use

12    the term "tachypnea"?
13        A.   Yes, we do.
14        Q.   What is tachypnea?
15        A.   Increased respiratory rate.
16        Q.   And is there a normal range for respirations
17    per minute in a healthy patient at rest?
18        A.   Generally, we feel 12 to 14 to 16 breaths per
19    minute would be a normal respiratory rate in a resting
20    healthy person.
21        Q.   Okay.
22              MR. STOCKMAN:  Note my objection to the
23          question.
24        Q.   With regard to this particular patient --
25              MR. STOCKMAN:  If they were healthy,
0115
1          they wouldn't be a patient.  That's my
2          objection.
3          (Recess taken)
4        Q.   In the note of 11:00 a.m. for the morning of
5    February 17th, there appears to be a notation that
6    reads, quote:
7              R-e-s-p, resp, 20 dash 24, end quote.
8          Do you see that?  That's on page 96 of the
9    chart.
10        A.   Yes, I do.
11        Q.   What does that refer to, based on your
12    understanding?
13        A.   That would be a nurse's report of respiratory
14    rate being between 20 and 24 breaths per minute.
15        Q.   Is that within normal range?
16              MR. STOCKMAN:  Objection.  You can
17          answer.
18        A.   It's slightly elevated.
19        Q.   Given that this patient's abdominal
20    distention contributed to his atelectasis, could laying
21    this patient supine have any impact on his respiratory
22    status?
23              MS. HUNT:  Object to the form.
24              MR. TIMOTHY GRADY:  Objection to the
25          form.
0116
1              MR. STOCKMAN:  Objection.  You can
2          answer.
3        A.   The answer is yes.
4        Q.   In what way?
5              MS. HUNT:  Objection.

6          MR. STOCKMAN:  Objection.
7          MR. TIMOTHY GRADY:  Join.
8      A.   It's normal respiratory physiology that the
9   best way to breathe is in the erect position.  That's
10  when the lungs ventilate the best.
11     Q.   Would that have held true for the morning of
12  February 17th of 2001?
13         MS. HUNT:  Objection.
14         MR. TIMOTHY GRADY:  Objection.
15         MR. STOCKMAN:  Join.
16     A.   That holds true for any physiological
17  position.  People breathe better upright as opposed to
18  laying flat.
19     Q.   If you could just pull out your report,
20  please.  And in that report you state on page 3 at the
21  top, quote:
22             The nursing staff did not violate the
23             standard of care with regard to transport of
24             the patient to CT scan on February 17th
25             because the patient had been examined earlier
0117
1             in the day on rounds by several physician
2             observers and was felt to be medically stable
3             with regard to vital signs and examination,
4             period, end quote.
5          Do you see that?
6      A.  Yes, I do.
7      Q.   That's one aspect of your opinion -- your
8   opinions in this case concerning the transport of this
9   patient to CT scan; correct?
10     A.   Yes, sir.
11     Q.   All right.  And when you say that "the
12  patient had been examined earlier in the day on rounds
13  by several physicians," what physicians are you
14  referring to?
15     A.   I would need to go back to the records.
16     Q.   All right.  Why don't you go back to pages 95
17  and 96 in the chart.
18         MR. STOCKMAN:  There's also -- there's
19         also another note --
20         MR. TIMOTHY GRADY:  It was out of order.
21         It's not out of order in the way it's been
22         given to us.
23         MR. STOCKMAN:  That's on page 95 and 96.
24         MR. TIMOTHY GRADY:  He just didn't write
25         his note at the time.

0118
1          MR. LANNI:  What are you referring to?
2          MR. TIMOTHY GRADY:  Dr. Gray's note on
3       page 103.
4          MR. STOCKMAN:  It's 95, 96 and 103.
5          MR. LANNI:  That's right.
6          MR. STOCKMAN:  It's actually from the
7       morning.
8          MR. LANNI:  All right.
9      A.   So, actually, you gentlemen have already
10   pointed out three physicians who saw the patient,
11   perhaps four, and my understanding from the deposition
12   of Nurse Milleville, that there is another physician
13   who saw the gentleman just one hour prior to his
14   transport to CT scan.
15          So there were several physicians observing,
16   apparently, who had seen this patient on the morning of
17   February 17th, 2001.
18      Q.   And when you say from the deposition of Nurse
19   Milleville there was a gentleman who saw the patient
20   about an hour before his transport, first of all, do
21   you know who it is that Nurse Milleville is referring
22   to?
23      A.   I don't have a specific recollection, but
24   having just reread her deposition, the discussion was
25   something about a physician that she discussed the case
0119
1   with around the time that she had given the Dulcolax
2   suppository.
3      Q.   And -- do you recall if that was Dr. Kessler?
4      A.   I believe it was not Dr. Johnson, so it may
5   have been Dr. Kessler.
6      Q.   All right.  Well, could you point out to me
7   where in Nurse Milleville's deposition she refers to
8   this patient -- I'm sorry, this physician being present
9   and discussing the patient with her one hour before
10   transport?
11      A.   It was toward the end of the deposition.  It
12   may take some time.
13          She refers to Dr. Kessler, Dr. Gray.
14          "Both physicians were in, saw him also,
15          Dr. Kessler, Dr. Gray, both, before he went
16          down."
17      Q.   What page are we at?
18      A.   We're on page 65 of the deposition.
19          "They didn't have any concerns with him

20        leaving the floor to go."
21        I believe that's what I was referring to.
22              MR. MICHAEL GRADY:  Did you say page 65,
23        Doctor?
24              THE WITNESS:  Yes.
25              MR. MICHAEL GRADY:  Thanks.
0120
 1     A.  I thought there may have been another
 2   statement that she had an interaction with one
 3   physician prior to the patient being transported, but I
 4   may not be recalling it correctly.
 5     Q.  All right.
 6     A.  Nevertheless, the implication is that several
 7   physicians had seen the patient on the morning of the
 8   17th prior to him being transported.
 9     Q.  On page 65 of Nurse Milleville's deposition
10   or any other place in Nurse Milleville's deposition,
11   does she specifically state that Dr. Kessler saw the
12   patient an hour or so before he was transported down to
13   CT scan?
14              MR. STOCKMAN:  Do you want to give him a
15         chance to review the deposition?
16              MR. LANNI:  Absolutely.
17              (Pause in the proceedings)
18     A.  There is a statement in her deposition on
19   page 19 where she is asked:
20              "Did you see Dr. Kessler on the unit
21         that day?"
22              She responds:  "Yes."
23              The question was:  "Where did you see
24         him?"
25              The answer was:  "At the nursing
0121
 1         station."
 2              The question was:  "Did he speak to you
 3         about the patient?"
 4              The answer is:  "Yes."
 5              The question is:  "Do you recall what,
 6         if anything, he said about the patient?"
 7              The answer is:  "Well, we both talked a
 8         little.  I talked with him, and he said it
 9         looks like Michael, you know.  I want you --
10         I know he has the CAT scan coming.  But I did
11         ask him -- I said, 'You know, he seems to get
12         respirations increase a little, you know,
13         positioning in bed.  I did tell him he's on

14          the monitor,'" et cetera.
15              I think the implication here is that
16          Dr. Kessler saw the patient.
17     Q.   But would it be correct for me to say there
18   is no reference in this testimony by Nurse Milleville
19   as to exactly when Dr. Kessler saw the patient?
20     A.   I don't want to be held to that statement,
21   because I'd have to read this with a fine-tooth comb,
22   but my understanding is that Dr. Kessler saw the
23   patient.
24     Q.   I'm just saying you've cited page 19 and
25   page 20 of the deposition and page 65 of the deposition
0122
1   in which Nurse Milleville relates a conversation with
2   Dr. Kessler, and I'm just asking does she specify the
3   time that she had this conversation?
4     A.   I can't answer yes or no.
5     Q.   Why not?
6     A.   Because I'd have to reread every page of the
7   deposition.  At least in the pages that we referred to,
8   it does not say the times specifically that Dr. Kessler
9   or any other doctor saw this patient.
10     Q.   Okay.
11     A.   Although again, I, to the best of my
12   recollection, remember that there was an interaction
13   between the nurse and a physician about one hour before
14   the patient was transported.
15     Q.   Can you tell me where that appears?
16     A.   I can't at this point.
17     Q.   Okay.  On page 95, there's a surgery note
18   that appears; correct?
19     A.   95 of where, please?
20     Q.   Of the chart.
21     A.   Yes.
22     Q.   All right.  And are you under -- are you
23   under the -- withdrawn.
24          Are you of the understanding that this is
25   Dr. Catania's note?
0123
1     A.   That does not look like the signature of
2   Dr. Catania.
3              THE WITNESS:  Is it?
4              MR. LANNI:  I initially thought that,
5          too.
6              (Discussion off the record)
7              MR. LANNI:  Back on the record.

8     Q.   There has been testimony in the case that
9   that is Dr. Catania's signature.
10     A.   Thank you.  Amazing, but --
11     Q.   And that follows the 6:45 a.m. nursing note;
12   correct?
13     A.   That is correct.
14     Q.   Okay.  And then there is Dr. Kessler's note
15   on the next page, on page 96, and that's at the top of
16   the page.
17     A.   I see that note.
18     Q.   Okay.  And then after that is Nurse
19   Milleville's note at 11:00 a.m.?
20     A.   I see that as well.
21     Q.   Okay.  If you could just turn to -- hold on a
22   second.  If you could just turn to page 487 of -- 487
23   of the doctor's orders.  There's an order for a
24   CAT scan by -- that is entered in there.  Do you see
25   that?
0124
1     A.   I'm looking for the number 478, 487.  Oh,
2   page 487.
3     Q.   I'm going to draw your attention to an order
4   that's dated February 17, '01.
5     A.   Yes.
6     Q.   And there's an order for a CAT scan of the
7   abdomen and pelvis; correct?
8     A.   I see the order.
9     Q.   Okay.  And by the way, do you know what that
10   reference is to P.O. slash I.U.?
11     A.   Yes, I do.  It's I.V.
12     Q.   It's I.V.?
13     A.   Yes.  And the reason that's written is
14   because the CAT scan is done of the abdomen and pelvis
15   with both oral and intravenous contrast, so I believe
16   the order is specific.  And, in fact, P.O. I.V.
17   contrast on the next line.
18     Q.   I see that.  Okay.
19     A.   So that's an I.V.
20     Q.   All right.  Great.  Thank you.
21        And then there is --
22     A.   I do remember that the patient was given P.O.
23   contrast material.
24     Q.   Okay.  So there's a time -- there's a time
25   here indicating when this order was picked up; correct?
0125
1     A.   May I?

2            (Pause in the proceedings)
3       A.   In our institution, we put in orders by
4   computer.  We've been doing that for years, and we
5   haven't written orders in quite some time.
6       Q.   Okay.
7       A.   The timing here is not a hundred percent
8   clear to me.  This may be when the nurse picked up the
9   order.  This could be when the order was written.  This
10  could be when the order was carried out.  So I honestly
11  can't be sure by convention in this particular
12  situation what the time of 7:45 means.
13      Q.   Okay.
14      A.   There's also a time of nine on this order as
15  well.  What is clear to me is that the time the order
16  was written is not placed, because it would be put in a
17  different location --
18      Q.   Well --
19      A.   -- so more likely than not this time refers
20  to when the order was transcribed.
21      Q.   Would that indicate to you that Dr. Catania
22  saw this patient sometime at or before 7:45 a.m.?
23      A.   I think that would be a fair assumption, yes.
24      Q.   And now if you could just turn to the next
25  page of the physician's orders, that is page 488, and
0126
1   there's a note at the top of the page that's for
2   February 17th, 2001 by Dr. Kessler.  Do you see that?
3       A.   Could you help me with the signature, because
4   it certainly is illegible.
5            You can compare now.  Without a doubt, this
6   is the signature of Dr. Kessler with the order written
7   at 9:15 a.m.
8       Q.   Right.  He timed the order 9:15 a.m.?
9       A.   Yes, he did.  He saw the patient, wrote a
10  note on February 17th, and there's an order written on
11  February 17th, which is timed when it was written.
12      Q.   Nine --
13      A.   And the signature is that of Dr. Kessler.
14      Q.   So would it be correct for me to say that
15  Dr. Kessler saw the patient at or about 9:15 a.m.?
16  Would that be correct for me to say?
17            MR. STOCKMAN:  Objection.
18      A.   I think the correct impression would be that
19  Dr. Kessler saw the patient at 9:15, because the order
20  would have been written when he saw the patient.
21      Q.   Okay.

22     A.   And it should be noted that there is the time
23  of 9:40 written, which is probably the time the order
24  was picked up.
25          MR. STOCKMAN:  Off the record for one
0127
1      second.
2          (Discussion off the record)
3      Q.   Now, would it be correct for me to say that
4   both Dr. Catania and Dr. Kessler saw this patient
5   before Nurse Milleville wrote her 11:00 a.m. note?
6      A.   I think that is correct.
7      Q.   Now, when you write in your report that the
8   patient was examined by several physicians and, quote,
9   was felt to be medically stable with regard to vital
10  signs and examination, end quote, what do you mean by
11  that?
12     A.   I think I have to ask you what do you mean by
13  what do I mean?
14     Q.   Let me ask you this question:  Are you saying
15  that Dr. Catania felt that this patient was medically
16  stable?
17     A.   I think all the physicians involved felt that
18  the patient was ill.  I don't want to get confused
19  between medical stability and well.  From a stability
20  point of view, we're talking about cardiopulmonary
21  hemodynamics, vital signs, et cetera.  It doesn't imply
22  that the patient is well.
23          In fact, we know the patient is not well,
24  because he's being sent for a test with significant
25  concerns that something is not right.  I don't want to
0128
1   imply at any point that I feel this patient is well,
2   but when you ask me is he medically stable, that
3   implies that hemodynamics, cardiopulmonary status
4   appears to be, by all the data we have, as stable, what
5   we would call stable.
6      Q.   Now, my question was a little bit different.
7          Are you saying that Dr. Catania was one of
8   the physicians who felt that this patient was medically
9   stable?
10          MR. TIMOTHY GRADY:  Object to the form.
11     Q.   Are you saying that in this statement?
12          MR. TIMOTHY GRADY:  Object to the form.
13     A.   I answered that question by taking the
14  implication of his notes.
15     Q.   Right.  Okay.  You anticipated my next

16   question, which is:  What is the basis of that
17   statement?
18       A.   The basis is, if the patient were not stable,
19   I think Dr. Catania would have written an entirely
20   different note --
21       Q.   Well, in Dr. Catania's --
22       A.   -- and would have raised significant concerns
23   that are not reflected in this note.
24       Q.   Well, in Dr. Catania's note on page 95, does
25   he make any reference to the patient's vital signs, for
0129
1   instance?
2       A.   He does not.
3       Q.   Does he make any reference to an examination
4   of the patient other than an examination of the
5   abdomen?
6       A.   I'm not sure we can even imply that he
7   examined the abdomen.
8       Q.   Well --
9       A.   He observes that the abdomen remains
10   distended, which is an observation.  He does not state
11   on his note that he palpated the abdomen, and there was
12   a finding.
13       Q.   And there's no reference to him, to
14   Dr. Catania, listening to the patient's lungs?
15           MR. TIMOTHY GRADY:  Object to the form.
16       Q.   There's no reference in this note?
17       A.   That's correct.
18       Q.   And there's no reference in the note to
19   Dr. Catania listening to the patient's heart?
20           MR. TIMOTHY GRADY:  Objection.
21       A.   Again, that's correct.
22       Q.   And with regard to the note that appears on
23   the next page, Dr. Kessler's note, what is it about
24   this note -- withdrawn.
25           Are you saying that Doctor -- that based on
0130
1   Dr. Kessler's note, Dr. Kessler believed that this
2   patient was stable, medically stable?
3       A.   Again, that word is not written, so I can't
4   tell you all his thought processes.
5       Q.   Would it be correct for me to say that
6   neither in Dr. Catania's note nor in Dr. Kessler's note
7   is the word "stable" used?  Would that be correct for
8   me to say?
9       A.   That is correct, because that is what the

10    note says.
11        Q.  In Dr. Kessler's note is there any reference
12    to the patient's vital signs?
13        A.  There is not.
14        Q.  Is there any reference to Dr. Kessler
15    examining the patient that date?
16        A.  He makes a statement that "ileus continues,"
17    so perhaps the implication is that he examined him, but
18    he did not write his physical examination on the note.
19        Q.  So there's no specific indication that he
20    examined the patient; correct?
21        A.  That is correct.
22        Q.  And there's no statement in there that he
23    listened to the patient's lungs?
24        A.  Again, correct.
25        Q.  No statement in there that he listened to the
0131
1    patient's heart?
2        A.  Again, correct.
3        Q.  Now, going on -- continuing on with your
4    report, you give another reason for your opinion that
5    the nursing staff did not violate the standard of care
6    with regard to transporting this patient to the CT scan
7    by stating, quote:
8                There was no acute precipitous decline
9            in his condition on that day prior to his
10           transport, period, end quote.
11           Correct?
12       A.  That's what I wrote.
13       Q.  Okay.  And when you make that statement in
14   your report, are you referring only to the date of
15   February 17th?
16       A.  I'm referring to the entire flow of the case
17   since the patient was admitted to the hospital.
18       Q.  On the 17th, in the morning, is there a
19   notation indicating that this patient had, to some
20   degree, shortness of breath on the morning of the 17th?
21       A.  I think shortness of breath is referred to
22   several times during the patient's course.
23       Q.  But my question is on the 17th.
24       A.  One recollection I have is that shortness of
25   breath was referred to with regard to the patient's
0132
1    movement.
2        Q.  Position?
3        A.  Or positioning.

4    Q.   Right.  In fact, it's the note of Nurse
5    Milleville at -- at 11:00 a.m. on the 17th; correct?
6    A.   May I?
7    Q.   Yes.  Sure, if you want to turn to it in the
8    chart.
9         MR. STOCKMAN:  I've got it.
10   Q.   Do you have it in front of you?
11   A.   The identical note is in front of me without
12   the highlighting.
13   Q.   All right.  And in fact, that note says or
14   makes reference to shortness of breath with position
15   change activity; correct?
16   A.   Position change dash activity.
17   Q.   Right.
18   A.   Which means that when he moves, he's short of
19   breath.  The implication is when he is not moving, he's
20   not short of breath.
21   Q.   All right.  Now, this patient, by the way,
22   had multiple fractures of his leg?
23   A.   That is my understanding, yes.
24   Q.   And in fact, he had two operations to repair
25   those fractures?
0133
1    A.   Again, correct.  By two different physicians.
2    Q.   Right.  And can we agree that this patient's
3    mobility was limited to some extent?
4    A.   Would I agree with that statement?
5    Q.   When you see the notation regarding shortness
6    of breath and you see position change as one of the
7    references to this shortness of breath, what is your
8    understanding of that?
9    A.   I'm a pulmonologist, and I see shortness of
10   breath in the hospital all the time, and the reasons
11   can be multiple.  My understanding is nothing more than
12   the patient was short of breath when he moved.  That
13   does not imply a cause; that implies a physical
14   finding.
15   Q.   I understand.
16   A.   So my understanding of that is simply what it
17   states.  He's short of breath when he moves.  The next
18   step in the thought process would be why is that the
19   case.
20   Q.   All right.  So when you see shortness of
21   breath with position change, you're of the
22   understanding that he was getting shortness of breath
23   whenever he moved in any way?

24      MR. STOCKMAN:  Objection.  You can
25      answer.
0134
1      A.  I think I would rather not take this nurse's
2   statements too far out of context.  She's an observer,
3   and she is not implying that every single position or
4   activity causes difficulty.
5          She's making an observation that shortness of
6   breath occurs when he does something.  She is not
7   making a statement of degree.  She's not making a
8   statement of intensity.  She's just making an
9   observation, which is a helpful piece of information
10   for the physician to use.
11      Q.  Well, that morning of February 17th, 2001,
12   from the first nurse's note at 3:45 a.m. up until
13   11:00 a.m., is this patient out of bed?
14      A.  I believe there are times when he's gotten
15   out of bed, yes, to sit in a chair.
16      Q.  I'm talking about that particular morning.
17   Do you see that?  Can you show me that?
18      A.  No, I can't.
19      Q.  Well, could you go back over those notes,
20   those nurse's notes starting at 3:45 a.m., and show me
21   where he's out of bed?
22      A.  Did I imply that he was out of bed?
23      Q.  That was my question.  My question was:  Is
24   there anything that morning where it shows that he's
25   out of bed?
0135
1      A.  I think you're confusing me with your
2   questions.  Between the time of the 10th and the 17th,
3   I believe there were many times when he was out of bed.
4      Q.  That's not my question.  My question was a
5   little bit more specific than that.
6          I'm talking about from the morning of the
7   17th, from the first note there, from 3:45 a.m. up
8   until 11:00 a.m., is there anything in the nurse's
9   notes which indicate that he was out of bed?
10      A.  I see nothing written that says that he was
11   out of bed.
12      Q.  So would it be fair to say that whatever
13   position change was accompanying the shortness of
14   breath would be a position change within the bed?
15      MR. STOCKMAN:  Objection.
16      Q.  Would that be fair to say?
17      MR. STOCKMAN:  Objection.  You can

18          answer.
19       A.  Not necessarily, Attorney.
20       Q.  Why do you say that?
21       A.  Just because it was written doesn't mean it
22    didn't happen, but I understand all we have to go on is
23    these notes.
24       Q.  According to these notes, would it indicate
25    to you that the position change which accompanied the
0136
1    shortness of breath occurred within -- while the
2    patient was in bed, based on these notes?
3       A.  Based on my experience in the hospital,
4    that's not necessarily a fair assumption.  Again, just
5    because the nurse doesn't write it doesn't mean it
6    didn't occur.  For her to write down every activity
7    that a patient had would be too much to expect.
8          During the nighttime, if the patient was
9    uncomfortable, he might have gotten out of bed to the
10    chair.  That would imply activity.  In the morning of
11    the 17th, the nurse may have had him out of bed to the
12    chair or moved him to the commode or asked him to walk
13    to the bathroom to use the toilet.  That would be
14    activity that would have identified shortness of
15    breath, but she may not have written it down.
16          So all I'm going to say is I can't say for
17    sure that the patient was only in bed, only had
18    activity in bed, and therefore, that's the type of
19    activity that we're talking about.
20       Q.  Well, is there any specific reference in the
21    notes on the morning of February 17th, 2001 to this
22    patient having engaged in activity or engaging in some
23    type of position change outside of his bed?
24       A.  There's nothing written by anyone to imply or
25    suggest that.
0137
1       Q.  You cited Nurse Milleville's deposition
2    earlier.  Do you remember whether she discussed or
3    testified about when he was exhibiting shortness of
4    breath with position change?
5       A.  I do not recall that information
6    specifically.
7       Q.  All right.  Now, going back to your statement
8    that there was no precipitous decline in his condition
9    on that date prior to transport, we note that there's a
10    reference to shortness of breath on the morning of the
11    17th; correct?

12    A.  Correct.
13    Q.  Okay.  Is there a reference to shortness of
14  breath prior to the 17th, the morning of the 17th?  Go
15  ahead.
16    A.  To the best of my recollection, there were
17  comments about the patient being uncomfortable with
18  abdominal distention, and short of breath, and
19  difficult time breathing.
20    Q.  All right.  Let me draw your attention to
21  what I think you're referring to, and you can correct
22  me if I'm wrong.  All right.
23        On page 93 of the chart, and I'm going to
24  draw your attention to a nurse's note of February 16th
25  of 2001, time 3:30 p.m., and halfway through that note
0138
1  there's a reference to the patient becoming short of
2  breath while sitting at the edge of bed.
3    A.  I do remember reading this note, yes.
4    Q.  So that's one reference to the shortness of
5  breath; correct?
6    A.  There's also a reference that he did get out
7  of bed to use the commode.
8    Q.  Right.
9    A.  And there's also a reference to his oxygen
10  saturation of 89 percent on 1 liter.
11    Q.  Right.
12    A.  Which was 24 hours -- almost 24 hours before
13  the reference on the 17th.
14    Q.  Okay.  So, in any event, on the afternoon of
15  the 16th, he's short of breath while sitting at the
16  edge of the bed?
17    A.  Correct.
18    Q.  Okay.  And I'm just saying that's one
19  reference to the shortness of breath that occurs before
20  the morning of the 17th; right?
21    A.  Thank you for pointing that out.  And there
22  may be others.
23    Q.  In fact, I'm going to draw your attention to
24  another one.  On page 91, there's a pulmonary note.
25  It's timed February 16th, 2001.  And I believe it
0139
1  reads, quote:
2          Feels more uncomfortable today, and then
3        there's an upturned arrow SOB, secondary to
4        distended abdomen, end quote.
5        Do you see that?

6    A.   I do, and I think your reading of the
7  penmanship is absolutely correct.
8    Q.   By the way, would you agree with this note,
9  that the shortness of breath here is in some way
10  contributing to -- or caused by the abdominal
11  distention?
12            MS. HUNT:  Object to the form.
13            MR. TIMOTHY GRADY:  Objection.
14            MR. STOCKMAN:  Objection.
15    A.   I think there's no way I can make that
16  assessment at all except to parrot what Dr. Kessler
17  says.
18    Q.   Kotch, you mean?
19    A.   Dr. Kotch, yes.  I'm sorry.  The
20  pulmonologist.
21        It would be logical to assume that the
22  abdominal distension was associated with his shortness
23  of breath, of course.  I do note, and I believe that's
24  the interpretation of the penmanship, that he reports
25  that the lungs are clear, and the abdomen is distended
0140
1  and soft, and the assessment is stable pulmonary
2  status.
3        I can't read anything after that.  But this
4  is the pulmonologist's note of the 16th.
5    Q.   Now, is there any reference to shortness of
6  breath prior to the 16th that you saw?
7    A.   You might have to help me with that,
8  Attorney.  I don't recall any offhand, but there may
9  have been.  I do know that the patient's abdomen was
10  distended for several days, and he was uncomfortable
11  for several days, and it was my understanding that that
12  discomfort affected his breathing.
13    Q.   Okay.
14    A.   He was, in fact, given intensive spirometry
15  to help him with his breathing, and that would be a
16  therapy to treat shortness of breath for abdominal
17  distention and atelectasis.
18    Q.   I'm asking if you recall any description that
19  he had shortness of breath prior to the 16th and what's
20  noted in Dr. Kotch's note here.
21    A.   The best way I can answer that is, to the
22  best of my recollection, I do not remember any other
23  references.
24    Q.   When Dr. Kotch wrote "Patient stable
25  pulmonary status," did you have an understanding as to

0141
1    what he's referring to?
2        A.   Again, I think I tried to define stability as
3    best I could earlier, and Dr. Kotch probably has the
4    same understanding that I do.  The patient is not well
5    but is stable in the hospital from -- in terms of vital
6    signs and hemodynamics, cardiopulmonary status.
7        Q.   In other words, they're remaining roughly
8    within the same parameters?
9        A.   If it helps you -- that's correct.  If it
10   helps you, just to reference from a stability point of
11   view, I'll point out to you that he had an oxygen
12   saturation written by the nurse on the 16th of
13   89 percent with 1 liter, and he rose to 95 percent on
14   2 liters.  This is a nurse who is identifying the
15   oxygen saturation on the 16th.  24 hours later, the
16   findings are essentially identical in that he has a low
17   oxygen saturation.
18       Q.   On 1 liter?
19       A.   On 1 liter.  And then it rises again to
20   94 percent on 2 liters.
21       Q.   Okay.
22       A.   That to me is essentially stability.  Not
23   well, but stability.  And this is how I try and
24   describe to you that the patient seems to be stable in
25   that there's no precipitous change in his vital signs
0142
1    or oxygenation, at least in this 24-hour period, that
2    we can identify.
3        Q.   Going back to your statement that there's no
4    precipitous decline in his condition, on the morning of
5    the 17th at 3:45 a.m., there's a reference to
6    inspiratory and expiratory wheezing.  Do you see that?
7    Again, I'm going to draw your attention to page 95.
8        A.   That's the note written by the nurse at
9    3:45 a.m.?
10       Q.   Right.
11       A.   Or it was timed 3:45 a.m.  And I'm not sure
12   whose signature that is.
13       Q.   And by the way, what is inspiratory and
14   expiratory wheezing?
15       A.   These are sounds that are heard by
16   auscultation, and they imply some degree of
17   bronchospasm of the airways.
18       Q.   Bronchospasm being what?
19       A.   Constriction of the major airways, implying

20   that there is a tightness of the breathing tubes with
21   difficulty air moving in and out.
22      Q.   Could you get wheezing as a result of
23   compression of the lungs, to some degree?
24            MS. HUNT:  Objection to form.
25            MR. STOCKMAN:  Objection.  You can
0143
1       answer.
2            MR. TIMOTHY GRADY:  Objection.
3      A.   Are you talking in general or in this
4   particular case?
5      Q.   In general.
6      A.   Generally that's not the finding one would
7   expect with abdominal distention, compression or
8   atelectasis.
9      Q.   Well, with respect to this patient's
10   wheezing, on the morning of the 17th, did you formulate
11   an opinion or a differential diagnosis as to what was
12   causing the wheezing?
13      A.   Just as a comment, it's generally my opinion
14   that nurses are very poor observers when it comes to
15   breath sounds, and when I see written that there was
16   wheezing on inspiration and expiration, I honestly
17   don't know what that means.  I need better information
18   in order to understand what wheezing means.
19            It is not likely to me that this patient
20   would be wheezing.  Dr. Kotch, the pulmonologist, did
21   not identify wheezing on his examination.  Early in the
22   morning, nurses listening to the lungs may write notes
23   that I don't understand.  Therefore, this note is the
24   only one that says wheezing, and I'm not sure what that
25   means.
0144
1      Q.   Okay.  Did any physician --
2      A.   And I'm just talking in general reading notes
3   and trying to understand the case as an outside
4   observer.
5      Q.   Based on the notes that appear on the 17th,
6   did any physician listen to his lungs before his
7   transfer to CT scan?
8      A.   There are no notes that say that, no.
9      Q.   All right.  Is there -- is there -- I'm
10   sorry, go ahead.
11      A.   I don't have -- I don't see any note by
12   Dr. Kotch, the pulmonologist, that he saw this patient
13   on the morning of the 17th.

14     Q.  Is there any reference to this patient
15  exhibiting wheezing prior to the 17th, the morning of
16  the 17th, in this chart?
17     A.  I think I would have to go back and look at
18  all the notes.  To the best of my recollection, I do
19  not recall anyone identifying wheezing in this patient.
20     Q.  Based on the materials that you reviewed, is
21  there any reference in the Danbury Hospital records to
22  an oxygen saturation in this patient between the
23  11:00 a.m. nursing note and the Code 99 Flow Sheet?
24         MR. STOCKMAN:  We can stipulate that
25      there isn't.
0145
1     A.  I think the question is, between the time the
2  patient left the floor until the code, whether oxygen
3  saturation was monitored, and I think the answer to
4  that question is yes.  We'd need to go back through the
5  records, because in the radiology department --
6     Q.  I'm sorry?
7     A.  I think I'm hesitating.  I think we'd have to
8  go back and look over the records, but my understanding
9  was that oxygen was looked at prior to the cardiac
10  arrest and monitored.
11     Q.  You're talking about an oxygen saturation
12  reading by pulse oximetry?
13     A.  As opposed to?
14     Q.  Any other type of monitoring, like an
15  arterial blood gas.
16     A.  I'm almost entirely sure that there was no
17  oxygen -- there was no arterial blood gas done between
18  the time the patient left the floor at 11:00 o'clock to
19  be transported to CAT scan and the cardiac arrest.  I
20  have no recollection that an arterial blood was done.
21  My implication is oxygen saturation monitoring.
22     Q.  Just so we're clear, from the time -- from
23  that 11:00 a.m. nursing note up until the time that the
24  pulse oximetry reading is taken in CAT scan, there's no
25  other pulse oximetry reading that you've seen?
0146
1     A.  To the best of my knowledge, there are no
2  other readings taken.
3     Q.  And there is -- by the way, there's no other
4  reference to a telemetry reading in that same time
5  frame?
6     A.  As you know, the patient was taken off
7  telemetry to be transported.

8      Q.   My question is:  Is there any other telemetry
9  reading?
10      A.   My understanding is that the patient was
11  taken off in order to be transported.
12      Q.   Do you know when the patient was transported
13  off the floor to go to the CAT scan?
14      A.   Attorney, you'd have to help me with the
15  specific time, and I know that that's recorded with the
16  transport log.
17      Q.   Right.
18      A.   But I don't have that fresh in my memory.
19  Maybe you can help me with the specific time.
20      Q.   I will.
21          MR. LANNI:  Why don't you give that to
22      him.  It's already been marked as an exhibit.
23      Q.   I'm going to have Mr. Stockman put in front
24  of you the transportation scheduling sheet.
25      A.   Yes.
0147
1      Q.   And I believe it's -- there's a reference
2  there to someone being sent to transport this patient
3  at 12:17 p.m.
4      A.   I see that.  That's when they were sent for.
5      Q.   So that would indicate that the patient was
6  transported off the floor sometime after 12:17 p.m.?
7      A.   I'll be honest, I'm not exactly sure how
8  these times are written in, who writes them.  There's
9  also a time of 12:30 signed by Lorissa, and I'm not
10  sure what that implies.  Maybe the patient was sent for
11  at 12:17 but actually was transported at 12:30.
12      Q.   So would it be correct for me to say that as
13  of 12:17 p.m., this patient was still on the floor?
14  Would that be correct for me to say?
15      A.   I think that might be a fair assumption, yes.
16      Q.   Let me sort of narrow my time frame a little
17  bit.  Is there any pulse oximetry reading in this
18  patient between 11:00 a.m. when the nurse's note
19  appears, and 12:17 p.m.?
20      A.   To the best of my knowledge, the answer is
21  no.
22      Q.   How about telemetry reading?
23          MR. STOCKMAN:  Recorded in the chart?
24          MR. LANNI:  Right.
25      A.   It would be my implication, although we'd
0148
1  need to support it by the records, that if the patient

2   remained on the floor until 12:17, that is the time the
3   telemetry would have been removed.
4       Q.   So I'm just saying is there any telemetry
5   reading between 11:00 a.m., when it's noted by the
6   nurse in her note, and 12:17 p.m.?
7       A.   Attorney, I'm not sure that's a fair question
8   unless we review all the records of telemetry.  I don't
9   have that in my memory at this point.
10      Q.   I'm just asking did you see it in the chart?
11      A.   To the best of my recollection, the answer is
12  no, but that means nothing.
13      Q.   Is there anything in this Danbury Hospital
14  chart referring to the condition of this patient after
15  11:00 a.m. and up until 12:17 p.m.?
16      A.   The last note that we have on the chart
17  referring to the patient's condition was timed
18  11:00 a.m., written by Nurse Milleville, and I would
19  suggest that that's the last time we had a significant,
20  substantial record of this patient's condition before
21  he left the floor.
22      Q.   Okay.  Now, another reason that you cite in
23  your report concerning the transport of this patient or
24  the propriety of the transport of this patient to
25  CAT scan on February 17th is a statement where you say,
0149
1   quote:
2               The nurses were justified in relying on
3           a statement from the treating physician that
4           the patient could be taken off telemetry to
5           go down to the CT suite, period, end quote.
6           That's another reason that you cited;
7   correct?
8       A.   That's what I wrote.
9       Q.   Would it be correct for me to state that
10  you're basing that aspect of your opinion on Nurse
11  Milleville's testimony about an alleged conversation
12  that she had with Dr. Kessler?
13      A.   That would be one factor, yes.
14      Q.   Is there anything else that you base that
15  statement on other than Nurse Milleville's deposition
16  testimony?
17      A.   I would need to go back through all the
18  records.  To the best of my recollection, sitting here
19  today, I don't remember the reasons why telemetry was
20  DC'd in order for the patient to be transported
21  specifically.  It was my recollection today that the

22    decision to come off telemetry was one that the nurse
23    obtained in order to transport this patient.
24        Q.   And when you say it was one the nurse
25    obtained, you're referring to this conversation that
0150
1    Nurse Milleville is said to have had with Dr. Kessler?
2        A.   I can't -- I can't tell you for certain that
3    that is the conversation that we're talking about.
4    Coming off telemetry in our institution can be a verbal
5    decision -- discussion between the patient's -- between
6    the nurse and the physician.
7        Q.   Well, you read us a portion of Nurse
8    Milleville's testimony about the patient being taken
9    off telemetry; right?
10        A.   (No audible response)
11        Q.   You read us a portion of that.
12        A.   I don't think we were talking about telemetry
13    at that time --
14        Q.   I think we were.
15        A.   -- in that deposition.
16        Q.   I'm going to just draw your attention to -- I
17    think you quoted to me -- you quoted to me some
18    language on pages 19 and 20 of Nurse Milleville's
19    deposition.
20        A.   We're on page 19 and 20?
21        Q.   Right.  You read that deposition testimony to
22    me earlier; correct?
23        A.   I mean, I have it here in front of me now.  I
24    don't think I read all the way down that far, but it's
25    right in front of me, and we can read that together, if
0151
1    you'd like.
2        Q.   Sure.  Well, I want to ask you to look at the
3    testimony from page -- on page 19 beginning with
4    line 14, all the way to page 20, line 20.  Just look at
5    it.
6        A.   Page 19, line 14?
7        Q.   To page 20, line 20 --
8        A.   Yes.
9        Q.   -- of Nurse Milleville's deposition
10    testimony.
11        A.   I see that here.
12        Q.   Did you read it over?
13        A.   I'm reading it now, yes.
14            (Pause in the proceedings)
15        A.   Would you like me to read --

16      Q.  I'm just asking you -- I'm just asking you
17  for you to read it over.  Are you finished reading it
18  over?
19      A.  Yes, I am.
20      Q.  And you read this testimony in formulating
21  your opinions; right?
22      A.  I made a statement in my -- I made a
23  statement in my written opinion on December 28th, 2005,
24  and I believe that this deposition testimony here
25  supports what I wrote.  And specifically, this is a
0152
1  conversation between the nurse and Dr. Kessler where
2  Dr. Kessler said he could come off for the test.  He
3  was on a telemetry monitoring.  They don't work in the
4  halls.
5          "I said," quote, "'he needs to go down to the
6  test.'  He said he could come off to go down."
7      Q.  Right.  Okay.  So my question is:  When you
8  wrote in your report, quote, The nurses were justified
9  in relying on a statement from the treating physician
10  that the patient could be taken off telemetry to go
11  down to the CT scan suite, end quote, you were basing
12  that part of your opinion on Nurse Milleville's
13  testimony about an alleged conversation with
14  Dr. Kessler?
15      A.  It could be that the specific reason I wrote
16  what I did in my December 28th, 2005 letter was because
17  of that statement I just wrote -- I just read to you.
18      Q.  Did you base that aspect of your opinion on
19  anything else other than her testimony?
20      A.  I can't answer that question, Attorney.
21      Q.  Why not?
22      A.  Because this is data that supports what I
23  wrote, and I can't say whether there are other places
24  in this voluminous amount of deposition material where
25  it may have been written that I picked up the
0153
1  information.
2      Q.  Well, do you recall any other information to
3  support that statement?
4      A.  Attorney, I read hundreds of pages of
5  depositions.
6      Q.  So did I.  I'm just asking:  Do you recall
7  it?
8      A.  Today I do not recall.
9      Q.  Okay.  Now, you also reviewed Dr. Kessler's

10    deposition; correct?
11        A.   At some time in the past, yes, I did.
12        Q.   Do you recall what he said about a -- about a
13    conversation or an alleged conversation with Nurse
14    Milleville about the removal of telemetry?
15        A.   Today I do not.
16        Q.   Now, you also read the deposition of a
17    Maureen Burnett.  That's in your list; right?
18        A.   (No audible response)
19        Q.   That's in your list of materials?
20        A.   Yes.
21        Q.   That's number seven on your list; right?
22        A.   Yes, it is.
23        Q.   Okay.  And do you recall reading
24    Ms. Burnett's testimony about her conversation with
25    Nurse Milleville?
0154
 1        A.   I don't, and that deposition is not fresh in
 2    my mind, so I would need to review that.
 3        Q.   All right.  I'm just going to draw -- I'm
 4    going to hand to you right now pages 82 and 83 of the
 5    deposition of Nurse Burnett.  I'm going to ask you to
 6    read pages 82 and 83.
 7             (Pause in the proceedings)
 8        A.   I've read page 82 and 83 of her deposition.
 9        Q.   And Nurse Burnett relates a conversation that
10    she had with Nurse Milleville after the code event;
11    correct?
12        A.   That's correct.
13        Q.   And do you know who Nurse Burnett was?
14        A.   It's my understanding that she was a clinical
15    supervisor or clinical administrator on duty at that
16    time, and she questioned the floor nurse --
17        Q.   Right.
18        A.   -- of what had happened.
19        Q.   Okay.  And she testified about her
20    conversation with Nurse Milleville; correct?
21        A.   In her deposition, yes.
22        Q.   All right.  And with regard to this
23    particular portion of her testimony, and beginning on
24    line 5 of page 83.
25             "Question:  Do you have a recollection
0155
 1         of your conversation with Ms. Milleville?
 2             "Answer:  Yes.
 3             "Question:  Okay.

4           "Answer:  Not verbatim.
5               "Question:  I understand not verbatim.
6       So do you recall the sum and substance of the
7       conversation that you had with Ms. Milleville
8       at that time?
9           "Answer:  Yes.
10              "Question:  What was the sum and
11      substance?
12              "Answer:  Essentially I asked her if the
13      patient was stable.  Could you tell me what
14      his condition was prior to transfer, and was
15      your assessment that he was stable to
16      transfer?
17              "Question:  And did she respond?
18              "Answer:  She responded yes, that she
19      felt that, based on her assessment, that the
20      patient was stable to transfer, end quote.
21          All right.  Based on Nurse Burnett's account
22  of her conversation with Nurse Milleville, is there any
23  indication that someone other than Milleville
24  determined that this patient was stable for transfer?
25              MR. STOCKMAN:  Objection.
0156
1               MR. TIMOTHY GRADY:  Objection.
2               MR. STOCKMAN:  You can answer.
3       A.   Based on the words you just read, there was
4   no one else involved in the decision.
5       Q.   And is there any reference in that testimony
6   about the conversation with Nurse Milleville to
7   Dr. Kessler being part of the determination to transfer
8   this patient?
9               MR. STOCKMAN:  Objection.  You can
10          answer.
11      A.   I don't recall that the question was asked.
12      Q.   Well, is there any reference in Nurse
13  Burnett's account of her conversation with Nurse
14  Milleville to Dr. Kessler?
15      A.   Again, I didn't note that the question was
16  asked.
17      Q.   I'm just asking you.  Is there any reference
18  to that?
19      A.   None that I see.
20      Q.   All right.  Is there any reference to a
21  physician being part of the determination that the
22  patient was stable to transfer?
23      A.   Could you ask the question again, please.

24      Q.  Is there any reference to Nurse Burnett's
25   account of her conversation -- of this conversation
0157
1   with Nurse Milleville, is there any reference to a
2   physician being part of the determination that this
3   patient was stable to transfer?
4      A.  I think the questions asked Nurse Burnett was
5   what she had asked Nurse Milleville.  I didn't see the
6   question asked were any other people involved in the
7   decision-making.
8      Q.  I'm just asking you.  Is there a reference
9   here in Nurse Burnett's account of what Nurse
10   Milleville told her?  All right.  Is there any
11   reference there to a physician being part of the
12   determination that this patient was stable to transfer?
13          MR. STOCKMAN:  Object.  All you're
14          asking him is do the words of that deposition
15          mention Dr. Kessler.
16          MR. LANNI:  Or any other physician.
17      A.  The words we read on page 82 and 83 just now
18   did not have reference to any other physician or anyone
19   else involved.
20   Q.  Other than Milleville?
21   A.  Other than Milleville.
22   Q.  Is there any reference to a conversation
23   between Nurse Milleville and Dr. Kessler in
24   Dr. Kessler's note?
25      A.  In Dr. Kessler's note dated February 17th?
0158
1   Q.  Right.
2   A.  No, there's not.
3   Q.  And now in Nurse Milleville's note of
4   11:00 a.m., she makes reference to the findings of an
5   abdominal examination; correct?
6      A.  Which note are you referring to?
7   Q.  The 11:00 a.m. note.
8      A.  I'm looking at that right now.  She does
9   report that the abdomen is firm and distended.
10   Hypoflatus.
11      Q.  So she makes reference to the findings of an
12   abdominal examination; right?
13      A.  Yes, she does.
14   Q.  And she makes reference to giving the patient
15   a suppository?
16      A.  A Dulcolax suppository.
17   Q.  And she makes reference to the patient taking

18    sips of contrast material?
19        A.   Yes.
20        Q.   She makes reference to his respiratory rate?
21        A.   Yes, she does.
22        Q.   And that the patient is having or feeling
23    shortness of breath with position change in activity --
24        A.   Yes.
25        Q.   -- right?
0159
 1            She makes reference to the telemetry
 2    readings?
 3        A.   Yes, she does.
 4        Q.   Okay.  And she makes reference to the fact
 5    that the patient is leaving the floor for a CT scan;
 6    right?
 7        A.   No, sir.  She makes reference that he is
 8    awaiting CT scan.
 9        Q.   Well, that's what I'm saying --
10        A.   Not that he's leaving the floor.
11        Q.   Excuse me.  I misspoke.  She's making
12    reference in this note to the fact that the patient is
13    going for a CT scan at some point in time that day?
14        A.   He is awaiting CT scan.
15        Q.   That day; right?
16        A.   Her note says, "He is awaiting CT scan."
17        Q.   Okay.  And would you agree with me this is a
18    pretty detailed note?
19        A.   I think it's a very thorough nursing note,
20    yes.
21        Q.   An it makes no reference to a conversation
22    with Dr. Kessler?
23        A.   That is correct.
24        Q.   And is there any order in the chart that you
25    saw discontinuing telemetry or cardiac monitoring in
0160
 1    this patient?
 2        A.   To the best of my recollection, I can't
 3    answer the question.
 4        Q.   Well, would you look at the physician's
 5    orders for the 17th.
 6        A.   I believe you have those orders that you took
 7    back.
 8        Q.   I'm going to draw your attention to the
 9    orders on page 487 and 488.
10        A.   There's no written order that I can see in
11    the orders you showed me to identify that telemetry was

12    discontinued as written by a physician.
13        Q.   Okay.  Thanks.
14            Now, going on in your report, you write the
15    next paragraph, quote:
16                It is protocol in our hospital, which I
17            believe reflects the prevailing standard of
18            care, to transport a patient to radiology
19            without specialty personnel when that patient
20            is hemodynamically stable and not on any
21            hemodynamic or pulmonary monitoring, period,
22            end quote.
23            Do you see that?
24        A.   Yes.
25        Q.   Okay.  And first let me ask you, what is your
0161
1    definition of hemodynamically stable?
2        A.   I believe we've talked about that before.
3    That stability means no change in hemodynamics as
4    defined by vital signs, by blood pressure, pulse,
5    respirations over a period of time.  And that stability
6    period can be several hours, it can be several days.
7    Usually in this context we're talking about over a
8    period of a couple of days.
9        Q.   Okay.  So you're referring to when you talk
10    about stable, you're talking about change in those
11    signs as opposed to --
12        A.   Significance --
13        Q.   -- whether those parameters are within normal
14    range?
15        A.   No sir.  Normal range and stability might be
16    two different things.  Stable means no change of
17    significance.
18        Q.   Okay.
19        A.   Small variabilities in my world are not
20    terribly important.
21        Q.   What is your -- when you talk about
22    hemodynamic monitoring, what is that, in your
23    definition?
24        A.   Hemodynamic monitoring could be as simple as
25    the basic vital signs, blood pressure, pulse,
0162
1    respirations, or it can be very sophisticated in terms
2    of being invasive, a Swan-Ganz catheter, interior
3    indwelling line.
4            In this particular case, hemodynamic
5    stability would refer to the blood pressure and the

6    pulse.  And we also have the addition of a telemetry
7    monitoring, which adds to hemodynamic evaluation.
8        Q.  It would be correct for me to say that the
9    telemetry is hemodynamic monitoring -- is a form of
10   hemodynamic monitoring?
11       A.  It's a stretch past the basics, yes.
12       Q.  When you talk about pulmonary monitoring,
13   what is pulmonary monitoring, in your definition?
14       A.  Pulmonary monitoring includes respiratory
15   rate, evaluation of the lung sounds and oxygen
16   saturation.  And, of course, we can, again, become much
17   more sophisticated depending on the level.  But at the
18   basics, which this gentleman had, we're talking about
19   respiratory rate, and we're talking about oxygen
20   saturation.
21       Q.  So that would include pulse oximetry as
22   pulmonary monitoring?
23       A.  That would include pulse oximetry as
24   pulmonary monitoring.
25       Q.  You're aware of notations in the chart
0163
1    concerning the patient being transported to V/Q  for --
2    rather, transported to -- withdrawn.
3            You're aware of notations in the chart
4    concerning this patient undergoing a V/Q scan on the
5    morning of February 10th, 2001; correct?
6        A.  I remember that study, yes.
7        Q.  Okay.  And do you recall reading a
8    multispecialist note concerning that test?
9        A.  I do not recall that specific note.
10       Q.  All right.  It's on page 63 of the record,
11   but first I'm --
12           MR. LANNI:  Do you want to take a break?
13           MR. STOCKMAN:  I do, actually.
14           (Recess taken)
15       Q.  I'm just turning your attention now,
16   Dr. Teiger, to the February 10th note of the
17   multispecialist.  Do you have that in front of you?
18       A.  I see that note.
19       Q.  Do you see -- did you read that in
20   formulating your opinions in this case?
21       A.  I had read the note, yes.
22       Q.  First of all, do you know what a
23   multispecialist is, based on the materials you saw
24   regarding this case?
25       A.  Yes, I do.

0164
1    Q.   What is that?
2    A.   A multispecialist is a nurse who is
3    identified as somebody with knowledge in multiple
4    different organ systems, who can be used as a resource
5    for the nursing staff on the floor.
6    Q.   Okay.  In any event, this particular note on
7    page 63 refers to a multispecialist who accompanied the
8    patient to V/Q scan?
9    A.   That is correct.
10   Q.   Okay.  And when the patient was transported,
11   he had pulse oximetry monitoring?
12   A.   That is correct.
13   Q.   And he was also on cardiac monitoring;
14   correct?
15   A.   Yes, a monitor is referred to.
16   Q.   Do you know if there was any physician's
17   order in the chart regarding transporting this patient
18   with a multispecialist and these monitoring devices?
19   A.   I do not have a recollection of that.
20   Q.   Well --
21   A.   I'm not sure that the use of a
22   multispecialist requires a physician's order.
23   Q.   With regard to this particular note, it makes
24   reference to the -- the head of the patient's bed being
25   lowered for the test.
0165
1    A.   Could you show me where that is, please?
2    Q.   Yes, sure.  It's on the second to last line
3    of the note.
4    A.   "P.O. decreased to 88" --
5         "Pulse oximetry decreased to 88 percent
6         when head of bed down for test.  Oxygen
7         increased to 6 liters per minute with
8         improvement."
9    Q.   Okay.  In any event, with respect to that
10   aspect of the note, what happened when this patient --
11   the head of the bed was lowered for the test?
12   A.   The oxygen saturation dropped to 88 percent.
13   Q.   And the multispecialist undertook some type
14   of intervention in response to that?
15   A.   She turned the oxygen delivery up to 6 liters
16   per minute.
17   Q.   And what was it initially when she was --
18   before that event occurred?
19   A.   I'm looking for reference to that number, and

20   I don't see the number of oxygen saturation beforehand.
21       Q.   I'm going to help out here.  4 liters per
22   minute, it looks like.
23       A.   That's not a saturation.
24       Q.   I'm sorry, I meant the flow rate.  I'm sorry.
25       A.   Yes, I understand.
0166
 1       Q.   So the flow rate went for 4 liters a minute
 2   to 6 liters a minute at that time?
 3       A.   That's correct.
 4       Q.   Okay.  And the patient's oxygen saturation
 5   returned within an acceptable range, according to this
 6   note?
 7       A.   According to the note.
 8       Q.   Okay.
 9       A.   The nurse doesn't document what the oximetry
10   is when the oxygen was turned from four to six.  She
11   just says that it's an acceptable improvement of
12   pulse ox.  She doesn't give what the number is.
13       Q.   Does that note have any particular
14   significance to you in terms of the decrease in oxygen
15   saturation when the head of the bed is lowered?
16           MS. HUNT:  Object to the form.
17           MR. TIMOTHY GRADY:  Object to the form.
18           MR. STOCKMAN:  Objection.  You can
19         answer.
20       A.   Nothing terribly remarkable comes to mind.
21       Q.   Okay.
22       A.   Because we don't know what the oxygen
23   saturation was when we started.  We note that it
24   dropped to 88 percent, but we don't know if it was
25   90 percent when we started, and we don't know what the
0167
 1   improvement was when she went from four to six.
 2           The only comment I would make is this note
 3   compared to the note on the 17th, the patient's lungs
 4   were better on the 17th than they were at this point.
 5       Q.   Why do you say that?
 6       A.   Well, we note that there's an oxygen
 7   saturation of 88 percent, but the delivery is 4 liters.
 8   If you notice on the time of February 17th, the
 9   patient's oxygen saturation is described as 88 percent,
10   but the patient is only on 1 liter.  So that implies to
11   me that there has been significant improvement in
12   pulmonary function between the 10th and the 17th.
13       Q.   Is there -- to your recollection, is there

14    any other difference in this patient's condition
15    between the morning of February 10th and the morning of
16    February 17th when he was -- when he was scheduled for
17    the CT scan?
18              MR. STOCKMAN:  Objection.  You can
19        answer.
20              MR. TIMOTHY GRADY:  Objection.
21      A.   There are a multitude of differences between
22    the 10th and the 17th.
23      Q.   Go ahead.  Tell me what they are.
24      A.   For one thing, we know the patient had
25     pneumonia on the 10th and was treated with antibiotics,
0168
1     and his oxygen saturation was -- as I just mentioned,
2     seemed to be improved.
3              He had several days now of abdominal
4     distention, and he had Clostridium difficile,
5     C-l-o-s-t-r-i-d-i-u-m, next word d-i-f-f-i-c-i-l-e,
6     colitis, which is pseudomembranous colitis, a condition
7     that was probably induced by the use of antibiotics
8     which were used to treat his pneumonia.
9              He had what was felt to be narcotic bowel,
10     which was sluggish bowel, because of the chronic use of
11     narcotics to treat his pain from the fracture.  He had
12     atelectasis, and he had anxiety and generalized
13     discomfort from being in the hospital.
14              So his condition between the 10th and the
15     17th was materially different, but not necessarily
16     worse.  Just that he had other things going on.
17      Q.   When you say that he -- let me just --
18              MR. LANNI:  Off the record.
19              (Discussion off the record)
20              MR. LANNI:  Back on the record.
21      Q.   You say one of the differences is that he had
22     pneumonia.  You're saying he had pneumonia on the 10th,
23     and he didn't have pneumonia on the 17th?
24      A.   Attorney, he had a temperature of 102 and a
25     chest x-ray that showed pneumonia.  On the 17th, he'd
0169
1     been treated for several days for the pneumonia.  The
2     implication in my world of pulmonology is that the
3     pneumonia's probably still there and is being treated
4     and is in the process of resolving.
5              Pneumonias don't come and magically go.  They
6     take time to resolve, and I'm sure by the 17th there
7     was still some residual in the lung from his pneumonia,

8    which was being treated apparently successfully.
9        Q.  When you say -- when you say the pneumonia
10   was treated and -- I'm sorry, did you say resolving?
11       A.  The x-rays that were taken subsequent to the
12   10th showed atelectasis and not pneumonic infiltrate.
13   That means to me that the pneumonia was being treated
14   successfully and resolving.
15       Q.  Now, when was -- you're saying that the
16   resolving -- the pneumonia was resolving on the 10th?
17   Is that what you're saying?
18       A.  No, sir.
19       Q.  Okay.  You're saying it was resolving on the
20   17th?
21       A.  No, sir.
22       Q.  All right.  When are you referring to the
23   pneumonia resolving?
24       A.  I'm saying that the pneumonia was being
25   treated successfully, therefore, the pneumonia is
0170
1    resolving.
2        Q.  When is the pneumonia being treated
3    successfully?
4        A.  From the time he was placed on antibiotics
5    until the time that we're defining, which is the 17th.
6        Q.  Okay.  When was he placed on antibiotics?
7        A.  It's my understanding that he was treated
8    when he developed a temperature of 102 degrees and the
9    x-ray showed pneumonic infiltrates.
10       Q.  And when you say the x-rays showed pneumonic
11   infiltrates, which x-rays are you referring to?
12       A.  I would have to go back and look through the
13   record of which specific x-ray, and we can do that now
14   if you'd like.
15       Q.  Sure.  Of course.
16       A.  But there was a chest x-ray which showed
17   pneumonia.
18       Q.  Okay.
19           MR. STOCKMAN:  Do you have the radiology
20           reports there?
21       A.  I do have a specific recollection that there
22   was an x-ray report that said pneumonia.
23       Q.  I'm going to show you the chest x-rays for
24   February 8th through February 10th, and these are the
25   radiology reports appearing on the pages numbered 576
0171
1    through 579, and if you could just look at those.

2      A.   On February 8th, there is a report dictated
3   by Stewart Roberts which states in his impression:
4              "New bilateral perihilar and lung-based
5              infiltrates with elevation of the diaphragm
6              since 2/7/2001, which may be due to areas of
7              atelectasis or even aspiration pneumonia."
8      Q.   That's the 8th.
9           Okay.  What else?
10     A.   On February 10th, another x-ray report under
11  the impression states:
12             "Bilateral perihilar densities which may
13             represent infiltrate or suggestive changes."
14             The indication for this chest x-ray was for
15  shortness of breath.
16     Q.   So on -- on the chest x-ray of February 8th
17  of 2001, the impression is consistent with either
18  atelectasis or aspiration pneumonia, one or the other?
19     A.   According to the x-ray report.
20     Q.   Right.  And then the next one you referred
21  to, that's the one on the 9th -- I'm sorry, the one on
22  the 10th?
23     A.   Yes.
24     Q.   Is the word "pneumonia" used in the
25  impression on the 10th?
0172
1      A.   The word "infiltrates" is used.
2      Q.   I'm just asking was the word "pneumonia"
3   used?
4      A.   The word "pneumonia" is not used in this
5   x-ray report, but the word -- no, in the report from
6   the 12th you've showed me, Attorney.
7      Q.   The 12th?
8      A.   I mentioned the report from the 10th, and you
9   just handed me the report from the 12th.
10     Q.   No, sir.
11     A.   If you look at the bottom, that's --
12     Q.   Right, I understand that, sir, but there's
13  also a date and a time on there.  It says 2/10/01,
14  2:00 a.m.
15     A.   Perhaps you could pass me all the reports
16  that you have there, and I'll say what I referred to.
17             (Mr. Lanni complies)
18     A.   Is the chest x-ray --
19             MR. TIMOTHY GRADY:  Can we note the
20             pages in the chart?
21     A.   This is page 576.  And I refer to the x-ray

22   which is dated 2/8, 2001.
23     Q.   Yes.
24     A.   And the impression there is:
25           "A new bilateral perihilar and
0173
1         lung-based infiltrates, which may be due to
2         areas of atelectasis or even aspiration
3         pneumonia."
4         Then next referred to an x-ray done on 2/9,
5   and it was typed on 2/10, where the impression was:
6           "Bilateral perihilar densities, which
7         may represent infiltrate or congestive
8         changes."
9         We then referred to the report of 12/10,
10   which you handed to me last, which was transcribed on
11   February 12th, which states:
12           "Subsegmental atelectasis at the
13         periphery of the left base and minimal disk
14         atelectasis at the right base."
15         So this is a series of x-rays from the 8th,
16   the 9th and the 10th which demonstrate infiltrate
17   suggesting pneumonia.
18     Q.   Okay.  And can infiltrate be consistent with
19   anything else other than pneumonia?
20     A.   Yes, Attorney.
21     Q.   What else?
22         MR. STOCKMAN:  In this patient?
23     A.   In this patient or in the general field of
24   pulmonology?
25     Q.   Why don't we talk about this patient first.
0174
1     A.   Taken in the context of --
2         (Pager interruption)
3         (Recess taken)
4         THE WITNESS:  I have to have somebody
5         make this call.  I'll be right back.
6         (Record read)
7     A.   -- this patient, considering that the patient
8   developed a temperature of 102.4 documented on
9   February 10th, it is highly more likely than not that
10   the patient had an infectious disease pneumonia as the
11   result -- as identified by this infiltrate on chest
12   x-ray, and I think in this particular patient there
13   would be almost no other cause for the infiltrate.
14     Q.   All right.  And in general, are infiltrates
15   consistent with anything other than pneumonia?

16    A.  Infiltrates can occur from other reasons
17  besides infectious disease.
18    Q.  Such as?
19    A.  Such as inflammatory conditions, such as
20  hypersensitivity allergic conditions, such as
21  conditions due to aspiration of foreign bodies.  It all
22  depends on the context in which we're talking.
23    Q.  What are infiltrates, by the way?
24    A.  Infiltrates are identified on the chest x-ray
25  as abnormal shadows, which imply fluid within the
0175
1  alveolar interstitial space of the lung.
2    Q.  Can atelectasis cause infiltrates?
3    A.  Atelectasis on chest x-ray looks like
4  atelectasis, and infiltrates look like infiltrates.
5  They're really two different radiographic appearances.
6    Q.  Okay.  Was there any diagnosis of pneumonia
7  by any of his treating physicians in this chart?
8    A.  I don't recall any specific notes that said
9  the word "pneumonia."  However, the patient was placed
10  on antibiotics as a result of the findings, and as you
11  know, the V/Q scan done was negative for pulmonary
12  embolism.  The patient was treated for pneumonia with
13  antibiotics.
14    Q.  In all three of these radiology reports that
15  you cite on pages 476, 578 and 579, the impression
16  includes atelectasis?
17    A.  The radiologist is making a comment about the
18  differential diagnosis.
19    Q.  I'm saying the impression includes
20  atelectasis.
21    A.  Atelectasis is written on those reports.
22    Q.  Now, another difference that you cited was
23  Clostridium difficile colitis?
24    A.  Yes, sir.
25    Q.  That was present on the 17th?
0176
1      MS. HUNT:  Objection.
2    A.  The diagnosis was made several days earlier.
3  It is not clear whether the condition resolved, but as
4  we all know, the abdomen was still an issue.  The
5  abdomen was distended, and things were wrong, so it
6  would be assumed that the Clostridium difficile
7  pseudomembranous colitis was still present.  It takes
8  several weeks or months for the condition to resolve
9  after therapy is instituted sometimes.

10      Q.   Based on your review of the chart, was the
11   Clostridium difficile colitis either diagnosed or
12   present on the 10th?
13      A.   There was a culture report which was positive
14   for Clostridium toxin, but it was either the 10th, the
15   11th or the 12th.
16      Q.   And the issue of a narcotic bowel, was that
17   present on February 10th, or was it present on
18   February 17th, or was it present on both dates?
19      A.   The condition of the narcotic bowel was
20   considered and assumed in the differential diagnosis on
21   the basis of the prolonged abdominal difficulty.  The
22   patient received narcotics.  His bowel was sluggish.
23   The narcotics can cause sluggish bowel.  The diagnosis
24   is not a diagnosis that can be proven or disproven.
25   It's assumed based on the clinical picture entirely.
0177
 1      Q.   Was it assumed on the 17th?
 2      A.   I think narcotic bowel was assumed all the
 3   way through this patient's abdominal difficulty.
 4      Q.   Was it assumed on the 10th?
 5      A.   I think that that would have been too soon
 6   for the abdominal difficulty to have been appreciated.
 7      Q.   All right.
 8      A.   The abdominal difficulty occurred several
 9   days subsequent.
10      Q.   Okay.  And with regard to the anxiety and
11   generalized discomfort, was that present on the 17th?
12      A.   Yes.
13      Q.   Was it present on the 10th?
14      A.   I think not to the degree it was on the 17th.
15      Q.   All right.
16      A.   It progressed as time went on.
17      Q.   All right.  Other than what you just
18   testified to as being differences in his condition
19   between the 10th and the 17th, the pneumonia, the
20   Clostridium difficile colitis, the anxiety and
21   generalized discomfort and the narcotic bowel, any
22   other difference between those two dates?
23          MR. STOCKMAN:  As well as the other
24          things he cited earlier on in the definition
25          you're --
0178
 1      Q.   I don't recall any other difference, but go
 2   ahead.
 3          MR. STOCKMAN:  Objection.  You can

4        answer.
5     A.   The patient had pain.
6     Q.   I was talking about differences between the
7   10th and the 17th.
8     A.   The patient had pain.
9     Q.   He didn't have pain on the 10th?
10     A.   Of course he had, but it's a question of
11   degree.
12     Q.   What else?
13     A.   It is not clear exactly what his nutritional
14   status was, but the patient was weak as a result of
15   long hospitalization, and lack of P.O. intake.
16     Q.   That would be on the 17th as compared to the
17   10th?
18     A.   That was a part of his entire picture
19   throughout.
20     Q.   I'm just talking about differences between
21   the 10th and the 17th.
22     A.   The case has to be looked at as a continuum,
23   not as point to point.  Throughout this period, these
24   are ongoing, active medical problems which need to be
25   addressed.
0179
1     Q.   Okay.
2     A.   He had pneumonia, he had two surgeries, he
3   had a bowel difficulty, he had anxiety about being laid
4   up in the hospital.  There are a multitude of medical
5   problems that presented his clinical picture on the
6   17th.  And again, I state, as I did from the beginning,
7   this patient was stable but not well.  He had multiple
8   problems ongoing.
9     Q.   Now, is there any -- is there any other
10   difference in his clinical condition between the 10th
11   and the 17th from what you've -- aside from what you've
12   already testified to?
13     A.   I think those issues are the most prominent
14   ones.
15     Q.   Okay.  Was this patient at some degree of
16   risk for a pulmonary embolus on the morning of the
17   17th?
18     A.   Yes, he was.
19     Q.   Why?
20     A.   One of the most common inciting causes of
21   pulmonary embolism is prolonged immobility.
22   Additionally, he had an orthopedic fracture of a long
23   bone, and those are highly identified as precipitants

24   for the development of deep venous thrombosis and
25   subsequent pulmonary embolism.
0180
1      Q.   Based on your review of the materials, was
2   there anyone who was aware of this risk of pulmonary
3   embolus?
4           MS. HUNT:  Object to the form.
5           MR. STOCKMAN:  Objection.  You can
6       answer.
7      A.   Somebody thought about pulmonary embolism,
8   because a V/Q scan was ordered in this gentleman.
9      Q.   When?
10     A.   That was done on February 10th.
11     Q.   I'm talking about February 17th.  My question
12   was with regard to February 17th.  My question was,
13   let's -- so we're clear here, on the morning of
14   February 17th, was this patient at some degree of risk
15   for a pulmonary embolus?
16     A.   Yes.
17     Q.   Because he was immobilized for a significant
18   period of time; right?
19     A.   For all the reasons that I cited above.
20     Q.   Okay.  Now, based on the materials that you
21   reviewed, was there someone who was aware of this
22   pulmonary embolus risk on the morning of the 17th?
23           MS. HUNT:  Object to the form.
24           MR. TIMOTHY GRADY:  Object to the form.
25           MR. MICHAEL GRADY:  I object to the
0181
1       form.
2      A.   I think every physician who took care of him
3   was aware that a pulmonary embolism was a risk in this
4   patient.  I can't speak to what was in the mind of
5   every physician.  What I just cited are the known
6   standard worries of someone who is in prolonged
7   bedrest.
8      Q.   Was this -- withdrawn.
9           Did this patient have some prophylactic
10   measures in place concerning pulmonary embolus as of
11   the morning of the 17th?
12     A.   The patient had been treated with heparin.
13     Q.   Okay.  Do you recall seeing the insertion of
14   an IVC filter?
15     A.   Yes, I did.
16     Q.   That would be another prophylactic measure?
17     A.   Yes, it is.

18      Q.   With respect to the treatment with heparin,
19   as of the morning of the 17th, was this patient
20   therapeutically anticoagulated?
21      A.   I believe the answer is yes.  We can review
22   the anticoagulant data.
23      Q.   That's your recollection?
24      A.   To the best of my recollection, yes.
25      Q.   Is there any way for you to quantify the risk
0182
1   of pulmonary embolus in this patient as of February --
2   as of the morning of February 17th?
3      A.   The risk of him developing it?
4      Q.   Yes.
5      A.   I might use the term "worrisome."  If you
6   gave a scale of low, medium or high risk, I'd say he
7   was at moderately high risk for developing pulmonary
8   embolism.  He's the guy you worry about the most.
9      Q.   Okay.
10      A.   He needs to be in the hospital under
11   observation.
12      Q.   Monitored, also?
13      A.   Not necessarily, Attorney.
14      Q.   Now, you're of the opinion that there were no
15   departures from the standard of care with respect to
16   the code event on February 17th of 2001; correct?
17      A.   That is my opinion, yes.
18      Q.   And does that opinion encompass the issue of
19   the timeliness with which the code was called?
20      A.   I believe the time that the code was called
21   was extremely rapid, and participating people were on
22   the scene when the code occurred.
23      Q.   What is the basis of that statement?
24      A.   The basis of the statement is that the
25   patient was surrounded by professional medical
0183
1   personnel throughout the entire episode, as opposed to
2   him being found unwitnessed in the middle of a cardiac
3   arrest.  He was seen by radiology technicians.  A
4   physician was called and came to the scene immediately.
5   So his attention throughout the entire period, I think,
6   was immediate.
7      Q.   Okay.  Do you recall reading a neurology
8   consultation by a Dr. Culligan in this chart in which
9   he makes reference to the code measures?
10      A.   I have a recollection that I did read the
11   neurologist's report, but I certainly would appreciate

12    looking at it again for our discussion here.
13      Q.   Page 42 of the record.
14      A.   In front of me now is a consultation written
15    by Dr. Neil Culligan and dated February 18th, 2001,
16    which is 24 hours or so after the cardiac arrest.
17      Q.   And a portion of that report, he writes,
18    quote:
19            A code 99 was called, and the code team
20            responded.  According to the residents,
21            possibly ten minutes may have passed before
22            effective CPR was initiated, period, end
23            quote.
24            Do you see that?
25      A.   I see that reference.
0184
1      Q.   Assuming -- let's assume for the moment, for
2    argument's sake, that that's correct.  Do you have an
3    opinion with a reasonable degree of medical probability
4    as to whether that is a departure from the standard of
5    care, that period of ten minutes?
6      A.   I don't think this is a standard-of-care
7    issue, Attorney.
8      Q.   Why not?
9      A.   Because the implication would be that the CPR
10    was done not correctly by technique, rather than
11    somebody was not attending to him.  So I'm not sure how
12    to answer the question except to look at it a little
13    bit differently.
14      Q.   In other words, you're reading this as a
15    question of technique?
16      A.   Well, ten minutes of ineffective CPR, when we
17    know that he was surrounded by medical personnel at the
18    time the event occurred, implies that the CPR was done
19    incorrectly, ineffective CPR, or before effective CPR
20    was done.
21            So there's a period of ten minutes where
22    medical personnel who know how to do CPR are in the
23    room, but the tech -- but effective CPR wasn't done,
24    and that doesn't make sense to me.  So this is, to me,
25    hearsay information rather than correct information.
0185
1      Q.   Okay.
2      A.   The neurologist may have assumed that nothing
3    was done for ten minutes, and the neurologist may not
4    have had an understanding of all the events that we
5    know to be correct based on other data.

6      Remember, this note is written only 24 hours
7  after the event, and we're reconstructing here. So I
8  take that comment by the neurologist as less than
9  helpful to me.
10      I do know, from all the other depositions
11  that we have and all the other data, that this man was
12  surrounded by personnel, and that a physician was there
13  immediately, and the code team was called immediately.
14  Therefore, to me, effective CPR was started right away
15  within seconds, not with a delay of ten minutes.
16    Q.  All right. Well, if --
17    A.  That may be my incorrect interpretation, but
18  my suggestion is that this is hearsay information
19  passed in the hallway and not corroborated by any
20  substantial fact.
21    Q.  Well, it appears that he's receiving this
22  information from residents; correct?
23    A.  In a hospital environment, codes develop with
24  multiple residents running in and having varying
25  degrees of responsibility. The information may have
0186
1  been passed from a peripheral resident who heard from a
2  technician, who heard from the nurse something.
3      So we gather information as best as we can at
4  the particular time. I would suggest to you that this
5  note may be less than helpful, because the total data
6  is not available to the neurologist who wrote it.
7    Q.  Well, if what Dr. Culligan writes here is
8  correct, that ten minutes may have passed before
9  effective CPR was initiated, all right, would that be a
10  departure from the standard of care? I'm just asking.
11    A.  Again, I'm not sure how to answer that, and
12  I'm not trying to be difficult. To me that would mean
13  that the CPR that was done was done incorrectly with
14  bad technique if the CPR was ineffective. The people
15  were there, but they weren't doing it effectively.
16  Therefore, of course, that would be a departure from
17  standard of care, but code teams know how to do CPR.
18    Q.  Here, in the report of Dr. Hindes,
19  H-i-n-d-e-s, on page 46 he writes, quote:
20        It is estimated that approximately ten
21        minutes may have passed before effective CPR
22        was established, period, end quote.
23      And what is your understanding of that
24  statement, if you have one?
25    A.  Well, again, the information may be passed

0187
1    from one physician to another.  Dr. Hindes may have
2    read the neurologist's report and copied the data.
3         Again, my comment is that unless I read all
4    the information incorrectly, the truth of the matter
5    was that effective CPR was begun immediately.
6        Q.  Okay.
7        A.  Because the qualified personnel were there.
8        Q.  Did you review the report, the handwritten
9    report of Vanessa Saipher, the radiology technician?
10        A.  I believe I reviewed all the medical records,
11    but my recollection does not help me recall that
12    specific name.
13            MR. STOCKMAN:  You gave it to him at the
14            first deposition.  We've already been over
15            that with him a little bit.  He read it at
16            the last deposition.
17            MR. LANNI:  I don't know he read it.
18            MR. STOCKMAN:  You had him take the time
19            and read it again.
20            MR. LANNI:  You're probably correct.
21            All right.
22        Q.  This was actually marked as Plaintiff's
23    Exhibit 2 at the last deposition.
24        A.  Okay.
25        Q.  I'm just asking you if you could read that
0188
1    over.
2            (Pause in the proceedings)
3        A.  I've read this report now.
4        Q.  Okay.  And just -- let's just go over that
5    report, because I want to ask you some questions about
6    it.  In the report Ms. Saipher writes:
7            Joe Roth, the transporter, and myself
8            lowered the stretcher and pulled him
9            across -- to the table.  Almost immediately
10            after the move, he started flailing, gasping
11            for breath.  He said he couldn't breathe and
12            became cyanotic, end quote.
13            Do you see that?
14        A.  Yes, I do.
15        Q.  And first of all, what is cyanosis?
16        A.  Cyanosis is the skin manifestation of low
17    oxygenation in the blood.  It's characterized by deep
18    dark blue or purple discoloration of the skin, and
19    suggests a lack of oxygenation of hemoglobin.

20      Q.   Usually this cyanosis is observed in the
21   face?
22      A.   It can be observed in the lips.  It can be
23   observed in the fingertips, in the toes, and as it
24   progresses, it becomes manifest in all parts of the
25   skin.
0189
1      Q.   Okay.  And can cyanosis be consistent with
2   hypoxemia?
3      A.   It is consistent with hypoxemia, unless we're
4   talking about met methemoglobinemia, but that's not
5   pertinent to this case.
6      Q.   Do you ever use the term "acute respiratory
7   distress"?  Do you ever use that term?
8      A.   Always.  In my field, that's common.
9      Q.   The fact that this patient began gasping for
10   breath and became cyanotic, is that consistent with
11   acute respiratory distress?
12      A.   In this case it is a picture of acute
13   respiratory distress.
14      Q.   Is there any reference in Ms. Saipher's note
15   that you have in front of you to the cyanosis
16   dissipating prior to the arrival of the code team?
17      A.   There's no reference to that.
18      Q.   Okay.  Now, continuing on with the note,
19   there's a portion in there that reads, quote:
20           Joe hooked him to the pulse ox.  The
21           reading was 79 or 80, end quote.
22           Do you see that?  It's about three-quarters
23   of the way down the page.
24      A.   Yes, I do.
25      Q.   Okay.  And that makes reference to a pulse
0190
1   oximetry reading?
2      A.   Yes, it does.
3      Q.   And the fact that the pulse oximetry reading
4   shows a 79 to 80 percent oxygen saturation, does that
5   have any particular significance to you?
6      A.   The number is low and not acceptable and
7   should be treated, but it is not terribly low.
8      Q.   Is there any reference to the pulse oximetry
9   reading improving prior to arrival of the code team in
10   this note?
11      A.   I see no evidence for that in this particular
12   report, no.
13      Q.   Okay.  Now, in the report, it talks about,

14   quote:
15           Joe reached for an oxygen mask and
16      covered his face, end quote.
17           Do you see that portion of the report?  It's
18   about midway through.
19      A.   Yes, I do.
20      Q.   Is there any reference to use of supplemental
21   oxygen on this patient in this report prior to that
22   notation?
23      A.   In other words, you're asking me whether this
24   particular report documents that the patient had been
25   transported or was receiving oxygen prior to what she
0191
1   documents here?
2      Q.   Well, let me be more specific.  All right.
3   From the time that he's laid on this table, according
4   to this note, up until the time that Joe takes the
5   oxygen mask and puts it on his face, is there any
6   reference to the patient receiving supplemental oxygen?
7      A.   There's none in this report, no.
8      Q.   Okay.  Did you read the deposition of Vanessa
9   Saipher?  Is that in your report?
10      A.   I have listed in my letter that I read
11   Vanessa's report, which is number 5.
12      Q.   Okay.
13      A.   I don't have the specific deposition with me,
14   and it's mixed in with all my other depositions.
15      Q.   Do you recall any testimony about the
16   circumstances under which she would call a code?
17      A.   I believe that was a part of the discussion
18   in the deposition.
19      Q.   Do you recall what she specifically testified
20   to?
21      A.   No, sir, I do not.
22      Q.   Based upon the materials that you reviewed,
23   is there any way that you can identify the approximate
24   time that this patient began to experience his
25   respiratory distress, his acute respiratory distress?
0192
1      A.   We'd have to refer most accurately to the
2   code sheet timing, which identified when the code
3   began.  And it's my understanding and implication that
4   the difficulty that this gentleman developed was
5   literally minutes before the actual code developed.
6   There's nothing to suggest to me that there was a
7   prolonged period of time of difficulty here where he

8   was being cyanotic and not attended to.
9       Q.   All right.
10      A.   The implication is things happen very
11  rapidly, and this was acute respiratory distress.
12      Q.   All right.  Could you just put in front of
13  you Plaintiff's Exhibit 5.  I believe it's the Patient
14  Transportation Log.
15              MR. STOCKMAN:  We've got the
16          Transportation Scheduling Sheet.  I've also
17          put in front of him the handwritten code
18          sheet and the Hospital Operator Emergency
19          Code.
20              MR. LANNI:  Thank you.  You anticipated
21          what I was going to produce.
22      Q.   Based on -- first of all, the Patient
23  Transportation Scheduling Sheet has a reference to the
24  time 12:56.  In fact, it's circled.  Do you see that?
25      A.   Yes, I do.
0193
1       Q.   And did you review the deposition testimony
2   of a Lorissa Howard?
3       A.   There is a deposition of a Vanessa Howard.
4       Q.   I think it's Lorissa, L-o-r-i-s-s-a, but you
5   may have written it down as Vanessa.
6              MR. STOCKMAN:  Yes, it's Lorissa.
7       Q.   For the record, it's Lorissa Howard.
8       A.   Okay.
9       Q.   Do you recall testimony about what the 12:56
10  time refers to?
11      A.   I have to admit, Attorney, I don't remember
12  specifically.  On the sheet it implies that that's when
13  the patient was returned, but we know that the code
14  progressed through 1:45, so I don't think that's
15  correct.
16      Q.   And did you review the deposition of a
17  Dorothy Triano.  It's item 17 on your list.
18      A.   That is one of the depositions that was made
19  available to me.  Her name is Dot.
20      Q.   Dot or Dorothy.
21      A.   Uh-huh.
22      Q.   Do you recall whether she testified about
23  this 12:56 notation?
24      A.   Again, to the best of my recollection, I did
25  review all of this information at the time, but if we
0194
1   want to go over specifics, I think you need to refer

2    back to the deposition itself.

3        Q.   All right.  I'm not going to get into it with

4    you with respect to their deposition testimony.

5            The code sheet indicates -- the Code 99 Flow

6    Sheet indicates the code being called at 1:02 p.m.?

7        A.   I see the time is 1:05.

8        Q.   Well --

9        A.   She started recording -- the time is 1:05 up

10   here.

11           (Discussion off the record)

12       Q.   I'm sorry.  I think my question was:  With

13   respect to this code sheet, there's a time that says

14   1:02 p.m.  Do you see that there?

15       A.   I do.

16       Q.   Do you know what that refers to?

17       A.   It is the time at which the code began.

18       Q.   So when it was called?

19       A.   Not necessarily.  I don't see where that is

20   implied by that timing here.

21       Q.   Okay.  Do you recall the -- any testimony

22   regarding what that 1:02 p.m. means?  Do you recall any

23   testimony about that?

24       A.   No, I don't.

25       Q.   All right.  And then --

0195

1        A.   But that's not information that would be

2    difficult to find.

3        Q.   I understand.

4            And then the Hospital Emergency Code Log,

5    which is Plaintiff's Exhibit 4, does that give a time

6    for the calling of the code?

7        A.   The Hospital Operator Emergency Code Log

8    identifies February 17th at 1:04 p.m. as the time that

9    a code 99 was called.  The location was 3T CAT scan,

10   and the time paged was 1:04 as well.

11       Q.   Okay.  Do you recall in the deposition of

12   Vanessa Saipher any testimony with regard to the source

13   of the supply of supplemental oxygen that she gave to

14   this patient before he was transported from the room?

15   Do you recall any testimony about that?

16       A.   I do remember that there was a discussion

17   about the oxygen canister and whether it was a portable

18   oxygen and where it was located, and it was located

19   underneath the stretcher, underneath the bed.

20       Q.   Do you recall any testimony regarding the

21   mask, the oxygen mask that is referred to in her note,

22  being connected to a wall unit?  Do you recall any
23  testimony about that?
24      A.  I remember there were issues about where it
25  was connected and issues about whether there was a mask
0196
1  or a nasal cannula.  The patient was transported on a
2  nasal cannula.
3      Q.  Do you recall any testimony about whether
4  that -- whether the oxygen supply or the oxygen source
5  was disconnected from the wall unit when the patient
6  was removed from the CT scan room on the stretcher?  Do
7  you recall any testimony about that?
8      A.  Removed from the CT scan on the stretcher?
9  He was wheeled, when he was developing distress, into
10  the hallway and then wheeled back in, too, by the time
11  he had respiratory distress and an oxygen mask had been
12  placed.
13      Q.  I think if you read Ms. Saipher's note, he
14  develops the respiratory distress in the CT scan room;
15  correct?
16      A.  (No audible response)
17      Q.  Correct?
18      A.  Correct.
19      Q.  And then at some point he's wheeled out of
20  the room, according to this note?
21      A.  And that is correct.
22      Q.  Okay.  And I'm just asking, do you recall her
23  testimony about use of a wall source of oxygen for the
24  mask?  Do you recall that?
25      A.  Yes.
0197
1      Q.  And do you recall her testimony about whether
2  that was disconnected when he was wheeled out of the
3  room?
4          MR. STOCKMAN:  Objection.
5      Q.  Do you recall any testimony about that issue?
6          MR. STOCKMAN:  Objection.  You can
7      answer.
8          MR. LANNI:  I'm just asking if he
9      recalls.
10      A.  Let me see if I can explain to you what I
11  understand the sequence of events happening.  The
12  patient was wheeled down from the floor to the CAT scan
13  on nasal oxygen with a supplemental supply as part of
14  the stretcher.
15          That oxygen supply would be transferred from

16    the portable unit to a wall unit as the patient is
17    being moved from the stretcher to the CT scan gurney.
18    They would not use the tank that was on the patient's
19    stretcher for the supplemental oxygen.
20         Therefore, there would be a transfer from the
21    nasal oxygen supplied by the stretcher tank to the mask
22    oxygen supplied by the wall.  And if he were being
23    transported from the stretcher to the CAT scan, the
24    mask with the wall supply would be used for the
25    procedure, and not the oxygen canister on the
0198
 1    stretcher.
 2         So all this seemed to me by documentation to
 3    be in the process of the transport -- of the transfer
 4    of the patient from the stretcher to the CAT scan
 5    gurney, use of the supplemental oxygen on the transport
 6    stretcher to the wall oxygen with the mask, and all of
 7    this seemed to occur with a reasonable amount of
 8    rapidity as part of the routine when you transfer a
 9    patient from a stretcher to the CAT scan gurney,
10    CAT scan machine.
11      Q.  Okay.
12      A.  And that's my understanding.
13      Q.  What is the basis of your statement here that
14    this patient was receiving oxygen via nasal cannula
15    from the time that he was moved from the gurney to the
16    CAT scan table?  What is the basis of that?
17      A.  He may not have been receiving oxygen during
18    that period of time.  I think we're talking about a
19    very short period of time.
20      Q.  I'm just asking.  I'm just asking.
21      A.  It's very possible that one oxygen source was
22    taken off and another one was put on.  That would be
23    the implication to me.
24      Q.  Okay.
25      A.  Of course, these are the details that are --
0199
 1    are so trivial that they're not documented, but I think
 2    my statement to you is that's how things are done.
 3      Q.  I don't think they were trivial to
 4    Mr. Guigliano.
 5      A.  The event was not trivial, Attorney, but the
 6    documentation is difficult.
 7      Q.  So you say.
 8         Can you tell us what was the progression of
 9    events physiologically to the cardiopulmonary arrest in

10    this patient?
11       A.   The patient developed hypoxemia, and a
12    cardiac arrest developed.
13       Q.   Was there -- between the development of
14    hypoxemia and the cardiac arrest, was there a
15    respiratory arrest?
16       A.   The events that were described was that of a
17    seizure.  Cardiopulmonary arrest usually occurs
18    simultaneously, but a seizure developed, and a code was
19    called.
20       Q.   All right.  The Code 99 Flow Sheet, which you
21    had in front of you the other -- just a few moments
22    ago, does it make any reference to the reason for the
23    code?  I'm going to draw your attention to the upper
24    left-hand corner.
25       A.   The check is for respiratory.
0200
 1       Q.   Right.  What does that indicate to you?
 2       A.   That means that the most compelling
 3    observation was that the patient had a respiratory
 4    event.
 5       Q.   When you say "respiratory event," what are
 6    you referring to?
 7       A.   Breathing was difficult, cyanosis was a
 8    problem.  We know that the patient was not being
 9    monitored at the time of the event, so I cannot comment
10    about whether there was a cardiac event primarily.
11          As you know, a cardiac rhythm problem can
12    cause similar difficulty, but the implication is
13    respiratory is the reason for the code.
14       Q.   Okay.  Is that your opinion, too?
15       A.   I think the data that we have here supports
16    that, yes.
17       Q.   Do you have an opinion with a reasonable
18    degree of medical probability as to the causes of the
19    hypoxemia that led to the cardiac arrest?
20          MS. HUNT:  Object to the form.
21          MR. TIMOTHY GRADY:  Objection to the
22          form.
23          MR. STOCKMAN:  Objection.  You can
24          answer.
25       A.   I have some opinions as to why all this
0201
 1    developed, yes.
 2       Q.   Please tell me.
 3       A.   I believe that the cardiac arrest developed

4    as a result of multiple difficulties, primarily the
5    respiratory compromise that was occurring as a result
6    of abdominal distention, primarily.  He also had
7    compromised lung function, as we know, and that was
8    defined earlier.  Anxiety may have played a component
9    here, and there may be other factors as well which have
10   not been defined.
11       Q.  Okay.  Just so I can clarify, other than the
12   abdominal distention, what other factors contributed to
13   the respiratory compromise at this point in time?
14       A.  Well, we know that anxiety was a big issue in
15   this gentleman.  And as I mentioned, there may have
16   been other factors, including circulatory difficulty,
17   hypotension.  One consultant suspected a new pulmonary
18   embolism.  I'm not sure we know all the data here.  But
19   his respiratory condition was compromised, and he
20   became cyanotic and arrested.
21       Q.  Okay.  What, if any, clinical evidence is
22   there to support circulatory difficulties as a cause?
23       A.  We don't have any data to support one way or
24   the other.
25       Q.  Same question with respect to hypotension.
0202
1        A.  We don't have any data to support one way or
2    the other.
3        Q.  New pulmonary embolus, same question.
4        A.  Again, we don't have any data to support one
5    way or the other.
6        Q.  Okay.
7        A.  But these issues are in the differential
8    diagnosis of what was observed.
9        Q.  Understood.
10           Based on your knowledge as a pulmonologist,
11   what, if any, medical intervention can be undertaken
12   to -- withdrawn.
13           Based on your knowledge as a pulmonologist,
14   what, if any, medical intervention can be undertaken
15   to -- in an attempt to prevent hypoxemia from
16   progressing to a cardiac arrest?
17           MR. STOCKMAN:  Objection.  You can
18           answer.
19       A.  It, obviously, depends on the situation.
20   Sometimes there's nothing you can do.  When hypoxemia
21   develops, you try and treat the cause, whatever that
22   may be.  You give supplemental oxygen.  You use a
23   ventilator, if necessary, before a cardiac arrest

24   develops.
25        Again, you try and find the cause, if it's
0203
1   identifiable, and with rapidity and see if that can be
2   a reversible, treatable phenomenon.
3        In this particular case, things happened so
4   rapidly, that the development of a cardiac arrest may
5   have been totally unpreventable.
6     Q.   Can you tell us how much time transpired from
7   the onset of hypoxemia to the onset of the cardiac
8   arrest?
9     A.   To me, the event seemed to have occurred
10   within an extremely short period of time, and I would
11   say in terms of minutes.
12    Q.   Can you be more specific than "minutes"?
13    A.   I can't.
14    Q.   Less than five?
15    A.   I think less than five would certainly be
16   reasonable. From the time this gentleman developed
17   agitation and respiratory difficulty to the time of his
18   seizures may have been one to two minutes.
19    Q.   What do you base that on?
20    A.   I base that on the fact that the technician
21   made the attempt to move him from the stretcher to the
22   CT scan, and he was unable to tolerate that for a
23   moment, at which point she said, "We can't do this."
24        And from that time until the time he
25   developed a seizure seemed to be, by the report that
0204
1   we've just -- the handwritten report that we've read, a
2   very short period of time.  And if I understand the
3   scenario correctly that's been described, I think we're
4   talking in terms of less than five minutes; perhaps one
5   to two minutes.
6     Q.   Between the time that this patient -- between
7   when this patient developed acute respiratory distress
8   up until the time that he had his seizure, what, if
9   any, medical intervention was undertaken?
10    A.   Nothing, except for the delivery of oxygen, I
11   think.
12    Q.   Is there any indication as to the flow rate
13   of the oxygen that he was receiving through the mask?
14    A.   I can't be sure that I know that there was an
15   indication.
16    Q.   Okay.
17    A.   I'm not even sure I know what the source of

18   the oxygen was at that time, but I assumed that he was
19   put back on the stretcher and moved away from the wall.
20   So it would be the stretcher oxygen.
21       Q.   The last time we were here, on February 28th,
22   I believe it was Mr. Stockman gave me this article;
23   correct?
24            MR. LANNI:  Is that true?
25            MR. STOCKMAN:  I'm not under oath here,
0205
1        Joe.
2            MR. LANNI:  I'm just asking.
3            MR. STOCKMAN:  The article was given to
4        you by the doctor, actually.
5            MR. LANNI:  It was given to me by the
6        doctor.  I thought you handed it to me.
7            MR. STOCKMAN:  The doctor provided that
8        to the attorney or vice versa.  We're all in
9        possession of the article now.
10           MR. LANNI:  Off the record.
11           (Discussion off the record)
12       Q.   This article you had given Mr. Stockman, and
13   I believe you had given me a copy?
14       A.   Yes.
15       Q.   And is this an article that you reviewed in
16   coming -- in formulating your opinions in this case?
17       A.   This happens to be an article that we came
18   across that may be timely with respect to this
19   particular case.  It was published in JAMA on
20   January 4th, 2006, and by that time I had already been
21   involved with the evaluation of this case, and it
22   seemed to be timely, and we identified this as a
23   perhaps meaningful reference with regard to this case.
24       Q.   And we'll mark it as Plaintiff's Exhibit 6 at
25   the end of this deposition, but just to save time, with
0206
1    respect to this article, its subject is the
2    survivability of in-hospital cardiac arrest?
3        A.   Yes.
4        Q.   And with regard to the article, it discusses
5    statistics of survivability of in-house cardiac
6    arrests?
7        A.   I believe that's correct, yes.
8        Q.   And in the first page, there's reference to
9    some statistics regarding survivability?
10       A.   Yes.
11       Q.   And the article makes reference, in part, to

12  patients who have pulseless electrical activity or
13  asystole as part of their cardiopulmonary arrests?
14      A.  Yes.
15      Q.  If you could turn to page 55, and in the
16  left-hand column of the text, it talks about arrests
17  being associated with progressive respiratory failure,
18  circulatory shock or both.  Do you see that?
19      A.  Yes, I do.
20      Q.  And first of all, what is progressive
21  respiratory failure?
22      A.  It's a term we use to identify the worsening
23  of respiratory function over a period of time.  It may
24  be a short period of time or it may be a long period of
25  time, but usually in the context of these discussions,
0207
1  it's hours or days rather than months or years.
2      Q.  I see.  And the reference to circulatory
3  shock, what is that?
4      A.  Shock is identified as blood pressure which
5  is so low that critical organs are not perfused
6  adequately to allow function, such as the brain, the
7  kidneys and the heart.
8      Q.  Okay.  And --
9      A.  Circulatory shock is the lack of blood supply
10  adequately to these organs.
11      Q.   And the next column of the text, there's a
12  portion of the text which reads, quote:
13              Although asystole and PEA are often
14          considered futile cardiac arrest rhythms,
15          substantial numbers of children and adults
16          survive to hospital discharge.
17          And it quotes 24 percent and 11 percent,
18  respectively.
19      A.  Yes.
20      Q.  Do you agree with that statement?
21      A.  It's not for me to agree or disagree.  This
22  is a researched text, and this is their data.  So I
23  read the data and understand it, and say that this
24  makes medical sense.
25      Q.  Okay.
0208
1      A.  I'm not sure that I can agree or disagree.
2      Q.  Okay.  How many patients do you recall were
3  part of this study?
4      A.  The numbers who were identified are in the
5  thousands.  There were 8,361 adults who had pulseless

6    electrical activity.  There were 13,024 adults with
7    asystole.  So the numbers are fairly large, and the
8    statistical reliability is fairly high.
9        Q.   Is there any classification of the patients
10   in this study by underlying medical condition?
11       A.   I would consider this more a generic study of
12   cardiac arrest rather than cardiac arrest by cause.
13       Q.   I understand.
14           Now, on page 56 of the article, there is
15   some, what appear to be, conclusions that are drawn by
16   the authors of the study about implications for
17   in-hospital care?
18       A.   Yes.
19       Q.   And one of those conclusions is that focus
20   should be on training directed to a rapid recognition
21   and treatment of respiratory failure and shock.  That's
22   one of the conclusions.
23       A.   I think the implications are really
24   self-evident and are not telling us anything
25   earth-shattering or startling.
0209
1        Q.   That's something you would agree with?
2        A.   Of course.  Of course.
3        Q.   Whatever event or whatever cause of this
4    patient's cardiopulmonary arrest, Mr. Guigliano, would
5    you agree that that event was survivable in this
6    patient?
7            MR. STOCKMAN:  Objection.
8            MR. TIMOTHY GRADY:  Objection to form.
9        A.   That's such a difficult question to answer,
10   Attorney.  Cardiac arrests are always life-threatening,
11   and there are times when we successfully resuscitate
12   patients who develop cardiac arrest.  So, God willing,
13   this may be survivable, and in this gentleman it was
14   not.
15       Q.   Well, he didn't die --
16       A.   He survived the cardiac arrest, yes.  He was
17   successfully resuscitated.
18       Q.   Okay.  And he survived for another two and a
19   half years, approximately?
20       A.   Yes, sir, with deficits, as we know.
21       Q.   Right.
22           MR. LANNI:  I have no further questions.
23           MR. TIMOTHY GRADY:  Can we take a quick
24           break?
25           (Article entitled "First Documented

0210
1          Rhythm and Clinical Outcome From In-Hospital
2          Cardiac Arrest Among Children and Adults"
3          marked Plaintiff's Exhibit 6 for
4          identification)
5              (Discussion off the record)
6              MR. STOCKMAN:  We're going to adjourn
7          now at 5:00 o'clock, and I'm agreeing to
8          bring the witness back.  I may have some
9          questions.  The other defendants may have
10          some cross-examination, and we'll bring the
11          witness back, if requested, for a period of
12          time adequate to provide them the opportunity
13          to cross-examine.
14              MR. TIMOTHY GRADY:  So agreed.
15              MR. MICHAEL GRADY:  That's fine.
16              MR. LANNI:  So agreed.  Whatever
17          testimony at another session, I'm not --
18          plaintiff is not going to take responsibility
19          for paying for.
20              MR. STOCKMAN:  That's fine.
21              (Time noted:  5:00 p.m.)
22              (Jurat follows on page 212, no omission)
23
24
25
0211
1

                    VOLUME II
2
    IN THE UNITED STATES DISTRICT COURT
3
    FOR THE DISTRICT OF CONNECTICUT
4    - - - - - - - - - - - - - - - - - - x

5    LAURA GUIGLIANO, as Administrator   :
    of the Estate of Michael Guigliano,
6    Deceased, and LAURA GUIGLIANO,       :
    individually,
7                                    :
            Plaintiffs,
8                            : Case No.
        vs.
9                            : 3:02 CV 718
    DANBURY HOSPITAL, J. BORRUSO,
10    M.D., JOSEPH CATANIA, M.D., and     :

DANBURY SURGICAL ASSOCIATES, P.C.,

11                           :

          Defendants.

12                           :

- - - - - - - - - - - - - - - - - - x

13          With the addition of the changes, if

14      any, indicated on the attached errata sheet,

15      the foregoing is a true and accurate

16      transcript of my testimony given in the

17      above-entitled action on April 7, 2006.

18      _____

                 MICHAEL B. TEIGER, M.D.

19

          Subscribed and sworn to before me, the

20

      undersigned authority, on this the _____ day of

21

      _____, 2006.

22

          _____

23                 Notary Public

24   My commission expires:

25

0212

1                 I N D E X

2

                 EXAMINATIONS

3

                                    Page

4

      Direct examination by Mr. Lanni (Continued) ........ 86

5

6          PLAINTIFF'S EXHIBITS FOR IDENTIFICATION

7   No.  Description                      Page

8   1    Article entitled "First Documented Rhythm and  211

          Clinical Outcome From In-Hospital Cardiac

9        Arrest Among Children and Adults"

10

11

12

13

14          (Exhibit retained by Mr. Lanni)

15

16

17

18

19
20
21
22
23
24
25
0213
1              C E R T I F I C A T E
2
3          I hereby certify that I am a Notary Public,
4    in and for the State of Connecticut, duly commissioned
5    and qualified to administer oaths.
6          I further certify that the deponent named in
7    the foregoing deposition was by me duly sworn, and
8    thereupon testified as appears in the foregoing
9    deposition; that said deposition was taken by me
10   stenographically in the presence of counsel and reduced
11   to typewriting under my direction, and the foregoing is
12   a true and accurate transcript of the testimony.
13          I further certify that I am neither of
14   counsel nor attorney to either of the parties to said
15   suit, nor am I an employee of either party to said
16   suit, nor of either counsel in said suit, nor am I
17   interested in the outcome of said cause.
18          Witness my hand and seal as Notary Public
19   this _____ day of _____, 2006.
20
21          _____
                      Bonita Cohen
22                    Notary Public
23   My Commission expires:
     November 30, 2007
24
25