```
0213
 1            VOLUME III
 2   IN THE UNITED STATES DISTRICT COURT
 3   FOR THE DISTRICT OF CONNECTICUT
     - - - - - - - - - - - - - - - - - x
 4
     LAURA GUIGLIANO, as Administrator   :
 5   of the Estate of Michael Guigliano,
     Deceased, and LAURA GUIGLIANO,     :
 6   individually,
                                         :
 7           Plaintiffs,
                         : Case No.
 8      vs.
                         : 3:02 CV 718
 9   DANBURY HOSPITAL, J. BORRUSO,
     M.D., JOSEPH CATANIA, M.D., and    :
10   DANBURY SURGICAL ASSOCIATES, P.C.,
                                         :
11           Defendants.
                                         :
12   - - - - - - - - - - - - - - - - - x
13
14        Continued deposition of MICHAEL B.
15        TEIGER, M.D., taken pursuant to the
16        Federal Rules of Civil Procedure, at the
17        Offices of Pulmonary Internal Medicine
18        Associates of Greater Hartford, 1000 Asylum
19        Avenue, Hartford, Connecticut, before Bonita
20        Cohen, a Registered Merit Reporter and Notary
21        Public in and for the State of Connecticut,
22        License Number 00041, on Wednesday, May 31,
23        2006, at 10:27 a.m.
24
25
0214
 1
 2          A P P E A R A N C E S
 3
     THE LAW FIRM OF JOSEPH LANNI, P.C.
 4   Attorneys for the Plaintiffs
     Suites 6-8
 5   138 Chatsworth Avenue
     Larchmont, New York  10538
 6   (914) 834-6600
       By:  JOSEPH LANNI, Esq.
```

```
 7
 8   NEUBERT, PEPE & MONTEITH, P.C.
     Attorneys for the Defendant Danbury Hospital
 9   13th Floor
     195 Church Street
10   New Haven, Connecticut  06509-1940
     (203) 821-2000
11       By:  MAUREEN SULLIVAN DINNAN, Esq.
12
     RYAN, RYAN, JOHNSON DeLUCA, LLP
13   Attorneys for the Defendant J. Borruso, M.D.
     80 Fourth Street
14   P.O. Box 3057
     Stamford, Connecticut  06905-0057
15   (203) 357-9200
         By:  BEVERLY J. HUNT, Esq.
16
17   RENDE, RYAN & DOWNS
     Attorneys for the Defendant Dr. Kessler
18   202 Mamaroneck Avenue
     White Plains, New York  10601
19   (914) 681-0444
         By:  MICHAEL GRADY, Esq.
20
21
22
23
24
25
0215
 1
             A P P E A R A N C E S (cont'd)
 2
 3
     HALLORAN & SAGE, LLP
 4   Attorneys for the Defendant Joseph Catania, M.D.
     One Goodwin Square
 5   225 Asylum Street
     Hartford, Connecticut  06103-4303
 6   (860) 522-6103
         By:  TIMOTHY J. GRADY, Esq.
 7
 8
 9
10
11
```

12
13
14
15
16
17
18
19
20
21
22
23
24
25
0216
1        M I C H A E L  B .  T E I G E R , M.D.,
2     called as a witness, having first been duly sworn
3     by Bonita Cohen, a Notary Public in and for the
4     State of Connecticut, was examined and testified
5     as follows:
6   CROSS-EXAMINATION
7   BY MS. HUNT:
8      Q.  Dr. Teiger, my name is Beverly Hunt.  I
9   represent Dr. Borruso.
10         As I said when were you sitting down, I'm
11   sorry for bringing you back.  I know this is
12   becoming -- sort of getting in the way of what I know
13   your schedule is.
14         I think at your prior deposition you
15   indicated that in your opinion the respiratory arrest
16   preceded in time the cardiac arrest.  Is that your
17   opinion?
18            MS. DINNAN:  Do you have a page of the
19         deposition that you want to refer us to?
20      A.  I would agree with that statement.
21      Q.  Okay.  And what's the basis for that opinion,
22   that the respiratory arrest preceded the cardiac
23   arrest?
24      A.  I think the records indicated that he had
25   breathing difficulty first and he was gasping for
0217
1   breath.  We don't know that ever for sure, but it would
2   be my opinion that the respiratory arrest preceded the
3   cardiac arrest.
4      Q.  What you were referring to, we won't know for
5   sure -- the respiratory arrest preceded the cardiac

6  arrest, is that what you were referring to when you
7  said "we won't ever know for sure"?
8     A.  I think I was talking more in general terms.
9  When you're talking about a cardiopulmonary arrest, we
10  always struggle with which came first.  In this
11  particular case, it's my opinion he had a respiratory
12  arrest first.
13     Q.  Okay.
14     Q.  In your opinion what was the cause of the
15  respiratory arrest?
16     A.  I believe I said in my deposition earlier
17  that I felt it was multifactoral, but primarily he had
18  respiratory difficulty due to atelectasis associated
19  with abdominal distention from his pseudomembranous
20  colitis.
21     Q.  All right.  In your opinion, then, his
22  respiratory arrest resulted initially from respiratory
23  insufficiency?
24           MS. DINNAN:  Objection to the form.
25     A.  Could you restate that for me, please.
0218
1     Q.  Yes.
2         In your opinion, then, the respiratory
3  insufficiency preceded the respiratory arrest?
4     A.  I think he was struggling to breathe prior to
5  the arrest, yes.
6     Q.  And by that you mean some degree of
7  respiratory insufficiency?
8           MS. DINNAN:  Objection to the form.
9     A.  I think we're saying the same thing.
10     Q.  Okay.
11     Q.  And when you say "respiratory insufficiency,"
12  does that also equate to a particular design in oxygen
13  saturation?
14         (Pager interruption)
15     A.  I'm sorry.  Could you repeat the question,
16  please.
17     Q.  Yes.
18         When you were talking about his breathing
19  difficulty, which we've established means some degree
20  of respiratory insufficiency, when there is use of the
21  term "respiratory insufficiency," do you mean by that
22  some significant degree of decline in oxygen
23  saturation?
24           MS. DINNAN:  Objection to form.
25     A.  I'm sorry, Attorney, I'm not sure if you're

```
0219
 1  talking in general terms --
 2     Q.  Yes.
 3     A.  -- or specifically about this case.
 4     Q.  In general terms.
 5         MS. DINNAN:  Same objection.
 6     A.  I need you to restate the question, please.
 7     Q.  In this case, is it your opinion that the
 8  patient experienced at or about the same tine of the
 9  respiratory arrest a decrease in oxygen saturation?
10         MS. DINNAN:  Now you're not talking
11     generally.  You're talking about this case?
12         MS. HUNT:  That's what I just said.
13     A.  I'm confused.  I thought we were talking in
14  general terms and then we were going to specifics.
15     Q.  In this case --
16     A.  In this particular case?
17     Q.  -- did this patient experience some degree of
18  decrease in oxygen saturation that led to his gasping
19  that you referred to before?
20         MS. DINNAN:  Objection to the form.
21     A.  I think, Attorney, that's a matter of record.
22  It was not my understanding that he did have a decrease
23  in oxygen saturation in the time preceding his
24  transport down to x-ray.
25     Q.  I'm not talking about the time period before
0220
 1  his -- I'm not talking really about the time period
 2  before his transport down to the CT.  I'm just talking
 3  about the time just preceding the patient's respiratory
 4  arrest.
 5         In your opinion, did this patient experience
 6  a decrease in oxygen saturation that resulted in his
 7  gasping for breath that proceeded into, with time, his
 8  respiratory arrest?
 9     A.  I'm sure the answer --
10         MS. DINNAN:  Objection for the record.
11         You can answer.
12     A.  I'm sure the answer to that is yes.
13     Q.  Okay.
14     Q.  Do you have any opinion to a reasonable
15  degree of medical probability as to what that oxygen
16  saturation was that Mr. Guigliano experienced that
17  preceded the respiratory arrest?
18     A.  I think it would be speculation and
19  impossible for me to answer that question.
```

20    Q.  In general terms, in a patient, outside of
21  Mr. Guigliano, but a patient who has many factors
22  impacting his respiratory status, what is the range of
23  oxygen saturation that would precipitate a process
24  evolving into a respiratory arrest?
25        MS. DINNAN:  You're talking about
0221
1     someone with pseudomembranous colitis?
2        MS. HUNT:  Right.
3        MS. DINNAN:  Objection to the form of
4    the question.
5    A.  Again, I think that's a difficult question to
6  answer.  When you're talking about general terms, if
7  you're asking me what degree of oxygen saturation would
8  precipitate a cardiac arrest, it would depend on the
9  patient's underlying condition preceding.
10    Q.  Assuming that this -- that a patient had all
11  of those factors that you had noted at your previous
12  deposition, the multifactorial picture that you alluded
13  to earlier here, and I think you mentioned in your
14  early -- and in an earlier deposition he had abdominal
15  distention, he had a fall, a fracture, pain and
16  swelling, pseudomembranous colitis, in a patient with
17  those factors, what would be the oxygen saturation, a
18  range, that would be expected to precipitate a process
19  evolving into a respiratory arrest?
20        MS. DINNAN:  Objection to the form.
21    A.  Again, Attorney, I'm not clear what you're
22  asking me.
23     This was a 52-year-old man who was generally
24  healthy.  That's different than an 80-year-old man with
25  chronic obstructive pulmonary disease and coronary
0222
1  disease.  A 52-year-old man can handle low oxygen
2  saturation better.  However, he had multiple conditions
3  which caused his difficulty, including trauma from a
4  fracture, pseudomembranous colitis, which means that
5  his general condition was compromised.
6     So, when you ask me what oxygen saturation
7  would precipitate a cardiac arrest, I think the answer
8  to that question is possible.  You need to remember
9  that oxygenation normally is in the range of 97
10  percent.  Patients tolerate a level of 90 percent
11  without supplemental oxygen.  When they drop into the
12  80s, they are struggling.
13     A healthy 52-year-old can tolerate low oxygen

14  saturations in the 80s indefinitely if his underlying
15  constitution is okay. He cannot tolerate saturations
16  in the 70s or 60s or 50s for long periods of time.
17      There is not one single number I can give you
18  that would lead to a cardiac arrest in an otherwise
19  healthy 52-year-old. That data are not available. I
20  will tell you that oxygenation is important for life
21  and compromise will lead to organ system failure.
22      Q. All right. So you then don't have an opinion
23  to a reasonable degree of medical probability in this
24  case with this patient as to what oxygen saturation
25  precipitated his respiratory arrest?
0223
1   A. I would agree with that statement.
2   Q. There was a disclosure that's been discussed
3  at earlier depositions of a number of experts disclosed
4  on behalf of Danbury Hospital. It's dated
5  December 30th. You're one of the individuals who was
6  disclosed as an expert on behalf of Danbury Hospital
7  and the disclosure includes your report of
8  December 28th 2005.
9       Do you have that disclosure with you?
10     A. I do not have --
11         MS. DINNAN: December 28, 2005.
12     A. The letter you're describing, I don't have
13  the disclosure, but I do have this letter.
14     Q. Okay. What did you bring with you today to
15  today's deposition?
16     A. I have a very limited number of records with
17  me --
18     Q. Okay.
19     A. -- today.
20     Q. All right. And did your counsel tell you to
21  bring with you what we had enclosed in the notice of
22  deposition? We had asked that you bring with you a
23  copy of your CV, all of the original records concerning
24  this patient, your time records, your billing
25  statements.
0224
1          MS. DINNAN: For the record --
2      Q. In part, were you asked to bring those
3  materials with you?
4          MS. DINNAN: For the record, we notified
5        the office of the deposition being taken
6        today on May 31. The notice is dated May 25.
7        I have brought his CV with the notice. We

```
 8         expected, as we had for the other
 9         depositions, for him to bring the file.
10          There was a miscommunication about his file.
11         He thought the deposition for this morning
12         was for a different file.  He has those
13         records which he keeps in his office which do
14         include some billing, and I have the exhibits
15         from the first two days of depositions.
16             MS. HUNT:  Do you have as an exhibit, I
17         believe it was marked, the disclosure dated
18         December 28, 2005?
19             MS. DINNAN:  I have his report.  Yes,
20         here it is.
21     Q.  Dr. Teiger, let me just place your report in
22  front of you.  That was marked at a prior deposition as
23  Plaintiff's Exhibit 1, and on the first page of that
24  report, in the second paragraph, you were requested by
25  Attorney Stockman to provide opinions about the care
0225
 1  rendered to Michael Guigliano by surgeons during the
 2  postoperative course as well as hospital staff.
 3         In reviewing the report, the only reference I
 4  see to the surgeons is on page 3, and in the second
 5  section there, it says, second sentence, you indicated
 6  that you don't disagree that the patient was sick or
 7  required the need for a CT scan to determine the cause
 8  of the ileus.  "I think that the CT scan was
 9  appropriately ordered and this was a correct test to be
10  done considering the bowel difficulty he was having for
11  days."
12         In my reading of the report, that was the
13  only reference to the surgeons in this case, either --
14  reference either to Dr. Borruso or Dr. Catania.  Could
15  you, for me, take a look yourself at the disclosure or
16  letter of your opinion and verify for me that there is
17  no other reference to the surgeons in that report.
18     A.  I think, Attorney, you'll have to be more
19  specific what you're asking me.
20     Q.  All right.
21     A.  Because my opinion in general includes what
22  the surgeons did with regard to this patient.
23     Q.  All right.
24     A.  So if you're asking me specifically about
25  surgical protocol, I'm not sure that I make any
0226
 1  statement specifically with regard to that.  However,
```

```
 2  I'm giving an overall opinion as far as management, and
 3  that includes the surgical care of this patient.
 4         So I have to be honest and tell you I'm not
 5  sure what you're asking me.
 6     Q.  I'm asking you in that report of yours, the
 7  letter which is dated December 28, 2005, is there
 8  anything other than what I read into the record that
 9  relates to the functioning of the surgeons in this
10  case?
11     A.  I think the surgeons were responsible for the
12  patient's care and I'm giving you an opinion with
13  regard to his episodes.
14     Q.  Okay.
15     A.  So I think I am giving an opinion in general
16  with regard to the patient's care, and he was cared for
17  by surgeons.
18     Q.  But I'm asking you about the report of
19  December 28th 2005.
20         Is there any reference or -- to the care of
21  the surgeons other than that reference on page 3?
22     A.  I think, Attorney, you're asking me does my
23  report stand as my report, I think.  I think you'd have
24  to be more specific.  You're asking me a general
25  question about the overall report that I'm giving you
0227
 1  and how it relates to the surgical care.  I think
 2  that's a confusing question.
 3     Q.  All right.  I'm not asking you about prior
 4  deposition testimony.  I'm asking you about your
 5  report.
 6         For instance, your report refers to the code
 7  situation, the CT suite, the CT scan technician, the
 8  speed with which the code developed.  On the top of
 9  page 3 you're talking about nursing staff.
10         So what I'm asking you is in that report of
11  December 28th 2005, is there anything else that relates
12  directly to the care provided by the surgeons other
13  than that notation that I just read into the record on
14  page 3?
15            MS. DINNAN:  Objection.
16     A.  Attorney, I think -- I'm not the trying to be
17  difficult, but I think if you want me to give an
18  opinion there, you'll have to ask me specific
19  questions.  I am not holding this report out as a
20  comment on surgical care of this patient.
21     Q.  All right.
```

22      A.  I am holding this report out as an overall
23   opinion with regard to how this patient did.
24      Q.  All right.
25      A.  And the surgeons were involved with his care.
0228
1       Q.  Let me ask you this:  Based on the
2    disclosure, based on your disclosure, I am making the
3    assumption that at trial you will not be providing any
4    opinion to the extent that the surgeons deviated from
5    the standard of care; is that correct?
6              MS. DINNAN:  Objection insofar as I
7          think he will be giving testimony regarding
8          abdominal distention.
9       A.  I will do my best to try and limit my
10   testimony to my expertise, which is as a pulmonologist
11   and critical care physician, who practices taking care
12   of patients like this for 23 years.
13      Q.  Okay.
14      A.  But I will clearly maintain that I am not a
15   surgeon, and I don't have training as a surgeon, and
16   I'm not board-certified in surgery.
17      Q.  Okay.  So, at trial, then, it is not your
18   intent to provide testimony concerning whether the
19   surgeons in this case conformed or did not conform to
20   the standard of care?
21      A.  I think I would point out to you, Attorney,
22   that the care of this patient is in the purview of both
23   surgery and medicine.  This is a management of an ill
24   patient in the hospital, and that crosses lines of both
25   surgery and medicine.
0229
1       Q.  But my question is simply this:  At trial, I
2    take it from your disclosure you will not be providing
3    any opinion that the surgeons in this case deviated
4    from the standard of care; is that fair to say?
5              MS. DINNAN:  Objection to the form.  I
6          think what he's indicated, and he just
7          testified, that at times the management of
8          the patient may have crossed the line of
9          surgery and medicine.  Insofar as the
10          surgeons may have exercised some role which
11          crosses that line, then he may in fact be
12          rendering an opinion regarding that.
13      Q.  Doctor, can you answer that question?
14      A.  I will do my best to answer any question
15   within the realm of my specialty in pulmonary and

16  hospital-based medicine.
17      Q.  All right.  This is my question, because this
18  is the time that we have to elicit opinion testimony
19  from experts, and that's why I'm asking you this
20  question, because this is the time at which that sort
21  of process takes place.
22          My question to you is:  Based on your
23  disclosure, I am presuming that you are not going to be
24  providing at trial testimony critical of the surgeons
25  in this case; is that fair to say?
0230
 1      A.  What you're not clear to me, Attorney, is
 2  what the purview of surgical versus medical care is,
 3  and I am not trying to be difficult in answering your
 4  question, but I would suggest to you that the areas
 5  that I'm giving opinion on may cross the lines of both
 6  medicine and surgery, and by you asking me the
 7  question, you are limiting my ability to answer
 8  questions, and I'm not sure where you are drawing the
 9  line between medical versus surgical care.
10      Q.  You read the Danbury Hospital record, did you
11  not, that relates to the hospitalization with admit
12  date in February 2001 of Michael Guigliano, correct?
13      A.  That is correct.
14      Q.  And you read the depositions of both
15  Drs. Catania and Borruso, correct?
16      A.  Correct.
17      Q.  You know what roles they function in in this
18  case, correct?
19      A.  I believe so.
20      Q.  All right.  So my question is this:  Having
21  reviewed all of that material, I'm assuming from your
22  disclosure that you are not going to be providing
23  testimony at trial critical of the functioning of the
24  surgeons; is that correct?
25          MS. DINNAN:  Again, I have to object.
0231
 1          MS. HUNT:  That's okay.  Under
 2      Connecticut rules you can state your
 3      objection to form but it cannot be a speaking
 4      objection.
 5          MS. DINNAN:  That's why I objected.
 6      A.  Unfortunately, Attorney, your question is too
 7  broad for me to know how to answer it with any
 8  accuracy, and again, I apologize if I seem difficult.
 9  I just don't know how to answer this question.

10    Q. All right. We will certainly deal with this
11  issue further at trial because your answer is not
12  responsive.
13       In this case, when did Mr. Guigliano begin to
14  require oxygen on a continuous basis?
15          MS. DINNAN: Do you need to look at the
16       medical records?
17          THE WITNESS: I think I'll need to look
18       at the records.
19          MS. DINNAN: Off the record.
20       (Discussion off the record)
21          MS. HUNT: I'll rephrase the question.
22    Q. During the hospitalization of Mr. Guigliano
23  in February of 2001, did he begin to require oxygen on
24  a continuous basis around the time of February 10th?
25    A. To be honest, Attorney, I have not looked at
0232
1  this record since we met last, which means that I would
2  have to go back and look through this entire record to
3  refresh my memory. I'd be happy to do that, but I
4  think that would be not possible at this time for me to
5  answer your questions specifically. If we need to do
6  that, then I'll need to come back and rereview all
7  these in careful detail to answer these specific
8  questions.
9    Q. All right. As of February 17th, 2001, was
10  this patient requiring in the morning time period, let
11  me just say 6:00 a.m., was this patient requiring
12  oxygen on a continuous basis?
13          MS. DINNAN: I'm going to also object to
14       the form. What do you mean by "a continuous
15       basis"?
16    Q. Was he receiving oxygen continuously or did
17  he have it on and take it off? Was it intermittent?
18  Was it prn? Was it ad-lib? What was his use of oxygen
19  during the morning hours?
20          THE WITNESS: Can we take a break for a
21       minute, please?
22          MS. DINNAN: Sure.
23       (Recess taken)
24          MS. DINNAN: On the record now.
25       In light of the fact that Dr. Teiger's
0233
1       office had given him a similar sounding name
2       to this case, but not this Guigliano case, he
3       had not reviewed the right chart prior to

```
 4         this deposition.  We're going to reconvene
 5         the deposition and the doctor is going to
 6         commit sufficient time in order for the
 7         defendants to do their cross-examination, a
 8         full cross-examination.
 9            MS. HUNT:  Okay.  And all counsel here
10         agree?
11            MR. LANNI:  Yes.
12            MR. MICHAEL GRADY:  Agreed.
13            MR. TIMOTHY GRADY:  Agreed.
14            MS. HUNT:  Thank you very much.
15            (Time Noted:  11:20 a.m.)
16            (Jurat follows on page 233)
17
18
19
20
21
22
23
24
25
0234
 1
   IN THE UNITED STATES DISTRICT COURT
 2  FOR THE DISTRICT OF CONNECTICUT
   - - - - - - - - - - - - - - - - - x
 3
   LAURA GUIGLIANO, as Administrator   :
 4  of the Estate of Michael Guigliano,
   Deceased, and LAURA GUIGLIANO,      :
 5  individually,
                                       :
 6         Plaintiffs,
                        : Case No.
 7     vs.
                        : 3:02 CV 718
 8  DANBURY HOSPITAL, J. BORRUSO,
   M.D., JOSEPH CATANIA, M.D., and     :
 9  DANBURY SURGICAL ASSOCIATES, P.C.,
                                       :
10         Defendants.
                                       :
11  - - - - - - - - - - - - - - - - - xDS
            With the addition of the changes, if
12         any, indicated on the attached errata sheet,
```

```
            the foregoing is a true and accurate
13             transcript of my testimony given in the
            above-entitled action on May 31, 2006.
14
                    _____
15                      MICHAEL B. TEIGER, M.D.
16        Subscribed and sworn to before me, the
17   undersigned authority, on this the _____ day of
18   _____, 2006.
19
                    _____
20                         Notary Public
21   My commission expires:
22
23
24
25
0235
 1              C E R T I F I C A T E
 2
 3        I hereby certify that I am a Notary Public,
 4   in and for the State of Connecticut, duly commissioned
 5   and qualified to administer oaths.
 6         I further certify that the deponent named in
 7   the foregoing deposition was by me duly sworn, and
 8   thereupon testified as appears in the foregoing
 9   deposition; that said deposition was taken by me
10   stenographically in the presence of counsel and reduced
11   to typewriting under my direction, and the foregoing is
12   a true and accurate transcript of the testimony.
13         I further certify that I am neither of
14   counsel nor attorney to either of the parties to said
15   suit, nor am I an employee of either party to said
16   suit, nor of either counsel in said suit, nor am I
17   interested in the outcome of said cause.
18         Witness my hand and seal as Notary Public
19   this _____ day of _____, 2006.
20
21                    _____
                             Bonita Cohen
22                           Notary Public
23   My Commission expires:
     November 30, 2007
24
25
```