# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - x

LAURA GUIGLIANO, as guardian ad litem for Michael Guigliano, a person adjudged to be incompetent, and LAURA GUIGLIANO, individually,

Plaintiffs,

vs.

: Case No.

: 302CV718 (RNC)

DANBURY HOSPITAL, JAMES DEPUY, M.D., F. SCOTT GRAY, M.D., GEORGIANA KNOWLES, P.A., DEANNA WOLFFE, P.A., DAVID OELBERG, M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D., ARTHUR KOTCH, M.D., JULIA CIRCIUMARA, M.D., ANDRE KOUZNETSOV, M.D., MICHAELA FEDERICA, M.D., MAUREEN BENNETT, R.N., JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N., JANE DOE NO. 1, JANE DOE NO. 2 and JANE DOE NO. 3,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

Deposition of LAURA G. GUIGLIANO, taken pursuant to the Federal Rules of Civil Procedure, at the offices of Information Technology Group, 84 Locust Avenue, Danbury, Connecticut, before Bonita Cohen, a Registered Merit Reporter and Notary Public in and for the State of Connecticut, License Number 00041, on Thursday, April 10, 2003, at 11:07 a.m.





A P P E A R A N C E S

THE LAW FIRM OF JOSEPH LANNI, P.C.
Attorneys for the Plaintiffs
Suites 6-8
138 Chatsworth Avenue
Larchmont, New York 10538
By: JOSEPH LANNI, Esq.
-and-
YVETTE KING, Esq.

-and-

WEINER, MILLO & MORGAN, LLC
7th Floor
220 Fifth Avenue
New York, New York 10010
By: SCOTT F. MORGAN, Esq.

NEUBERT, PEPE & MONTEITH, P.C.
Attorneys for the Defendants Danbury Hospital, David Oelberg, M.D., David Yuan, M.D., Arthur Kotch, M.D., Julia Circiumara, M.D., Andre Kouznetsov, M.D., Michaela Federica, M.D., Maureen Bennett, R.N., JoAnn Brown, R.N., Beth Ann Hoffman, R.N., Jane Doe No. 1, Jane Doe No. 2 and Jane Doe No. 3
13th Floor
195 Church Street
New Haven, Connecticut 06510-2026
By: MICHAEL D. NEUBERT, Esq.

BAI, POLLOCK BLUEWEISS & MULCAHEY, P.C.
Attorneys for the Defendant Georgiana Knowles, P.A.
P.O. Box 1978
Suite 820
10 Middle Street
Bridgeport, Connecticut 06604
By: CATHERINE CREAGER, Esq.





A P P E A R A N C E S (cont'd):

RYAN, RYAN, JOHNSON, McCAGHEY & DeLUCA, LLP
Attorneys for the Defendant J. Borruso, M.D.
80 Fourth Street
P.O. Box 3057
Stamford, Connecticut 06905-0057
By: JANE HAGERTY, Esq.

SACHNER & O'CONNOR, LLC
Attorneys for the Defendants James Depuy, M.D., F. Scott Gray, M.D., and Deanna Wolffe, P.A.
The Crossroads at Middlebury West
Building 2, Suite 1001
765 Straits Turnpike
P.O. Box 1323
Middlebury, Connecticut 06762-1323
By: STEPHEN P. SACHNER, Esq.





(Notice of deposition dated March 27, 2003 marked Defendants' Exhibit 1 for identification)

(Document entitled "Plaintiffs' responses to interrogatories of Defendants Danbury Hospital, et al.," marked Defendants' Exhibit 2 for identification)

L A U R A G . G U I G L I A N O ,

called as a witness, having first been duly sworn by Bonita Cohen, a Notary Public in and for the State of Connecticut, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NEUBERT:

Q. Good morning.

Could you pronounce your name for me?

A. Guigliano.

Q. Good morning, Mrs. Guigliano. I introduced myself when I first came in, but let me do so on the record.

My name is Mike Neubert. As I indicated to you, I represent Danbury Hospital and a number of individual defendants -- I won't list them on the record now -- that are associated with

other than a soda.
Q. So you would have been waiting for your sandwich?
A. I would have.
Q. The next sentence references the fact that your son was approached by a hospital employee identified as a respiratory therapist -- I'm sorry -- that "both women" -- when it says "both women," I assume that means you and your daughter and your --
A. No. This is the amended one.
Q. Let's --
A. I wasn't approached by a respiratory therapist. It was put in the interrogatory mistakenly.
It's my son that was approached.
Q. Let me get the question on the record so we can correct this. And I understand where you're going now. I'll certainly let you make the correction, but let's take it one step at a time.
The reference in the first -- what I had marked as Exhibit 2 makes a reference that "Both women and plaintiff's son were approached by a hospital employee identified as a respiratory therapist."
What I understand you to be saying today and what you say has been corrected in an amended response -- but let's not worry about the amended





response; I'm more interested at this point in what your recollection is -- is that you were not personally present when a respiratory therapist may have spoken to your son?
A. Absolutely right. I was not present.
Q. Do you know whether Lauren, your daughter, was present?
A. She was not present.
Q. So the conversation that's referred to was only between the respiratory therapist and your son; correct?
A. Correct.
Q. I assume, though, your son told you about that at some point?
A. Yes.
Q. When did he tell you about that conversation?
A. After he had it with her. After he had it.
Q. When was that?
A. I'm not really sure.
Q. Was it a while before --
A. It was a while after it happened.
Q. A while.
Was it while your husband was still at Danbury Hospital?
A. I think so.





Q. And other than what's quoted there, that she had given a statement to Hartford and the family should get a lawyer, did your son tell you anything else about the conversation?
A. That, again, was amended in the amendment. That's why it was amended, because the person giving the statement to Hartford was the person that I did talk to.
The respiratory therapist talked to my son separately.
Q. Why don't you just tell me what your memory is, then. Let's just keep it to the conversation with the respiratory therapist.
A. I didn't speak to her, so I don't know.
Q. What did your son say that he was told?
A. That something happened and that we should get the record.
Q. Should get the record or get a lawyer?
A. I don't know. I think he said record.
MR. NEUBERT: Now, this is my only copy that I brought with me today.
Off the record.
(Discussion off the record)
(Document entitled "Plaintiffs' amended responses to interrogatories of Defendants





Danbury Hospital, et al.," marked Defendants' Exhibit 3 for identification)
Q. I'm going to show you what has been marked as Exhibit 3. Take a look at the front.
MR. NEUBERT: Just for identification purposes, it's called "Plaintiffs' amended responses to interrogatories of Defendants Danbury Hospital, et al."
Q. Do you recall having seen this document previously?
A. Yes.
Q. Okay. And, indeed, you signed this document as well; is that correct?
A. Yes.
Q. I know you've, on the record, made reference to your amended response or correcting your response that had been provided previously and has been marked as Exhibit Number 2 in this deposition.
Is this the document that you're referring to as your amended response?
A. Yes.
Q. Okay. Turning over, then, again, to the final paragraph of the section that's been entitled "Facts and clinical evidence," which I believe you're turned to at this point -- is that correct?

A. Yes.

Q. -- the final paragraph has now been amended; is that correct?

A. Correct.

Q. Is the information as stated in that final paragraph accurate, to the best of your knowledge?

MR. LANNI: Go ahead. Read through it.

A. It is.

It was amended on my request.

Q. Okay. So you're comfortable with its accuracy?

A. Absolutely. I wanted it to be as accurate as possible.

Q. There's a sentence that I believe is either new or amended. It says:

"Moreover, several days after the code, Plaintiff Laura Guigliano was approached by a female hospital employee," parens, "a nurse's aide," "who identified herself as one of the medical personnel involved in transporting the patient to the radiology department," period. "This hospital employee told her," quote, "I had to go to Hartford to make a statement," end quote, "and," quote, "this is very good for you," end quote.

A. Exactly what she said.





Q. Okay. You say "several days."

Can you give me any better estimate? Are we talking as much as a week?

A. It was more than that, because -- after Michael was transferred upstairs, into the room. So it was way more than several days.

Q. He had been transferred out of ICU?

A. Yes.

Q. And I take it you do not recall the individual's name?

A. I don't.

She was -- the people that transport the patients around the hospital -- they're like teenagers, or young people. I don't know what they classify them, their titles, as.

Q. Did she have a name tag on?

A. I didn't see one.

And she had transported Mike down for the CAT scan. And she, from the very -- the following week, actually, she appeared in ICU and was very upset with Mike being where he was. And she introduced herself. I just don't remember her name. And she -- but it's on the record in the hospital, because she was the one that brought him down to the CAT scan. And she seemed -- she was upset. She was really upset. And





she told me she hadn't been back at work for the week, she just came back that following Thursday, because she was so upset.

And I could see she was very shaky, and I wanted to ask her questions about what happened, and I -- you know, sometimes -- you know, "Did you go down with him?" Various questions I asked her.

And she would like stay for a few minutes and just look at him, and then she would leave.

And she met various members of my family, you know, not to chat or anything, but just -- she looked like she was devastated that my husband was laying in that bed.

And I thought it was very -- you know, my mind was of the opinion that it was very sweet of her to be that taken with what happened. But the more she came back, the more I -- you know, she was really overly upset with my husband being in that bed.

And the reference to her -- Michael was transferred back up to the ninth floor, and he was laying in the bed. She appears on the scene, comes in the room, and she's actually angry with me. And she was looking at me and she said, "What did you do?"

And I said, "What are you talking about?"

So she says, "My supervisor said I had to go





to Hartford to make a statement."

So I said, "Really?" So I, you know, didn't know what to say to her, and all I said was something ridiculous. I said, "I live in New York." I said, "'To me, Hartford is in Connecticut." I said, "I didn't do anything."

So she says to me, "Oh." So she said, "Well, they told me I had to go make a statement."

So I said, "I'm sorry. I didn't do anything."

So she asked how he was and everything, and she left the room.

And I did tell her at that time, hoping I could get information out of her as to what happened -- I'm still asking, "What happened?" "How long was he out?" That's my question of anybody I've ever come in contact with here. And I said to her, "Let me know what happens." Didn't want to frighten her away, because I figured maybe she would tell me what the statement was about. And I said, "Would you let me know what happened."

You know, I figured she's going to come back and come again. She's been coming; keeps checking and see how he was; is he better. And she left.

I guess -- I don't know -- a little bit of

time went by, and -- she didn't come right back in, you know. It was funny, because you'd think she would come right back in. She must have went somewhere and then came back. And she just said to us -- we were standing there. It was -- my daughter was there also -- "This is good for you."

And being she was the type of person that I was afraid, if I questioned her, she'd run away and I'd never see her again and I wouldn't find out what happened to Mike, I just looked at her, and I said, "Okay."

And she left. And that was the last time I saw her.

Q. Again, this conversation you just described took place after he'd been transferred up to a medical floor?

A. Yes.

Q. Could you describe this individual physically?

A. 18. African-American. Seemed like a very nice girl. She -- in fact, one time, when Mike went downstairs, he -- for a test -- he needed to use the bedpan, and there was none, and Mike joked about the fact that this particular girl got him back up into the twelfth floor in record time and he was proud of her.





And, you know, she seemed like a very nice person. You know. And then there was -- she was just -- she seemed like a regular kid. I mean, nothing -- she reminded me of my daughter. Around the same age. And she worked at the hospital. She was very pleasant.

Q. You said she was 18 years old and African-American.

A. Uh-huh.

Q. Did she have the --

A. She could have been Cuban. She could have been -- I don't know for sure if she was African-American.

Q. Was she light-skinned or dark-skinned?

A. She was lighter skin.

Q. Did she have short or long hair?

A. She had -- good question. It was medium.

Q. Curly or straight?

A. No, it looked straight.

Q. And her approximate height, if you recall?

A. She was a little -- I think she was a little taller than I. Figure about five five, five six, something like that.

Q. And normal build?

A. Yes, regular build.





Q. Did she talk with an accent or no?

A. No.

Q. Did she wear a uniform?

A. She did.

Q. What was the uniform?

A. I think it was -- it's hard for me to remember. It wasn't that candy stripe uniform. It was a green; I think the greens or something like that I think they came in. Blues. Maybe they have a color for them.

Q. Pants as opposed to skirt?

A. I believe so.

Q. You're saying that she visited him in the ICU?

A. She did.

Q. On how many occasions?

A. Quite often.

If she wasn't there when I was there, someone in my family commented that she had stopped by to see how he was doing.

Q. Do you know how often, approximately?

A. Maybe a couple of times a week.

And one time we did try to ask her -- we were always afraid of asking her and never seeing her again, because we wanted to know what happened down at the





CAT scan.

And I asked her specifically about the oxygen on Michael's nose or was it -- you know, I just said, "Did Michael have the oxygen on when he went down to the test?" The reason I say that, because one previous time that I went down with Michael to the surgery -- I believe it was the second surgery -- he did not have the oxygen tank with him. So I inquired to the girl if he had oxygen on him, because they're telling me he stopped breathing.

And she said to me on one occasion he had the nose, and then on another occasion, she said -- she said, "Oh, well, he was complaining that he was having trouble."

Then it turned out he had a mask, the mask on.

So I got to the realization that the more I asked her, the more the things were changing, and I was -- just didn't think I was the right person to, you know, press her on the information, because it seemed to be changing.

Q. The information she seemed to be providing seemed to be changing?

A. Regarding the respiration -- respiratory, anyway.

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - x

LAURA GUIGLIANO, as Guardian Ad Litem for MICHAEL GUIGLIANO, a PERSON Adjudged to be Incompetent, and LAURA GUIGLIANO, Individually,

Plaintiffs,

vs.

Civil Action 302CV718 (RNC)

DANBURY HOSPITAL, JAMES DEPUY, M.D., F. SCOTT GRAY, M.D., GEORGIANA KNOWLES, P.A., DEANNA WOLFFE, P.A., DAVID OELBERG, M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D., ARTHUR KOTCH, M.D. JULIA CIRCIUMARA, M.D., ANDRE KOUZNETSOV, M.D., MICHAELA FEDERICA, M.D., MAUREEN BENNETT, R.N. JOANN. BROWN, R.N., BETH ANN HOFFMAN, R.N. JANE DOE NO. 1, JANE DOE NO. 2, AND JANE DOE NO. 3,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

Deposition of MICHAEL GUIGLIANO, taken pursuant to the Federal Rules of Civil Procedure, at the offices of Information Technology Group, 84 Locust Avenue, Danbury, Connecticut, before Janet C. Phillips, License #00124, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on Monday, July 7, 2003, at 1:50 p.m.

ICU when he was letting us know that we should go home, that there was nothing that we could do, he was saying that it was almost as if he was sleeping and that they were going to let him sleep it off and wake him up the next day. Other than that, there's no other specifics that I remember.

Q. Any other health care providers that you spoke to or that you spoke to while your dad was at Danbury Hospital?

A. There was a respiratory therapist at one point in ICU it was after the 17th, I'm not sure how many days. We had seen him a couple times. He had come in, he was very nice, asking us how we were, and one day, again, I'm not sure, he was almost looking out the door to see if anybody was coming in, and he had sat down next to my mother and was, "How are you doing? Is everything okay?"

And he kind of checked behind him again to make sure that his back was covered and he continued to tell us that something went wrong, that -- trying to give us some of the rights as people to get the charts that we, that we should pursue something, that something had happened.

MR. NEUBERT: Can you just read back that last answer?

(Record read.)

Q. Could you describe this individual?

A. What kind of description would you like, height, weight?

Q. Well, he's a male, correct?

A. Right.

Q. Age?

A. I couldn't give you an accurate one. Mid-30's maybe.

Q. Skin color?

A. White.

Q. Body type, in other words, large, small, thin, tall?

A. Large, not overweight large. Tall, muscular guy. I know his first name was John.

Q. Okay. How did you know he was a respiratory therapist?

A. We had seen him a couple times in the ICU room and he let us know what he did, or what he was doing.

Q. And you indicated that he said something to the effect that something went wrong, is that what I understood you to say?

A. Not in those words, but yes.

Q. Do you recall the words what he used?

A. No, I do not.

Q. And then there was -- he tried to provide you, when I say you, again, I mean -- who else was there, was it your sister as well as your mom --

A. Yes.

Q. -- regarding some of the rights as an individual to obtain the records?

A. The charts.

Q. The charts?

A. Yes.

Q. Do you recall or can you tell me as best you can recall the language he used?

A. As a calm demeanor --

MR. LANNI: He's just asking you can you tell him either verbatim or as close to verbatim as possible what did he say to you with respect to your rights as family members.

A. I couldn't tell you. All I know is he was trying to give us some -- he was trying to give us something, 'cause at this point we had nothing. We didn't know what had happened. And he was trying to -- I don't know what he was trying to do.

Q. Okay. Did anyone ask him any questions at this time?

A. What kind of questions?

Q. Any questions. In other words, did your mom or your sister or you follow up whatever remarks he did make to you with any question?

A. At that point?

Q. Right.

A. We were trying to understand what he was saying, and he wasn't telling us exacts, but he was letting us know that we could do a couple things, I guess.

Q. Do you know who spoke to him or who asked him anything?

A. No. Probably something came out of each of our mouths at that point. I'm not sure what.

Q. Okay. So as I understand it, you don't recall the specific words that he spoke, but you got the sense that he was trying to provide you with some information about what rights you as a family might have?

A. For the most part. I mean, that's what -- I don't know. That's what I got. I mean, you've also got my father lying on the bed jumping around, and trying to pay attention to a couple things. It was what I got from it.

But he just seemed like -- the thing that got

me is when he sat there and he was looking behind him to kind of check his back to see if anybody was coming in, as if he was saying something he shouldn't, you know.

Q. Did you have conversations with any other health care provider while your dad was at Danbury Hospital in February and April of 2001?

A. That was involved with my father, or anybody in the hospital?

Q. Well, anyone in the hospital that you understood to be a health care provider.

A. Okay. I'm not sure if it was April, it might have been -- yes, no, it definitely was April. I got a call at my job from an ex-girlfriend that was employed, I believe she's still employed.

Q. In April of 2001?

A. Yes.

Q. While your father was still at the hospital?

A. Yes.

Q. You received a phone call, okay.

A. She was letting me know again that something had happened and that we should get a lawyer.

Q. And this is an ex-girlfriend?

A. Yes.

Q. And her name?

A. First name is Suzanne. Last name is spelled E-s-a-c-k.

Q. Esack?

A. Esack.

Q. And what was she, at the hospital, what was she?

A. I'm not sure of her title. I would say nurse. She had just graduated and gotten a job.

Q. But your understanding was that she was employed at the hospital?

A. Yes.

Q. Okay. Did she to your knowledge have any contact with your father as a patient?

A. No.

Q. Did you ever see her at the hospital?

A. No.

Q. When was the last time you had spoken to her prior to April of 2001 when you received this call?

A. I'm not sure.

Q. Had it been awhile?

A. Not too long.

Q. Okay. So can you again just tell me as best you can recall what she said to you when she called you?

A. She started out by asking how everything was

going, curious about my father, and she let me know that she had heard other people talking about what happened to my father, almost like brunch conversation, on how things had gone wrong. And she had mentioned that she was talking to a lady, and she didn't give a name and I don't know who, but the lady knew everything that had happened.

And from what I understood from her, she was not directly in contact with my father, she had heard through other people, so around the hospital this story was going. And it got to her, and she knew me, so she called me and she said something happened.

Q. Did she explain what she meant by that?

A. In detail?

Q. Well, in any way?

A. Not really.

Q. Okay. Did she -- beyond indicating that something happened, did she recommend anything, recommend that you do anything?

A. She said that we should get a lawyer.

Q. Okay. Did she say anything else other than something happened and you should get a lawyer?

A. As to the situation?

Q. Yes.

A. No.




IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - x

LAURA GUIGLIANO, as Guardian Ad Litem For MICHAEL GUIGLIANO, a PERSON Adjudged to be Incompetent, and LAURA GUIGLIANO, Individually,

Plaintiffs,

vs.

Civil Action 302CV718 (RNC)

DANBURY HOSPITAL, JAMES DEPUY, M.D., F. SCOTT GRAY, M.D., GEORGIANA KNOWLES, P.A., DEANNA WOLFFE, P.A., DAVID OELBERG, M.D., DAVID YUAN, M.D., J. BORRUSSO, M.D. ARTHUR KOTCH, M.D., JULIA CIRCIUMARA, M.D., ANDRE KOUZNETSOV, M.D., MICHAELA FEDERICA, M.D., MAUREEN BENNETT, R.N. JOANN BROWN, R.N., BETH ANN HOFFMAN, R.N., JANE DOE NO. 1, JANE DOE NO. 2, AND JANE DOE NO. 3,

Defendants.

- - - - - - - - - - - - - - - - - - - - x

Deposition of LAUREN GUIGLIANO, taken pursuant to the Federal Rules of Civil Procedure, at the offices of Information Technology Group, 84 Locust Avenue, Danbury, Connecticut, before Janet C. Phillips, License #00124, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on Monday, July 7, 2003, at 12:05 p.m.

CD player, and the first time it happened and the CD had ran into track 2, then we stopped the music altogether and waited and then played track 1 again, their wedding song, and he did the same exact face, and then when track 2 came on, he stopped doing it again. And it's something that he would -- I was flabbergasted at his reaction 'cause I had never seen him do that before.

Q. Okay. You said his face cringed?

A. It like tightened up like he was gonna cry.

Q. I know I've asked you about conversations you had with physicians while your father was a patient at Danbury Hospital.

Did you have conversations with anyone else that you believe may have been employed at Danbury Hospital regarding your father's condition while he was there?

A. No.

Q. Okay. Have you ever spoken with anybody associated with the Department of Public Health for the State of Connecticut in connection with your father's care at Danbury Hospital?

A. No.

Q. Do you know if Dr. Kessler is involved at all in your dad's care anymore?